# CASES

## ARGUED AND DETERMINED

### IN THE

# SUPREME COURT OF ILLINOIS.

_[illegible handwriting]_

### AUGUST SPIES et al.

_v._

### THE PEOPLE OF THE STATE OF ILLINOIS.

_Filed at Ottawa September 14, 1887._

_[illegible handwriting]_

1. MURDER defined—malice presumed. Murder is the unlawful killing of a human being in the peace of the people, with malice aforethought, either express or implied. Malice is always presumed where one person deliberately injures another. It is the *deliberation* with which the act is performed that gives it character. It is the opposite of an act performed under uncontrollable passion, which prevents all deliberation or cool reflection in forming a purpose.

2. ACCESSORY BEFORE THE FACT—as *principal*. The statute abolishes the distinction between accessories before the fact and principals; by it all accessories before the fact are made principals.

3. SAME—*how the accessory may be charged*. As the acts of the principal are made the acts of the accessory, the latter may be charged as having done the act himself, and may be indicted and punished accordingly.

4. CONSPIRACY—*defined*. A conspiracy may be described, in general terms, as a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose, or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means.

5. SAME—*of the concurrence of the several members—how made to appear*. If one concur, no proof of agreement to concur is necessary. As soon as the union of wills for the unlawful purpose is perfected, the offence

of conspiracy is complete. This joint assent of minds, like all other parts of a criminal case, may be established as an inference from the other facts proved,—in other words, by circumstantial evidence.

6. Though the common design is the essence of the charge of conspiracy, it is not necessary to prove that the alleged conspirators came together and actually agreed, in terms, to have that design and to pursue it by common means. If it be proved that they pursued by their acts the same object, often by the same means, one performing one part, another performing another part of the same, so as to complete it with a view to the attainment of that same object, the conclusion will be justified that they were engaged in a conspiracy to effect that object.

7. SAME—*what is an unlawful purpose—change of government by force.* It can not be properly assumed that "a conspiracy to bring about a change of government, by peaceful means if possible, but if necessary, to resort to *force* for that purpose," is not unlawful. The fact that the conspirators may not have intended to resort to force, unless, in their judgment, they should deem it necessary to do so, would not make their conspiracy any the less unlawful.

8. SAME—*not in at the inception.* It is not necessary to prove that the conspiracy originated with those who are particularly charged, or that they met during the process of its concoction; for every person entering into a conspiracy or common design, already formed, is deemed in law a party to all acts done by any of the other parties, before or afterwards, in further-ance of the common design.

9. SAME—*not present at the consummation.* It makes no difference in the degree of responsibility resting upon those conspiring to do an unlaw-ful act, that some of them were not present at the consummation of the design of the conspiracy. Where persons combine to stand by one another in a breach of the peace, with a general resolution to resist all opposers, and, in the execution of their design, a murder is committed, all of the company are equally principals in the murder, though at the time of the act some of them were at such a distance as to be out of view, if the murder be in furtherance of the common design.

10. SAME—*specific malice not necessary.* In the case of a homicide, there might be no special malice against the person slain, nor deliberate intention to hurt him; but if the act was committed in the prosecution of the original purpose, which was unlawful, the whole party will be involved in the guilt of him who gave the blow.

11. SAME—*particular result not anticipated.* A person may be guilty of a wrong which he did not specifically intend, if it came naturally, or even accidentally, through some other specific or general evil purpose. When, therefore, persons combine to do an unlawful thing, if the act of one proceeding according to the common plan terminates in a criminal re-sult, though not the particular result meant, all are liable.

12. He who enters into a combination or conspiracy to do such an unlawful act as will probably result in the taking of human life, must be presumed to have understood the consequences which might reasonably be expected to flow from carrying it into effect, and also to have assented to the doing of whatever would reasonably or probably be necessary to accomplish the objects of the conspiracy, even to the taking of life.

13. SAME—*difference in ultimate purpose—as between those who incite and those who execute.* If men combine together as conspirators to accomplish an unlawful purpose, as, the overthrow of society and government and law, called by them a "social revolution," and seek, as a means to an end, by print and speech, to excite to tumult and riot and murder, another class of persons having a different purpose in view, as, in case of workingmen who have entered upon a "strike" with the view of bringing about a reduction of the hours of day labor, then, notwithstanding the difference in the ultimate objects desired to be attained by the respective classes of persons, the conspirators who advised and instigated the others to violence will be held responsible for murder that may result from their aid and encouragement.

14. SAME—*original plan deviated from.* A plan for the perpetration of crime, or for the accomplishment of any action whether worthy or unworthy, can not always be executed in exact accordance with the original conception. It must sometimes be changed or modified in order to meet emergencies or unforeseen contingencies.

15. If A hire B to shoot C at a designated place, on a certain night, but B, seeing C at another locality on the same night, shoots him there, A is none the less guilty of aiding, abetting, advising and encouraging the murder of C. So if there be a conspiracy to kill policemen at a station house, but the agents of the conspiracy kill the policemen a short distance away from the station house, there is no such departure from the original design as to relieve the conspirators of responsibility.

16. SAME—*specific means not appointed.* Where there is a conspiracy to accomplish an unlawful purpose, and the means are not specifically agreed upon or understood, each conspirator becomes responsible for the means used by any co-conspirator in the accomplishment of the purpose in which they are all at the time engaged.

17. SAME—*as to which of two persons caused the immediate injury.* In the case of a joint attack upon a body of persons, made by a number of other persons, with two kinds of weapons, as, pistols and bombs, in pursuance of a previously arranged conspiracy, and the murder of one of the persons attacked results, those of the attacking party who fired pistol shots only, will be equally responsible for the murder with the one throwing a bomb, although the killing was in fact done by the bomb and not by a pistol shot.

18. SAME—*inciting to violence by newspaper organs, and speeches.* He who inflames people's minds, and induces them, by violent means, to accomplish an illegal object, is himself a rioter, though he takes no part in

the riot. One is responsible for what wrong flows directly from his corrupt intentions. If he set in motion the physical power of another, he is liable for its result. If he contemplated the result, he is answerable, though it is produced in a manner he did not contemplate. If he awakes into action an indiscriminate power, he is responsible. If he gives directions vaguely and incautiously, and the person receiving them acts according to what he might have foreseen would be the understanding, he is responsible. It can make no difference whether the mind is affected by inflammatory words addressed to the reader through the newspaper organ of a society to which he belongs, or to the hearer through the spoken words of an orator whom he looks up to as a representative of his own peculiar class.

19. The "International Association" in Chicago was an illegal organization engaged in making bombs and drilling with arms for the unlawful purpose of attacking the police force of the city in case the latter should assume to do their duty in the preservation of the public peace. Its members were conspirators, and, by their act of conspiring together, they jointly assumed to themselves, as a body, the attribute of individuality, so far as regarded the prosecution of the common design. Newspapers, conducted by members of the organization, as its organs, advocated the purposes of the conspiracy, and speakers addressed public meetings, called by some of the conspirators, inciting the people to resist the police, and advising riot and murder. The police were attacked, and several of them killed. On a prosecution of some of the conspirators for murder, it was *held*, that the utterances of these papers and speakers were competent evidence against the defendants, as showing the purposes and intentions of the conspiracy which they represented.

20. SAME—*adopting the writings of others—Most's Science of Revolutionary Warfare.* On the same trial, Johann Most's book on the Science of Revolutionary Warfare, was admitted in evidence against the defendants. This book is a treatise upon the most improved methods of making bombs and preparing dynamite and other explosives, and contained suggestions as to how to apply the results of modern science to the work of destruction of the "capitalistic system," and advice to persons who, as members of the so-called revolutionary forces, might purpose to engage in the use of these weapons and explosives. The treatise was distributed among the members of the International groups at their picnics and meetings through the agency of the International Association. Its circulation was an act of the illegal organization to which all the defendants belonged, and was one of the methods by which that organization instructed and advised its members to get ready for the murder of the police during the excitement among the striking workingmen, at the time existing. Their newspaper organs commended it and quoted from it. Some of the conspirators read it and acted upon the suggestions contained in it. When the leaders of the organization thus made use of this treatise, they adopted it as a manual of tactics, and it became a book of their written advice and instructions to their followers. It was

competent evidence as showing the purposes and objects which they had in view and the methods by which they proposed to accomplish those objects.

21. SAME—*evidence—exhibiting to jury weapons similar to those used.* The policeman for whose murder the defendants were indicted, was killed by the explosion of a bomb thrown in the midst of the police force. On the trial the court allowed to be given in evidence, bombs, and cans containing dynamite, and prepared with contrivances for exploding it, which had been found under sidewalks and buried in the ground at certain points in the city, placed there by certain of the conspirators. As specimens of the kind of weapons which Lingg, the one of the conspirators who had charge of their manufacture, and his associates, were preparing, and as showing the malice and evil heart which the intended use of such weapons indicated, the introduction of bombs made by him was not improper. The jury had a right to see them and compare their structure with the description of the bomb that killed the policeman, with a view of determining whether Lingg, as was charged, was the maker of the latter or not.

22. As to the fact that some of these bombs and cans, like some which had been shown to certain of the conspirators during their drill, were found buried near one of the designated meeting places where certain of the armed men were to assemble on the night of the attack of the police,—this was a circumstance proper to be considered by the jury in determining the nature and character of the conspiracy and its connection with the events of the night of the killing.

23. SAME—*the particular agency, or the particular victim, not known to the perpetrator.* It is not essential to the guilt of a person who has conspired with others for the commission of a crime, that in the preparation of the instrumentalities for the carrying out of the design of the conspirators, he did not know the name of the particular individual who was to use them. So where a number of persons conspired together to destroy the police force of a city, in a certain event. as, in case of a collision between them and workingmen, by throwing a bomb among the police, if the bomb-maker knew that it was to be thrown by one of those having the common purpose, that would be sufficient to affect him with the guilt of advising, encouraging, aiding or abetting the crime resulting from the act.

24. And it would be alike unimportant, in fixing the guilt of the bomb-maker, that he did not know what particular policeman might be injured or killed. The design of the conspiracy virtually designated the body or class of men who were to be attacked. Should one of such class be killed. the guilt would be the same as though a person having a particular name had been pointed out as the victim.

25. So, too, it would be immaterial that he did not know the bomb would be thrown at any particular time or place. It would be enough that he knew it was to be used at the place where the anticipated event might transpire,— the collision between the workingmen and the police.

26. SAME—*identity of the person doing the particular act, sufficiently shown.* Though where, in the execution of the unlawful purpose of a conspiracy, a bomb was thrown among a body of police, for the purpose of sustaining a conviction of some of the conspirators for murder, as resulting from the throwing of the bomb, the identity of the bomb-thrower is sufficiently shown if it appeared he belonged to the conspiracy, and if he threw the bomb to carry out the conspiracy and further its designs, even though his name and personal description were not known. A person may very properly be charged with advising, encouraging, aiding and abetting an unknown principal in the perpetration of a crime.

27. SAME—*as to the particular person doing the act, whether known or unknown—allegations and proofs in respect thereto.* In an indictment against several for murder, some of the counts charged the defendants with having advised, encouraged, aided and abetted a particular person named, in the perpetration of the crime, and evidence was introduced to show that the particular person named *did* perpetrate the crime. Other counts charged the defendants with having advised, encouraged, aided and abetted an *unknown person* in the commission of the crime, and proof was given which tended to show that the perpetrator of the crime *was* an unknown person. In this condition of the pleadings and the proofs, it was not required of the trial court that it should so direct the jury as to restrict them to the consideration of the case on the theory that the crime was committed by the particular person named, and to omit any reference to the other theory that it was perpetrated by an unknown person.

28. Under our statute, the man who, "not being present aiding, abetting or assisting, hath advised, encouraged, aided or abetted *the perpetration of a crime,*" may be considered as the *principal* in the commission of the crime, may be indicted as principal, and may be punished as such. The indictment need not say anything about his having aided and abetted either a known principal or an unknown principal. It may simply charge him with committing the crime as principal. Then, if, upon the trial, the proof shows that the person charged, aided, abetted, assisted, advised or encouraged the perpetration of the crime, the charge that he committed it *as principal* is established against him. It would make no difference whether the proof showed that he so aided and abetted a *known* or an *unknown* principal.

29. SAME—*consideration of the purposes and principles of the conspirators—as, that they are socialists, communists or anarchists.* If there be a conspiracy, and crime has resulted from it, it becomes material to show the purposes and objects of the conspiracy with the view of determining whether and in what respects it is unlawful. Anarchy is the absence of government; it is a state of society where there is no law or supreme power. If the conspiracy had for its object the destruction of the law and the government, and of the police and militia as the representatives of law and government, it had for its object the bringing about of practical anarchy.

And when murder has resulted from the conspiracy, and the perpetrators are on trial for the crime, whether or not the defendants were anarchists may be a proper circumstance to be considered, in connection with other circumstances in the case, with a view of showing what connection, if any, they had with the conspiracy and what were their purposes in joining it. So it would be putting it too broadly to instruct the jury in such a case that it could not be material in the case that the defendants, or some of them, were or might be "socialists, communists, or anarchists," and such an instruction might well be refused.

30. SAME—*acts and declarations of one conspirator as the acts and declarations of all.* When the fact of a conspiracy is once established, any act of one of the conspirators in the prosecution of the enterprise, is considered the act of all. And when murder results from the act of the conspirators, individuals who, though not specifically parties to the killing, are present and consenting to the assemblage by whom it is perpetrated, are principals when the killing is in pursuance of the common design.

31. After a conspiracy has been established, only those declarations of each member, however, which are in furtherance of the common design can be introduced in evidence against the other members. Declarations that are merely narrative as to what has been done or will be done, are incompetent, and should not be admitted except as against the defendant making them, or in whose presence they were made.

32. SAME—*as to the order in which the proofs may be given, as to the existence of the conspiracy and the individual acts of its members.* Whether the acts and declarations of one of several alleged conspirators shall be allowed to be proven before proof is made of the conspiracy, or of the connection of those sought to be charged, is a matter largely discretionary with the trial judge. The proof of conspiracy which will authorize the introduction of evidence as to the acts and declarations of the co-conspirators may be such proof only as is sufficient, in the opinion of the trial judge, to establish *prima facie* the fact of conspiracy between the parties, or proper to be laid before the jury as *tending* to establish such fact. Sometimes, for the sake of convenience, the acts or declarations of one are admitted in evidence before sufficient proof is given of the conspiracy, the prosecution undertaking to furnish such proof at a subsequent stage of the cause.

33. The rule that the conspiracy must be first established *prima facie* before the acts and declarations of one conspirator can be received in evidence against another, can not well be enforced where the proof of the conspiracy depends upon a vast amount of circumstantial evidence, a vast number of isolated and independent facts; and, in any case, where such acts and declarations are introduced in evidence, and the whole of the evidence introduced on the trial, taken together, shows that such a conspiracy actually exists, it will be considered immaterial whether the conspiracy was established before or after the introduction of such acts and declarations. The prosecution may either prove the conspiracy which renders the acts

of the conspirators admissible in evidence, or it may prove the acts of the different persons, and thus prove the conspiracy.

34. In many important cases evidence has been given of a general conspiracy, before any proof of the particular part which the accused parties have taken. In some particular instances, in which it would be difficult to establish the defendant's privity without first proving the existence of a conspiracy, a deviation has been made from the general rule, and evidence of acts and conduct of others has been admitted to prove the existence of a conspiracy previous to the proof of the defendant's privity. The term "acts," as here used, includes written correspondence and other papers relative to the main design.

35. DISPERSING PUBLIC ASSEMBLAGES—*right of resistance.* A mere order to an assemblage of persons to disperse, although the meeting be lawfully convened and peaceably conducted, will not excuse the throwing of a bomb into a body of policemen giving the order.

36. If, however, a bomb-thrower were illegally and improperly attacked by the police, while quietly attending a peaceable meeting, and he threw the bomb to defend himself against such attack, another question would be presented.

37. REASONABLE DOUBT—*in criminal cases.* In a capital case, the trial court gave the rule as to a reasonable doubt, as affecting the finding of the jury, as follows: "The court instructs the jury, as matter of law, that in considering the case the jury are not to go beyond the evidence to hunt up doubts, nor must they entertain such doubts as are merely chimerical or conjectural. A doubt, to justify an acquittal, must be reasonable, and it must arise from a candid and impartial investigation of all the evidence in the case; and unless it is such that, were the same kind of doubt interposed in the graver transactions of life, it would cause a reasonable and prudent man to hesitate and pause, it is insufficient to authorize a verdict of 'not guilty.' If, after considering all the evidence, you can say you have an abiding conviction of the truth of the charge, you are satisfied beyond a reasonable doubt." The rule as thus formulated, has repeatedly received the approval of this court, and is correct.

38. In another instruction where the rule was somewhat differently expressed, these words were used: "You are not at liberty to disbelieve as jurors, if, from the evidence, you believe as men." This expression was unobjectionable.

39. JURY AS JUDGES OF THE LAW—*in criminal cases.* Under the statute providing that "juries in all criminal cases shall be judges of the law and fact," it is not improper for the court to tell the jury, that "if they can say upon their oaths that they know the law better than the court itself, they have the right to do so;" but that, "before saying this upon their oaths, it is their duty to reflect whether from their study and experience they are better qualified to judge of the law than the court."

40. EVIDENCE—*accused testifying in his own behalf—latitude of cross-examination.* If a defendant in a criminal prosecution offers himself as a witness in his own behalf to disprove the criminal charge, he can not excuse himself from answering on cross-examination, on the ground that by so doing he may criminate himself. So far as concerns questions touching the merits, the defendant, by making himself a witness as to the offence, waives his privilege as to all matters connected with the offence.

41. IMPEACHING A WITNESS—*based upon reputation for truth.* Before a witness can swear that he will not believe a man under oath, he must first swear that he knows that man's reputation for truth and veracity among his neighbors, and that such reputation is bad. The unwillingness to believe under oath must follow from and be based upon two facts,—first, the fact that the witness knows the reputation for truth and veracity among the man's neighbors; second, the fact that such reputation is bad. As the reputation must be bad before it can be known to be bad, the most material fact to be proved is that such reputation is bad. What a man's reputation is, is a fact to be proved just as any other fact.

42. PRACTICE—*time to object—as to competency of evidence.* When it is desired to object to the receiving in evidence, in a criminal prosecution, of a letter purporting to have been written to the defendant, on the ground that it came into the hands of the prosecution by means of an unlawful seizure, the objection should be taken at the trial. It can not be made for the first time on error, in this court.

43. And in taking such an objection at the trial, the ground of it not appearing on the face of the offered evidence, but depending upon proof of an outside fact, the party objecting should prove that the letter was obtained by illegal seizure, and then move its exclusion, or oppose its admission, upon that ground. In that way the question of its admissibility could be raised.

44. INSTRUCTIONS—*if erroneous, when cured by others in the series.* It was complained of an instruction given in a series, in a capital case, that it omitted all *reference to the evidence,* as being the guide to the jury in their finding. The trial judge, of his own motion, after having given the instructions as asked by the respective parties, gave the following: "What are the facts and what is the truth the jury must determine *from the evidence, and from that alone.* If there are any unguarded expressions *in any of the instructions,* which seem to assume the existence of any facts, or to be any intimation as to what is proved, all such expressions must be disregarded, and the *evidence only* looked to to determine the facts." This was enough to cure the omission complained of. It is the duty of the jury to consider all the instructions together, and when this court can see that an instruction in the series, although not stating the law correctly, is qualified by others, so that the jury were not likely to be misled, the error will be obviated.

45. Although an instruction, considered by itself, is too general, yet if it is properly limited by others given on the other side, or by the court of its

own motion, so that it is not probable that it could have misled the jury, judgment will not be reversed on account of such instruction.

46. Separate trials—*in criminal cases, where several are indicted.* Error can not be assigned upon the refusal of a trial court to grant separate trials where several are jointly indicted. It is a matter of discretion with the trial court.

47. Jury—*peremptory challenges in criminal cases—of the number given to the prosecution.* The statute says: "The attorney prosecuting on behalf of the People shall be admitted to a peremptory challenge of the same number of jurors that the accused is entitled to." Under this statute, in a case where several persons are jointly indicted and put upon trial, each being entitled to twenty peremptory challenges, the prosecution is entitled to a number equal to the aggregate of those accorded to all the defendants.

48. Same—*competency of juror who has formed an opinion from rumor and from reading newspapers.* In a capital case a juror, upon his examination as to whether he had formed and expressed an opinion as to the guilt or innocence of the accused, stated that he had formed an opinion based upon rumor or newspaper statements, but that he had expressed no opinion as to the truth of such rumors or statements. He stated upon oath that he believed he could fairly and impartially render a verdict in the case in accordance with the law and evidence. A challenge for cause was overruled, it thereby appearing that the court was satisfied of the truth of his statement. This brought the case exactly within the scope and meaning of the statute prescribing the qualifications of jurors, and established his competency.

49. Same—*competency—prejudice against crime, as a disqualification.* Upon the trial of several persons on the charge of murder, the crime being the result of an alleged conspiracy to establish anarchy in the place of government, and law and order, the conspirators themselves being anarchists, a person called as a juror, upon his examination, stated that he had a prejudice against socialists, communists and anarchists: *Held,* such prejudice was not a disqualification of the juror to sit in the case.

50. Same—*statute prescribing qualifications of jurors—its constitutionality.* The third proviso of the 14th section of chapter 78, of the Revised Statutes, which provides, "that in the trial of any criminal cause the fact that a person called as a juror has formed an opinion or impression based upon rumor or newspaper statements, (about the truth of which he has expressed no opinion,) shall not disqualify him to serve as a juror in such case, if he shall, upon oath, state that he believes he can fairly and impartially render a verdict therein in accordance with the law and the evidence, and the court shall be satisfied of the truth of such statement," is not obnoxious to the objection that it is in violation of that clause of the constitution which guarantees to the accused party in every criminal prosecution "a speedy trial by *an impartial jury.*"

51. Same—*error in rulings as to competency, after peremptory challenges are exhausted.* A judgment of conviction in a criminal case will not

be reversed for errors committed in the trial court in overruling challenges for cause to jurors, even though the defendant had exhausted his peremptory challenges, unless it is further shown that an objectionable juror was forced upon him and sat upon the case, after he had exhausted his peremptory challenges.

52. FORM OF VERDICT—*on trial for murder*—*direction in respect thereto.* On the trial of several persons upon the charge of murder, the trial court instructed the jury as to the form of their verdict, as follows: "If all the defendants are found guilty, the form of the verdict will be: 'We, the jury, find the defendants guilty of murder, in manner and form as charged in the indictment,' and fix the penalty." "If all are found not guilty, the form of the verdict will be, 'We, the jury, find the defendants not guilty.'" And correspondingly, in case part were found guilty and part not guilty. The verdict was, guilty of murder. It was objected by the defendants, that under this instruction, the jury were obliged to find the defendants guilty or not guilty of murder, whereas the jury were entitled to find that the offence was a lower grade of homicide than murder, if the evidence so warranted. But the objection was not well taken. If the defendants desired to have the jury differently instructed, they should have prepared an instruction accordingly.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. JOSEPH E. GARY, Judge, presiding.

A collection of extracts from documentary evidence, found in the record in this cause, has been prepared as a preface to the opinion. These extracts are referred to in the opinion as being contained in a "statement" that precedes the opinion. That "statement," or collection of extracts, and the instructions referred to, and commented upon in the opinion, are as follows:

Extracts from articles which appeared in the "Arbeiter Zeitung" under the following dates:

*February 23, 1885.*—"The already approaching revolution promises to be much grander and more terrible than that at the close of the last century, which only broke out in one country. The common revolution will be general, for it makes itself already felt everywhere and generally. It will demand more sacrifices, for the number of those over whom we have to sit in judgment is now much greater than that of the last century."

*March 2, 1885.*—"Our censure is not directed only against the workingmen of Philadelphia. It strikes especially, and in much higher degree, those dirty souls who carry on, as a business, the quieting of the working class, under idle promises of reform in the near future. \* \* \* That thing could not have happened in Chicago, without placing for exhibition on the telegraph wires and cornices of houses, a dozen cadavers of policemen in pieces, for each broken skull of a workman. And this is due solely and purely to the *revolutionary propaganda carried on here.* \* \* \* (We wonder) whether the workingmen of Chicago will take a lesson from this occurrence, and will at last supply themselves with *weapons, dynamite and prussic acid, as far as that has not been done yet.*"

*March 11, 1885.*—"The community will soon have to decide whether to be or not to be. Either the police must be, and then the community can not be; or the community must be, and then the police can not be. One, only, of the two, is possible."

*March 16, 1885.*—"In all revolutionary action three different epochs of time are to be distinguished: *First, the portion of preparation for an action, then the moment of the action itself,* and finally that *portion of time which follows the deed.* All these portions of time are to be considered one after another.

"In the first place, a revolutionary action should succeed. Then as little as possible ought to be sacrificed,—that is, in other words, *the danger of discovery ought to be weakened as much as possible, and, if it can be, should be reduced to naught.* This calls for *one of the most important tactical principles, which briefly might be formulated in the words: Saving of the combatants.* All this constrains us to further *explain the measures of organization and tactics which must be taken into consideration in such an action.*

"Mention was made of the *danger* of *discovery.* That is, in fact, present in all three of the periods of conflict. This

danger *is imminent in the preparation of the action itself,* and finally, *after the completion thereof.* The question is now, *how can it be met?"*

"If we view the different phases of the development of a deed, we have, *first, the time of preparation.*

"It is easily comprehensible for everybody, that the *danger of discovery* is the *greater* the *more numerous the mass of people* or *the group is which contemplates a deed, and vice versa.* On the other hand, the threatening *danger approaches* the *closer* the *better the acting persons are known to the authorities* of the place of action, and *vice versa.* Holding fast to this, the following results :

"In the commission of a deed, a comrade who does not live at the place of action,—that is, a comrade of some other place,—ought, if possibility admits, to participate in the action ; or, formulated differently, a revolutionary deed ought to be enacted where one is not known.

"A further conclusion which may be drawn from what was mentioned, is this :

"*Whoever is willing to execute a deed,* has, in the first place, to *put the question to himself, whether he is able, or not, to carry out the action by himself.* If the former is the case, let him *absolutely initiate no one into the matter* and *let him act alone;* but if that is not the case, then let him look, with the *greatest care, for just as many fellows as he must have, absolutely,—not one more nor less;* with *these* let him *unite* himself *to a fighting group.*

"*The founding of special groups of action or of war is an absolute necessity.* If it were attempted to make use of an existing group to effect an action, discovery of the deed would follow upon its heels, if it would come to a revolutionary action at all, which would be very doubtful. It is *especially true in America,* where *reaction has velvet paws, and where asinine confidentially is, from a certain direction, directly without bounds.* In the preparation, already, endless debates would

develop; the thing would be hung upon the big bell; it would be at first a public secret, and then, *after the thing was known to everybody, it would also reach the long ears of the holy Hermandad,* (the sacred precinct of the watchman over the public safety,) which, as is known to every man, woman and child, hear the grass grow and the fleas cough.

"In the *formation* of a *group of action,* the *greatest care must be exercised. Men must be selected* who have head and heart in the right spot.

"Has the formation of a fighting group been effected, has the intention been developed, does each one see perfectly clear in the manner of the execution, then *action must follow with the greatest possible swiftness, without delay,* for now they move within the scope of the *greatest danger,* simply from the very adjacent reason, because the *selected allies might yet commit treason without exposing themselves in so doing.*

"In the *action itself, one must be personally at the place, to select personally that point of the place of action, and that part of the action, which are the most important and are coupled with the greatest danger,* upon which depend chiefly the success or failure of the whole affair.

"Has the *deed* been *completed?* Then the *group of action dissolves* at once, without further parley, *according to an understanding* which must be had beforehand, leave the place of action, and *scatters to all directions.*

"If this theory is acted upon, *then the danger of the discovery is extremely small,*—yea, reduced to almost nothing; and from this point of view the *author ventures so say, thus, and not otherwise, must be acted, if the advance is to be proper.*

"It would be an *easy matter* to *furnish* the *proof,* by the different revolutionary acts in which the history of the immediate past is so rich, *that the executors sinned against the one or the other of the aforementioned principles, and that in this fact lies the cause of the discovery, and the loss to us of very important fellow-champions* connected therewith; but we will

be brief, and leave that to the individual reflection of the reader. But one fact is established—that is this: That all the *mentioned rules can be observed without great difficulties;* further, that the *blood of our best comrades can be spared thereby;* finally, as a consequence of the last mentioned, that light actions can be increased materially, for the *complete success of an action* is the *best impulse to a new deed,* and the things *must always succeed when the rules of wisdom are followed.*

"A further question which might probably be raised, would be this: *In case a special or conditional group must be formed for the purpose of action,* what is the *duty,* in that case, *of the public groups,* or the *entire public organization,* in view of the aforesaid actions? Well, the answer is very near at hand. In the first place, *they have to serve as a covering,*—as a *shield behind which one of the most effective weapons of revolution is bared;* then these *permanent groups* are to be the *source* from which the *necessary pecuniary means are drawn* and fellow-*combatants are recruited;* finally, the *accomplished deeds* are to *furnish the permanent groups,*—the *material* for critical *illustration.* These discussions are to *wake the spirit of rebellion,*—that important lever of the advancing course of the development of our race,—without which we would be forever nailed down to the state of development of a gorilla or an orang outang. This *right spirit is to be inflamed,* the *revolutionary instinct is to be roused* which still sleeps in the breast of man, although these monsters, which, by an oversight of nature, were covered with human skin, are honestly endeavoring to cripple the truly noble and elevated form of man by the pressure of a thousand and again a thousand years,—to morally castrate the human race. Finally, the means and form of conquest are to be found by untiring search and comparison, which enhance the strength of each proletarian a thousand-fold, and make him the giant Briareus, which alone is able to crush the ogres of capital."·

*March 23, 1885:*—"Yet one thing more.    Although every day brings the news of collisions between armed murder-serfs of the bourgeoise with unarmed crowds of people, (strikers and the like,) we must ever and again read in the so-called workingmen's papers, discussions of the question of arming ought to be avoided in the associations of the proletarian.    *We characterize such pacifying efforts as criminal.*

"*Each workingman ought to have been armed long ago.*    We leave it an open question whether whole corporations are able to completely fit themselves out in a military point of view, with all their numbers; but we say that each single one, if he has the necessary seriousness and the good will, can arm himself, little by little, very easily.    *Daggers and revolvers are easily to be gotten.    Hand grenades are cheaply to be produced; explosives, too, can be obtained; and finally, possibilities are also given to buy arms on installments.    To give an impulse in that direction one should never tire of.    For not only the revolution proper, approaching with gigantic steps, commands to prepare for it, but also the wage contests of to-day demand of us not to enter into it with empty hands.*

"*Let us understand the signs of the times!    Let us have a care for the present, that we will not be surprised by the future, unprepared!*"

*April 8, 1885.*—"That is something worth hearing.    A number of strikers in Quincy, yesterday, *fired upon their bosses, and not upon the scabs.    This is recommended most emphatically for imitation.*"

*May 5, 1885.*—"When anywhere a small party of workingmen dare to speak of rights and privileges, then the 'order' draw together all the murdering scoundrels of the whole city, (and, if necessary, from the whole country,) to put their sovereignty the more clearly before the sovereigns.    In short, the whole power of the capital,—that is, the entire government,—

is ever ready to suppress the petty demonstrations of the workingmen by force of arms, one after another,—now here, then there. This would be quite different if the workingmen of the entire country could only see that their class is in this wise subjected, part by part, without condition and without repartee. *The workingmen ought to take aim at every member of the militia, and do with him as one would do with some one of whom it is known that he is after taking one's life. It might then sooner be difficult to obtain murdering tools.*"

In a small notice, under the same heading, is this: "Workingmen, arm yourselves! Let the butchery of Lemont be a lesson to you."

*May 7, 1885.*—"Before you lies this blissful Eden. The road to it leads over the smoking ruins of the old world. Your passport *to it is that banner which calls to you, in flaming letters, the word 'Anarchy.'*"

*June 19, 1885.*—"It is scarcely necessary for us to say, in conclusion, that it would be an insane undertaking to meet the serfs of order with empty hands, and to allow one's self to be clubbed down and to be shot down without means of defence. Taking this into consideration, it appears clearly that it is more necessary than anything else, to arm one's self *as soon as possible. Therefore, workingmen, do arm yourselves with the most effectual means. The better you do this the quicker the fight is fought, the sooner the victory is yours. Do not delay, for that would be your ruin.*"

*June 20, 1885.*—"Enough is now said about the importance of being armed, and another question approaches us now which also must be discussed. *We are to go to work to supply ourselves, as quickly as possible, with these useful things.* The price of them is too high than that one could buy them himself. *The writer of these lines expresses his opinion, which does*

2—122 Ill.

*not intend to be too previous, to this effect: That special groups ought to form themselves to this end, which are to accomplish these things incorporal, and which collect and pay the money in small sums, optional with each one, according to his means. Small contributions one can easily spare. One does not mind them, and he is, in this way, the sooner in fighting trim for our purposes. In explanation, it must also be said that dynamite bears several names here in America. Among others, it is known in trade also under the names of Hercules powder and giant powder.*

*"But we will not tire the reader any longer, and go about to close this article. The fable reports to us that founders of great and difficult works have been nursed by wild beasts,—among others, Romulus and Remus by a she-wolf. That is to be understood fig-uratively. It is not said that the founders of a great work must have something wolfish in their individuality, for such a beginning is ever the password in a fight, and in this it is meant for one to be a wild animal. Workingmen, fellows in misery, men of action! A creation greater, more important, higher, more elevated than one has ever been, it is for us to found and establish!*

*"The temple of the unveiled Goddess of Liberty upon the whole face of the globe. But to this end you must be wolves, and, as such, ye need sharp teeth. Workingmen, arm yourselves!"*

In the "Arbeiter Zeitung" of April 29, 1885, is an editorial describing what is known as the "Board of Trade Meeting," in which it is stated, that in the procession which marched past the board of trade, there "marched a strong company of well-armed comrades of the various groups. Let us remark, here, that, with perhaps few exceptions, they were all well armed, and that also the *nitro-glycerine pills were not missing.* They were prepared for a probable attack, and if it had come to a collision there would have been pieces. The cordons of the police could have been quite excellently adapted for experiments with explosives! About twenty detectives were loitering about the Market square at the beginning, and then.

disappeared. That explains the keeping back of our otherwise impertinent order,—scoundrels."

*October 5, 1885.*—"The question which presents itself to the wage-worker is this : Will you look on quietly that they eject in such manner those who have shown themselves most willing to be sacrificed, and that they are driven from house and home, and persecuted with the whip of hunger,—will you or will you not? *And if they do not want that, there is no other way than to become immediately soldiers of the revolutionary army, and establish conspiring groups, and let the ruins fall on the home of such.*"

*October 8, 1885.*—"All organized workingmen in this country, no matter what views they might have otherwise, should be united on one point,—they should engage in a general prosecution of Pinkerton's secret police. No day should pass without a report being heard, from one place or another, of the finding of a carcass of one of Pinkerton's,—that this should be kept up until nobody would consent to become the bloodhound of these assassins."

In the issue of the same paper, of December 29, 1885, is a report of a meeting of the North Side group, at 58 Clybourn avenue, which is as follows :

"The following resolutions were adopted :

"This assembly declares, that the North Side group, I. A. A., pledges itself to work, with all means, for the introduction of the eight-hour day, beginning on the 1st of May, 1886. *At the same time, the North Side group cautions the workingmen not to meet the enemy unarmed, on the 1st of May,*" etc.

*January 22, 1886.*—"The eight-hour question is not, or at least should not be, the final end of the present organization, but, in comparison to the present state of things, a progress not to be underrated. But now let us consider the question

in itself. How is the eight-hour day to be brought about? Why, the thinking workingman must see for himself, under the present power of capital in comparison to labor, it is impossible to enforce the eight-hour day in all branches of business, otherwise than with *armed force.* With empty hands the workingmen will hardly be able to cope with the representatives of the club, in case, after the 1st of May of this year, there should be a general strike. Then the bosses will simply employ other men,—so-called 'scabs.'. Such will always be found.

"The whole movement, then, would be nothing but filling the places with new men; *but if the workingmen are prepared to eventually stop the working of the factories, to defend himself, with the aid of dynamite and bombs, against the militia, which will, of course, be employed, then, and only then, you can expect a thorough success of the eight-hour movement.*

"*Therefore, workingmen, I call upon you, arm yourselves.*"

In the "Arbeiter Zeitung," November 27, 1885, is the following:

"LETTER Box, S.—Steel and iron are not on hand, but tin two or three inches in diameter. The price is cheap. It does not amount to fifty cents apiece."

During the months of December, 1885, January, February and March, 1886, appeared the following notice, headed "Exercise in Arms :"

"Workingmen who are willing to exercise in the handling of arms, should 'call every Sunday forenoon, at half-past nine, at No. 58 Clybourn avenue, where they will receive instructions gratuitously."

In the "Arbeiter Zeitung" of March 2, 15, 18 and 25, 1886, appeared the following notice :

" '*Revolutionary Warfare*' *has arrived, and is to be had through the librarian, at 107 Fifth avenue, at the price of ten cents.*"

*This was not a paid advertisement,* as appears from the testimony of Fricke, the business manager of the "Arbeiter Zeitung," as also from the testimony of Seiger, the translator.

In the issue of March 15, 1886:

"LETTER BOX.—Seven lovers of peace. A dynamite cartridge explodes not through mere concussion, when thrown. A concussion primer is necessary."

In the "Arbeiter Zeitung" of January 6, 1886, appeared the following editorial:

"A NEW MILITIA LAW.

"To return to the Lehr und Wehr Verein, we have already said, that after the adoption of the law, the shallow waters would gradually dry up. That lasted until about the fall elections of 1879, when, at once, the socialistic vote shrunk to four thousand votes,—in the spring there were over twelve thousand,—then the whole 'movement,' to which (we) look back with unaccountable pride, was stopped. What was done for the mass of the people has proved to be a shallow and unclean    *    *    *

"Well, let us drop the subject. The lesson of 1877 has, meanwhile, been forgotten. Politically, they could not do much with it, and in a business sense,—well, after the failure of the movement,—there was not much the matter. To be brief, it did not *pay* any more to be a socialist or an armed proletarian. The thing didn't pay any more, and of the big pile there remained but a very little pile. But this little pile was a good one, and had lately achieved more than formerly the big pile. *The army has since made a gigantic progress. Where six years ago a thousand men had been armed with muskets, the majority of which are even to-day on hand, we find, to-day, a power which can neither be fought by law nor by force. Where a military organization existed formerly, the strength of which was well known, there exists, to-day, on invisible network of fighting groups, the dimensions of which are beyond any calculation, and*

*therefore this organization is a timely one.* To the above law we are partially indebted for that."

*January 23, 1886.*—"Brief is the space of time until the eventful day. The working people feel that something must be done. The conditions force them to wake up from slumber. Already an immense mass is without means of subsistence. They are more and more meagre. Capital sucks the marrow out of the bones of the workingmen.

"But why do we complain? Why do we murmur? We have no right to. Do we not know that all the misery, all the want, are the necessary consequence of the present state of society? As long as we admit that we are pariahs,—that we are born to submit our necks, as slaves, under the whip of hunger, of extortioners,—as long as we admit that, we have no right to complain. *Therefore, associates in misery,—for this pressure has finally become unbearable,—do not let us treat peaceably with our deadly enemies on the first of May. We do not want to cheat ourselves for the hundredth time that we would get from them, in a peaceable and harmonious way, even the least for the betterment of our situation.* We have so many examples and experiences, that even the large and indifferent mass does not believe any more that an agitation which tends to ameliorate the condition of the workingmen in a harmonious way, would be of any purpose to those people,—and I, for one, think they are right. *On the first of May, also, we will have an example of how harmoniously the capitalists will have our skulls crushed by their hirelings, if, out of sheer love of harmony, we will stand by with our fists in our pockets. He who employs the best means of battle, and uses them, is the victor. Force is right, (by Bismarck,) and if once we have seen that, on account of our unanimity and the modern means of warfare, we have the power, then we will also see we have the right, and that it is a great stupidity to work for that rabble of parasites instead of ourselves.*

"*Therefore, comrades, armed to the teeth, we want to demand our rights on the first of May. In the other case there are only blows of the club for you.*"

In the issue of February 17, 1886, is an editorial: "That the conflict between capitalism and workingmen is taking constantly a sharper form, is to be hailed, inasmuch as thereby the decision will be (word out.) *Hundreds and thousands of reasons indicate that force will bring about the decisive results in the battle for liberty, and the more conscious the masses are, in that conflict, of their irresistible power, the nearer will be the approaching spring-tide of the people.*"

*March 2, 1886.*—"The order-scoundrels beamed yesterday morning in their full glory. With the help of pick-pockets, (the natural allies of professional cut-throats, who otherwise call themselves also detectives,) they succeeded yesterday in taking seventy scabs to the factory, accompanied also by scoundrels of the secret service, to give a better appearance. This morning the number of the scabs which went back to work was materially increased. At this opportunity it was once again seen for what purpose the police existed: to protect the workingman if he works for starvation wages, and is an obedient serf; to club him down when he rebels against the capitalistic herd of robbers. Force only gives way to force. *Who wants to attack capitalism in earnest, must overthrow the body-guards of it, — the well-drilled and well-armed 'men of order,'—and kill them, if he does not want to be murdered himself. But for this is needed an armed and systematically drilled organization.*"

On the same page: "*The time up to the first of May is short. Look out!*"

In the issue of April 20 is an editorial: "As long as the people in the kitchen of life are satisfied with the smell of the roast, and feeds his empty stomach with the idea of national

greatness, national riches, national liberty of the poll, the glutton is always for liberty. Why not? It is useless to others, and he feels comfortable with it. Freedom of making contracts,—most sacred constitutional right of mankind,— why shouldst thou not be welcome to gentlemanly gluttons? \* \* \* *It is true that hundreds have armed themselves; but thousands are still unarmed.* Every trades-union should make it obligatory to every member to keep a good gun at home, and ammunition. The time is probably not very far where such neglect would be bitterly felt, and the governing class is prepared, and their demands and their importunes are backed by muskets and Gatling guns. Workingmen, follow this example."

*March 19, 1886.*—"*The only aim of the workingmen should be the liberation of mankind from the shackles of the existing damnable slavery.* Here, in America, where the workingman possesses yet the freedom of meeting, of speech, and of the press, most should be done for the emancipation of suffering mankind. But the press gang and the teachers in the schools do all in their power to keep the people in the dark. Thus everything tends to degrade mankind more and more, from day to day, and this effects a 'beastening,' as is observable with Irishmen, and more apparent, even, with the Chinese.

"*If we do not soon bestir ourselves for a bloody revolution, we can not leave anything to our children but poverty and slavery. Therefore prepare yourselves, in all quietness, for the revolution.*"

In the issue of April 21, 1886, appears an editorial, as follows: "*The love for law on the part of the workingman is not so well established, if put to the test.* But the hypocritical peace assurances in quiet times are in the way of preparations for serious conflict. When it comes to serious occasions, it unfortunately happens that very often the workingmen break their heads on the walls of the law. *The desire to ignore the law is there, but it remains a desire.* Possible action

·means to remain unorganized, and to stand anything that the extortioner may see fit to do.

"*He who submits to the present order of things has no right to complain about capitalistic extortion, for order means sustaining that; and he who revolts against the institutions vouchsafed by the constitution and the laws, is a rebel, and has no right to complain if he is met by soldiers. Every class defends itself as well as it can. A rebel who puts himself opposite the mouth of the cannons of his enemies, with empty fists, is a fool.*"

*April 28, 1886.*—Editorial on second page, headed "Editorial:" "What anarchists have predicted months ago, they have realized now. In quiet times the shackles of law were forged, to apply them in tempestuous times. From dusty garrets they have fetched their musty law books, and so, by a practical application of American liberty, tried to build a wall against the stream of the laborers' movement.

"Well, after you have erected protecting walls in the shape of laws, we will have to break them. The theory of the homœopath, 'like cures like,' is applicable here. The power of the associate manufacturers and their state must be met by labor associations. *The police and soldiers who fight for that power must be met by armed armies of workingmen. The logic of facts requires this. Arms are more necessary in our times than anything else. Whoever has no money, sell his watch and chain to buy firearms for the amount realized. Stones and sticks will not avail against the hired assassins of the extortionists. It is time to arm yourselves.*

"What a modest demand, the introduction of the eight-hour day! And yet a corps of madmen could not demean themselves worse than the capitalistic extortioners. They continually threaten with their disciplined police and their strong militia, and those are not empty threats, indeed. This is proved by the history of the last few years. It is a nice thing, this patience; and the laborer, alas! has too much of this

article, but one must not indulge in a too frivolous play with it. If you go further, his patience will cease; then it will be no longer a question of the eight-hour day, but a question of emancipation from wage slavery."

*April 29, 1886.*—Editorial: "If the legitimate means of the thieves and scoundrels who practice extortion on their fellowmen, are exhausted, then they resort to force. A wage-slave who is not utterly demoralized should always have a breech-loader and ammunition in his house."

*April 30, 1886.*—"What will the first of May bring? The workingmen bold and determined. The decisive day has arrived. The workingman, inspired by the justice of his cause, demands an alleviation of his lot, a lessening of his burden. The answer, as always, is: 'Insolent rabble! Do you mean to dictate to us? That you will do to your sorrow. Hunger will soon rid you of your desire for any notions of liberty. Police, executioners and militia will give their aid.' Men of labor, so long as you acknowledge the gracious kicks of your oppressors with words of gratitude, so long you are faithful dogs. Have your skulls been penetrated by a ray of light, or does hunger drive you to shake off your servile nature, you offend your extortioners. They are enraged, and will attempt, through hired murderers, to do away with you like mad dogs."

*April 30, 1886.*—(Editorial of this date quoted in opinion.)

*May 1, 1886.*—"Bravely forward. The conflict has begun. An army of wage-laborers are idle. Capitalism conceals its tiger claws behind the ramparts of order. Workmen, let your watchword be: No compromise! Cowards to the rear! Men to the front. The die is cast. The first of May has come. For twenty years the working people have been begging extortioners to introduce the eight-hour system, but have been

put off with promises. Two years ago they resolved that the eight-hour system should be introduced in the United States on the first day of May, 1886. The reasonableness of this demand was conceded on all hands. Everybody, apparently, was in favor of shortening the hours; but, as the time approached, a change became apparent. That which was in theory modest and reasonable, became insolent and unreasonable. It became apparent, at last, that the eight-hour hymn has only been struck up to keep the labor dunces from socialism.

"That the laborers might energetically insist upon the eight-hour movement, never occurred to the employers. And it is proposed again to put them off with promises. We are not afraid of the masses of laborers, but of their pretended leaders. Workmen, insist upon the eight-hour movement. 'To all appearances it will not pass off smoothly.' The extortioners are determined to bring their laborers back to servitude by starvation. It is a question whether the workmen will submit, or will impart to their would-be murderers an appreciation of modern views. We hope the latter."

In the "Arbeiter Zeitung" of the same day, (Saturday, May 1,) the following editorial notice appeared on the first page: "It is said that on the person of one of the arrested comrades, in New York, a list of membership has been found, and that all the comrades compromised had been arrested. *Therefore, away with all rolls of membership, and minute-books, where such are kept. Clean your guns, complete your ammunition. The hired murderers of the capitalists, the police and miltia, are ready to murder. No workingman should leave his house in these days with empty pockets."*

The next day, Sunday, May 2, 1886, there appeared in the "Fackel," which was the Sunday edition of the "Arbeiter Zeitung," the following words: "Letter-box Y. Come Monday night." This was a summons to the members of the

armed sections of the different groups to meet at Greif's Hall on the next evening, to-wit., on the evening of Monday, May 3, 1886.

In the same Sunday issue of the "Arbeiter Zeitung," called "Die Fackel," published on May 2, 1886, appeared the following passage: "Even where the workingmen are willing to accept a corresponding reduction of wages with the introduction of the eight-hour system, they were mostly refused. 'No, ye dogs,—you must work ten hours; that's the way we want it,—we're your bosses.' Something like this was the answer of the majority, translated into intelligible language.

"*In the face of this fact, it is pitiful and disgusting; but more than that, it is treacherous, to warn the strikers against energetic, uncompromising measures.*

"*Everything depends upon quick and immediate action. The tactics of the bosses are to gain time; the tactics of the strikers must be to grant them no time. By Monday or Tuesday the conflict must have reached its highest intensity, else the success will be doubtful. Within a week, the fire, the enthusiasm, will be gone, and then the bosses will celebrate victories.*"

*May 3, 1886.*—"A hot conflict. The determination of the radical elements brings the extortioners in numerous instances to terms. The capitalistic press has good grounds for abusing the Reds. Without them no agitation. Numerous meetings. The general situation at noon, to-day, was encouraging. A considerable number of extortioners had capitulated this morning, and further capitulations are looked for in the course of the day. The freight-handlers were marching in full force from depot to depot at noon to-day. It was rumored that 'scabs' had been imported from Milwaukee. The railroad depots are occupied by special policemen, while the municipal minions of order, under the command of five lieutenants, have entrenched themselves in the Armory. The arch-rascals have made provisions for good victuals and drink. The laborers

in the stone yards have formed a union.   *   *   *   They went on a strike.   The stone-cutters and masons are compelled to join in the strike.   *A strike will probably take place in the lumber districts.*   The brewers plan a strike if their bosses do not fully accede to their demand to-day.   In the furniture business, strike and lock-out, respectively, still continue. *   *   *   The cabinet-makers' union will make no compromise.   The metal-workers are confident of victory.   *The number of strikers to-day* can not be determined, but *will probably amount to forty thousand.*

"Courage, courage is our cry.   Don't forget the words of Herways: 'The host of the oppressors grows pale, when thou, weary of thy burden, in the corner puttest the plow; when thou sayest, It is enough.'"

In the "Arbeiter Zeitung" of Tuesday, May 4, 1886, appeared the following article, written by Spies:

### "BLOOD.

*"Lead and Powder as a Cure for dissatisfied Workmen!*
*"About six Laborers mortally and four times that number slightly Wounded!*
*"Thus are the Eight-hour Men to be intimidated!*
*"This is Law and Order!*
*"Brave Girls parading the City!*
*"The Law and Order Beast frightens the Hungry Children away with Clubs!*

#### GENERAL NEWS.

"Six months ago, when the eight-hour movement began, there were speakers and journals of the I. A. A. who proclaimed and wrote: 'Workmen, if you want to see the eight-hour system introduced, arm yourself.   If you do not do this you will be sent home with bloody heads, and birds will sing May songs upon your graves.'   ('That is nonsense,' was the reply.   'If the workmen are organized, they will gain the eight hours in their Sunday clothes.')   Well, what do you say, now?

Were we right or wrong? Would the occurrence of yesterday
have been possible if our advice had been followed?

"Wage-workers, yesterday the police of this city murdered,
at the McCormick factory, so far as it can now be ascer-
tained, four of your brothers, and wounded, more or less
seriously, some twenty-five more. If brothers who defended
themselves with stones, (a few of them had little snappers in
the shape of revolvers,) had been provided with good weapons
*and one single dynamite bomb, not one of the murderers would
have escaped his well-merited fate.* As it was, only four of them
were disfigured. That is too bad. The massacre of yester-
day took place in order to fill the forty thousand workmen of
this city with fear and terror,—took place in order to force
back into the yoke of slavery the laborers who had become
dissatisfied and mutinous. Will they succeed in this? Will
they not find, at last, that they miscalculated? The near
future will answer this question. We will not anticipate the
course of events, with surmises.

"The employes in the lumber yards on the South Side held
a meeting yesterday afternoon, at the Black road, about one-
quarter mile north of McCormick's factory, *for the purpose of
adopting resolutions in regard to their demands, and to appoint a
committee to wait upon a committee of lumber-yard owners, and
present the demands which had been agreed upon.*

"It was a gigantic mass that had gathered. Several mem-
bers of the lumber yard union made short addresses in Eng-
lish, Bohemian, German and Polish. *Mr. Fehling attempted
to speak, but when the crowd learned that he was a socialist,
he was stoned, and compelled to leave the improvised speaker's
stand on a freight car.* Then, after a few more addresses were
made, the president introduced *Mr. August Spies,* who had
been invited as a speaker. *A Pole or Bohemian cried out:
'That is a socialist!' and again there arose a storm of disappro-
bation, and a roaring noise, which proved sufficiently that these
ignorant people had been incited against the socialists by their*

*priests.* But the speaker did not lose his presence of mind. He continued speaking, and very soon the utmost quiet prevailed. He told them that they must realize their strength over against a little handful of lumber-yard owners; that they must not recede from the demands once made by them. The issue lay in their hands. All they needed was resolution, and the 'bosses' would be compelled to and would give in.

"At this moment some persons in the background cried out (either in Polish or Bohemian): 'On to McCormick's! Let us drive off the scabs!' About two hundred men left the crowd, and ran towards McCormick's.

"The speaker did not know what was the matter, and continued his speech. When he had finished, he was appointed a member of a committee to notify the 'bosses' that the strikers had no concessions to make. Then a Pole spoke. While he spoke, a patrol wagon rushed up towards McCormick's. The crowd began to break up. In about three minutes several shots were heard near McCormick's factory, and these were followed by others. At the same time, about seventy-five well-fed, large and strong murderers, under the command of a fat police lieutenant, were marching toward the factory, and on their heels followed three patrol wagons besides, full of law and order beasts; two hundred policemen were on the spot in less than ten or fifteen minutes, and the firing on fleeing workingmen and women resembled a promiscuous bush-hunt. *The writer of this hastened to the factory as soon as the first shots were fired, and a comrade urged the assembly to hasten to the rescue of their brothers who were being murdered, but no one stirred.* 'What do we care for that?' was the stupid answer of poltroons brought up in cowardice. The writer fell in with a young Irishman who knew him. 'What miserable sons of b—— are those,' he shouted to him, 'who will not turn a hand while their brothers are being shot down in cold blood! We have dragged away two. I think they are dead. If you have any influence with the people, for Heaven's sake run back and

urge them to follow you.' *The writer ran back. He implored the people to come along,—those who had revolvers in their pockets,—but it was in vain. With an exasperating indifference they put their hands in their pockets, and marched home, babbling as if the whole affair did not concern them in the least.* The revolvers were still cracking, and fresh detachments of police, here and there bombarded with stones, were hastening to the battle ground. The battle was lost !

"It was in the neighborhood of half past three o'clock when the little crowd of between two and three hundred men reached McCormick's factory. Policeman West tried to hold them back with his revolver. A shower of stones for an answer, put him to flight. He was so roughly handled that he was afterwards found about one hundred paces from the place, half dead, and groaning fearfully. The small crowd shouted : 'Get out, you d——d scab,' 'you miserable traitors,' and bombarded the factory window with stones. The little guard-house was demolished. The 'scabs' were in mortal terror, when, at this moment, the Hinman street patrol wagon, summoned by telephone, came rattling along with thirteen murderers. When they were about to make an immediate attack with their clubs, they were received with a shower of stones. 'Back ! Disperse !' cried the lieutenant, and the next minute there was a report. The gang had fired on the strikers. They pretend, subsequently, that they shot over their heads. But, be that as it may, a few of the strikers had little snappers of revolvers, and with these returned the fire. In the meantime, other detachments had arrived, and the whole band of murderers now opened fire on the little company,—twenty thousand, as estimated by the police organ, the 'Herald,'—while the whole assembly scarcely numbered eight thousand ! Such lies are told. With their weapons, mainly stones, the people fought with admirable bravery. They laid out half a dozen bluecoats, and their round bellies, developed to extreme fatness in idleness and luxury, tumbled about, groaning on the ground.

Four of the fellows are said to be very dangerously wounded. Many others, alas, escaped with lighter injuries. (The gang, of course, conceals this, just as in '77 they carefully concealed the number of those who were made to bite the dust.) But it looked worse on the side of the defenceless workmen. Dozens who had received slight shot wounds hastened away amid the bullets which were sent after them. The gang, as always, fired upon the fleeing, while women and men carried away the severely wounded. How many were really injured and how many were mortally wounded could not be determined with certainty, but we think we are not mistaken when we place the number of mortally wounded at about six and those slightly injured at two dozen. We know of four, one of whom was shot in the spleen, another in the forehead, another in the breast, and another in the thigh. A dying boy, Joseph Doedick, was brought home on an express wagon by two policemen. The people did not see the dying boy; they saw only the two murderers. "Lynch the rascals!' clamored the crowd. The fellows wanted to break away and hide themselves; but in vain. They had already thrown a rope around the neck of one of them, when a patrol wagon rattled into the midst of the crowd, and prevented the praiseworthy deed. Joseph Hess, who had put the rope around his neck, was arrested.

"The scabs were afterwards conducted, under the protection of a strong escort, down Blue Island avenue. Women and children gave vent to their indignation in angry shouts; rotten eggs whizzed through the air. The men about took things coolly, and smoked their pipes as on Kirmess day.

"McCormick's assistant, Superintendent C. J. Bemly, was also wounded, and, indeed, quite severely.

"The following strikers were arrested: Ignatz Erban, Frank Kohling, Joseph Schuky, Thomas Klafski, John Patolski, Anton Sevieski, Albert Supitar, Hugh McWhifter, Anton Sternack, Nick Wolna and Thomas O'Connell.

3—122 Ill.

"The 'pimp,' McCormick, when asked what he thought of it, said: 'August Spies made a speech to a few thousand anarchists. It occurred to one of these brilliant heads to frighten our men away. He put himself at the head of a crowd, which then made an attack upon our works. Our workmen fled, and in the meantime the police came and sent a lot of anarchists away with bleeding heads.'

"*Last night thousands of copies of the following circular were distributed in all parts of the city:*" (And then follows the German portion of the Revenge Circular.)

The following extracts appeared in the "Alarm," under the following dates:

*October 18, 1884.*—"One man armed with a dynamite bomb is equal to one regiment of militia, when it is used at the right time and place. *Anarchists are of the opinion that the bayonet and Gatling gun will cut but sorry part in the social revolution. The whole method of warfare has been revolutionized by latter-day discoveries of science, and the American people will avail themselves of its advantages in the conflict of upstarts and contemptible braggarts who expect to continue their rascality under the plea of preserving law and order.*"

*October 25, 1884.*—"*A weak opposition, or an opposition that is believed to be weak, will cause bloodshed, but an opposition that is known to be sufficiently strong for certain victory will command and obtain a bloodless surrender. This is why the communist and anarchist urges the people to study their school books on chemistry, and read the dictionaries and cyclopedias on the composition and construction of all kinds of explosives, and make themselves too strong to be opposed with deadly weapons. This alone can insure against bloodshed. Every person can get this knowledge inside of one week, and a majority now have one or more books, containing all this information, right in their own homes. And every man who is master of these explosives can not be even ap-*

*proached by an army of men. Therefore, bloodshed being useless, and justice being defenceless, people will be forced to deal justly and generously with each other.*"

*November 1, 1884.*—"*How can all this be done? Simply by making ourselves masters of the use of dynamite, then declaring we will make no further claim to ownership in anything, and deny every other person's right to be the owner of anything, and administer instant death, by any and all means, to any and every person who attempts to continue to claim personal ownership in anything. This method, and this alone, can relieve the world of this infernal monster called the 'right of property,'*

"*Let us try and not strike too soon, when our numbers are too small, or before more of us understand the use and manufacture of the weapons.*

"*To avoid unnecessary bloodshed, confusion and discouragement, we must be prepared, know why we strike and for just what we strike, and then strike in unison and with all our might.*

"Our war is not against men, but against systems; *yet we must prepare to kill men who will try to defeat our cause*, or we will strive in vain.

"The rich are only worse than the poor because they have more power to wield this infernal 'property right,' and because they have more power to reform, and take less interest in doing so. Therefore, it is easy to see where the bloodiest blows must be dealt.

"We can expect but few or no converts among the rich, and it will be better for our cause if they do not wait for us to strike first."

*November 15, 1884.*—"What, then, is the use of an army? What is to prevent its destruction in the same manner? Dynamite is the emancipator! In the hand of the enslaved, it cries aloud: 'Justice or—annihilation.' But, best of all, the workingmen are not only learning its use,—they are going to use it. They will use it,—and effectually,—until personal

·ownership,—property rights,—are destroyed, and a free so-·ciety and justice becomes the rule of action among men. There ·will then be no need for government, since there will be none ·to submit to be governed. Hail to the social revolution! Hail ·to the deliverer—*dynamite.*"

*November 29, 1884.*—"The moment you pay a man for what he produces, he will take that pay and then spend his energies in taking advantage of somebody with it. *Down with pay, and dynamite the man who claims it; and hang him who will not let his energies produce something. This is socialism.*

"Upon this principle,—and this only,—can all humanity be raised up, and upon this principle alone can we stop all this quarreling, robbing, starving and throat-cutting. There is no reason on earth why any living being should have less of the benefits and pleasures of this world than ———— now possesses. The idea that the world can have no more than there are dollars to every representative, is rediculous non-sense. There isn't money enough in the world to represent the amount of fine combs and tooth-brushes that humanity ought to possess. Down with this infernal nonsense that we must measure everything by money. We have no just use for money, or for banks, or for brokers, or for insurers, or jailers, or for any other hoodlum classes who are wickedly wasting the energy of their whole lives. *Nothing but an uprising of the people, and a bursting open of all stores and storehouses to the free access of the public, and a free application of dynamite to every one who opposes, will relieve the world of this infernal night-mare of property and wages.* Down with such wretched non-sense. No rascality or stupidity is sacred because it is old. Down with it!"

*December 6, 1884*—"One dynamite bomb, properly placed, will destroy a regiment of soldiers,—a weapon easily made, and carried with perfect safety in the pockets of one's clothing. The First regiment may as well disband, for if it should ever

level its guns upon the workingmen of Chicago, it can be totally annihilated."

*November 29, 1884.*—"**The Black Flag!** The emblem of hunger, unfurled by the proletariats of Chicago. The red flag borne aloft by thousands of workingmen on Thanksgiving day. The poverty of the poor is created by the robberies of the rich. Speeches, resolutions and a grand demonstration of the unemployed, the tramps and the miserables of the city. Significant incidents. * * *

"Mr. Parsons then called for the resolutions, which were then read as follows :

"WHEREAS, We have outlived the usefulness of the wage and property system, that is now and must hereafter cramp, limit and punish all increase of production, and can no longer gratify the necessities, rights and ambitions of man ; and

"WHEREAS, The right of property requires four times more effort to adjust it between man and man, than is required to produce, manufacture and distribute it ; therefore, be it

"*Resolved,* That property rights should no longer be maintained or respected ; that the great army of useless workers, among which are the lawyers, insurers, brokers, canvassers, jailers, police, politicians, armies and navies,—including all useless employes whose sole business is to adjust property claims between man and man,—should be deprived of this useless and corrupting employment, and be allowed to spend their energies producing, manufacturing and delivering the necessaries and luxuries of life.

"And this is impossible so long as man continues to pay or receive pay for production ; therefore, be it further

"*Resolved,* That no man shall pay for anything, or receive pay for anything, or deprive himself of what he may desire, that he finds out of use or vacant. While none can eat more than they ought, under any system, or wear more than one suit of clothes at a time, or occupy more than one house at a

time, yet, as a free access to all will require more production; therefore, be it further

"*Resolved,* That any person who will not spend a reasonable portion of energy in the production, manufacture or distribution of the necessaries, comforts and luxuries of life is the enemy of all mankind, and ought to be treated as such. He who will willfully or maliciously waste is no better.

"*As this system can not be introduced against existing ignorance, selfishness and distrust, without the force of arms and strong explosives; therefore, be it*

"*Resolved, That when all stores, storehouses, vacant tenements and transporting property are thrown open and held open to the free access of the general public, the good of mankind and the saving of blood requires that all forcible opposition should be dealt with summarily, as fast as it may present itself,"* etc.

*January 13, 1885.*—"We are told that force is cruel. But this is only true when opposition is less cruel. If the opposition is a relentless power,—that is, starving, freezing, exposing and depriving tens of thousands, and the application of force would require less suffering while removing the old cause,—then the force is humane. *Seeing the amount of needless suffering all about us, we say a vigorous use of dynamite is both humane and economical.* It will, at the expense of less suffering, prevent more. It is not humane to compel ten persons to starve to death when the execution of five persons would prevent it.

"*It is upon this theory that we advocate the use of dynamite.*

"*It is clearly more humane to blow ten men into eternity than to make ten men starve to death.*"

*February 21, 1885.*—"The deep-rooted, malignant evil which compels the wealth-producers to become the dependent hirelings of a few capitalistic czars, can not be reached by means of the ballot.

"*The ballot can be wielded by free men alone; but slaves can only revolt, and rise in insurrection against their despoilers.*

"*Let us bear in mind the fact that here in America, as elsewhere, the worker is held in economic bondage by the use of force, and the employment of force, therefore, becomes a necessity to his economic emancipation! Poverty can't vote!*"

*January 9, 1885.*—

## "The Right to Bear Arms.

"The conspiracy of the ruling against the working classes, in 1877, the breaking up of the monster meeting on Market square, the brutal assault upon a gathering of furniture workers in Vorwärts Turner Hall, the murder of Tessmann, and the general clubbing and shooting down of peaceably inclined wage-workers by the blood-hounds of 'law and order,'—greatly enraged the producers in this city, and also convinced them that they had to do something for their future protection and defence. The result was the organization of an armed proletarian corps, known as the '*Lehr und Wehr Verein.*' About one and one-half years later, this 'corps' had grown so immensely that it numbered over one thousand well-equipped and well-drilled men.

"Such an organization the 'good citizens' of our 'good city' considered a menace to the common weal, public safety and good order, as one might easily imagine, and they concluded that 'something had to be done.' And very soon after something was done. The State legislature passed a new 'militia law,' under which it became a punishable offence for any body of men, other than those patented by the Governor and chosen as the guardians of 'peace,' to assemble with arms, drill or parade the streets. This law was expressly aimed at the 'Lehr und Wehr Verein,' who, as a matter of course, did not enjoy the sublime confidence and favor of 'His Excellency.' * * * *Where there once was a military body of men publicly organized, whose strength could be easily ascertained,*

*there exists an organization now whose strength can not even be estimated,—a network of destructive agencies, of a modern military character, that will defy any and all attempts of suppression. We don't grumble.     Make more 'laws' if you like."*

*February 21, 1885.—"Dynamite!     Of all the good stuff, this is the stuff.     Stuff several pounds of this sublime stuff into an inch pipe, (gas or water pipe,) plug up both ends, insert a cap with a fuse attached, place this in the immediate neighborhood of · a lot of, rich loafers who live by the sweat of other people's brows, and light the fuse.     A most cheerful and gratifying result will follow. In giving dynamite to the down-trodden millions of the globe, science has done its best work.     The dear stuff can be carried around in the pocket without danger, while it is a formidable weapon against any force of militia, police or detectives that may want to stifle the cry for justice that goes forth from the plundered slaves.     It is something not very ornamental, but exceedingly useful.     It can be used against persons and things.     It is better to use it against the former than against bricks and masonry.     It is a genuine boon for the disinherited, while it brings terror and fear to the robbers.*     It brings terror only to the guilty, and consequently, the Senator who introduced a bill in Congress to stop its manufacture and use must be guilty of something.     He fears the wrath of an outraged people that has been duped and swindled by him and his like.     The same must be the case with the 'servant' of the people who introduced a like measure in the Senate of the Indiana legislature.     All the good this will do!     Like everything else, the more you prohibit it, the more it will be done.     Dynamite is like Banquo's ghost,—it keeps on fooling around, somewhere or other, in spite of his satanic majesty.     *A pound of this good stuff beats a bushel of ballots all hollow, and don't you forget it!*     Our law-makers might as well try to sit down on the crater of a volcano or a bayonet as to endeavor to stop the manufacture and use of dynamite. It takes more justice and right than is contained in laws to

quiet the spirit of unrest. *If workingmen would be truly free, they must learn to know why they are slaves. They must rise above petty prejudice and learn to think. From thought to action is not far, and when the worker has seen the change, he need but look a little closer to find, near at hand, the sledge with which to shatter every link. The sledge is dynamite.*"

*March 7, 1885.*—"Our agitators. The agitation trips of comrades Gorsuch, Fielden and Griffin, during the past two weeks, was prolific of good results. Twelve American groups were organized in different cities, and those united with the International are working to bring into the ranks of the revolutionary army the proletariats of the contiguous districts. The working people's International Association now embraces eighty groups, scattered all over the United States, mainly in centers of industry, from which the propagandism radiates everywhere, the membership being many thousands. In Chicago, with thousands of members, five newspapers, with increasing circulations, are published. The good work goes bravely on, and exertions should be redoubled.

"Agitation for the purpose of organization,—organization for the purpose of rebellion against wage slavery,—is the duty of the hour."

*March 21, 1885.*—

"How to Make Dynamite.

"The next issue of the 'Alarm' will begin the publication of a series of articles concerning revolutionary warfare, viz.: 'The manufacture of dynamite made easy.' 'Manufacturing bombs.' 'How to use dynamite properly.' 'Exercises in the use of dynamite by the military department of the United States and other countries.' Each of these articles will be complete and thorough on the subject considered by them. Agents can order copies of paper containing the above information, in advance."

*April 18, 1885.*—"The moment the abolition of a government is suggested, the mind pictures the uprising of a hundred little despotic governments on every hand, quarreling among themselves, and domineering over the unorganized people. *This fact suggests the idea that the present governments must be destroyed, only in a manner that will prevent the organization or rise of any and all other governments, whether it be a government of three men or three hundred million. No government can exist without a head, and by assassinating the head just as fast as a government head appears, the government can be destroyed, and by this same process all other governments can be kept out of existence.*

"This is the policy of the nihilist of Russia, and the moment it gets any popular support throughout civilization, all governments will disappear forever. Those governments least offensive to the people should be destroyed last. All governments exist by the abridgment of human liberty, and the more government the less liberty. He, alone, is free, who submits to no government. All governments are domineering powers, and any domineering power is a natural enemy to all mankind, and ought to be treated as such.

"*Assassination will remove the evil from the face of the earth.*

"Man will always have and always need advisers, teachers and leaders in all departments of life, but bosses, jailers and drivers are unnecessary.

"Man's leader is his friend. His driver is his enemy. This distinction should be understood, and the parties should be dealt with accordingly. *Assassination, properly applied, is wise, just, humane and brave. For freedom, all things are just.*"

*June 27, 1885.*—In the "Alarm" of this date appears the following, written by the defendant August Spies:

"Though everybody nowadays speaks of dynamite, that great force of civilization, some with awe, others with delight, it may be said that but few have any knowledge of the general

character and nature of this explosive. For those who will, sooner or later, be forced to employ its destructive qualities in defence of their rights as men, and from a sense of preservation, a few hints may not be out of place.

"Dynamite may be handled with perfect safety, if proper care is used. It is a two-edged sword if handled by one who is not acquainted with its character. Dynamite, which is also known in the market as 'giant powder' and 'Herculean powder,' is a compound of nitro-glycerine and clay (China clay is the best.) In many cases sawdust is used. It requires a practical chemist to mix nitro-glycerine with clay or sawdust, for it is a very dangerous piece of work. Revolutionists would do well to buy the dynamite ready made. It is very cheap—much cheaper than they can manufacture it for themselves. No. 1 is the best. No. 2 will do also. Dynamite can be purchased from any large powder concern in any of our cities.

"Dynamite explodes from heat and detonation. It is self-explosive at a temperature of 180 degrees (Fahrenheit), and through sudden and violent concussion, as, for instance, produced by the fulminate of silver or mercury. If you keep your stock of dynamite below a temperature of 100 degrees, and even 125, it will not explode itself. Yet you ought not expose it directly to the rays of the sun or get it too near the stove. The best way of storing it is: Wrap it well in oil paper, place it in a box of sawdust, and bury it in your cellar, garden, or where nobody can touch it. The moisture is neutralized by the sawdust. Never attempt to thaw frozen dynamite. This requires the skillful hand of a chemist, and is very dangerous.

"In handling dynamite, be careful not to get any of it on your lips, nose, eyes, or skin anywhere, for if you do, it will give you a terrible headache. When filling bombs, and you must handle it with your fingers, place a rubber mitten on your hand, and tie a handkerchief over mouth and nose, so

that you may not inhale the dangerous gases. They likewise produce a frightful headache. In filling bombs, use a little wooden stick, and never be careless.

"Keep the stuff *pure!* Beware of sand. For the revolutionist, it is necessary that the revolutionist should experiment for himself. Especially should he practice the knack of throwing bombs.

"For further information, address A. S., 'Alarm,' 107 Fifth avenue, Chicago."

In the "Alarm" of July 25, 1885, is an article entitled, "STREET FIGHTING.—*How to Meet the Enemy.*—Some valuable hints for the revolutionary soldiers.—What an officer of the United States army has to say."

In the "Alarm," from August 17, 1885, to the last issue of that paper, appeared the following notice:

"The armed section of the American group meets Monday night, at 54 West Lake street."

*September 5, 1885.*—"Now, in regard to the proposed strike next spring, a few practical words to our comrades. The number of organized wage-workers in this country may be about 800,000; the number of the unemployed about 2,000,-000. Will the manufacturing kings grant the modest request under such circumstances? No, sir. The small ones cannot, and the big ones will not. They will then draw from the army of unemployed. The strikers will attempt to stop them. Then comes the police and the militia. * * * *Say, workingmen, are you prepared to meet the latter—are you armed?*"

The following extract from "Bakunin's Groundwork for the Social Revolution," was published in the "Alarm," December 26, 1885:

"A revolutionist's duty to himself:—

"1. The revolutionist is a self-offered man. He has no personal interest, feelings or inclinations; no property,—not even a name. Everything in him is consumed by one single interest, by one single thought, one single passion,—the *Revolution.*

"2. The whole work of his existence,—not only in words, but also in deeds,—*is at war with the existing order of society, and with the whole so-called civilized world. With its laws, morals and customs he is an uncompromising opponent. He lives in this world for the purpose to more surely destroy it.*

"3. The revolutionist despises every doctrine, and disclaims society in its present form. He leaves the re-organization of society to the future generations. *He knows only one science— the science of destruction.* He studies mathematics, physics, chemistry, and perhaps medicine, for, and *only* for, this purpose. For the same reason he studies, day and night, the living science of men, characters, conditions, and also the situation of the present social 'order.' *The quick and sure destruction of the present unreasonable order of the world is the object of these studies.*

"4. He despises public sentiment. He despises and hates the present social 'morality' in all *its* instigations and manifestations. He acknowledges as moral whatever favors the triumph of the revolution; immoral and criminal whatever checks it.

"5. The revolutionist is a consecrated being,—who does not belong to himself. *He would not spare the State in general, and the entire class society, and at the same time does not expect mercy for himself. Between him and society reigns the war of death or life, publicly and secretly, but always steady and unpardoning.* He has got to get used to standing all endurance.

"6. Stringent with himself, he must also be to others. All weak sentiment towards relation, friendship, love and thankfulness must be suppressed through the only cold passion of

the revolutionary work.   For him there exists only one benefit,. one wager, one satisfaction, — the effect of the revolution.. *Day and night dare he have only one thought,—one aim:   The unmerciful destruction.   While he, cold-blooded and without rest, follows that aim, he himself must be ready to die at any time, and ready to kill, with his own hands, any one who seeks to thwart his aim.*   *   *   *

"The revolutionist's duty towards his revolutionary com- rades :—   *   *   *

"9.  It is unnecessary to speak of the fellowship amongst the revolutionists.   Upon them exists the entire might of the revolutionary work.   Comrades of the revolution, who stand even high on the revolutionary understanding and revolution- ary habit, must, as much as possible, consult all important. affairs in common, and take resolution unanimously.   *In exe- cuting a resolved-upon case, everybody must, as much as possible,. depend upon himself.   In case where a lot of destructive deeds is to be done, everybody must be self-operating, and request help and counsel of his comrades only in cases where it* is absolutely neces- sary for success.

"10.  Every comrade of the revolution shall have several revolutionists in the second or third order, on hand,—that is, such persons as are not thoroughly instructed; he shall dis- pose of them as a trusted part of the revolutionary capital.. He shall use his part of the capital economically, in order to get as great results from them as possible.   He shall dispose of himself as so much capital to be used for the triumph of the work of the revolution, but a capital which he can not dis- pose of without the full consent of all the fully consecrated. comrades.   *   *   *

"The revolutionist's duty toward society :—   *   *   *

"13.  A revolutionist moves in the world of State, in the world of classes, in the so-called 'civilized' world, and lives in the same, *just for the simple reason that he believes in its speedy destruction.*   He is no true revolutionist who clings to

anything at all in this bourgeoise world. He dare not shrink where the cause is at stake, or refuse to break any tie which binds him to the old world, or hesitate to destroy any institution or its upholders. Equally must he hate everything but that is anti-revolutionary. So much the worse for him *if he has in the present world ties of relation, friendship or love. He is no revolutionist if these ties are able to arrest his arm.*

"15. The entire filthy society of our times should be divided into different categories. *The first one consists of those who are immediately sentenced to death.* The members may make up lists of such delinquents, in a degree according to their rascality, and in regard to the effect of the revolutionary work, but so that the first numbers may be served before the rest.

"16. In making up these lists, and arranging the categories, the individual corruptionist dare not justify himself, or perhaps the hatery by which he is feared, to the members of the organization or the people, because corruption is useful when it is able to stir up a riot. The measure of usefulness is only to be considered, which may result from the death of a certain person for revolutionary work. *In the first place, those persons are to be destroyed who are most harmful to the revolutionary organization, and whose violent and sudden death is able to terrify the governments and shake their might the most, in so far as it will rob the powers that be, of their most energetic and intelligent agents.* * * *

"21. The sixth category is of importance. It is the women, who are to be divided into three classes: To the first belong the perfunctorious women, without intellect or heart, who are to be used in the same manner as the men in the third and fourth categories. To the second class belong the passionate, devoted and qualified women, who, although they do not belong to us, because they have not risen to the practical, praiseless, revolutionary comprehension, they must be handled as the men in the fifth category. In the third category are the women who are wholly consecrated to the social revolu-

tion, — that is, they have accepted our whole programme. *They are to be regarded as the most valuable part of the revolutionary treasures, for without their assistance we are unable to achieve the social revolution.*"

*March 20, 1886.*—"Argument is no good unless based on force. You must be able to *make* your antagonist stand still and listen to your plea. When he refuses to do that, the use of force becomes a necessity."

*April 3, 1886.* — "American group," etc. "Mr. Parsons thought the organization of the vast body of unskilled and unorganized laboring men and women a necessity, in order that they formulate their demands and make an effective defence of their right. He thought the attempt to inaugurate the eight-hour system would break down the capitalistic system, and bring about such disorder and hardship that the social revolution would become a necessity. As all roads in ancient times led to Rome, so now all labor movements, of whatever character, inevitably lead to socialism." The unskilled laborers' eight-hour league was then organized, thirty joining.

*April 24, 1886.*—"Workingmen, to arms. War to the palace, peace to the cottage, and death to luxurious idleness. The wage system is the only cause of the world's misery.

"One pound of dynamite is better than a bushel of bullets. Make your demand for eight hours with weapons in your hands, to meet the capitalistic blood-hounds, police and militia in proper manner."

"Above hand-bill sent from Indianapolis, Indiana, as posted all over that city last week.".

*April 24, 1886.*—
"KNAVES OR FOOLS?

"In the contest now going on between labor and capital, the pretended leaders and official mouth-pieces of trades-unions and Knights of Labor assemblies are attempting to prevent

the toiling masses from using the best, most effective and only successful means against the predatory beasts which must be exterminated as public enemies, during strikes and boycotts,— our only weapons against capitalistic conspiracy, and organized murder, starvation and wage-slavery. These flunkies and lickspittles speculate on their chances of securing places at the public crib as influential agitators, or as foremen and 'sweaters' over their fellow-workers, or some other sinecure. Others are tickled by the praises of the capitalistic press, and by being quoted as representative reformers, in interviews, etc. These enemies of labor manage to get themselves elected to trades assemblies and other representative bodies of organized labor, where they play the role of harmonizers and peacemakers between the despoiled wage-slaves and their despoilers. The toiling masses never gave Mr. Powderly or any other man the authority to issue a proclamation against the enforcement of the eight-hour law from and after May 1, nor has he been empowered by any plebiscite to forbid strikes and boycotts, and to preach the harmony of capital and labor, as against the gospel of discontent. The Knights of Labor, trade unionists, and other working people, repudiate, by their action, the foolish talk of such men. *The social war has come, and whoever is not with us is against us.*"

The following is an extract from the "Anarchist:"

"Motto: All government we hate. Organ of the autonomous group of the I. A. A. Volume 1. Chicago, January 1, 1886. No. 1. Complaints should be sent to G. Engel, 286 Milwaukee avenue. Call.—Workingmen and fellows: We recognize it our duty to contend against existing rule, but he who would war successfully must equip himself with all implements adapted to destroy his opponents and secure victory. In consideration thereof we have resolved to publish the 'Anarchist,' as a line in the fight for the disinherited. It is necessary to disseminate anarchistic doctrine. As we strive for freedom from gov-

4—122 ILL.

ernment, we advocate the principle of autonomy, in this sense: We strive towards the overthrow of the existing order, that an end may be put to the 'abhorrent work of destruction on the part of mankind, and fratricide may be done away.' The equality of all, without distinction of race, color or nationality, is our fundamental principle, thus ending rule and servitude. We reject reformatory endeavors, as useless play, adding to the miserable derision and oppression of the workingmen. Against the never-to-be-satisfied ferocity of the capital, we recommend the radical means of the present age. All endeavors of the working classes, not aiming at the overthrow of existing conditions of ownership, and at complete self-government, are to us reactionary," etc.

During the years 1885 and 1886 the defendants Fielden, Parsons, Engel, Spies and Schwab made numerous speeches to the workingmen. Schwab and Spies were generally together on these occasions, and an address by one was generally followed by an address by the other. At a gathering of workingmen at Mueller's Hall, in the North Division, in June, 1885, Schwab said in German, that the gap between the rich and poor was growing wider; that, although despotism in Russia had endeavored to suppress nihilism, nihilism was still growing; that the death of Reinsdorf, a man then recently executed in Europe, had been avenged by the killing of the chief of police of Frankfort, who had been industrious in endeavoring to crush out socialism; that murder was forced on many a man through the misery brought on him by capital; that freedom in Illinois was unknown; that what was needed here was a bloody revolution, which would right their wrongs. The "Arbeiter Zeitung," in reporting this speech, quotes the concluding remark of Schwab as follows: "Because we know that the ruling class will never make any concessions, therefore *we have, once for all, severed our connection with it, and made all preparations for a revolution by force.*"

On February 15, 1886, Schwab made a speech at the Twelfth street Turner Hall, in regard to the London riots, which closed as follows: "We greet the London events as the announcement of the near approach of the social revolution."

At a mass meeting on the Lake Front on April 26, 1886, about a week before the Haymarket meeting, the defendant Schwab said: "To-day is Easter day. * * * The workingmen of Chicago to-day celebrate their resurrection. They are resurrected from their laziness,—from their indifference in which they have remained so long. * * * From the first of May we will work eight hours a day. The workingmen want this, and wanting it is having it, if the desire is based on power. The workingmen are powerful if they are united. * * * Therefore, also in future let us be a united, solid army. Unite with your unions! Never desert them! * * * *Everywhere police and murderers are employed to grind down workingmen. For every workingman who has died through the pistol of a deputy sheriff, let ten of those executioners fall. Arm yourselves. After the first of May, eight hours, and not a minute more.*"

Spies, in a speech at the Mueller Hall meeting, in June, 1885, advised the workingmen to revolt at once, and said, that he had been accused of giving this advice before, and that it was true, and that he was proud of it; that wage-slavery could only be abolished through powder and ball. He says that he was accused by a little paper to have called upon the workingmen to commit criminal acts. He conceded that, and repeated it again. What is crime, anyway? When the workingman was putting himself in the possession of the fruits of his labor, stolen from him, that was called a crime. A pseudo-opponent had remarked that he could bring about the emancipation of the working classes through the ballot. *This, however, was impossible. If the ballot had been of advantage to*

*the workingman, then Napoleon and Bismarck never would have given the franchise to the people.* The ballot was serving only for the covering over of capitalistic tyranny and highway robbery. The speaker pointed out the miserable condition the coal-diggers in the Hocking Valley had gotten into, and in conclusion he gave his hearers the advice to frequently visit the meetings of the International Workingmen's Association, and to read the organs of the workingmen for the purpose of informing themselves.

At a meeting at Twelfth street Turner Hall, on October 11, 1885:

"Mr. August Spies was introduced at this point, and offered the following resolution:

"WHEREAS, a general move has been started among the organized wage-workers of this country for the establishment of an eight-hour work day, to begin May 1, 1886; and

"WHEREAS, it is to be expected that the class of professional idlers,—the governing class, who prey upon the bones and marrow of the useful members of society,—will resist this attempt by calling to their assistance the Pinkertons, the police and State militia: Therefore, be it

"*Resolved*, That we urge upon all wage-workers the necessity of procuring arms before the inauguration of the proposed eight-hour strike, in order to be in a position of meeting our foe with his own argument—force.

"*Resolved*, That while we are skeptical in regard to the benefits that will accrue to the wage-workers in the introduction of an eight-hour work day, we nevertheless pledge ourselves to aid and assist our brethren in this vast struggle with all that lies in our power, as long as they show an open and defiant front to our common enemy, the labor-devouring classes of aristocratic vagabonds, the brutal murderers of our comrades in St. Louis, Lemont, Chicago, Philadelphia and other places. Our war-cry may be, 'Death to the enemy of the human race— our despoilers.'

"August Spies supposed that Mr. ———— did not like the terms in which members of the government were referred to. The reason of this was, that Mr. ———— was one of those political vagabonds himself. There were nine millions of people engaged in industrial trades in this country. There were but one million of them as yet organized, while there were two millions of them unemployed. *To make a movement in which they were engaged a successful one, it must be a revolutionary one.* Don't let us, he exclaimed, forget the most forcible argument of all,—the gun and dynamite."

At a meeting on the Lake Front, in July, 1885, the defendant Parsons made a speech. "He was speaking in a general way about trouble with the workingmen and the people, what he called the proletariat class, and *spoke about their enemies, as he termed them,—the police and the constituted authorities. He said that they were their enemies, and that they would use force against them. The authorities would use the police and the militia, and they would have to use force against them. He advised them to purchase rifles. If they hadn't money enough to buy rifles, to buy pistols; and if they couldn't buy pistols, they could buy sufficient dynamite for twenty-five cents to blow up a building the size of the Pullman building, and pointed to it.*"

At another meeting, in the same month, at the same place: "After the picnic *Mr. Parsons—I won't be sure of that—spoke about a young German experimenting with dynamite at this picnic. He had dynamite in a can, a tomato can, and spoke of how the thing was thrown into a pond, or lake, and how much execution could be done with that amount of dynamite. He also spoke of what could be done with it in destroying buildings and property in the city.*"

At a meeting in Market square, in April, 1885, the defendant Parsons made a speech to a company of workingmen, in which he said: "It is no use of arguing,—we will never gain

anything by argument and words. *The only way to convince these capitalists and robbers is to use the gun and dynamite."*

At a meeting at Baum's Pavilion, on February 22, 1885, Parsons said, in a speech: "I want you all to unite together and throw off the yoke. We need no president; no congressmen, no police, no militia and no judges. They are all leeches, sucking the blood of the poor, who have to support them all by their labor. *I say to you, rise, one and all, and let us exterminate them all. Woe to the police or the militia whom they send against us."*

At a meeting in April, 1885, of workingmen, for the purpose of denouncing the new board of trade, the defendant Parsons spoke as follows:

"The present social system makes private property, of the means of labor and the resources of life, capital; and thereby creates classes and inequalities, conferring upon the holders of property the power to live upon the labor product of the propertyless. Whoever owns our bread owns our ballots, for a man who must sell his labor or starve, must sell his vote when the same alternative is presented. The inequalities of our social system, its classes, its privileges, its enforced poverty and misery, arise out of the institution of private property, and so long as this system prevails, our wives and children will be driven to toil, while their fathers and brothers are thrown into enforced idleness, and the men of the board of trade, and all other profitmongers and legalized gamblers, who live by fleecing the people, will continue to accumulate millions at the expense of their helpless victims. This grand conspiracy against our liberty and lives is maintained and upheld by statute law and the constitution, and enforced by the military arms of the State. *If we would achieve our liberation from economic bondage, and acquire our natural right to life and liberty, every man must lay by a part of his wages, buy a Colt's navy revolver, (cheers, and 'That's what we want,')*

a Winchester rifle, (a voice, 'And ten pounds of dynamite! we will make it ourselves,') and learn how to make and use dynamite. (Cheers.) Then raise the flag of rebellion, (cries of 'Bravo,' and cheers,) the scarlet banner of liberty, fraternity, equality, and strike down to the earth every tyrant that lives upon this globe. (Cheers, and cries of 'Vive la Commune.') Tyrants have no rights which we should respect. Until this is done you will continue to be robbed, to be plundered, to be at the mercy of the privileged few. Therefore, agitate for the purpose of organization, organize for the purpose of rebellion, for wage-slaves have nothing to lose but their chains. They have a world of freedom and happiness to win. (Cheers.)"

At a meeting in Greif's Hall, in August, 1885, referring to the late street car strike, the defendant Parsons made a speech, in which he said: "*If but one shot had been fired and Bonfield had happened to be shot, the whole city would have been deluged in blood, and the social revolution would have been inaugurated.*"

At a meeting at Greif's Hall, on March 29, 1885, *Fielden* said that a few explosions in the city of Chicago would help the cause considerably. "There is the new board of trade,—a roost of thieves and robbers. *We ought to commence by blowing that up.*"

At another meeting, at the same place, Fielden said: "*It is a blessing that something has been discovered wherewith the workingman can fight the police and the militia with the Gatling guns.*"

At a meeting held at Ogden's Grove, June 7, 1885, Fielden said: "*I want all to organize. Every workingman in Chicago ought to belong to our organization. It is of no use to go and beg of our masters to give us more wages or better times. When I say organize, I mean for you to use force. It is of no use for*

*the working people to hope to gain anything by means of the ordinary weapons. Every one of you must learn the use of dynamite, for that is the power with which we hope to gain our rights.*"

In the fall of 1885, the defendant Fielden addressed a crowd on the Lake Front, in which he stated "*that the workingmen, the laborers, were justified in using force to obtain that which was theirs, and which was withheld from them by the rich.* That our present social system was not proper,—that an equality of possession should exist; and if the rich kept on withholding from the poor what was justly due to the poor, because they had earned it, *they should use force and violence. That force should be used against the rich, the wealthy, and the men who had means. That the existing order of society should be destroyed—annihilated—and as no other redress could be had peaceably, they were justified in using force and violence.*"

At a meeting of the American group, on the 2d of September, 1885, Fielden, in a speech, said: "It is useless for you to suppose that you can ever obtain anything in any other way than by force. You must arm yourselves, and prepare for the coming revolution."

At a public meeting, held in Twelfth street Turner Hall October 11, 1885, Fielden said: "The eight-hour law will be of no benefit to the workingman. *You must all organize and use force. You must crush out the present government, as by force is the only way in which you better your present condition.*"

On the 20th of December, at the same place, *Fielden said:* "All the crowned heads of Europe are trembling at the very name of Socialism, *and I hope soon to see a few Liskas (the man who murdered the chief of police of Frankfort and was hanged for it) in the United States, to put out of the way a few of the tools of capital.*"

At a meeting at 106 Randolph street, on January 14, 1886, Fielden made a speech, in which he said: "It is quite true that we have lots of explosives and dynamite in our possession, and we will not hesitate to use it when the proper time comes. We care nothing either for the military or police, for these are in the pay of the capitalist."

On March 12, 1886, Fielden made a speech at Zepf's Hall, at the corner of West Randolph and Desplaines streets, in which he said: "We are told that we must attain our ends and aims by obeying law and order. Damn law and order! We have obeyed law and order long enough. The time has come for you, men, to strangle the law, or the law will strangle you."

At a meeting at the Twelfth street Turner Hall, the defendant Fielden, in a speech, said: "*The first of May will be our time to strike the blow, there are so many strikes, and there will be fifty thousand men out of work—that is to say, if the eight-hour law is a failure*—if the eight-hour movement is a failure."

Henry Weinecke, a police officer, testified that some time in February, 1886, before he came on the police force, he heard the defendant *Engel*, at Timmerhoff's Hall, 703 Milwaukee avenue, address a meeting. The witness said: "I was standing in the door,—the door that goes in the hall from the saloon. I heard him *talking about buying revolvers for the police. He advised everybody—'every man wants to join them, to save up three or four dollars to buy revolvers to shoot every policeman down.' He says he wants every workingman whom he could get, to join them, and then advise everybody you know— you save up three or four dollars to buy a revolver that was good enough for shooting policemen down, he said."* The witness further stated that the hall at that meeting was crowded, and Engel spoke in German.

Gustav Lehmann, a socialist, and a member of the Lehr und Wehr Verein, testifies that in January or February of this year, (1886) he heard the defendant *Engel* make a speech at Neff's Hall, 58 Clybourne avenue, before the assembly of workmen of the North Side, in which he *said* that *those who could not arm themselves, and who could not buy revolvers, should buy dynamite, that it was very cheap, and easily handled,* and *gave a general description of how bombs could be made,—how gas-pipes could be filled; that a gas-pipe was to be taken and a wooden block put into the end, and it was to be filled with dynamite; then the other end is also closed up with a wooden block, and old nails are tied around the pipe by means of wire;* then a hole is bored into one end of it, and a fuse with a cap is put into that hole; that the nails should be tightened to the pipe, so that when it explodes there will be many pieces flying around; that gas-pipe could be found on the west side from the river, near the bridge.

William Seliger, a member of the "International," testified that he heard Engel, one of the defendants, make a speech to the North Side group, in Neff's Hall, last winter, in which he said that every one should manufacture bombs for themselves; that pipes could be found everywhere, without any cost; that the pipes were to be closed up with wooden blocks, fore and aft, and that in one of the blocks was to be drilled a hole for the fuse and cap; that every workingman should arm himself with them; that they were cheap to be had, and were the best means against the police and capitalist.

Moritz Neff, who was the keeper of the hall known as "Thoeringer Hall," sometimes called "The Shanty of the Communists," and also called "Neff's Hall," testified that he heard Engel address a public meeting of the North Side group, at that place; that he addressed the meeting on general principles, and came, around and wanted money for a new paper which they had started. It is called the "Anarchist." "It

is a paper started by the North-west Side group and two of the South Side groups. He came there for the purpose of obtaining money in order to push the paper along. He said that the 'Arbeiter Zeitung' was not outspoken enough in those anarchistic principles; therefore, it was necessary to start something else, and for this purpose they started this paper. They distributed some of these papers around there, and after that he sat down. Later on he spoke again, and he gave a kind of history of revolutions in the old country, and stated that the nobility of France were only forced to give up their privileges by brute force; and then he stated that the slaveholders at the South had only liberated their slaves after being compelled by force by the Northern States, and therefore, he said, that the present wage-slavery would only be done away with by force also; and he advised them to arm themselves, and if guns were two dear for them, they should use cheaper means,—dynamite, or anything they could get hold of, to fight the enemy. He stated that in order to make bombs it was not necessary that they should be round; anything that was hollow inside would,—in the shape of gas-pipes, or something like that. * * * This was in the speech that he made. He sat down afterwards. It was customary to have a discussion after the speech was made, and anybody that wanted to ask the speaker a question could do so. That part of the speech I did not hear. I was in the saloon."

The following is a substantial abstract of the contents of Herr Most's book:

"Science of Revolutionary War.—Manual for instruction in the use and preparation of nitro-glycerine, dynamite, gun-cotton, fulminating mercury, bombs, fuses, poisons, etc., etc. By Johann Most, New York. Printed and published by the Internationale Zeitung Verein, (International News Co.) 167 William street.

The substance of this treatise is as follows:

About the importance of modern explosives for the social revolution, present and future, nothing need be said. They will form a decisive element in the next epoch of the world's history. It is, therefore, natural that the revolutionists of all countries should be anxious to obtain these explosives, and learn to apply them practically. Too much time has been wasted, books are expensive, etc. Even explanations of learned treatises are unavailing. Persons attempting to experiment according to the instructions, met with results not encouraging. The matter was expensive, dangerous, etc.

Some, under experiment, have produced tolerable gun-cotton, and small quantities of nitro-glycerine converted into dynamite. But this was of small value, as with small quantities of dynamite little can be done, and it is expensive. For manufacture of dynamite on a large scale, an expensive outfit is required, and separate quarters. A private dwelling can not be used. Such a laboratory must be kept in a secluded spot, because of the stench, which would lead to discovery and ejection. We have not, however, abandoned experiments, but concluded that dynamite can not be successfully supplied by private manufacture, but must be obtained from professional manufacturers. Not an ounce of dynamite heretofore used has been manufactured by revolutionists, but obtained by them. Watchmen can not prevent the securing of a supply. Beside, it is now an article of commerce for many purposes, so that its obtainment can not be prevented. The purchase is easier and cheaper than private manufacture, and for this money is required. Dynamite factories may be confiscated. The purpose of this treatise is to publish the simplest methods for the manufacture of explosives, and to explain their use and effect. In this direction many mistakes have been made, attributable to ignorance. Dynamite may be exploded by a spark of fire, but it is not so usually, for when brought in contact with the flame, it

usually burns without causing further effects. It is exploded by shock, and therefore must be handled carefully; explodes easier when frozen than not, and freezes a few degrees above zero, Reaumer. It will stand a high degree of heat without exploding. Moisture has no effect upon it, as the principal ingredient, nitro-glycerine, is greasy. The simplest and surest way to explode dynamite, is in the application of blasting cartridges, obtainable in all large houses dealing in blasting or shooting utensils. (Description of the cartridge given.) In important undertakings procure best quality of fuse, which looks like common twine, which should be guarded against moisture, by being soaked in tallow or tar, or incased in rubber. When explosion is desired from a distance, a wire and electric battery are preferable, but if only a few minutes are desired to get away, six or eight inches of fuse will answer, attached to a piece of touchwood. For a bomb only so much fuse required as can burn in the interval of throwing—six or eight inches is enough, determinable by experiment. To explode dynamite by fuse and percussion cartridge, the bomb or other vessel should be inclosed on all sides, with an opening through which the blasting cartridge may be introduced. The cartridge should reach into the explosive material, two-thirds of its length, but not let the fuse touch, for the fuse might set fire to the dynamite, and it might escape in flame through the orifice. When the fuse burns to the cartridge, it explodes the latter, and that, the dynamite. The fulminating cap should be tightly squeezed into the petard, to avoid dislocation. Before introducing the fuse into the cap, cut it off to make a fresh end. In important undertakings, the greatest care is advisable. The fulminating mercury rests loosely, and may fall out of the cartridge, which should therefore be examined before being used. The same rules obtain as to nitro-glycerine, but the latter is a more powerful explosive than dynamite, the latter consisting of seventy-five to eighty per cent of nitro-glycerine, and twenty to twenty-five per cent

of charcoal, sawdust, or other proper material. On account of its rapidity, the greatest force of a dynamite explosion is in the direction where it meets the greatest resistance. No very heavy or very strong cylinder should be used to demolish a wall, but a simple tin can is preferable. But where dynamite is proposed to be exploded among a number of persons, the stronger the shell "the more splendid are the results."

The best shape for a bomb is globular, as furnishing equal resistance, and producing the same explosive effect in all directions. Iron shells are the best, obtainable in a foundry. Zinc globes are not to be despised, and can be privately manufactured; but the latter requires obtaining a brass mould from a trustworthy expert. With such a mould, fifty semi-globes of moderate size can be manufactured in a day, and these can be soldered together. Every bomb must have an opening, about three-quarters of an inch, through which to fill, provided with a screw top, to be put in after the filling is done, with a hole bored through the top, large enough to pass a detonating cap, which is connected with the fuse. After the bomb is filled with dynamite, it is screwed together, and then the fuse can be lighted and the bomb thrown. "A trial of such a bomb has had a most excellent result."

A zinc globe, four inches in diameter, filled with dynamite, was experimented with. The explosion was like a cannon shot, bursting a large flagstone into twenty pieces, scattering them ten to fifteen feet, making a hole two feet in the ground, and at thirty to forty feet distance, pieces of the shell were found, about the size of a revolver ball, and very ragged. If this bomb had been placed under the table of a gluttonous dinner party, or if it had been thrown, through a window, onto the table, what a beautiful effect it would have had.

Another method: A piece of gas or water-pipe, a few inches long. Cut a screw on each end, and cover with a screw cap, and for explosion, proceed as with the other bomb. Such missiles are easily manufactured, cheap, and against a crowd.

must produce brilliant effects. No certainty of one bomb being successful,—may result only in broken windows, etc. Any ordinary house will resist such explosions, and in operating against houses, a different method must be pursued. Percussion primer bombs can be provided by making pyramid or other shaped shells, with a percussion cap on each side, so that when thrown, whichever side strikes will explode the cap; but these, if falling in soft ground, are ineffective. The cap must be secured tightly, so as not to fall off, and the detonating chamber closed at its bottom with fulminating mercury, and the space being filled with fine gunpowder,— a second explosive cap being placed at the bottom of the vent in the dynamite, which is to be used preferably. A bomb filled with fulminating mercury would have to have a very strong shell to be effective, and filling a bomb with fulminating mercury is dangerous, and the fulminate is more expensive than dynamite. Besides all which, the primer bombs described are more expensive and difficult of construction than a globular bomb. We are of opinion that the fuse construction (with detonating chamber) is more practical and reliable. The best construction for a bomb that will explode by concussion, is one in which is inserted a small glass tube, slightly bent, closed at each end by melting, and then inserted in a shell, so that the ends of the tube meet the opposite sides of the chamber. Around this inner tube is placed another tube full of a mixture of chlorate of potash and sugar, and around this combined tube the chamber is filled with dynamite, and the shell closed. When this bomb is thrown, the concussion breaks the glass tube, the sulphuric acid ignites the potash mixture, and the result is an explosion of the dynamite. In practical use, the power of dynamite is illustrated in mining blasts, etc., small quantities producing wonderful results, which are dependent upon the confinement of the dynamite. In attacking buildings, unless the dynamite can be introduced into the chimneys or other orifices, considerable

quantity must be used to shake the building or bring it down. For ordinary buildings, nothing less than ten pounds will do, and for massive buildings, barracks, churches, etc., forty or fifty pounds may be required, and even then will not be effective unless skillfully placed. The explosive should be placed under or within a foundation, or close to the main wall, just above the ground, but not packed in a shell,—simply in tin cylinders, the length of the cylinder being proportionate to the breadth of the breach desired. Care must be taken not to break the fuse. Waterproof fuse may be had ready made.

Following are results of experiments by the War Department of Austria: Four pounds of dynamite, in a tin box, made a hole two feet by eighteen inches, in a one-foot brick wall; seven pounds made a hole thirteen by fifteen inches, in a two-foot brick wall; twenty-seven pounds made a hole fifteen feet square in a three-foot brick wall; forty-three pounds knocked down a brick wall three and a half feet thick. Good results were obtained by loading down the dynamite with sandbags of earth,—two pounds at the bottom of a wall, sunk in the earth and covered with a foot and a half of ground, shaking down seven feet of a wall eighteen inches thick; fourteen pounds of dynamite in two tin cylinders, each two feet long and three inches in diameter, made a breach in a wall six and one-half feet wide and seven feet high. In a foundation of a four-foot brick wall, three holes were dug, eight feet apart, and seven and one-half feet deep, and six pounds of dynamite, in a tin box, placed in each hole, and exploded simultaneously by electricity. The result was the demolition of the wall for a distance of twenty-five feet. As compared with dynamite, sixty pounds of gunpowder in tin boxes, exploded against a stone wall, produced no other effect than to blacken it, the damage to the wall being eight to ten times less, even when confined, than in the case of dynamite. In case of war, the destruction of bridges, etc., is important, and here, dynamite has been especially effective.

As examples : Two pounds of dynamite in a tin box, exploded on a wrought iron plate two inches thick, tore a hole through the plate; twenty-six pounds of dynamite, in eight tin boxes, laid one on another, destroyed an iron single-track railroad bridge, pipe construction, securely built; seven pounds of dynamite, exploded near a railroad track, threw off one rail and splintered the second, destroying the nearest tie. A train following immediately, (perhaps imperial special,) might have "gone to the .devil." Other experiments also mentioned.

To thaw dynamite, which freezes very easily, the best plan is to put the dynamite in a waterproof vessel into a larger one containing water. Frozen dynamite is dangerous when ignited, and may fail to explode if special pains are not taken. Failures should be avoided in revolutionary movements. It is cheapest to buy explosives, or confiscate them; but instruction given for manufacture, avoiding technical terms. Advises processes which we have tried successfully, the principles of operation resting on the method discovered by Ditmar, the New York dynamite manufacturer, but simpler.

To manufacture dynamite, there are mixed, first, two parts sulphuric acid with one of nitric acid; second, there is added one-eighth of the whole quantity of glycerine. Scientists have overstated the dangers of this manufacture, with the result, that on the part of revolutionists less nitro-glycerine has been manufactured than would otherwise have been. Sulphuric acid of at least forty-five degrees can be had of any wholesale druggist, in nine-pound bottles; nitric acid of at least sixty-six degrees, in seven-pound bottles. To eighteen pounds of sulphuric acid you need nine pounds of nitric acid and three and one-half pounds of glycerine. Mixing can be done in an iron pot, enameled, or in any porcelain or glazed vessel. In an outer vessel pour water till it reaches three-fourths of the height of the inner vessel, kept cold by the use of ice. Put the sulphuric acid into the inner vessel; add half the quantity of nitric acid, stirring with a glass rod, and pouring in

5—122 ILL.

slowly. To get rid of the offensive and unhealthy fumes, cover the mouth and the nose by a handkerchief, keep the windows open, and mix near or under an open flue. When the mixture is completed, cover with a piece of glass, and leave for fifteen to twenty minutes to cool off, the mixture causing a high degree of heat; then add the glycerine, stirring briskly with the glass rod while pouring. If yellowish-red fumes arise, indicating conflagration, stop pouring the glycerine, and stir more briskly, and afterwards resume the addition of the glycerine. After completing the mixture, stir for ten minutes or so; then lift out the inner vessel, containing the mixture, and pour it into the water in the outer vessel, slowly. A yellowish oil will settle to the bottom, which is nitro-glycerine. After some time, pour off the water. Then pour the nitro-glycerine, for further purification, into a bowl filled with good soda lye, stirring briskly, so as to cause all of the nitro-glycerine to come in contact with the lye; let settle and pour off the lye, when the nitro-glycerine can be bottled. Nitro-glycerine, in a natural state, being dangerous from concussion, it is desirable to manufacture the dynamite at once. To do this, take sawdust or pulverized charcoal, or a mixture equal parts powder, sugar, dust of saltpetre and wood pulp; put this material into a vessel, and pour on the nitro-glycerine, kneading it with a wooden ladle, to the consistency of a thick dough; pack in oil paper or tin boxes. Long-continued handling of dynamite with the bare hands, produces severe headache.

Gun-cotton is also an explosive, not much inferior to dynamite. To prepare it, take unglued cotton wadding, boil in soda lye, dry carefully, either in the air or upon hot iron plates or bricks. The cotton is then dipped in the mixture of acids (sulphuric and nitric,) and after being left until thoroughly saturated, is taken out, squeezed dry, but not with the hands, and is then put in a vessel with soda lye; after fifteen minutes again taken and squeezed out, which may be done with

the hand, and which is repeated two or three times, but each time in new warm water. Then the wadding must be dried by atmosphere,—not by hot material. It is not extensively used, because it ignites in warm sunshine. Use immediately after manufacture, or keep in water until required; and then dry and use. Unconfined gun-cotton burns without explosion, but is explosive when placed in cylindrical bombs and rammed in securely. It can be exploded by fire without concussion. It is not to be despised, because it is more easily manufactured than dynamite, and has an innocent appearance.

Gun-cotton saturated with nitro-glycerine results in nitro-gelatine, incredibly explosive, and far superior to dynamite; but its keeping on hand is dangerous, and the mixture should therefore immediately precede its contemplated use.

Near Washington the following experiment was recently made: By a dynamite gun, bombs were thrown containing eleven pounds of nitro-gelatine, two thousand feet against solid rock. One bomb tore a hole six feet deep and twenty-five feet in diameter in the rock, and ten tons of rock were cut loose and thrown in all directions, while stones from ten to twelve pounds were carried about half a mile. The spectators, nearly all military men from foreign countries, concurred that an ordinary vessel would be destroyed by the explosion of a single such bomb, while an ironclad receiving it in the side would thereby be disabled. Revolutionists can not manufacture dynamite cannon, (which are about forty feet long,) but they can make bombs and use ordinary slings. "That which reduces what had been solid rocks into splinters, may not have a bad effect in a court, or monopolists' ball room."

Fulminate of mercury is a powerful explosive, consisting of mercury, sulphuric acid and alcohol, equal weights, which must be mixed in a clean, glazed vessel, in cold water or ice, the mercury being first put into the vessel and the rest stirred in slowly, the acid being added first, and enough of it to se-

cure the entire solution of the mercury; pour in the alcohol after cooling. The product, a gray substance, is then spread on tissue paper to dry, and a little potash is added to reduce the danger of explosion. It explodes at a temperature of 150 degrees. Silver may be substituted for mercury, giving a better product, but more expensive. Experimenting should be done with very small quantities, to begin with. Fulminate of mercury explodes under a spark, as, for instance, a gun cap and bombs charged with this explosive, explode by concussion, simply. In filling a bomb, great care must be taken, as no ramming or concussion is allowed, and the filling is therefore better done while the mixture is moist, and when it will settle into shape; but in this event the shell must be left open until completely dry. In closing the shell, care must be taken not to cause any spark or ignition, which would be followed by an explosion. In modern wars they do not confine themselves to explosives and weapons of any particular description, but are aimed to weaken the enemy by all means possible.

A particularly effective weapon is fire. For example, in Moscow, against Napoleon, and by the Prussians in France in 1870-71. Therefore, in a list of revolutionary war utensils the article serviceable for incendiary purposes must not be omitted. A very effective mixture is of phosphorus and bisulphide of carbon. Buy yellow phosphor, (which is always kept under water, and must never be touched with the bare hands, but taken from the containing bottle with a fork or stick,) put in a porcelain bowl full of water, and cut into portions about the size of a bean, under water. The phosphor must be kept in a bottle with a glass stopper, fitting air-tight. Fill a bottle with bi-sulphide of carbon, drop in the phosphor quickly, and close, then shake slowly until dissolved. The fluid is then ready for use, and if poured on rags will result in spontaneous combustion, after a time. Petroleum added, retards the combustible action, and may be used when one

desires to make good his escape. Experiments with this mixture were made in France by detectives.

Another incendiary article is thus constructed : Take a tin fruit jar, remove the cover; cut a hole in the center of the cover, into which insert a medicine glass; then resolder the cover; pour in benzine; fill the medicine glass with gunpowder, and close with a stopper, passing a fuse through the stopper; light the fuse; the result is, after a time, the explosion of the powder, bursting the can and scattering the benzine blazing in every direction. A hundred men equipped with such implements, scattered through a city, could achieve more than twenty batteries of artillery, and the thing is easily made, and cheap.

There may be cases in which the revolutionist must abandon shelter, and sacrifice his own life in the warfare against the property-owning beast of society; but no revolutionist should unnecessarily endanger his own life. An unknown danger is the more terrible. Therefore, revolutionists should act singly, or in as small numbers as possible.

Owing to the failure of various attacks, the idea has been suggested to poison weapons used for assault; but this idea has never been carried out, owing to the expense and difficulty of procuring suitable poisons. The best substance for poisoning arms is curari, used by the South American Indians on their arrows. It is absolutely fatal, but is high-priced. A dagger red-hot, and hardened, in a decoction of rose laurel, is fatal. Pulverized phosphor, mixed with gum-arabic, and applied to the weapon, is also fatal. So with verdigris. So as to cadaver poison and prussic acid. But poisons must always be prepared immediately before use, as they dissolve in the atmosphere and become innocuous.

The successful arming of the people can not be achieved by one definite procedure, but by utilizing all different circumstances. The best thing would be for organized workingmen throughout the civilized world to provide themselves with

muskets and ammunition, and to thoroughly drill; but this is almost impossible, as the authorities would interfere with them, and throughout Europe even the purchase of weapons by the common people is made difficult, while secret purchase subjects to the charge of "constructive treason." In America every one has the constitutional right to arm, but the carrying of concealed weapons is prohibited, while, if carried openly, that also would soon be prohibited. That is not all. Hardly had a military organization been effected in Illinois, when the legislature passed a law allowing to march and drill, only the State organizations. A litigation has resulted, which is as yet undetermined. There is evidenced also among legislators, a disposition to prohibit dynamite, except for industrial purposes and national defence. The workingmen of America can not arm themselves unless they do it soon. If they arm themselves at once,—well. If not, it will soon be difficult or impossible, and "you will find yourselves defenceless and powerless in the face of a mob of murderers in uniform, armed to the teeth." The price of a watch would buy a fine breech-loader. We do not take much stock in the arming of organizations for several reasons, among others, that it will cause a great pressure upon those who are unwilling to join, which is in violation of the anarchistic principle, and dangerous to the existence of the organization. Besides which, it would involve great financial sacrifice to those who prefer to do nothing for the cause. Labor organizations should therefore content themselves with allowing arming by those who desire to do so. They may buy arms at wholesale, and retail to those who wish to purchase, on the installment plan, if necessary, at cost, thus saving expense, without trenching upon the assets of the society. Muskets are not the only desirable weapons. Good revolvers, daggers, poisons and firebrands are destined to be of immense service during a revolution. The modern explosives deserve attention first of all. Quantities of nitro-glycerine

and dynamite, numerous hand grenades and blasting cartridges, should be at the disposal of the revolutionists, these things acting as the proletariats' substitute for artillery. These are particularly recommended to European revolutionists, as they can not buy rifles. "Taken all in all, our motto is: Proletarians of all countries, arm yourselves, arm yourselves, no matter what may happen. The hour of battle draws near."

Certain precautions should be adopted by the revolutionist if he wishes to address an associate in writing. He should use a fictitious address, which should be frequently changed, and its contents ought to be shaped with a view to the possibility of its falling into the wrong hand. He should never mention the true name of his confederates. Initials or nicknames are preferable. There should never be a communication, even to a comrade, of a fact which it is not necessary for him to know. Your right name should never be signed. The use of a cipher is not desirable, because it is a suspicious method and is very liable to detection. If used at all, the key to the cipher should be communicated only to one confederate. "All letters received, which bear secrets, should always be burned immediately after reading." Revolutionists should never retain things which would lead to detection, and should always be on guard against detectives and police. Neither through friendship, love or family ties should you talk unnecessarily. These rules apply particularly "to all enterprises that are directed against the prevailing disorder and its laws." If a revolutionary deed is proposed, it should not be talked about, but silently pursued. If assistance is indispensable, it may be chosen, but a misstep in this is fatal. The society of suspected persons should be carefully avoided, thus spies would be rendered harmless. Self-composure in arrest is essential. Only when the arrest can be successfully resisted should there be resort to it, or when it becomes a question of life and death. But if you are sure that the arrest is on suspicion, you protest energetically and submit

quietly. To examinations by a judge, the revolutionist should submit only so far as he can prove an alibi. Admit nothing except what is proven. If all means of deliverance are exhausted, then the prisoner should defend his deed from the standpoint of the revolutionist and anarchist, and convert the defendant's seat into a speaker's stand. Shield your person as long as possible, but when you are irredeemably lost, use your respite for the propagation of your principles. We thus speak because we observe that even expert revolutionists violate its plainest rules.

## *Appendix.*

We have received, from a layman, an essay presenting another means of preparing fulminate of mercury, which essay reads as follows : Use an ordinary retort; to precipitate the fumes, put the neck of the retort in water, put in five grains of mercury and fifty grains of nitric acid; after this has cooled, add sixty grains of best alcohol in small quantities, shaking the retort well while mixing; upon the neck of the retort put an india rubber tube, thirty or forty centimeters long, passing through a vessel filled with water; light an alcohol flame under the retort until the mixture begins to boil; the fulminate of mercury crystallizes; pour off the liquid residue; refine the fulminate in cold water several times, and then boil the water; spread on tissue paper to dry, in a high temperature; then close carefully to prevent absorbing moisture. Thus writes our correspondent.

As a substitute for a blasting cartridge, where the latter can not be conveniently obtained, cut a piece off the closed end of a metal penholder, say an inch and a half long, and fill this with the caps ordinarily used for toy pistols, stuffing them in, then add a fuse, and the cartridge is ready for use.

Pulverized seeds of stramonium, baked in almond or other cake, furnish an effective poison to be used against a spy, informer, minion of the law, or other scoundrel.

Invisible ink is recommended for revolutionary correspondence. To mislead spies, write an ordinary letter, and then write with the invisible ink between the lines, or on the reverse pages, or send an old book and write on the blank pages, or write on the inside of paper wrappers. There are invisible inks which are developed by heat, but these are not recommended, as heat is always applied to suspicious correspondence, by the detectives. The chemical is preferable. If you write with nitrate of cobalt (invisible,) it becomes bluish if you spread oxalate of potash over it. Nitrate of copper made legible by spreading cyanide of potassium on. And so, if written with hydro-chlorate. There are still other methods, but enough has been suggested.

We speak now of Sprengel's acid and neutral explosives. Sprengel has found that hydro-carbons, mixed with vehicles, can be exploded by a cap, like dynamite. For instance, equal parts of carbolic acid, dissolved in nitric acid, gives an explosive. By the solution of carbolic in nitric acid, picric acid is produced; in the mixture, heating takes place, which should be cooled off. Mix the picric acid with nitric acid, and an explosive as strong as nitro-glycerine is produced, the proportions being 58.3 of picric acid to 41.7 of nitric acid. If, instead of carbolic acid, benzine is used, the result is nitrobenzole. Add nitric acid in the proportion of 71.92 to 28.08 nitric benzole, and you have an explosive. These various liquids can be utilized by absorbing them into chlorate of potash, moulded into suitable shapes, which can be exploded ordinarily by a percussion cap; but these preparations are not as handy as dynamite, and can be used only in glass, stone or iron shells, other shells being affected by the acid, but they are easier to produce than nitro-glycerine.

Prussic acid may be prepared as follows: Take thirty grains yellow prussiate of potash, twenty grains sulphuric acid, and forty grains of water; heat the mixture in a retort, and catch the fumes in a well-cooled receiver. It is desirable that the

receiver should be bent, and furnished with water in its lower portion, through which the fumes must pass, thus aiding condensation. There must be a hollow globe to receive the accumulating prussic acid. It is very volatile, and, upon drying up, no poisonous substance remains. Avoid the escaping fumes. Proceed under a well-ventilated flue. Prussic acid is not useful for poisoning arms, but is for liquors,—looks like water, and smells and tastes like bitter almonds. May be preserved in the dark for a long time.

For combustion, we add the following suggestion: Take blotting paper, saturate it with the phosphor dissolved in carbon, as published recently in the "Freiheit," and put it in an unclosed envelope, with pulverized chlorate of potash. Close the letter, and in about a quarter of an hour, upon opening it, an explosion and intense blaze will ensue. These letters can be carried around and dropped, and be carried safely in an air-tight tin box. For large buildings, such as courts, etc., put the phosphor in a small box, that can be carried in the overcoat pocket, filling the lower part with tar, and the upper part with shavings, saturate with prepared phosphor, and add potash, nail on a lid carefully, bore a few holes to let in the air, and in the course of three or four hours an explosion will follow, and a fire.

Phosphor may be used as a fuse for dynamite, keeping it from the air until the box of dynamite is placed in the proper position, then raise the lid, letting the air to the fuse, and in due time an explosion will follow.

Platform International Association of Workingmen, published in the "Arbeiter Zeitung" during February, March and April, 1886:

The Declaration of Independence declares when a long train of abuses and usurpation, pursuing invariably the same object, evinces a design to reduce them (the people) under absolute despotism, it is their right,—it is their duty,—to

·throw off such government, and to provide new guards for their future security.   Are we not too much governed, and is it not the time to practice this·thought of Jefferson?   Is our government anything but a conspiracy of the privileged classes against the people?   Fellow-laborers, read the following declaration, which we issue in your interest, for humanity and progress :

The present order of society is based upon the spoliation of the non-property by the property owners.   The capitalists buy the labor of the poor for wages, at the mere cost of living, taking all the surplus of labor.   By machinery constantly reducing the volume of human labor, produces constantly increasing quantities of goods, whereby the competition of labor is increasing, and its price being reduced.   Thus, while the poor are increasingly deprived the opportunities of advancement, the rich grow richer through increasing robbery. Only by rare and accidental opportunities can the poor become rich; ˙ avarice increases with wealth, and capitalists compete for the spoliation of the masses   In this struggle, the moderately wealthy succumb, while monopolists flourish, concentrating in their hands entire branches of industry, trade and commerce   Industrial and commercial crises follow, which force the wretchedness of the non-property owners to the highest point.   Statistics of the United States show, that after deducting raw material, interest on capital, etc., property-owners claim five-eighths, and allow to the laborers but three-eighths of the residue.   The result of the present system is recurring over-production, while the increasing elimination of labor from the process of production brings the impoverishment of an increasing percentage on non-property owners, "who are driven into crime, vagabondage, prostitution, suicide, starvation and manifold ruin.   This system is unjust, insane and murderous."   Therefore, those who suffer under it, and do not wish to be responsible for its continuance, ought to strive for its destruction by all means and with their

utmost energy. "In its place is to be put the true order of society. This can be brought about only when all instruments of property,—all capital produced by labor,—has been transformed into common property, for thus only is the possibility of spoliation cut off. Only by the impossibility of accumulating private capital can every one be compelled to work who claims the right to live. Neither lordship nor servitude will thereafter exist. This system would result further, that no one would need to work more than a few hours a day, and yet every reasonable want of society would be satisfied. In this way, time and opportunity are also given for opening to all the people the possibility of the highest imaginable culture."

Opposed to such a system are the political organizations of the capitalists, whether monarchies or republics. States are in the hands of property owners, with no other apparent end than to maintain the disorder of the present day. The laws turn their sharp points against the laboring people, and, so far as they seem otherwise, are evaded by the ruling class. The school exists for the offspring of the rich, while the children of the poor receive scarcely an elementary education, and this directed to promote conceit, prejudice, servility,— anything but intelligence. By reference to a fictitious heaven the church seeks to make the masses forget the loss of paradise on earth, while the press takes care to confuse the public mind. These institutions aim to prevent the people from reaching intelligence, being under the sway of the capitalist class. The laborers can look for aid from no outside source in their fight against the existing system, but must achieve deliverance through their own exertions. Hitherto, no privileged class have relinquished tyranny, nor will the capitalists of to-day forego their privilege and authority without compulsion. This is evidenced by the brutal resistance always manifested by the middle classes against all efforts by the laboring classes for their advancement. It is therefore evi-

dent that the fight must be of a revolutionary character—that wage conflicts can not lead to the goal. Every reform in favor of the laboring classes involves a curtailment of the privileges of the rich, to which we can not expect their assent. "The ruling classes will not voluntarily relinquish their prerogatives, and will make no concession to us. Under all these circumstances, there is only one remedy left—force." Our ancestors of 1776 have taught us that resistance to tyrants is justifiable, and have left us an immortal example. By force, they freed themselves from foreign oppressors, "and through force their descendants must free themselves from domestic oppression." Therefore, it is your right and duty to arm, says Jefferson. Agitation to organize, organizations for the purpose of rebellion,—this is the course if the workingmen would rid themselves of their chains. And since all governments combine in their policy of oppression, it is evident that the victory of the laboring population can be confidently expected only when the wage-workers along the whole line of capitalistic society inaugurate the decisive combats simultaneously. Hence the necessity for international affiliation and the organization of the International Association of Workingmen. Our platform is simple and clear:

*First*—Destruction of existing class denomination, through inexorable revolution and international activity.

*Second*—The building of a free society on communistic organizations or production.

*Third*—Free exchange of equivalent products through the productive organization, without jobbing and profit making.

*Fourth*—Organization of the educational system upon nonreligious and scientific and equal basis for both sexes.

*Fifth*—Equal rights for all, without distinction of sex or race.

*Sixth*—The regulation of public affairs through agreements between the independent communes and confederacies.

The letter referred to as Most's letter, was offered in evidence by the State. A translation of the letter, dated 1884, was read, as follows:

"*Dear Spies*—Are you sure that the letter from the Hocking Valley was not written by a detective? In a week I will go to Pittsburg, and I have an inclination to go also to the Hocking Valley. For the present I send you some printed matter. There Sch. 'H' also existed but on paper. I told you this some months ago. On the other hand, I am in a condition to furnish 'medicine,' and the 'genuine' article at that. Directions for use are perhaps not needed with these people. Moreover, they were recently published in the 'Fr." The appliances I can also send. Now, if you consider the address of Buchtell thoroughly reliable, I will ship twenty or twenty-five pounds. But how? Is there an express line to the place, or is there another way possible? Paulus, the Great, seems to delight in hopping around in the swamps of the N. Y. V. Z. like a blown-up (bloated) frog. His tirades excite general detestation. He has made himself immensely ridiculous. The main thing is only that the fellow can not smuggle any more rotten elements into the newspaper company than are already in it. In this regard, the caution is important to be on the minute. The organization here is no better nor worse than formerly. Our group has about the strength of the North Side group in Chicago, — and then, besides this, we have also the soc. rev. 6. 1, the Austrian League and the Bohemian League,—so to say, three more groups. Finally, it is easily seen that our influence with the trade organizations is steadily growing. We insert our meetings in the Fr., and can not notice that they are worse attended than at the time when we got through, weekly, $1.50 to $2 into the mouth of the N. Y. V. Z. Don't forget to put yourself into communication with Drury in reference to the English organ. He will surely work with you much and well. Such a paper is more necessary as to truth. This,

indeed, is getting more miserable and confused from issue to· issue, and in general is whistling from the last hole. Enclosed is a flyleaf, which recently appeared at Emden, and is perhaps adapted for reprint. Greeting to Schwab, Rau and to you.                Yours,            JOHANN MOST.

"P. S.—To Buchtell I will, of course, write for the present only in general terms.

"A. Spies, No. 107 Fifth avenue, Chicago, Illinois."

A translation of postal card referred to, was as follows:

"L. S. (*Dear Spies*)—I had scarcely mailed my letter yesterday, when the telegraph brought news from H. M. One does not know whether to rejoice over that or nȯt. The advance is in itself elevating. Sad is the circumstance that it will remain local, and, therefore, might not have a result. At any rate, these people make a better impression than the foolish voters on this and the other side of the ocean. Greetings and a shake.                Yours,            J. M."

The following are among the instructions given for the prosecution:

"4. The·court further instructs the jury, as a matter of law, that if they believe, from the evidence in this case, beyond a. reasonable doubt, that the defendants, or any of them, conspired and agreed together, or with others, to overthrow the law by force, or to unlawfully resist the officers of the law, and if they further believe, from the evidence, beyond a reasonable· doubt, that in pursuance of such conspiracy and in furtherance of the common object, a bomb was thrown by a member· of such conspiracy at the time, and that Matthias J. Degan was killed, then such of the defendants that the jury believe, from the evidence, beyond a reasonable doubt, to have been parties to such conspiracy, are guilty of murder, whether present at the killing or not, and whether the identity of the person throwing the bomb be established or not.

"5. If the jury believe, from the evidence, beyond a reasonable doubt, that there was in existence in this county and State, a conspiracy to overthrow the existing order of society, and to bring about social revolution by force, or to destroy the legal authorities of this city, county or State by force, and that the defendants, or any of them, were parties to such conspiracy, and that Degan was killed in the manner described in the indictment, that he was killed by a bomb, and that the bomb was thrown by a party to the conspiracy, and in furtherance of the objects of the conspiracy, then any of the defendants who were members of such conspiracy at that time, are in this case guilty of murder,—and that, too, although the jury may further believe, from the evidence, that the time and place for the bringing about of such revolution or the destruction of such authorities had not been definitely agreed upon by the conspirators, but was left to them and the exigencies of time, or to the judgment of any of the co-conspirators.

"$5\frac{1}{2}$. If these defendants, or any two or more of them, conspired together, with or not with any other person or persons, to excite the people or classes of the people of this city to sedition, tumult and riot, to use deadly weapons against and take the lives of other persons, as a means to carry their designs and purposes into effect, and in pursuance of such conspiracy, and in furtherance of its objects, any of the persons so conspiring, publicly, by print or speech, advised or encouraged the commission of murder, without designating time, place or occasion at which it should be done, and in pursuance of, and induced by such advice or encouragement, murder was committed, then all of such conspirators are guilty of such murder, whether the person who perpetrated such murder can be identified or not. If such murder was committed in pursuance of such advice or encouragement, and was induced thereby, it does not matter what change, if any, in the order or condition of society, or what, if any,

advantage to themselves or others, the conspirators proposed as the result of their conspiracy; nor does it matter whether such advice and encouragement had been frequent and long-continued or not, except in determining whether the perpetrator was or was not acting in pursuance of such advice or encouragement, and was or was not induced thereby to commit the murder. If there was such conspiracy as in this instruction is recited, such advice or encouragement was given, and murder committed in pursuance of and induced thereby, then all such conspirators are guilty of murder. Nor does it matter, if there was such a conspiracy, how impracticable or impossible of success its end and aims were, nor how foolish nor ill-arranged were the plans for its execution, except as bearing upon the question whether there was or was not such conspiracy.

"6. The court instructs the jury that a conspiracy may be established by circumstantial evidence, the same as any other fact, and that such evidence is legal and competent for that purpose. So as to whether an act which was committed was done by a member of the conspiracy, may be established by circumstantial evidence, whether the identity of the individual who committed the act be established or not; and, also, whether an act done was in pursuance of the common design may be ascertained by the same class of evidence; and if the jury believe, from the evidence in this case, beyond a reasonable doubt, that the defendants, or any of them, conspired and agreed together, or with others, to overthrow the law by force, or destroy the legal authorities of this city, county or State by force, and that in furtherance of the common design, and by a member of such conspiracy, Matthias J. Degan was killed, then these defendants, if any, whom the jury believe, from the evidence, beyond a reasonable doubt, were parties to such conspiracy, are guilty of the murder of Matthias J. Degan, whether the identity of the individual doing the killing

6—122 Ill.

be established or not, or whether such defendants were present at the time of the killing or not.

"11.    The rule of law which clothes every person accused of crime with the presumption of innocence, and imposes upon the State the burden of establishing his guilt beyond a reasonable doubt, is not intended to aid any one who is in fact guilty of crime, to escape, but is a humane provision of law, intended, so far as human agencies can, to guard against the danger of any innocent person being unjustly punished.

"12.    The court instructs the jury, as a matter of law, that in considering the case the jury are not to go beyond the evidence to hunt up doubts, nor must they entertain such doubts as are merely chimerical or conjectural.    A doubt, to justify an acquittal, must be reasonable, and it must arise from a candid and impartial investigation of all the evidence in the case; and unless it is such that, were the same kind of doubt interposed in the graver transactions of life, it would cause a reasonable and prudent man to hesitate and pause, it is insufficient to authorize a verdict of not guilty.    If, after considering all the evidence, you can say you have an abiding conviction of the truth of the charge, you are satisfied beyond a reasonable doubt.

"13.    The court further instructs the jury, as a matter of law, that the doubt which the juror is allowed to retain on his own mind, and under the influence of which he should frame a verdict of not guilty, must always be a reasonable one.    A doubt produced by undue sensibility in the mind of any juror, in view of the consequences of his verdict, is not a reasonable doubt, and a juror is not allowed to create sources or materials of doubt by resorting to trivial and fanciful suppositions and remote conjectures as to possible states of fact differing from that established by the evidence.    You are not at liberty to disbelieve as jurors, if, from the evidence, you believe as men.    Your oath imposes on you no obligation to

doubt, where no doubt would exist if no oath had been administered.

"$13\frac{1}{2}$.   The court instructs the jury, that they are the judges of the law, as well as the facts, in this case, and if they can say, upon their oaths, that they know the law better than the court itself, they have the right to do so; but before assuming so solemn a responsibility, they should be assured that they are not acting from caprice or prejudice, that they are not controlled by their will or their wishes, but from a deep and confident conviction that the court is wrong and that they are right.   Before saying this, upon their oaths, it is their duty to reflect whether, from their study and experience, they are better qualified to judge of the law than the court.   If, under all the circumstances, they are prepared to say that the court is wrong in its exposition of the law, the statute has given them that right.

"14.   In this case the jury may, as in their judgment the evidence warrants, find any or all of the defendants guilty, or not, or all of them not guilty; and if, in their judgment, the evidence warrants, they may, in case they find the defendants, or any of them, guilty, fix the same penalty for all the defendants found guilty, or different penalties for the different defendants found guilty.   In case they find the defendants, or any of them, guilty of murder, they should fix the penalty either at death, or at imprisonment in the penitentiary for life, or at imprisonment in the penitentiary for a term of any number of years, not less than fourteen."

The following instructions, among others, asked by the defendants, were refused by the court:

"3.   The court instructs the jury, that in order to convict these defendants, they must not only find that they entered into an illegal conspiracy, and that the Haymarket meeting was an unlawful assembly in aid of said conspiracy, but that in addition thereto, the bomb by which Officer Degan lost his life was cast by a member of said conspiracy in aid

of the common design, or by a person outside of said con-
spiracy, aided and advised by all or some one of these defend-
ants; but, in any event, should you find such a conspiracy,
from the evidence, to have been in existence, any one or more
of these defendants not found, beyond a reasonable doubt, to
have been a member thereof, and who is or are not proved,
beyond a reasonable doubt, to have been present at the Hay-
market meeting, or who, if present, did not knowingly counsel,
aid or abet the throwing of the bomb by which Officer Degan
lost his life, such defendant or defendants you are bound to
acquit.

"8.   If the jury believe, from the evidence, that the de-
fendants, or any one of them, entered into a conspiracy to
bring about a change of government for the amelioration of
the condition of the working classes, by peaceable means, if
possible, but, if necessary, to resort to force for that purpose,
and that, in addition thereto, in pursuance of that object,
the Haymarket meeting was assembled by such conspirator
or conspirators to discuss the best means to right the griev-
ances of the working classes, without any intention of doing
any unlawful act on that occasion, and, while so assembled,
the bomb by which Officer Degan lost his life was thrown by
a person outside of said conspiracy, and without the knowl-
edge and approval of the defendant or defendants so found
to have entered into said conspiracy, then, and in that case,
the court instructs the jury that they are bound to acquit the
defendants.

"9.   The court instructs the jury, that it is not enough to
find that the defendants unlawfully conspired to overthrow
the present form of government, and that the Haymarket
meeting was an unlawful assembly, called by these defend-
ants in furtherance of that conspiracy, but you must find, in
addition thereto, that the bomb by which Officer Degan lost
his life was thrown by a member of said conspiracy, in aid
of the common design; or, if you should find that it was

thrown by a person not proved, beyond a reasonable doubt, to have been a member of said conspiracy, then you must find that these defendants knowingly aided and abetted or advised such bomb-thrower to do the act, otherwise you are bound to acquit them.

"11. The court further instructs the jury, that unless you find, from the evidence, beyond all reasonable doubt, that there was a conspiracy existing, to which the defendants or some of them were parties, and that the act resulting in the death of Matthias J. Degan was done by somebody who was a party to said conspiracy, and in pursuance of the common design of said conspiracy, you must find the defendants not guilty, unless the evidence convinces you, beyond all reasonable doubt, that the defendants, or any of them, personally committed the act resulting in the death of Matthias J. Degan, as charged in the indictment, or that the defendants, or any of them, stood by and aided, abetted or assisted, or, not being present, had advised, aided, encouraged or abetted the perpetration of the crime charged in the indictment, and then you should find guilty only those defendants as to whom the evidence satisfies you, beyond all reasonable doubt, that they thus committed or aided in the commission of the crime charged in the indictment.

"13. The court further instructs the jury, that under the constitution of this State it is the right of the people to assemble, in a peaceable manner, to consult for what they believe to be the common good, and that so long as such meeting is peaceably conducted, orderly, and not tending to riot or a breach of the peace, no official or authority has or can have any legal right to attempt the dispersal thereof in a forcible manner. Such attempt, if made, would be unwarranted and illegal, and might legally be resisted with such necessary and reasonable degree of force as to prevent the consummation of such dispersal. If the jury believe, from the evidence in this cause, that the meeting of May 4, 1886, was called for a

legal purpose, and, at the time it was ordered to disperse by the police, was being conducted in an orderly and peaceable manner, and was about peaceably to disperse, and that the defendants, or those participating in said meeting, had, in connection therewith, no illegal or felonious purpose or design, then the order for the dispersal thereof was unauthorized, illegal, and in violation of the rights of said assembly and of the people who were then gathered. And if the jury further believe, from the evidence, that the meeting was a quiet and orderly meeting, lawfully convened, and that the order for its dispersal was unauthorized and illegal, under the provisions of the constitution of this State referred to, and that upon such order being given, some person in said gathering, without the knowledge, aid, counsel, procurement, encouragement or abetting of the defendants, or any of them, then or theretofore given, and solely because of his own passion, fear, hatred, malice or ill-will, or in pursuance of his view of the right of self-defence, threw a bomb among the police, wherefrom resulted the murder or homicide charged in the indictment, then the defendants would not be liable for the results of such bomb, and your verdict should be not guilty.

"18. Although certain of the defendants may have advised the use of force in opposition to the legally constituted authorities, or the overthrow of the laws of the land, yet, unless the jury can find, beyond all reasonable doubt, that they specifically threw the bomb which killed Degan, or aided, advised, counseled, assisted or encouraged said act, or the doing of some illegal act, or the accomplishment of some act, by illegal means, in the furtherance of which said bomb was thrown, you should return said defendants not guilty.

"22. The fact, if such is the fact, that the defendant Neebe circulated or distributed or handled a few copies of the so-called Revenge Circular, and, while doing so, said, substantially, 'Six workmen have been killed at McCormick's, last night, by the police; perhaps the time will come when it

may go the other way,' is not of itself sufficient to connect him with the killing of Degan; nor is the fact that he had in his house a red flag, a gun, a revolver and a sword, sufficient, even when taken together with the other statement contained in this instruction, to connect said Neebe with the act which resulted in the death of Degan, as charged in this indictment.

"23. There has not been introduced any evidence in this case, to either show that the defendant Neebe, by any declaration, either spoken or written, has advised or encouraged the use of violence or the doing of any act in any way connected with the offence at the Haymarket, at which Degan was killed, nor is there any evidence that he was engaged at any time in any conspiracy to do any unlawful act, or the doing of any act in an unlawful manner, in the furtherance of which said Degan was killed, and, therefore, the State has not established any case as against the defendant Neebe, and you are therefore instructed to render a verdict of not guilty as to him.

"24. The jury are instructed to return a verdict of not guilty as to the defendant Neebe."

Upon the conclusion of the reading of the instructions in behalf of the defendants, which were read after the instructions on behalf of the People, the court, of its own motion, gave to the jury the following instruction:

"The statute requires that instructions by the court to the jury shall be in writing, and only relate to the law of the case. The practice, under the statute, is, that the counsel prepare, on each side, a set of instructions and present them to the court, and, if approved, to be read by the court as the law of the case. It may happen, by reason of the great number presented, and the hurry and confusion of passing on them in the midst of the trial, with a large audience to keep in order, that there may be some apparent inconsistency in them, but, if they are carefully scrutinized, such inconsistencies will probably disappear. In any event, however, the

gist and pith of all is, that if advice and encouragement to murder was given, if murder was done in pursuance of and materially induced by such advice and encouragement, then those who gave such advice and encouragement are guilty of the murder. Unless the evidence, either direct or circumstantial, or both, proves the guilt of one or more of the defendants upon this principle, so fully that there is no reasonable doubt of it, your duty to them requires you to acquit them. If it does so prove, then your duty to the State requires you to convict whoever is so proved guilty. The case of each defendant should be considered with the same care and scrutiny as if he alone were on trial. If a conspiracy, having violence and murder as its object, is fully proved, then the acts and declarations of each conspirator, in furtherance of the conspiracy, are the acts and declarations of each one of the conspirators. But the declarations of any conspirator before or after the 4th of May, which are merely narrative as to what had been or would be done, and not made to aid in carrying into effect the object of the conspiracy, are only evidence against the one who made them. What are the facts and what is the truth, the jury must determine from the evidence, and from that alone. If there are any unguarded expressions in any of the instructions, which seem to assume the existence of any facts, or to be any intimations as to what is proved, all such expressions must be disregarded, and the evidence only looked to to determine the facts."

The following was the instruction given as to the form of the verdict:

"If all of the defendants are found guilty the form of the verdict will be: 'We, the jury, find the defendants guilty of murder in manner and form as charged in the indictment, and fix the penalty . . . . . . . . . .' If all are found not guilty the form of the verdict will be: 'We, the jury, find the defendants not guilty.' If part of the defendants are found

guilty and part not guilty, the form of the verdict will be: 'We, the jury, find the defendant or defendants (naming him or them) not guilty; we find the defendant or defendants (naming him or them) guilty of murder in manner and form. as charged in the indictment, and fix the penalty . . . . . . . '"

Mr. Leonard Swett, for the plaintiffs in error:

The admission of the letter of Most to Spies was error, being the result of a violation of the law in relation to cross-examination. It was also obtained by an unlawful search, and was the act of a stranger. An unanswered letter, even when found in a party's possession, addressed to him, is inadmissible, unless acted upon by him. *Gifford* v. *People*, 87 Ill. 210; *Commonwealth* v. *Edgerly*, 10 Allen, 187; Wharton on Crim. Law, (9th ed.) secs. 644, 682.

A party is protected against unreasonable searches, (Const. of U. S. art. 4 of amendments,) and against being compelled to testify against himself in a criminal case. Id. art. 5; *Boyd* v. *United States*, 116 U. S. 616; *Entic* v. *Carrington*, 19 Howell's State Trials, 1029; *Watts* v. *State*, 5 W. Va. 532.

When the common enterprise is ended by accomplishment or abandonment, no subsequent act or declaration of one conspirator is admissible against the others. Wharton on Crim. Evidence, sec. 699; *People* v. *Stanley*, 47 Cal. 112; *Commonwealth* v. *Thompson*, 99 Mass. 444; *State* v. *Westfall*, 49 Iowa, 328; *Strady* v. *State*, 5 Coldw. 300; *State* v. *Fuller*, 39 Vt. 74; *Hunter* v. *Commonwealth*, 7 Gratt. 641; *Hudson* v. *Commonwealth*, 2 Duv. 531; *Reuben* v. *State*, 25 Ohio St. 464; *People* v. *Stephens*, 47 Mich. 411; *People* v. *Arnold*, 46 id. 68; *Spencer* v. *State*, 31 Texas, 64; *Abe* v. *State*, id. 416; *Commonwealth* v. *Ingraham*, 7 Gray, 46; *Ormsbee* v. *People*, 53 N. Y. 472; *Morris* v. *State*. 50 Ohio St. 439.

It is necessary to prove the union of the minds conspiring, or the conspiracy, first, and then the acts and declarations of each become those of all so conspiring. Roscoe on Crim.

Evidence, (7th Am. ed.) 417, sec. 416; 1 Greenleaf on Evidence, sec. 111; 1 Starkie on Evidence, *342; Kylling's Crown Cases, *24.

One crime can not be established by proof of another crime. Wharton on Crim. Law, sec. 30; *Schaffner* v. *Commonwealth,* 72 Pa. St. 60; *Kribs* v. *People,* 82 Ill. 424; *Watts* v. *State,* 5 W. Va. 532.

The erroneous introduction of illegal evidence is not cured by its subsequent exclusion. (*Howe* v. *Rosine,* 87 Ill. 105.) In a capital case, no evidence should be admitted which does not prove or tend to prove the guilt of the defendant. *Devine* v. *People,* 100 Ill. 290; *Sutton* v. *Johnson,* 62 id. 209; 1 Phillips on Evidence, (5th Am. ed.) 765, 766, p. 644; *Kinchillow* v. *State,* 5 Humph. 9; *Wiley* v. *State,* 3 Coldw. 362.

After a conspiracy, it is only acts and declarations done and expressed in furtherance of the common design which are admissible. *People* v. *Stanley,* 47 Cal. 113; *State* v. *George,* 7 Ind. 321; *Rex* v. *Hardy,* 25 State Trials, 1.

Mr. W. P. BLACK, and Messrs. SALOMON & ZEISLER, also for the plaintiffs in error:

Mere participation in an unlawful assembly does not make one responsible for the independent crime of a participant. 1 Wharton on Crim. Law, secs. 220, 397; 1 Bishop on Crim. Law, secs. 633, 634, 641; *Regina* v. *Skeet,* 4 Foster & Fin. N. P. Cases, 931; *Rex* v. *Hawkins,* 3 Carr. & Payne, 392; 1 Curw. Hawk. 101; 1 Russell, 652; *Hodgson case,* 1 Leach, 6 S. P.; *Rex* v. *White,* Russ. & Ry. C. C. 99; *Rex* v. *Collison,* 4 Carr. & Payne, 565; *Regina* v. *Price,* 8 Cox's C. C. 96; *Duffey's case,* 1 Lewin's C. C. 194; *Regina* v. *Luck,* 3 Foster & Fin. N. P. Cases, 483; *State* v. *Hildreth,* 9 Ired. L. 440; *White* v. *People,* 81 Ill. 333; *United States* v. *Jones,* 3 Washb. C. C. 209.

To hold one as an accessory on the ground of a conspiracy, the principal actor must be identified as a co-conspirator.

Wharton on Crim. Evidence, sec. 325; *Ogden* v. *State*, 12 Wis. 553; *Hatchett* v. *Commonwealth*, 75 Va. 925; *Jones* v. *State*, 64 Ga. 697.

The crime charged must be within the purview of such conspiracy, and committed in its furtherance. *State* v. *Lucas*, 55 Iowa, 321; *Watts* v. *State*, 5 W. Va. 532; *State* v. *Absence*, 4 Porter, 397; 4 Blackstone's Com. 23; 3 Greenleaf on Evidence, secs. 44, 50; 1 Wharton on Crim. Law, sec. 647.

It is error for the court to suggest, in the hearing of the jury, an hypothesis not supported by the evidence. *State* v. *Harkin*, 7 Nev. 382; *Hair* v. *Little*, 28 Ala. 236; *Andrews* v. *Ketcham*, 77 Ill. 377.

By cross-examining Spies as to matters not covered by his direct testimony, improper evidence was elicited, and he was thus compelled to give testimony against himself. This was a fatal error. *Gifford* v. *People*, 87 Ill. 210.

There can be no criminal responsibility for the act of an associate in purpose, but not in action. 2 Starkie on Evidence, pt. 1, *324; *State* v. *Price*, 88 N. C. 627.

A distinct crime, unconnected with that charged in the indictment, can not be given in evidence. *Schaffer* v. *Commonwealth*, 72 Pa. St. 60; Wharton on Crim. Evidence, sec. 30; *Kribs* v. *People*, 82 Ill. 424; *Devine* v. *People*, 100 id. 290; *Sutton* v. *Johnson*, 62 id. 209; 1 Phillips on Evidence, (5th Am. ed.) 765, 766, p. 644; Roscoe on Crim. Evidence, sec. 90, p. 90; *Kinchillow* v. *State*, 5 Humph. 9; *Wiley* v. *State*, 3 Coldw. 362.

A *prima facie* conspiracy must be established, before the acts and declarations of an alleged co-conspirator can be evidence against another. *State* v. *George*, 7 Ired. 321; Roscoe on Crim. Evidence, (7th Am. ed.) 416, secs. 417, 418; 1 Greenleaf on Evidence, sec. 111.

Before one can be convicted as an accessory, the guilt of the principal must be alleged, and proved on the trial. See, 1 Wharton on Crim. Law, sec. 237; *State* v. *Ricker*, 29 Me.

84; *Baxter* v. *People*, 2 Gilm. 578; Bishop on Crim. Law,. sec. 71; Wharton on Crim. Evidence, sec. 325; *State* v. *Crank*, 13 S. C. (L. R.) 86; *Holmes* v. *Commonwealth*, 25 Pa. St. 221;. *Regina* v. *Howell*, 9 C. & P. 437; *Fairlee* v. *People*, 11 Ill. 5;. *Ritzman* v. *People*, 110 id. 362.

A known party can not be indicted as unknown, and if an indictment against an accessory states the principal to be unknown, contrary to the fact, no conviction can be had. Wharton on Crim. Pl. and Pr. sec. 112; Wharton on Crim. Evidence, sec. 97; *Geiger* v. *Steele*, 5 Iowa, 484; 2 East's Crown Law, 651, 781; *Simmons* v. *State*, 4 Ga. 465; *Moore* v. *State*, 65 Ind. 213; *Regina* v. *Stroud*, 2 Moody's C. C. *270; *Rex* v. *Waters*, 1 id. 457; *Rex* v. *Russell*, id. 489; *Blodgett* v. *State*, 3 Ind. 403; *Rex* v. *Walker*, 3 Campb. 264.

An instruction stating an abstract proposition of law, erroneous in itself, and not based on evidence properly before the jury, is erroneous. *Coughlin* v. *People*, 18 Ill. 266.

An instruction not restricting the jury's belief to the evidence, is bad. *Ewing* v. *Runkle*, 20 Ill. 448; *Chambers* v. *People*, 105 id. 409.

A material error in an instruction, calculated to mislead, is not cured by a subsequent contradictory one. Wharton on Crim. Pl. and Pr. sec. 793; *Clem* v. *State*, 31 Ind. 480; *Murray* v. *Commonwealth*, 79 Pa. St. 311; *Howard* v. *State*, 50 Ind. 194; *People* v. *Valencia*, 43 Cal. 543.

It is not the law, that to justify an acquittal the reasonable doubt must arise out of the evidence given, and be such as to cause a prudent man to hesitate. The doubt may arise from a want of evidence. *Jewell* v. *State*, 58 Ind. 293; *Stout* v. *State*, 90 id. 1; 1 Greenleaf on Evidence, sec. 13 a, and note a; Wharton on Crim. Evidence, sec. 718.

An instruction to the effect the jury must take the law as given by the court, unless they, on their oaths, are prepared to say they know the law better than the court, is bad. *Clem* v. *State*, 31 Ind. 480.

It was error for the court, on its own motion, to sum up all the People's instructions, and not, in like manner, present the points favorable to the defence. *McEwen* v. *Morey,* 60 Ill. 32.

A party charged with crime is entitled to a trial by an impartial jury. Const. of U. S. art. 6 of amendments; Const. of Illinois, art. 2, sec. 9.

As to the qualification of jurors, see *Neely* v. *People,* 13 Ill. 685; *Smith* v. *Eames,* 3 Scam. 76; *Gardner* v. *People,* id. 83; *Vennum* v. *Harwood,* 1 Gilm. 659; *Baxter* v. *People,* 3 id. 368; *Gray* v. *People,* 26 Ill. 344; *Collins* v. *People,* 48 id. 146; *Railroad Co.* v. *Adler,* 56 id. 344; *Plummer* v. *People,* 74 id. 361; *Insurance Co.* v. *Schueller,* 60 id. 465; *Robinson* v. *Randall,* 82 id. 521; *Wilson* v. *People,* 94 id. 299; *Stevens* v. *People,* 38 Mich. 742; *Holt* v. *People,* 13 id. 224; *State* v. *Clarke,* 42 Vt. 629; *Boardman* v. *Wood,* 3 id. 270; *Black* v. *State,* 42 Texas, 377; *Wright* v. *Commonwealth,* 32 Gratt. 941; *Curry* v. *State,* 4 Neb. 544; *Farmer* v. *People,* 4 id. 68; *Eason* v. *State,* 6 Baxter, 466; 1 Trial of Burr, 416.

As to the prisoner's right to question jurors, with a view to exercise his right of peremptory challenge, see *Railroad Co.* v. *Buttolf,* 66 Ill. 347; *Lavin* v. *People,* 69 id. 303; *Commonwealth* v. *Eagan,* 4 Gray, 18; *People* v. *Rogers,* 5 Cal. 347.

The motion for a new trial on account of the partiality of jurors, as shown by the affidavits, should have been allowed. *Vennum* v. *Harwood,* 1 Gilm. 659; *Brakefield* v. *State,* 1 Sneed, 215; *Wright* v. *Commonwealth,* 32 Gratt. 941.

It was improper conduct of the jurors to take partial notes of the evidence. Thompson & Merriam on Jury, sec. 390; *Cheek* v. *State,* 35 Ind. 492; *Palmer* v. *State,* 29 Ark. 249.

As to the number of peremptory challenges given by law to the State, on a trial of several, see Crim. Code, sec. 432; *Schaeffer* v. *State,* 3 Wis. 730; *Wiggins* v. *State,* 1 Lea, 738; *Mayhon* v. *State,* 10 Ohio, 232; *State* v. *Earle,* 24 La. Ann. 38; *State* v. *Gay,* 25 id. 472; *Savage* v. *State,* 18 Fla. 925; *Wylie* v. *State,* 4 Blackf. 458; *State* v. *Reed,* 47 N. H. 466.

When a panel of four jurors were excused by the defendants, it was the duty of the State to tender another panel accepted by it. *Brazier* v. *State*, 34 Ala. 387; *Fitzpatrick* v. *Joliet*, 87 Ill. 58.

As to the improper remarks of the court being error, see *Andrews* v. *Ketcham*, 77 Ill. 377; *State* v. *Harkin*, 7 Nev. 382; *Hair* v. *Little*, 28 Ala. 236.

As to the remarks of the prosecuting attorney, in his argument to the jury, see *Fox* v. *People*, 95 Ill. 70; *Henans* v. *Vogle*, 87 id. 242; *Ferguson* v. *State*, 19 Ind. 43; *State* v. *Smith*, 75 N. C. 306; *Dennis* v. *Haywood*, 63 id. 53; *Jenkins* v. *Ore Dressing Co.* 65 id. 563; *State* v. *Williams*, id. 505; *Earll* v. *People*, 99 Ill. 123; *Brown* v. *Swineford*, 42 Wis. 282; *Tucker* v. *Hennecker*, 41 N. H. 317; *Hilliard* v. *Beattie*, 59 id. 465; *Berry* v. *State*, 10 Ga. 522; *Mitchum* v. *State*, 11 id. 618; *Cobel* v. *Cobel*, 79 N. C. 587; *Willis* v. *McNeill*, 57 Texas, 465; *State* v. *Trumbull*, 86 Mo. 113.

In cases of conspiracy, a new trial as to one is a new trial as to all. Wharton on Crim. Pl. and Pr. sec. 305; Wharton on Crim. Law, sec. 1395; 3 Russell on Crimes, (9th ed.) *176; *Rex* v. *Gompertz*, 9 Q. B. 824; *Commonwealth* v. *McGowan*, 2 Parsons, 365.

Mr. George Hunt, Attorney General, Mr. Julius S. Grinnell, State's Attorney, Mr. Francis W. Walker and Mr. Edmund Furthman, Assistant State's Attorneys, and Mr. George C. Ingham, for the People:

Where there is a conspiracy to do an unlawful act, which naturally or probably involves the use of force and violence, the act of each conspirator, done in furtherance of the common design, is the act of all. If murder results, all are guilty of murder, even though the conspirator who does the act can not be identified. *Brennan* v. *People*, 15 Ill. 511; *Hanna* v. *People*, 86 id. 243; *Lamb* v. *People*, 96 id. 74, and cases cited in both

opinions; *Kennedy* v. *People*, 40 id. 488; Wharton on Crim. Law, (9th ed.) sec. 1405.

Even though the particular act may not have been arranged for, or the means of its perpetration provided, the act was the natural result of the conspiracy, and was perpetrated in furtherance of the common design. Whether the act was the act of a member of the conspiracy, and whether it was done in furtherance of the common design, are questions of fact. See same authorities.

A man may be guilty of a wrong which he did not specifically intend, if it came naturally, or even accidently, through some other specific or a general evil purpose. Where there is combination to do an unlawful thing, if the act of one, proceeding and growing out of the common plan, terminates in a criminal result, though not the particular result meant, all are liable. 1 Bishop on Crim. Law, 636; Hawkin's Pleas of the Crown, chap. 29, sec. 8; Foster, 351, sec. 6; Wharton on Homicide, 708; *State* v. *McCahill,* 30 N. W. Rep. 553; *Nevill* v. *State,* 60 Ind. 308; *Ritzman* v. *People,* 110 Ill. 369; *Hamilton* v. *People,* 113 id. 34; *Regina* v. *Tyler,* 8 C. & P. (34 E. C. L.) 616; *Regina* v. *Bernard,* 1 F. & F. 240.

Any act or declaration of any of the defendants, tending to prove the conspiracy, or the connection of that defendant with it, whether made during the existence of the conspiracy or after its completion, is admissible against him.

The conspiracy having been established *prima facie,* in the opinion of the trial judge, any act or declaration of any member of the conspiracy, though he may not be a party defendant, in furtherance of the conspiracy, is evidence against all the conspirators on trial. These propositions are elementary.

Whether a conspiracy is established *prima facie,* is a matter for the consideration of the trial court. But the order in which the proof is given is ordinarily immaterial. Greenleaf on Evidence, sec. 111; *State* v. *Winner,* 17 Kan. 298.

The conspiracy may be established, in the first instance, by evidence having no relation to the defendants. It may be shown by acts of different persons, at different times and places, and by any circumstances which tend to prove it, and the defendants will not be affected by such proof unless they are connected with the conspiracy by proof. *State* v. *Winner,* 17 Kan. 305; 3 Greenleaf on Evidence, sec. 93; *Rex* v. *Hammond,* 2 Esp. 718; *People* v. *Mather,* 4 Wend. 261; 1 Bishop on Crim. Practice, secs. 277, 228; Wharton on Crim. Law, sec. 1398; *Regina* v. *Murphy,* 8 C. & T. 310; *Regina* v. *Frost,* 9 id. 129; *United States* v. *Cole,* 5 McLean, 601; *King* v. *Parsons,* 1 W. Black. 391; *Regina* v. *Bernard,* 1 F. & F. 240; *Campbell* v. *Commonwealth,* 84 Ill. 187; Roscoe on Crim. Evidence, 414; *Rex* v. *Stone,* 6 Durn. & E. 527; *Railroad Co.* v. *Collins,* 56 Ill. 212.

When a defendant takes the stand he is subject to the same rules of cross-examination as any other witness. By making himself a witness as to the offence, he waives his privilege, and, as affecting his credibility, may be asked whether he has been in prison for other crimes, etc. Wharton on Crim. Evidence, sec. 432.

A judgment clearly right will never be reversed for errors not affecting the substantial merits of the case. *Wilson* v. *People,* 94 Ill. 327; *Calhoun* v. *O'Neill,* 53 id. 354; *Leach* v. *People,* id. 311; *Clark* v. *People,* 31 id. 479; *Richmond* v. *People,* 110 id. 371; *Lander* v. *People,* 104 id. 250; *State* v. *Winner,* 17 Kan. 304.

Where advice to murder instigates murder, the adviser is guilty even if the perpetrator is unknown, provided the proof shows that the act was caused by the advice. Rev. Stat. chap. 38, secs. 274, 275.

An accessory before the fact may be charged and punished as a principal. *Baxter* v. *People,* 3 Gilm. 368; *Dempsey* v. *People,* 47 Ill. 326.

At common law, the accessory may be guilty of the substantive crime, even if the principal is not pointed out, and is, in fact, unknown. 1 Archbold on Crim. Pl. and Pr. 67; 1 Wharton on Crim. Law, sec. 207; *Regina* v. *Tyler*, 8 C. & P. 616; 1 Bishop on Crim. Law, sec. 651; *Pilger* v. *Commonwealth*, 112 Pa. St. 220; *Brennan* v. *People*, 15 Ill. 516; *State* v. *Green*, 26 S. C. 103.

But if the principal is declared unknown in the indictment, and the proof shows he was known, there will be a fatal variance. *Rex* v. *Walker*, 3 Campb. 264; *Rex* v. *Blick*, 4 C. & P. 377.

No distinction exists between an accessory present and advising the commission of a crime, and one absent, who has advised, encouraged or instigated the act. *Pilger* v. *Commonwealth*, 112 Pa. St. 220; *Brennan* v. *People*, 15 Ill. 516; *State* v. *Green*, 26 S. C. 103; Hawkins' Pleas of the Crown, chap. 29, sec. 11; 1 Bishop on Crim. Law, sec. 673.

Under the statute making accessories principals, the fact that some other principal is also guilty, but unknown, in no way lessens the guilt of those known. *Commonwealth* v. *Adams*, 127 Mass. 15; 1 Wharton on Crim. Law, sec. 327.

One who instigates the perpetration of crime is guilty, even though the advice was general in its character, and was not specifically directed to any particular person to do any particular act. *Queen* v. *Most*, L. R. 7 Q. B. 244; *Green's case*, 26 S. C. 128; *Regina* v. *Sharp*, 3 Cox's C. C. 288; 1 Bishop on Crim. Law, sec. 641; Foster, 370, sec. 3; *Cox* v. *People*, 82 Ill. 192.

The giving of an instruction containing merely an abstract proposition of law, is a matter of discretion with the trial court. *Corbin* v. *Shearer*, 3 Gilm. 482; *Parker* v. *Fergus*, 52 Ill. 419; *Pate* v. *People*, 3 Gilm. 44; *Devlin* v. *People*, 104 Ill. 504.

As to instructions in relation to a reasonable doubt, see *Earl* v. *People*, 73 Ill. 329; *Dunn* v. *People*, 109 id. 635; *May* v.

*People,* 60 id. 119; *Miller* v. *People,* 39 id. 457; *Connaghan* v. *People,* 88 id. 460.

No error to instruct that the jury are not at liberty to disbelieve as jurors, if, from the evidence, they believe as men, and that their oath imposes no obligation to doubt, when no doubt would exist if no oath had been taken. *Commonwealth* v. *Harman,* 4 Pa. St. 272.

No error to instruct the jury to form their verdict from the evidence alone, unaided and uninfluenced by any opinions or presumptions not founded upon the evidence. *Nevling* v. *Commonwealth,* 98 Pa. St. 334.

It is proper to instruct the jury that they have no right to disregard the instructions, unless prepared, on their oaths, to say they know the law better than the court. *Schnier* v. *People,* 23 Ill. 17; *Fisher* v. *People,* 23 id. 283; *Mullinix* v. *People,* 76 id. 211; *Davison* v. *People,* 90 id. 223.

The office of an instruction is to inform the jury of the law of the case. *Lander* v. *People,* 104 Ill. 248.

The court may instruct of its own motion, or modify instructions asked, and explain those given. *Vanlandingham* v. *People,* 4 Gilm. 125; Rev. Stat. chap. 110, sec. 53.

If counsel desire an instruction as to the form of the verdict other than that given by the court, they should prepare and ask it. *Dunn* v. *People,* 109 Ill. 646.

The overruling of a challenge of a juror for cause, can not be assigned for error unless it appears that the party has exhausted his peremptory challenges. *Collins* v. *People,* 103 Ill. 23.

An opinion of a juror, formed upon rumor or newspaper statements, as to the truth of which he has expressed no opinion, does not disqualify him, if he can state, on oath, that he believes he can impartially try the case on the law and the evidence. Rev. Stat. chap. 78, sec. 14; *Stokes* v. *People,* 53 N. Y. 171; *Thomas* v. *People,* 67 id. 220; *Phelps* v. *People,* 72 id. 363; *Greenfield* v. *People,* 74 id. 277; *Balbo* v. *People,*

80 id. 484; *Cox* v. *People,* id. 512; *Abbott* v. *People,* 86 id. 460; *Corneth* v. *People,* 92 id. 85; *People* v. *Otto,* 101 id. 690; *Stevens* v. *People,* 38 Mich. 739; *People* v. *Mahoney,* 18 Cal. 183.

As to what is an impartial jury,—prejudice against crime : *Baxter* v. *People,* 3 Gilm. 376; *Smith* v. *Eames,* 3 Scam. 76; *Gardner* v. *People,* id. 83; *Neely* v. *People,* 13 Ill. 685.

In decisions of this court prior to the act of 1874, the jurors were competent. *Collins* v. *People,* 48 Ill. 145; *Leach* v. *People,* 53 id. 311; *Thompson* v. *People,* 24 id. 60.

And especially so under the act of 1874, changing the law. *Albright* v. *Walker,* 73 Ill. 69; *Plummer* v. *People,* 74 id. 261; *Insurance Co.* v. *Ward,* 90 id. 545; *Robinson* v. *Randolph,* 82 id. 521; *Wilson* v. *People,* 94 id. 299; *Richmond* v. *Roberts,* 98 id. 476; *Gradle* v. *Hoffman,* 105 id. 147; *Hughes* v. *People,* 116 id. 339; *Carrow* v. *People,* 113 id. 550; *Railroad Co.* v. *Bingenheimer,* 116 id. 226.

The jury was properly impaneled. *Fitzpatrick* v. *Joliet,* 87 Ill. 58.

A juror's affidavit will be received to sustain, but not to impeach, his verdict. 3 Graham & Waterman on New Trials, 1450, 1451; Hayne on New Trials, 224; *Hughes* v. *People,* 116 Ill. 338.

The People were entitled to the same number of peremptory challenges as the defendants,—one hundred and sixty. Rev. Stat. chap. 38, sec. 432.

The granting of separate trials is a matter of discretion. *Maton* v. *People,* 15 Ill. 536.

Where the evidence of guilt is satisfactory, the judgment will not be reversed for mere improper remarks of counsel for the People, tending to prejudice the jury against the accused. *Wilson* v. *People,* 94 Ill. 299; *Garrity* v. *People,* 107 id. 163.

Mr. Justice Magruder delivered the opinion of the Court:

This case comes before us by writ of error to the Criminal Court of Cook county. The writ has been made a *supersedeas.*

Plaintiffs in error were tried in the summer of 1886 for the murder of Matthias J. Degan, on May 4, 1886, in the city of Chicago, Cook county, Illinois. On August 20, 1886, the jury returned a verdict finding the defendants August Spies, Michael Schwab, Samuel Fielden, Albert R. Parsons, Adolph Fischer, George Engel and Louis Lingg guilty of murder, and fixing death as the penalty. By the same verdict they also found Oscar W. Neebe guilty of murder and fixed the penalty at imprisonment in the penitentiary for fifteen years.

About the 1st day of May, 1886, the workingmen of Chicago and of other industrial centers in the United States were greatly excited upon the subject of inducing their employers to reduce the time, during which they should be required to labor on each day, to eight hours. In the midst of the excitement, growing out of this eight-hour movement, as it was called, a meeting was held on the evening of May 4, 1886, at the Haymarket, on Randolph street, in the West division of the city of Chicago. This meeting was addressed by the defendants Spies, Parsons and Fielden. While the latter was making the closing speech, and at some point of time between ten and half-past ten o'clock in the evening, several companies of policemen, numbering one hundred and eighty men, marched into the crowd from their station on Desplaines street, and ordered the meeting to disperse. As soon as the order was given, some one threw among the policemen a dynamite bomb, which struck Degan, who was one of the police officers, and killed him. As a result of the throwing of the bomb and of the firing of pistol shots, which immediately succeeded the throwing of the bomb, six policemen besides Degan were killed, and sixty more were seriously wounded.

It is undisputed that the bomb was thrown and that it caused the death of Degan. It is conceded that no one of the convicted defendants threw the bomb with his own hands. Plaintiffs in error are charged with being accessories before the fact. There are sixty-nine counts in the indictment. Some of the counts charge, that the eight defendants above named, being present, aided, abetted and assisted in the throwing of the bomb; others, that, not being present, aiding, abetting or assisting, they advised, encouraged, aided and abetted such throwing. Some of the counts charge that said defendants advised, encouraged, aided and abetted one Rudolph Schnaubelt in the perpetration of the crime; others, that they advised, encouraged, aided and abetted an unknown person in the perpetration thereof.

The Illinois statute upon this subject is as follows (chap. 38, div. 2, secs. 2 and 3):

"Sec. 2. An accessory is he who stands by, and aids, abets, or assists, or who, not being present, aiding, abetting or assisting, hath advised, encouraged, aided or abetted the perpetration of the crime. He, who thus aids, abets, assists, advises or encourages, shall be considered as principal, and punished accordingly.

"Sec. 3. Every such accessory, when a crime is committed within or without this State by his aid or procurement in this State, may be indicted and convicted at the same time as the principal, or before, or after his conviction, and whether the principal is convicted or amenable to justice or not, and punished as principal."

This statute abolishes the distinction between accessories before the fact and principals; by it all accessories before the fact are made principals. As the acts of the principal are thus made the acts of the accessory, the latter may be charged as having done the acts himself; and may be indicted and punished accordingly. *Baxter* v. *People*, 3 Gilm. 368; *Dempsey* v. *People*, 47 Ill. 323.

If, therefore, the defendants advised, encouraged, aided or abetted the killing of Degan, they are as guilty, as though they took his life with their own hands. If any of them stood by and aided, abetted or assisted in the throwing of the bomb, those of them, who did so, are as guilty as though they threw it themselves.

It is charged, that the defendants formed a common purpose, and were united in a common design to aid and encourage the murder of the policemen among whom the bomb was thrown. If they combined to accomplish such murder by concerted action, the ordinary law of conspiracy is applicable, and the acts and declarations of one of them, done in further-ance of the common design, are, in contemplation of law, the acts and declarations of all. This prosecution, however, is not for conspiracy as a substantive crime. Proof of conspiracy is only proper, so far as it may tend to show a common design to encourage the murder charged against the prisoners. It may be introduced for the purpose of establishing the position of the members of the combination as accessories to the crime of murder.

The questions, which thus present themselves at the thres-hold of the case, are these: Did the defendants have a com-mon purpose or design to advise, encourage, aid or abet the murder of the police? Did they combine together and with others with a view to carrying that purpose or design into effect? Did they or either or any of them do such acts or make such declarations in furtherance of the common purpose or design, as did actually have the effect of encouraging, aid-ing or abetting the crime in question?

The solution of these questions involves an examination of the evidence.

The first inquiry, which naturally suggests itself, is: who made the bomb which killed Degan?

*First*—The bomb was *round.* Zeller, a witness for the defence, says of it, as he saw it going through the air: "It

seems to me it was more round and about as big as a base-ball." Taylor, another witness for the defence, says: "I saw the bomb enough to know it was a round bomb."

There is much evidence in the record as to the different kinds of bombs and as to the mode of their construction. The simplest and cheapest form is what is known as the gas-pipe bomb, the mode of constructing which is hereafter explained. The gas-pipe bomb is the one which the ordinary, unskilled laborer would be most apt to make, if he desired to use such a weapon.

The round bombs, however, are more expensive, and their construction is more difficult and more liable to discovery. Such a bomb consists of two semi-globes, which, if made of iron, must be obtained at a foundry, or if made of zinc or other material, require the use of brass or clay moulds and facilities for melting the metals entering into their composition. The semi-globes must be fastened together by solder or by bolts. Holes must be drilled for the insertion of the bolts and also for the insertion of the caps and fuse. Care must be taken to fill in the dynamite properly and to insert the fulminating cap into the dynamite and the fuse into the cap. The construction of such bombs requires time and skill and involves considerable expense in the purchase of materials.

*Second*—The bomb thrown at the Haymarket was exploded by means of a *projecting fuse*, ignited before leaving the hand by a match or a lighted cigar. This abundantly appears from the evidence of those who saw it before it fell. One witness says it was like a fire-cracker in the air; another, that "it was like a burnt out match, that was lit yet;" another, that it was a "streak of fire" in the air; still another calls it "a little tail of fire quivering in the air."

As we understand the evidence in regard to the mode of constructing a round bomb with a fuse, the method is as follows: When the two semi-globular shells are fastened to-

gether, and the dynamite is filled in through an opening made for that purpose, a fuse six or eight inches long is inserted in a detonating cap; the cap is pinched so as to hold the fuse; the cap is then inserted about two-thirds of its length into the dynamite through the opening, and five or six inches of fuse are left to project outside of the bomb.

There are bombs which do not have the projecting fuse. When explosion is desired from a distance, a wire and electric battery are used. A primer bomb has a percussion cap on each side, so that, when it is thrown, "whichever side strikes will explode the cap." Another kind of bomb is described in the testimony, as having the appearance of a fruit-can, containing a glass tube connected with the top by a screw, and so fixed as to explode when thrown against a hard substance.

The bomb with a projecting fuse of six or eight inches is made to be thrown into a crowd of men and when "only a few minutes are desired to get away," and "only so much fuse is required as can burn in the interval of throwing." When the fuse projects in the manner indicated it is necessary to apply a light externally to the end of the fuse before the bomb is thrown.

*Third*—The shell of the bomb, which exploded, was of *composite manufacture.* Pieces of the shell were taken by the physicians from the body of Degan and from the body of officer Murphy, who had fifteen shell wounds. These pieces were subjected to chemical examination, and were found to be composed of tin and lead, with traces of antimony, iron and zinc. The Degan piece contained slightly more tin than the Murphy piece, but the ingredients of the two pieces were exactly the same. The chemists, who made the analysis here referred to, and who have given their testimony in relation to the same, swear, that there is no commercial substance which has the same composition as these pieces of shell. Commercial lead, they say, never contains tin. Solder is composed of tin and lead, but the proportion of tin in solder to the

amount of lead therein is so different from the proportions of those ingredients in the pieces of shell so analyzed, that the latter could not have been made of solder. Experiments also demonstrated that the exploded bomb could not have been made out of old lead-pipe, that had been plugged or mended with solder. The proportions of lead and tin in such case are vastly different from their proportions in the pieces of the bomb, which were subjected to examination. In the latter, lead was the basis of the preparation, but tin, or some other metal containing tin, was mixed with the lead.

*Fourth*—The bomb, which exploded, had upon it a small *iron nut.* One Michael Hahn was standing on the north-west corner of Desplaines and Randolph streets when the bomb exploded at the Haymarket meeting, and was struck by a part of it. On the morning of May 5, 1886, a surgeon extracted from his body an iron nut, threaded in the circular opening through its center, so as to fit upon the screw end of a bolt, of which it had evidently been a part. The discovery of this nut points unerringly to the conclusion, that the two semi-globular halves of the exploded bomb had been fastened together by a bolt and had not been soldered together. The evidence shows that soldering was the usual method of fastening together the two halves of the round bomb.

The four characteristics of the exploded bomb, which have been thus indicated, were found to exist in the bombs, which were made by the defendant Louis Lingg.

*First*—Many of the bombs made by Lingg were *round* or globular in form. The defendant Lingg came to this country for the first time in the summer of 1885 from some place in Germany. In August of that year he became acquainted with William Seliger, a German carpenter, who had resided in America three years and a half. Two weeks before Christmas, 1885, he went to board and room at Seliger's house, No. 442 Sedgwick street, in the North division of the city of Chicago. More than six weeks before May 1, 1886, he brought

a bomb to the house and said he was going to make bombs. Some six weeks before that date, or about the middle of March, 1886, he brought dynamite there.    He had three different kinds of dynamite.    He had no regular employment for about four weeks prior to May 1, 1886.    During this time he was experimenting with dynamite, and with round and long or gas-pipe bombs.    He exploded the latter in the woods north of the city, and "says he put one right in the crotch of a tree and slit it all up."    During a period of six weeks prior to May 1, 1886, he was at work from time to time making semi-globular bomb shells, and was often assisted in this work by Seliger and by two men named Thielen and Hermann or Heumann.    These semi-globes appear to have been all finished before May 4, 1886, and, of course, were intended for round bombs, the only kind in the construction of which such shells were used.    After Lingg's arrest, round bombs were found in a trunk in his room and under a sidewalk on Sigel street, where he is proven to have hidden them, and in the possession or under the control of one Lehmann, to whom he is proven to have given them.    It thus appears that the exploded bomb corresponded in shape and form with many of the bombs made by Lingg.

*Second*—The bombs made by Lingg had the *projecting fuse* so as to be exploded by the external application of fire.

On April 30, 1886, being the Friday before the day of the Haymarket meeting, Lingg brought to Seliger's house a large wooden box, about three feet long, from sixteen to eighteen inches high and from sixteen to eighteen inches broad, inside of which was a tin box, containing dynamite.    On the next Tuesday, May 4, 1886, he was occupied, during the afternoon and until after seven o'clock in the evening, in filling this dynamite into gas-pipes and globular shells, using a flat piece of wood, which he had made for that purpose.    He was assisted in his labors by a number of persons, and among these were Seliger, Thielen and Hermann, already mentioned, and

two men, named Huebner and Munsenberg or Muensenberger, the latter of whom was probably the blacksmith hereafter referred to. Upwards of fifty bombs were finished that afternoon, and the work on them would appear to have been continued up to or beyond the hour on that evening for which the Haymarket meeting had been called, as hereafter stated. The rooms in Seliger's house, which were used by Lingg and his assistants for their work, are spoken of as the front room and the bedroom. The witness Lehmann visited these rooms twice on Tuesday afternoon in company with a countryman of his, a Prussian, named Smideke, who went there with him to buy a revolver. His first visit was made at five o'clock in the afternoon, at which time he saw there Lingg, Seliger, Huebner, and a person of whom he speaks as follows: "One whose name I did not know; it is said that he is a blacksmith." They were in the bedroom, and each had a cloth tied around his face, but the witness "could not precisely see what they were doing."

The second visit was made to the rooms at seven o'clock in the evening, and lasted about ten minutes. At this time Lehmann did not get into the bedroom, but they were busy there as at the first visit. He saw Heubner working at some *coil of fuse,* which looked like strings or white cord; he was cutting it into pieces; they were putting fuse into caps in the front room. During one of these visits Lingg gave to Lehmann a small leather hand-satchel or trunk, which the latter took home and placed in his woodshed, and, at three o'clock next morning, after he had learned of the destruction wrought at the Haymarket, carried "away to the prairie," there burying its contents. The satchel contained a tin box or can nearly full of dynamite, and three *round* bombs, some caps, and *two coils of fuse.* Another circumstance may be mentioned in this connection. After ten o'clock on Tuesday night, when Lingg and Seliger were on Larrabee street, just south of North avenue, in the North division of the city, a patrol wagon passed

them, which was manned with policemen, and·had been sum-
moned to the Haymarket by a call through the telephone.·
Lingg proposed to throw among the policemen in the wagon.
a bomb, which he had about his person, and, for the purpose·
of exploding it, demanded a light of Seliger, who was smoking·
a cigar at the time. It thus appears, that the bombs made·
by Lingg were made with the projecting fuse, and, so, cor-
responded with the second feature of the exploded bomb, as·
already noticed.

*Third*—The shells of the round bombs made by Lingg were·
constructed of *composite metal.*

Their correspondence in this particular with the shell of·
the exploded bomb tends very strongly to show, that the same·
hand, which made them, also made the exploded bomb. Lingg,
Seliger, Thielen and Hermann were frequently engaged in
"melting and casting" in Seliger's kitchen during the six weeks·
before May 1, 1886. Lingg melted lead or some other metal
in a ladle on the kitchen stove. A pan is identified, as one·
which was used by him in making the semi-globes, found in
his round bombs. He also made use for such purpose of clay
molds, constructed by himself. One of these clay molds could
only be used twice.

Pieces of bomb shells proven to have been made by Lingg
in the manner and with the materials here indicated, were
subjected to chemical analysis. They were composed of a·
certain percentage of tin, and the remainder was lead, with
traces of antimony, iron and zinc. Out of four bombs ex-
amined, the percentage of tin in the different bombs varied
slightly in three, and in the fourth considerably more than in
the other three. As a result of the chemical analysis, the piece
of shell taken from Degan's body, and the pieces of the shells,
discovered in Lingg's possession after his arrest, were shown
to be composed of exactly the same ·ingredients.

After May 4 there were found in Lingg's room a metal
cup, a cold chisel, a file, shells, loaded cartridges, "metal and

also some lead," "some babbitt-metal, some sheets of lead," bolts, pieces of metal in a Japan dinner box with four dynamite gas-pipe bombs, two loaded and two empty, a Remington rifle, a round dynamite bomb, loaded, two pieces of solder, a blast hammer and a smaller pointed hammer, a couple of iron bits and drills, a two-quart pail with sawdust in the bottom, a tin quart basin with fuse and sawdust or dynamite in it, two long cartridges of dynamite and some fuse already fixed, fuse about four inches long and caps, a big coil of fuse in the trunk, a piece of block tin, a piece of candlestick. Babbitt-metal is an alloy of copper, tin and zinc. Many of the articles found were chemically analyzed. The candlestick or toy proved, upon analysis, to contain tin, lead, antimony, zinc and a trace of copper. All the ingredients necessary to make up the composite material, out of which the exploded shell was constructed, were thus discovered to be in Lingg's possession.

The shell of the globular bomb, if entirely of lead, would be soft and yielding, and on this account would fail to furnish that degree of resistance to the dynamite, which appears from the evidence to be necessary, in order to make the explosion effective. It was evidently for this reason, that some other substance, such as tin, was combined with the lead to give the shell a firmer consistence and make its effects more deadly. With the same end in view, nails and wire, as will be hereafter seen, were recommended by the defendant Engel to be put around the gas-pipe bombs.

It appears, that, of the bombs made by Lingg, which were analyzed, each differed slightly from the others in the amount of tin, though all contained the same ingredients. It also appears, that the two halves of the same bomb would differ somewhat in the proportions of the metal present, and this accounts for the fact, that the piece from Degan's body contained a very little more tin than the piece from Murphy's body, each evidently coming from a different half of the bomb.

These slight differences are such as would naturally be expected, when shells were made with the rude materials with which Lingg worked, melting his metals in a small ladle on a kitchen stove, casting half a shell at a time, making use of clay molds made by himself, each one of which could only be used twice.

*Fourth*—The semi-globular halves of each round bomb made by Lingg were fastened together by a bolt, upon one end of which was screwed a *small iron nut,* showing a remarkable correspondence between the Lingg bombs and the exploded bomb in the fourth peculiarity of the latter, which has been heretofore mentioned.

On the morning of Tuesday, May 4, Lingg left Seliger's house to go to a meeting on the West Side and did not return until one o'clock in the afternoon. Before leaving he instructed Seliger to go to work at the bombs, remarking that they would be taken away that day. He gave Seliger a bolt, and said "that he had not enough of those bolts," and told him to go to Clybourne avenue and "get there some that he had already spoken to the man about." About fifty of the bolts were procured in accordance with the directions thus given. Seliger was engaged in the forenoon in drilling holes in the shells already on hand for the bolts to pass through. He was chided by Lingg, upon the latter's return, for having progressed so slowly with the work, and was informed, that they would "have to work very diligently during the afternoon."

The evidence shows, that the bolt used by Lingg was a metallic pin running through the bomb, that a head was formed on one end of this pin, and on the other end there was cut a thread, upon which was screwed a moveable piece called a nut, the head at one end and the nut at the other holding the two semi-globes together. These bolts were found in the bombs afterwards taken from the possession of Lingg, and proven

by the undisputed testimony in the case to have been made by him.

The nut taken from the body of Hahn, and which was a part of the exploded bomb, was applied to the threaded end of one of the bolts taken from a bomb made by Lingg and was found to fit it exactly. This can not be regarded otherwise than as a circumstance of very grave significance.

In view of the considerations thus far presented, and of others which will suggest themselves as the examination proceeds, we think the jury were warranted in believing from the evidence that the bomb, which killed Degan, was one of the bombs made by the defendant Lingg.

This conclusion receives indorsement from the fact, that the making of such bombs as have been described is a new, unusual and dangerous occupation. There are no bomb manufactories. A bomb is not an article, which can be bought in the market like a revolver. He, who would use such a weapon, must make it himself.

According to the evidence in this record, dynamite is composed of nitro-glycerine and clay or sawdust; it must be handled with care; it will explode, if subjected to too great a degree of heat; it should not be exposed to the rays of the sun, or placed too near the fire; if kept for any length of time, it must be stored with caution, for instance, it is recommended that it be wrapped in oil paper, placed in a box of sawdust and buried in the cellar; when, in handling it, it gets upon the skin, headache is produced; if its dangerous gases are inhaled, frightful pains in the head will be the result. Moreover, information as to its peculiarities and as to the safest mode of handling it is limited and, to some extent not accessible.

For these reasons so hazardous a business as filling bomb shells with dynamite will not usually be engaged in. Hence, when a murder is the result of the explosion of a dynamite

bomb, and, about the time of the murder, a man is found making such bombs near the scene of the explosion, his responsibility for the crime, viewed in connection with other criminating circumstances which may exist, will be a more natural inference than where some more common weapon of destruction has been used.

The next question to be considered is: why did the defendant Lingg make the bomb, which killed Degan?

In order to satisfactorily answer this question, it becomes necessary to examine the character and purposes of an association, with which all the defendants in this case were connected.

The record shows the existence of an organization, known as the International Workingmen's Association, or the International Arbeiter Association, generally called the "Internationals," and sometimes designated for brevity as the I. A. A.

The platform or declaration of principles adopted by this organization was published by a certain bureau of information and by certain newspapers, called the "Alarm" and the "Arbeiter Zeitung," which are more particularly referred to hereafter. It appeared in all the issues of the latter paper during the months of February, March and April, 1886. It is too long for insertion here. It urges, that the present system, under which property is owned by individuals, should be destroyed, and that all capital, which has been produced by labor, should be transformed into common property. It says: "It is only when capital is made common and indivisible that all can be made to partake fully and freely of the fruits of common activity; only by the impossibility of acquiring individual (private) capital can every one be compelled to work who claims the right to live." It charges, that the government, the law, the schools, the churches, the press, are in the pay and under the sway of the property-owning and capitalistic classes, and that the laboring classes must achieve their deliverance through their own strength.

This international platform thus addresses the workingmen : "As in former times no privileged class ever relinquished its tyranny, no more can we take it for granted, that the capitalists of the present day will forego their privileges and their authority without compulsion.   .   .   .   It is therefore self-evident, that the fight of proletarianism (the laboring classes) against the bourgeoise (the middle classes) must have a violent revolutionary character, and that mere wage conflicts can never lead to the goal.   We could show, by numerous illustrations, that all attempts, which have been made in the past to do away with the existing monstrous social system through peaceable means, for example, through the ballot-box, have been entirely useless and will be so in the future.   .   .   . We know, therefore, that the ruling classes will not voluntarily relinquish their prerogative, and will make no concessions to us.   Under all these circumstances, there is only one remedy left—force !   .   .   .   Therefore, it is your right, it is your duty, says Jefferson, to arm yourselves.   *Agitation,* with a view to organization, organizations for the purpose of *rebellion;* herein is indicated in a few words the way which workingmen must take, if they would rid themselves of their chains."

It is here admitted, that the property of each individual in the community could not be taken away from him and put into a common fund to be divided among all the members of the community without a resort to revolution and force.   The way to the result, sought to be reached by the International platform here referred to, leads, through the crimes of robbery, theft and murder, to the destruction of the existing system of social order and of all the laws and institutions upon which that system is based.

The association, whose principles are thus outlined in its platform, was divided into groups, of which there were eighty in the United States in March, 1885, located principally in the centers of industry.   For some time prior to May 1, 1886,

there was a number of these groups in Chicago. The following are spoken of by different witnesses: The North Side group, which met at No. 58 Clybourne avenue in the North division of the city; the North-west Side group, which met at Thalia Hall, No. 636 Milwaukee avenue, in the north-western part of the city; the American group, which met generally at No. 54 West Lake street, in the West division of the city, but sometimes at Baum's Pavilion at the corner of Cottage Grove avenue and Twenty-second street in the South division of the city, and at No. 45 North Clark street, No. 106 Randolph street, and on the Lake Front; the group "Karl Marx," which met at No. 63 Emma street in the West division; the group "Freiheit," which met on Sherman street in the South division; the South-west Side group, which met at No. 611 Throop street in the south-western part of the city; the group, "Jefferson No. 1," which met at No. 600 Milwaukee avenue.

The defendants Schwab, Neebe and Lingg belonged to the North Side group, the defendants Engel and Fischer to the North-west Side group, and the defendants Spies, Parsons and Fielden to the American group. Spies had also belonged to the North-west Side group.

The members of these groups were known by numbers and not by names. The members of the North Side group began to be known by numbers in July, 1884. The number of the witness Seliger, who belonged to the North Side group, was 72. Certain members of these groups were armed with rifles and drilled regularly once a week at their respective places of meeting, taking their rifles home with them after drill. These armed members were known and designated as the "armed sections" of the groups. The North Side group met every Monday night at 58 Clybourne avenue, and the armed section drilled there every Sunday morning. The armed section of the American group met every Monday evening at No. 54 West Lake street. The North-west Side group met Thursday evening at No. 636 Milwaukee avenue. The South-west

Side group met every Saturday evening at No. 611 Throop street.

There was also a certain armed socialistic organization, called the Lehr und Wehr Verein, whose members seem to have been members also of the International groups, but to have been of a higher rank and to have attained a higher grade in the perfection of their drill than was the case with the ordinary members of the "armed sections." The evidence does not disclose the exact number of those, who belonged to the Lehr und Wehr Verein at the time of the trial, but in 1879 it had one thousand men. Its members were armed with Springfield rifles and were known by numbers. They conducted their drills and military exercises at Thalia Hall, No. 636 Milwaukee avenue, where the North-west Side group, the most radically anarchistic of all the groups, held its meetings.

The Lehr und Wehr Verein had four companies in Chicago. The witness August Krueger, whose number was 8, was orderly sergeant and corresponding secretary of the second company. Godfried Waller, whose number was 19, and Bernard Schrade, whose number was 32, were members of this second company. Schrade also belonged to the North-west Side group, and says they drilled once a week and kept their Springfield rifles at home. The third company seems to have had a drill every Thursday evening at a workingmen's hall on West Twelfth street.

The "armed section" of the American group was called the "International Rifles." After one of its drills on August 24, 1885, at No. 54 West Lake street, ten men, dressed in blue blouses and each armed with a Springfield rifle, and who belonged to the first company of the Lehr und Wehr Verein, were introduced into the room and drilled for the benefit of the new members of the "International Rifles." It was then and there stated, that, in case of a conflict with the authorities, the International Rifles were to act in concert with the Lehr

und Wehr Verein and obey the orders of its officers.   From this it would appear, that the Lehr und Wehr Verein or its officers were to direct the movements of the ordinary "armed sections," when occasion should require.

In the spring of 1885 there were in the city of Chicago three thousand of these armed socialists, of whom the defendant Parsons then said that "they were well-armed with rifles and revolvers and would have dynamite and bombs when they got ready to use them."   As they were known by numbers, no record was kept of their names, and a system was adopted by which the members would be as little known to each other as possible.

These groups were represented by a general committee, composed of delegates from all the groups of the International Association in Chicago.   This committee met every two weeks in a building in the South division of the city, known as No. 107 Fifth avenue, and called by the witnesses the "Arbeiter Zeitung Building," or the building of the International Arbeiter Association.   The meetings of this committee were held in a library room which is spoken of by one of the witnesses as belonging to the "Arbeiter Zeitung" newspaper hereinafter mentioned, and which was located in the rear of the office room of that paper.   In August, 1885, at the time of what is called the "car-drivers' strike," the witness Seliger was present in this room, as a delegate from the North Side group to the meeting of the general committee, and speaks of the defendant Spies as being there present on that occasion.

The members of the general committee had been in the habit of meeting in this library-room for a number of years, certainly since 1880.   One Hirschberger was the librarian.

An exception should be made to the statement that all the groups appointed delegates to the general committee.   The North-west Side group did not do so, and the reason given for this by Fricke, who was at one time a member of that group and for two years book-keeper of the "Arbeiter Zeitung," was,

that the principles of the North-west Side group were more strongly anarchistic than those of the other groups. It was called an "autonomous" group.

A newspaper, called the "Arbeiter Zeitung," and conducted in the interest of the German-speaking groups of the International Arbeiter Association, was published in the building No. 107 Fifth avenue, and had its office and editorial rooms there. Its superintendent and chief editor was the defendant Spies. The defendant Schwab was co-editor, and wrote some of the most important of the editorials. The defendant Fischer was a type-setter in the office, and about the 1st of May, 1886, was the head foreman of the printing department. This paper was owned by a corporation, in which Spies, Schwab, Fischer and Neebe were stockholders. It was printed in the German language, and, besides its daily issue, had a Sunday edition, called the "Fackel," and a weekly edition called the "Vorbote." Its circulation was about thirty-six hundred. Notices of the meetings of workingmen were inserted in its columns without charge.

Another newspaper by the name of the "Alarm," owned by the International Arbeiter Association, and conducted in the English language in the interest of the English-speaking groups, was also published at the same building, No. 107 Fifth avenue. Its editor and manager from October, 1884, to May, 1886, was the defendant Parsons. The defendant Fielden owned some of the stock in the corporation which controlled it. Its circulation was about two thousand. It was first issued as a weekly, and afterwards as a semi-monthly paper. Still another newspaper, called the "Anarchist," was started in January or February, 1886, by the North-west Side group and two of the South Side groups. It was under the management of the defendant Engel. Its origin was announced as being due to the fact, that the "Arbeiter Zeitung" was not outspoken enough in its anarchistic principles. Its efforts

were directed to the same ends as those contemplated by the other papers mentioned.

All the bills for the printing of the "Arbeiter Zeitung" and the "Alarm" were made out to the "Arbeiter Zeitung" and were paid by the defendant Spies, occasionally by check, but generally in currency.

There was a bureau of information of the Internationals. This also had its headquarters at the "Arbeiter Zeitung" building. The bureau of information, designated to act for the years 1885 and 1886, consisted of the defendants Spies and Parsons, the librarian Hirschberger, one Belthazer Rau, an advertising agent of the "Arbeiter Zeitung," and one Joseph Bach, a member of the North Side group and afterwards a director of the "Arbeiter Zeitung." Letters were always addressed to Spies, as a member of this bureau, at 107 Fifth avenue.

Besides the regular weekly meetings of the groups heretofore mentioned in their respective halls, there was occasionally a meeting of all the "armed sections" of the different groups at No. 54 West Lake street, known as Greif's Hall.

These meetings of the armed sections, whose members were located in the North, South and West divisions of the city, were irregular. They were called by a signal, given by the "Arbeiter Zeitung." This signal was: "Y.—Komme Montag Abend," or "Y.—Come Monday night." Whenever these words appeared in the letter-box column of the "Arbeiter Zeitung," they were understood to be a summons to the "armed sections" to meet on Monday night at Greif's Hall.

The evidence in the record shows, that there were in the city of Chicago twenty-five or thirty labor unions, containing from fifteen thousand to sixteen thousand laborers, and that delegates from these unions constituted a body called the Central Labor Union. The large majority of those, who belonged to the labor unions, were well-meaning workingmen, whose designs were not unlawful, and the object of whose

organization was to better their own condition. They did not all belong to the groups of the International Association. But the members of those groups were, as a general thing, also members of the different labor unions.

It thus appears, that the branch of the International Workingmen's Association, which existed in Chicago during the year 1885, and up to May 4, 1886, was a compact, well-disciplined organization. At the head of it was a general or central committee. Next to the committee came the Lehr und Wehr Verein, a secret military organization divided into companies. Next to the Lehr und Wehr Verein came the "armed sections" of the various groups, practicing their weekly drills at night and on Sunday in various parts of the city, and, in some instances, under the direction of the officers of the Lehr und Wehr Verein. Next came the unarmed members of the groups, who were constantly in contact with their armed brethren and in hearty sympathy with their purposes and principles. As to some of the groups, however, all the members seem to have been engaged in arming and drilling.

There can be no doubt that the organization here described was an unlawful conspiracy.

*First*—Its *purpose* was unlawful. It designed to bring about a social revolution. Social revolution meant the destruction of the right of *private* ownership of property, or of the right of the *individual* to own property; it meant the bringing about of a state of society in which all property should be held in common. As a court, we are not concerned with the question, whether it was right or wrong to adopt and advocate an abstract theory in regard to the ownership of property, such as is here indicated. But this abstract theory assumed a concrete and practical form. The police and militia were looked upon as protectors and guardians of the form of ownership in property, which was objected to. Hence, "social revolution" meant war upon the police and militia. The destruction by force of the police and militia in the city of Chicago was the

practical object which this organization proposed to accomplish in that city.

*Second*—Its *methods* were unlawful. · The arming and drilling of the groups were in violation of the Militia law of the State of Illinois, which provides that "it shall not be lawful for any body of men whatever, other than the regular organized volunteer militia of this State and the troops of the United States, to associate themselves together as a military company or organization, to drill or parade with arms in any city or town of this State without the license of the Governor thereof," etc. It is not pretended, that any such license was ever issued to these groups by the Governor of the State.

The central or governing authority of this International organization had its headquarters in the "Arbeiter Zeitung" building and in a room connected with the office of the "Arbeiter Zeitung" newspaper. From that place mainly its policy was dictated and the orders, which controlled its movements, were issued. Among the principal persons, who shaped its policy and outlined its course of action, were the defendants Spies, Schwab, Engel, Lingg, Fielden, Parsons, Fischer, and, in a subordinate degree, Neebe.

These defendants sought to use the organization for the purpose of bringing about the "social revolution," and, to that end, endeavored to increase its membership and perfect its discipline so as to hurl it against the police and militia, as the representatives of law and order. Among the means, employed to accomplish this, were, "*agitation* with a view to organization," and "organization for the purpose of rebellion." The object of "*agitation*" was to increase the ranks of the "armed sections" of the International groups by recruits from the "Labor Unions" and other associations of workingmen. The meaning of "organization" was the arming of such recruits with dynamite and revolvers.

During the years 1885 and 1886 the defendants Spies, Schwab, Parsons, Engel and Fielden by numerous speeches,

and by articles published in the newspaper organs above mentioned, persistently advised and encouraged the workingmen to arm themselves for a conflict with what were called the property-owning classes and with the police and militia, who were regarded as the special protectors of those classes. These speeches were made at picnics, in workingmen's halls, at gatherings of the International groups, in Market square, and from the windows of the "Arbeiter Zeitung" building. They denounced the police and militia. They inveighed against the "private right of property." They advised the purchase of rifles and dynamite.

Extracts from the "Alarm," the "Arbeiter Zeitung" and the "Anarchist," and from speeches of Schwab, Spies, Parsons, Fielden and Engel, are set out in the statement which precedes this opinion.

The articles in the "Alarm" were most of them, written by the defendant Parsons, but some of them by the defendant Spies. The articles, quoted from the "Arbeiter Zeitung," were written by the defendants Schwab and Spies. The single extract from the "Anarchist" was written by the defendant Engel.

The articles and speeches so collated are of the most violent and incendiary character. They seek to inspire a feeling of hatred among the workingmen against the police and militia and the property-owning classes. They not only recommend the workingmen to arm themselves with dynamite and rifles, but they give specific instructions how to handle and use dynamite and how to make bombs and how to procure weapons. They recommend the workingmen to attend the meetings of the International Arbeiter Association and read its organs. They advise the formation of special groups for committing deeds of violence, which are called "revolutionary actions," and point out the means of avoiding discovery after such deeds are committed. In the "Arbeiter Zeitung" articles will be found such expressions as these: "Each workingman

ought to have been armed long ago;" "Daggers and revolvers are easily to be gotten, hand grenades are cheaply to be produced; explosives, too, can be obtained;" "The workingmen ought to take aim at every member of the militia;" "Your passport to it, Eden, is that banner which calls to you in flaming letters the word 'Anarchy;'" "Therefore, workingmen, do arm yourselves with the most effective means;" "There is no other way than to become immediately soldiers of the revolutionary army and establish conspiring groups, and let the ruins fall on the homes of such;" "We wonder whether the workingmen . . . will at last supply themselves with weapons, dynamite and prussic acid;" "Workingmen, arm yourselves;" "Enough is said about the importance of being armed. . . . We are to go to work to supply ourselves as quickly as possible with these useful things. . . . Dynamite bears several names here in America; among others it is known in trade also under the names of Hercules powder and giant powder;" "There marched a strong company of well-armed comrades of the various groups; . . . the nitro-glycerine pills were not missing;" "There exists to-day an invisible net-work of fighting groups;" "Every trades-union should make it obligatory to every member to keep a good gun at home and ammunition;" "If we do not bestir ourselves for a bloody revolution, we can not leave anything to our children but poverty and slavery. Therefore prepare yourselves in all quietness for the revolution."

The following expressions will be found in the extracts from the "Alarm:"

"One man, armed with a dynamite bomb, is equal to one regiment of militia," etc.; "Every man, who is master of these explosives, can not be approached by an army of men;" "How can all this be done? Simply by making ourselves masters of the use of dynamite; then. . . . administer instant death, by any and all means, to any and every per-

son, who attempts to continue to claim personal ownership in anything. . . . Our war is not against men, but against systems; yet we must prepare to kill men who will try to defeat our cause. . . . The rich are only worse than the poor because they have more power to wield this infernal 'property-right;' " "Dynamite is the emancipator! in the hands of the enslaved it cries aloud, 'Justice or annihilation.' But, best of all, the workingmen are not only learning its use, they are going to use it. They will use it, and effectually, until personal ownership, property-rights are destroyed, etc. . . . Hail to the social revolution! Hail to the deliverer Dynamite;" "Nothing but an uprising of the people and a bursting open of all stores and store-houses to the free access of the public, and a free application of dynamite to every one who opposes, will relieve the world of this infernal nightmare of property and wages;" "Seeing the amount of needless suffering all about us, we say a vigorous use of dynamite is both humane and economical. . . . It is upon this theory that we advocate the use of dynamite. It is clearly more humane to blow ten men into eternity than to make ten men starve to death;" "Dynamite! of all the good stuff, this is the stuff. Stuff several pounds of this sublime stuff into an inch pipe, gas or water-pipe, plug up both ends, insert a cap with a fuse attached, place this in the immediate neighborhood of a lot of rich loafers, who live by the sweat of other people's brows, and light the fuse. A most cheerful and gratifying result will follow;" "The next issue of the 'Alarm' will begin the publication of a series of articles concerning revolutionary warfare, viz.: 'The Manufacture of Dynamite Made Easy,' 'Manufacturing Bombs,' 'How to use Dynamite Properly,' " etc. "All governments are domineering powers, etc. . . . Assassination will remove the evil from the face of the earth. . . . Assassination properly applied is wise, just, humane and brave. For freedom, all things are just;" "Though everybody nowadays speaks of dynamite, . . . few have any

knowledge of the general character and nature of this explosive. For those, who will sooner or later be forced to employ its destructive qualities in defence of their rights as men, and from a sense of preservation, a few hints may not be out of place. Dynamite may be handled with perfect safety, if proper care is used," etc. (Then follows a series of minute directions.)

During the months of December, 1885, January, February and March, 1886, the following notice appeared in the "Arbeiter Zeitung:"

" 'Exercise in Arms.' Workingmen, who are willing to exercise in the handling of arms, should call every Sunday forenoon, at half past nine, at No. 58 Clybourne avenue, where they will receive instructions gratuitously."

In the "Alarm," from August 17, 1885, to April 24, 1886, appeared the following notice:

"The armed section of the American group meets Monday night, at No. 54 West Lake street."

One Herr Most had prepared a treatise or book, entitled "Revolutionary Warfare," containing instructions, that entered into the minutest details, as to the best mode of preparing dynamite and other explosives, and of making bombs and other weapons. From time to time in 1885 and 1886, the "Alarm" and the "Arbeiter Zeitung" published translations and extracts from this book, for the evident purpose of communicating the information in it to the members of the groups and to their other readers among the workingmen. Specimen extracts from this treatise are set out in the statement which prefaces this opinion.

In the extract from the "Anarchist" will be found the following expressions: "All government we hate. . . . Complaints should be sent to G. Engel. . . . Workingmen and fellows: . . . he, who would war successfully, must equip himself with all implements adapted to destroy his op-

ponents. . . . We strive towards the overthrow of the existing order," etc.

The defendant Schwab, in a speech delivered on April 26, 1886, about a week before the Haymarket meeting, said: "Everywhere police and murderers are employed to grind down workingmen. For every workingman, who has died through the pistol of a deputy sheriff, let ten of those executioners fall. Arm yourselves!"

The defendant Spies, in a speech made in October, 1885, said that "there were nine millions of people engaged in industrial trades in this country; there were but one million of them as yet organized, while there were two millions of them unemployed; to make a movement, in which they were engaged a successful one, it must be a revolutionary one; don't let us . . . forget the most forcible argument of all—the gun and dynamite."

In speeches made by him, the defendant Parsons said, in February, 1885: "We need no president, no congressmen, no police, no militia and no judges; they are all leeches sucking the blood of the poor, who have to support them by their labor; I say to you, rise, one and all, and let us exterminate them all. Woe to the police or the militia whom they send against us!" In April, 1885, he said: "The only way to convince these capitalists and robbers is to use the gun and dynamite." Again he said, in April, 1885: "If we would achieve our liberation from economic bondage and acquire our natural right to life and liberty, every man must lay by a part of his wages, buy a Colt's navy revolver, a Winchester rifle, and learn how to make and to use dynamite. Then raise the flag of rebellion, the scarlet banner of liberty, fraternity, equality, and strike down to the earth every tyrant, that lives upon this globe. Tyrants have no rights, which we should respect. Until this is done, you will continue to be robbed, to be plundered, to be at the mercy of the privileged few; therefore *agitate for the purpose of organization, organize for the pur-*

*pose of rebellion,* for wage-slaves have nothing to lose but their chains." And in August, 1885, referring to the street-car strike, he said: "If but one shot had been fired and Bonfield had happened to be shot, the whole city would have been deluged in blood and the social revolution would have been inaugurated."

The defendant Fielden, in speeches made by him, said in March, 1885: "I want all to organize; every workingman in Chicago ought to belong to our organization; it is of no use to go and beg of our masters to give us more wages or better times. When I say, 'organize,' I mean for you to use force; it is of no use for the working people to hope to gain anything by means of the ordinary weapons; every one of you must learn the use of dynamite, for that is the power with which we hope to gain our rights." In October, 1885, he said: "You must all organize and use force; you must crush out the present government, as by force is the only way, in which you better your present condition." He said in January, 1886: "It is quite true, that we have lots of explosives and dynamite in our possession, and we will not hesitate to use it, when the proper time comes. We care nothing either for the military or police, for these are in the pay of the capitalist." Again in March, 1886, he said: "We are told that we must attain our ends and aims by obeying law and order. Damn law and order! We have obeyed law and order long enough. The time has come for you, men, to strangle the law, or the law will strangle you."

The defendant Engel made a speech in German in February, 1886, to a crowded hall of workingmen, of which one witness says: "He advised everybody—'every man wants to join them, to save up three or four dollars to buy revolvers to shoot every policeman down;' he says he wants every workingman, whom he could get, to join them, and then advise every body you know—you save up three or four dollars to buy a revolver that was good enough for shooting police-

men down;" and again in the same month he made a speech to the North Side workmen at Neff's Hall, 58 Clybourne avenue, where the North Side group met, as already stated, in which he said "that those who could not arm themselves and could not buy revolvers, should buy dynamite; that it was very cheap and easily handled; he gave a general description how bombs could be made, how gas-pipes could be filled; that a gas-pipe was to be taken and a wooden block put into the end, and it was to be filled with dynamite; then the other end is also closed up with a wooden block, and old nails are tied around the pipe by means of wire; then a hole is bored into one end of it and a fuse with a cap is put into that hole; that the nails should be tightened to the pipe, so that when it explodes, there will be many pieces flying around; that gas-pipe could be found on the West Side from the river, near the bridge."

The utterances by printed and spoken words, of which the quotations above made are specimens, were addressed to workingmen, of whom the defendant Spies says that they were "stupid and ignorant." While the members of the International groups were reading and hearing the appeals, thus made to their prejudices, they were discussing their condition in weekly meetings, and very many of them participating in weekly drills with arms.

The time, when the war against the police was to be inaugurated, was not an indefinite period in the future. The evidence shows, that the date, fixed for the inauguration of the social revolution, was the 1st of May, 1886.

Two years before May 1, 1886, the working people had "resolved that the eight-hour system should be introduced in the United States" at that date. The defendants in this case and the more radical members of the International groups had no faith in the eight-hour movement. This abundantly appears from the testimony in the record. Gruenhut swears, that Spies did not consider the movement as amounting to any-

thing; that he regarded it as "only a palliative measure, not radical enough." A want of confidence in it on the part of the defendant Spies is apparent from the language of some resolutions, introduced by him on October 11, 1885, at a meeting at the Twelfth street Turner Hall, one of which began in this wise:

"*Resolved,* That, while we are skeptical in regard to the benefits that will accrue to the wage-workers in the introduction of an eight-hour work day," etc. At a speech made at the same meeting Fielden said: "The eight-hour law will be of no benefit to the workingman." An article in the "Alarm," dated April 3, 1886, in which the defendant Parsons gives an account of a speech made by him to the American groups, shows that he only valued "the attempt to inaugurate the eight-hour system," because he thought it "would break down the capitalistic system and bring about such disorder and hardship, that the 'social revolution' would become a necessity."

Engel said in the "Anarchist:" "We reject reformatory measures as useless play. . . . All endeavors of the working classes not aiming at the overthrow of existing conditions of ownership . . . are to us reactionary," etc.

The 1st of May was fixed upon as the date for the inauguration of the "social revolution" because of the strikes and disturbances, which were then expected to grow out of the demand for the eight-hour working day. It was anticipated, that many workingmen would then be out of employment and that their discontent and sufferings would drive them into an adoption of the revolutionary plans of the International groups.

The witness Johnson says, that, at the meetings of the armed section of the American group, "the 1st day of May was frequently mentioned as a good opportunity" for the revolution.

In a speech in December, 1885, at Twelfth street Turner Hall, Fielden said:

"The 1st of May will be our time to strike the blow; there are so many strikes and there will be fifty thousand men out of work."

Spies said that the conflict between the police and the "dynamiters" would probably occur, when there should be an universal strike for the eight-hour law.

The international groups and other associations of workingmen were frequently urged to prepare to demand the eight-hour law on the 1st of May, 1886, with arms in their hands. They were told that such demand would be the more readily acceded to, if made by armed men.

In an article published in the "Arbeiter Zeitung," on the afternoon of Tuesday, May 4, 1886, only a few hours before the Haymarket meeting occurred, the defendant Spies said: "Six months ago, when the eight-hour movement began, there were speakers and journals of the I. A. A. who proclaimed and wrote: 'Workmen, if you want to see the eight-hour system introduced, arm yourselves. If you do not do this, you will be sent home with bloody heads, and birds will sing May songs on your graves.'"

Looking into some of the statements, made by the journals and speakers referred to, we find the following:

The "Arbeiter Zeitung" said on January 22, 1886: "With empty hands the workingmen will hardly be able to cope with the representatives of the club, in case, after the 1st of May of this year, there should be a general strike; . . . but if the workingmen are prepared to eventually stop the working of the factories, to defend himself with the aid of dynamite and bombs against the militia, which will of course be employed, then and only then can you expect a thorough success of the eight-hour movement." It said on January 23, 1886: "Therefore, comrades, armed to the teeth, we want

9—122 ILL.

to demand our rights on the 1st of May; in the other case there are only blows of the club for you." It said on March 2, 1886 : "Who wants to attack capitalism in earnest must overthrow the body-guards of it, the well-drilled and well-armed 'men of order,' and kill them, if he does not want to be murdered himself. But for this is needed an armed and systematically drilled organization;" and on the same page are these words : "The time up to the 1st of May is short. Look out !"

The "Alarm" said on September 5, 1885 : "Now in regard to the proposed strike *next spring*, a few practical words to our comrades. . . . Will the manufacturing kings grant the modest request? . . . No, sir, . . . they will then draw from the army of unemployed; the strikers will attempt to stop them. Then comes the police and the militia. . . . Say, workingmen, are you prepared to meet the latter; are you armed ?"

The defendant Spies, on October 11, 1885, at the meeting at Twelfth street Turner Hall, already referred to, introduced, in a speech made by him, the following resolution :

"Whereas, a general move has been started among the organized wage-workers of this country for the establishment of an eight-hour work day, to begin May 1, 1886. And

"Whereas, it is to be expected that the class of professional idlers, the governing class, who prey upon the bones and marrow of the useful members of society, will resist this attempt by calling to their assistance the Pinkertons, the police and the State militia,

"*Resolved,* That we urge upon all wage-workers the necessity of procuring arms before the inauguration of the proposed eight-hour strike, in order to be in a position of meeting our foe with his own argument—force."

A little over two months after this resolution was introduced, to-wit, on December 29, 1885, the North Side group, to which Schwab, Lingg and Neebe belonged, held a meeting

at No. 58 Clybourne avenue and adopted the following reso-
lution: "This assembly declares that the North Side group,
I. A. A., pledges itself to work with all means for the introduc-
tion of the eight-hour day, beginning on the 1st of May, 1886.
At the same time *the North Side group cautions the workingmen
not to meet the enemy unarmed on the 1st of May*," etc.

Besides the publication of extracts from Herr Most's book
in the "Alarm" and "Arbeiter Zeitung," the book itself was
extensively circulated among the groups and other working-
men. The "Arbeiter Zeitung" inserted, without charge, on
March 2, 15, 18 and 25, 1886, the following notice: " 'Revo-
lutionary Warfare' has arrived and is to be had through the
librarian at 107 Fifth avenue, at the price of ten cents."
Hirschberger, the librarian here referred to, sold this book
at picnics, where the defendants Fielden, Parsons, Spies,
Schwab, Fischer and Neebe were present. It was distributed
at meetings of workingmen. It was seen at such meetings in
the Twelfth street Turner Hall, at Greif's Hall and at 106
Randolph street, at all of which places Fielden and Parsons
made speeches, and where the American group, to which they
belonged, held meetings. The "books were sold there. The
chairman had charge of the books."

One of the witnesses says he saw copies of Herr Most's book
at meetings of the North Side group and that "the North Side
group bought and sold them."

The efforts of the defendants to prepare for the disturb-
ances expected to grow out of the eight-hour movement on or
about May 1, 1886, were not confined to speeches or news-
paper articles. Nor was the circulation of Herr Most's book
on Revolutionary Warfare the only step taken towards the
instruction of the groups in the mode of preparing and using
dynamite. The record discloses the adoption by the defend-
ants of other and more practical measures in the work of pre-
paration.

In the fall of 1885 the defendant Engel called on a gunsmith and inquired what a hundred or possibly two hundred large revolvers could be purchased for, stating that they were wanted for some society. He bought and paid for one of the pistols for the purpose of presenting it at a meeting of the society. After the Haymarket meeting a machine, which was intended to be used for the purpose of making bombs, was found by the police at Engel's house. The proof shows, that, in the late spring or early summer of 1885, a part of this machine was made by a tinner on Milwaukee avenue in pursuance of an order therefor given by Engel in person.

A witness engaged in the gun business, swears, that in February or March, 1886, the defendant Parsons called at his store and stated, that he wanted to buy forty or fifty revolvers. Upon being shown the samples on hand, he declared that they were not what he desired, but that he wanted "old remodeled Remington revolvers." The witness wrote for quotations as to the prices and gave them to Parsons upon his calling afterwards. He came in again once or twice, but did not finally make the purchase.

The testimony shows, that in the summer of 1885 the defendants Fielden and Parsons participated in the drilling exercises, at No. 54 West Lake street, of the armed section of the American group, to which they both belonged, and of which Fielden was the secretary and treasurer. A drill occurred at that place on August 24, 1885. Fielden and Parsons were present and took part. Suspected persons were ejected, the doors were closed, and the company was drilled for half or three-quarters of an hour by a German drill-master, going through the regular manual of drill, marching, countermarching, turning, forming fours, wheeling, etc. It was on that occasion that the ten members of the first company of the Lehr und Wehr Verein, armed with Springfield rifles, were introduced, and drilled before the members of the "armed section" of the American group. On that occasion, also,

the "armed section" adopted the name of the "International Rifles," of which one Walters was elected captain, and the defendant Parsons lieutenant.    The International Rifles there agreed, as heretofore stated, to act in concert with the Lehr und Wehr Verein and obey the orders of its officers in the event of a conflict with the authorities.    At that meeting, the drill-master exhibited two specimens of the latest improved dynamite bombs for the examination of those present.    They were about the size and had the appearance of ordinary preserve fruit cans.    The top part unscrewed, and the inside of the cans was filled with a light-brown mixture.    There was also a small glass tube inserted in the center of the can.    The tube was in connection with the screw, and it was explained that where the can was thrown against any hard substance it would explode.

At a subsequent meeting at the same place on August 31, 1885, the defendants Fielden and Parsons were present and participated in another drill under Walters, which lasted an hour and a half.    A consultation was had as to the best means of procuring arms.    It was proposed that each member should pay so much a week, until enough should be raised to buy a rifle for each.    The defendant Parsons proposed that a raid be made at night upon the armory of the militia.

It furthermore appears from the evidence, that the defendants Spies, Schwab, Fielden, Parsons and Fischer were engaged in handling bombs and experimenting with dynamite. Samples of bombs were kept at the rooms of the "Arbeiter Zeitung."    Improved kinds of bombs were several times left there for the inspection of the defendant Spies.    At one time two bombs, whose shells were of iron, and which were so made as to be exploded by percussion, were left with the defendant Spies at his office in the building No. 107 Fifth avenue.    At another time two bombs, known as the czar bombs, were brought to Spies at the same office and left there with him.

The defendant Spies admits in his testimony that he pur-
chased bars of dynamite and caps and fuse for the purpose of
experimenting with them. On the morning after the Haymarket
meeting there were found at the office aforesaid a coil of fuse,
two bars of dynamite and a box containing fulminating caps
for the explosion of dynamite.

Three witnesses swear that they were at the office of the
"Arbeiter Zeitung" in April, 1885, on the evening of what is
known as the board of trade demonstration, and after the
demonstration had ended; that Spies, Parsons, Fielden and
Schwab were present; that a dynamite cartridge, a coil of
fuse and a fulminating cap were taken by Spies from a drawer
in the desk and handed to Parsons, by whom they were ex-
hibited to the witnesses. On that occasion Parsons said, that
they were preparing for a warfare against the police and mil-
itia with bombs and dynamite and rifles and revolvers; and
Fielden, who was standing at the elbow of Parsons, said that
"the next time the police attempted to interfere with them they
would be prepared for them," "and perhaps in the course of
a year or so."

In August, 1885, Seliger was present at the office of the
"Arbeiter Zeitung," at a meeting of the general or central
committee of the International Association. He was there as
a delegate from the North Side group. The committee met in
the evening in the library room belonging to the International
Workingmen's Association. The defendant Spies was present.
Seliger saw there two bombs, one round one and one long one.
They were below the counter. Rau, the advertising agent of
the "Arbeiter Zeitung," was exhibiting them, while the dele-
gates were present.

On Thanksgiving. day in November, 1885, there was a
meeting of workingmen on Market square. On that day at
Thalia Hall the defendant Fischer gave to Godfried Waller,
a member of the Lehr und Wehr Verein, a gas-pipe bomb,
seven or eight inches long, saying that it was to be used on

Market square in case of an attack by the police. Waller kept the bomb in his house two weeks, and then gave it to a member of the Lehr und Wehr Verein, who exploded it in the woods in a hollow tree.

Spies and other members of the organization, to which he belonged, were in the habit of going out into the country in the summer and practicing with bombs. Their practice was directed to the two-fold object of learning how to throw the bombs and also of learning how to explode them. An instance is referred to in the evidence, where one of them was exploded in a grove and demolished some of the trees.

One of the witnesses testifies, that, in January, 1886, at the "Arbeiter Zeitung" office, he had an interview with the defendant Spies, at which one of the czar bombs, heretofore referred to, was produced and shown by Spies, and afterwards carried away by the witness. On that occasion Spies stated, that bombs were sometimes distributed through the "Arbeiter Zeitung" office, and that the one then shown was one of the samples they kept there. He also then stated, that a fuse bomb with a detonating cap inside, such as was the czar bomb, had been proven to be the best kind, and that shells made of *compound metal* were much better than shells made of all lead or all metal. He spoke of a body of tall, strong men in their organization, who could throw bombs, weighing five pounds, one hundred and fifty paces.

He stated that the bombs in question were to be used in case of conflict with the police or militia.

Coming back to the defendant Lingg, we think it quite apparent from the testimony, that his efforts in the matter of constructing bombs, as heretofore narrated, were made under the auspices of the International Association, and in furtherance of its objects and purposes. What he did was merely a part of that general preparation, which the other defendants and the groups already described, were making for the conflict expected to take place in the early part of May, 1886.

That this is so will appear from several considerations.

*First*—In March, 1886, the carpenters' union had a ball at Florus Hall, No. 73 West Lake street. A profit was made on the beer sold at this ball, and it was there suggested, that the money representing that profit should be used to buy targets, lead, etc., for some shooting practices, that were expected to take place. The money was, however, turned over to the "armed section" of the carpenters' union, that is to say, to those members of the carpenters' union, who belonged to the armed sections of the different International groups. Several of these members came together at a subsequent meeting and resolved to buy dynamite and practice with that, instead of shooting at targets. The last-named meeting also took place at Florus Hall, and Lingg and Lehmann, who both belonged to the "armed section" of the North Side group, were present. Lehmann says: "It was unanimously resolved, that we were to buy dynamite with it, and experiment with it to find out how it was used; how it was handled. We were unanimous that some one should take the thing in hand, and Lingg was intrusted with it, and he took the money and bought dynamite with it."

It was just about this time, to-wit, the middle of March, 1886, when Lingg first brought a bomb and dynamite to Seliger's house and began to melt and cast and make shells, as heretofore set forth.

It thus appears, that about two months or six weeks before the Haymarket meeting the defendant Lingg was selected by certain members of the armed sections of the International groups as their agent to buy dynamite with their money, and experiment with and learn how to use and handle it.

The reason why Lingg was selected for this work is quite manifest. Although he was only twenty-one or twenty-two years old at the time of the trial, and, prior thereto, had lived in this country only about nine or ten months, he seems to have taken an active interest in the movements of the Inter-

national Association. He had been a socialist in Europe "ever since he could think." As already stated, he belonged to the armed section of the North Side group. He was not only a member of the carpenters' union, but its financial secretary. He was seen at meetings on the Lake Front, where some of the defendants already named were making speeches. He was present at meetings of the Central Labor Union. He made a speech on April 4, 1886, at 650 Blue Island avenue, at the second meeting of the lumber shovers' union. He was seen at almost every meeting of the carpenters' union at Zepf's Hall from September, 1885, to May, 1886. At a meeting of that union at Zepf's Hall on the night of May 3, 1886, he is said to have made a lengthy report as to the organization of the carpenters at the different shops, and to have had the floor two or three times in the discussion of the eight-hour movement. On the morning of May 3, young men came to his room at Seliger's house and had their names entered upon the list of the union. He was well known to Bach and Spies; the former had known him five or six months. He carried reports of anarchist meetings to the "Arbeiter Zeitung," and had gone to that paper for that purpose at least five times. He was present on the afternoon of May 3, 1886, at the attack hereafter mentioned of a mob of strikers upon a manufacturing establishment in the south-western part of the city, and must have heard the address of Spies on that occasion. He claimed, after his arrest, to have been clubbed by the police at that disturbance.

*Second* — Thielen, Lehmann, Seliger, Hermann or Heumann, and Huebner, who were with Lingg on Tuesday afternoon, while he was filling the bombs, and some of whom were assisting him in his work, were all prominent members of the "armed sections" of the International groups. Huebner was the librarian of the North Side group, and had charge of the distribution of Herr Most's book. Seliger, with whom Lingg had boarded for months, and who was his main assistant in

making the bombs, was a member of the general committee, which stood at the head of all the groups, and, as has already been stated, had been present with Spies at a session of that committee when Rau was exhibiting to its members samples of round and long bombs, such as Lingg himself afterwards made.

*Third*—One of the czar bombs, which was in the possession of Spies in January, 1886, was produced upon the trial of this cause in the court below. It is similar in all respects to the bombs made by Lingg, and to the bomb which exploded at the Haymarket. We find photographic views of it in the record. It consists of two semi-globular shells fastened together by a metallic bolt, with a head at one end and a nut at the other.

It has the fuse and detonating cap, the latter pinched to hold the fuse, just as appears in the photographic representations, to be found in the record, of the bombs made by Lingg.

The nut, taken from the body of Hahn, corresponded as exactly with the nut upon the czar bomb as with the nuts upon the Lingg bombs.

A chemical analysis was made of the material of the shell of the czar bomb, and such material was found to be of the same composite manufacture, as that which characterized the Lingg bombs and the Haymarket bomb. The "Spies bomb" or czar bomb "was found like the others to consist also chiefly of lead with a small quantity of tin, and traces of the same antimony, iron and zinc." This circumstance, taken in connection with the declaration of Spies, that members of the International groups had, by practice and experiment, demonstrated the superiority of compound metal in the construction of bomb shells, points very strongly to the conclusion, that the czar bomb, retained by Spies in his possession in January, 1886, was used by Lingg as a sample, and was the same bomb, which Seliger saw at his house in Lingg's hands more than six weeks before May 4, 1886.

*Fourth*—Another circumstance is worthy of mention in this connection. In a communication upon the subject of making bombs, published by Spies in the "Alarm" on June 27, 1885, he says: "When filling bombs . . . tie a handkerchief over mouth and nose, so that you may not inhale the dangerous gases. . . . In filling bombs use a little wooden stick," etc.

It has already been stated, that when Lingg and Huebner were filling bombs on the afternoon of Tuesday May 4, 1886, each of them had a cloth tied around his face, and Seliger and Lingg used a flat piece of wood, made by Lingg for the purpose of putting dynamite into the shells. Thus the instructions given by Spies in the "Alarm" were literally complied with by the bomb-makers on May 4, 1886.

We think the jury were warranted in believing from the evidence, that the bomb, which exploded at the Haymarket, was made by the defendant Lingg in furtherance of the conspiracy already described.

The question, which next suggests itself, is, whether the bomb, so made, was thrown at the Haymarket by a member of said conspiracy, or by some one acting under its direction and in pursuance of its designs.

In order to solve this question, it will be necessary to make a preliminary investigation as to the *disposition*, which Lingg and his assistants made of the bombs, constructed by them, after they were prepared for use.

The bombs, made and filled on Tuesday afternoon and evening, were carried by Lingg and Seliger on that evening from Seliger's house over to No. 58 Clybourne avenue, known as Neff's Hall. The trunk or satchel in which they had been placed, was carried a part of the way by Lingg and Seliger by means of a stick drawn through the handle. They were met on the way, however, by Muenzenberger, who has been heretofore spoken of, and he seems to have then taken the trunk and carried it the rest of the way on his shoulder. It was about

ten minutes' walk from 442 Sedgwick street to Neff's Hall.
Neff says, that they reached his saloon at ten or fifteen min-
utes after eight, but Seliger states that they started from his
house with the bombs at half-past eight.

At No. 58 Clybourne avenue the front room on the first
floor is a saloon. Back of the saloon is a hall or assembly
room. Between the saloon and hall is a passage-way, which
can be entered by doors leading from the saloon ·and hall,
and also by a door opening upon a walk that leads along the
side of the building into the street. On this evening a meet-
ing of painters was in session in the hall. Lingg, Seliger and
Muenzenberger first went into the saloon, and Lingg inquired
of Neff if any one had been there and asked for him, to which
he received a negative reply. Lingg and Seliger, accompanied
by Muenzenberger, with the satchel or trunk, then went from
the saloon into the passage-way above referred to. The trunk
was placed upon the floor in this passage-way or hall-way,
and opened. Seliger says: "Several persons came and took
bombs. There were different ones there who took bombs out
for themselves." He saw three or four take them. He him-
self took two and carried them in his pocket, until after the
explosion that night, when he buried them under the sidewalk
on Sigel street, where they were afterwards found, as shown
by the testimony of several witnesses.

Lingg and Seliger then went out of the building, No. 58 Cly-
bourne avenue, leaving the open satchel with the bombs in it
in the passage-way, where it had been deposited.

Muenzenberger also disappeared. The latter seemed to be
a stranger; Neff, the keeper of the saloon, never saw him,
until he brought the satchel there that night; Lehmann did
not know him, as has already been stated. Although he was at
Seliger's house that afternoon from four to six o'clock working
at bombs, Seliger did not know his name and did not learn it
until some time afterwards. .This circumstance naturally calls
to mind the instructions in regard to revolutionary actions,

published in the "Arbeiter Zeitung" on March 16, 1885, and
set forth in the statement hereto prefixed, one sentence of
which is as follows: "In the commission of a deed, a com-
rade who does not live at the place of action, that is, a comrade,
of some other place, ought, if possibility admits, to participate
in the action, or, formulated differently, a revolutionary deed
ought to be enacted where one is not known."

In this narration in regard to the *disposition* of the bombs
two facts are noticeable. *First*—They were carried to and
left at No. 58 Clybourne avenue. Why? Neff's Hall was
known as the "Shanty of the Communists." There the com-
munists and anarchists and all the various shades of the so-
cialistic organizations were in the habit of meeting. Some
statements already made in regard to this place may be here
briefly recapitulated. It was the place where the members of
the North Side group met every Monday evening and advised
together and reviewed what had happened among the working-
men during the week, and drilled with hunting-guns and shot-
guns, and some of them, on Sundays, with rifles. It was the
place where the "Arbeiter Zeitung" requested workingmen,
willing to exercise in the handling of arms, to call every Sun-
day for the purpose of receiving instructions gratuitously. It
was the place, where the North Side group had adopted a
resolution cautioning the workingmen "not to meet the enemy
unarmed on May 1st," etc. The manner, in which the bombs
were left at this particular place and there exposed to view,
considered in connection with all the other circumstances here-
tofore and hereafter mentioned, points strongly to the conclu-
sion, that they were intended for the use, on that evening, of
the members of the conspiracy, whose principles and purposes
have already been outlined.

*Second*—The fact, that as soon as the trunk was opened and
deposited in the hall-way, men came forward and took bombs
therefrom, indicates an *expectation*, that bombs would be found
at that place at that time. The prompt appearance of these

men at No. 58 Clybourne avenue as soon as Lingg arrived there, and their immediate appropriation of the bombs placed before them, are circumstances, which tend to establish the existence of some more specific plan for the use of the bombs than that which has heretofore been pointed out. To ascertain what this specific plan was will require an examination of the events immediately preceding the explosion of the bomb at the Haymarket.

Up to the last days of April, 1886, the conspiracy, in which the defendants were engaged, was general in its character. Its object was the destruction of the police and militia of Chicago. The forces to be used in the accomplishment of this object were the International groups and such of the workingmen as could be induced to join those groups. The time, when the conflict between the workingmen and the police was to be precipitated, was about the 1st of May and in the midst of the excitement, which should prevail during the efforts of the laborers to shorten their hours of work.

The preparations for the expected conflict became more definite, as the eight-hour movement approached its culmination. Inside of the general conspiracy already described, and growing naturally out of it, a more detailed plan for securing the ends sought to be attained was originated, adopted and partially executed.

Early in the evening of May 3, 1886, the commander of the Lehr und Wehr Verein rented the basement of the building, known as No. 54 West Lake street, and also called Greif's Hall, for the purpose of holding there on that evening a meeting of the "armed sections" of the International groups.

The meeting was held in pursuance of the arrangement so made. It was secret. A guard was placed in front of the building, and another was also stationed in the rear, to prevent any entrance into the basement by outsiders.

Some seventy or eighty members of the "armed sections" from the North, South and West divisions of the city were

present. The session lasted from eight o'clock to eleven o'clock. The members present at this gathering discussed and adopted the plan hereinafter set forth.

On the day before, that is to say, on the morning of Sunday, May 2, 1886, at ten o'clock, the members of the second company of the Lehr und Wehr Verein and of the North-west Side group had met at Bohemian Hall on Emma street in the north-western part of the city. On that occasion the defendants Engel and Fischer were both present. Engel had there submitted to this Emma street meeting *"a plan of his own conception, according to which, whenever it would come to a conflict between the police and the north-western groups, that bombs should be thrown into the police stations, and the riflemen of the Lehr und Wehr Verein should post themselves in line at a certain distance, and whoever would come out should be shot down—* all those that would come out of the station or stations, he said; *then it should proceed in that way until we would come to the heart of the city.* Within the heart of the city, of course, the fight should commence in earnest."* It was also arranged, that the members of the North-west Side groups should "mutually assist themselves to make an attack upon the police," and "if any one had anything with him he should use it."

This plan of Engel had been submitted by him to the Emma street gathering in the form of a resolution and had been adopted.

On the next evening, that is to say, on the evening of Monday, May 3, 1886, Engel and Fischer were also present at the meeting in the basement of Greif's Hall, and actively participated in the proceedings there taken. Among those assembled at this meeting there had been distributed a certain circular, written that afternoon by the defendant Spies, known as the "Revenge Circular." This circular will be hereafter more particularly referred to. It alleged that six working-men had been killed by the police on that very afternoon at a disturbance in the south-western part of the city, and

called upon the workingmen to arm themselves and "avenge the atrocious murder, which has been committed upon your brothers to-day and *which will likely be, committed upon you to-morrow.*"

The contents of the circular were discussed and suggestions were made as to what should be done *within the next few days.* The defendant Engel then presented to the representatives of all the groups the plan, which had been accepted, at his suggestion, on the day before by the North-west Side group alone. There was some opposition to it. One member "thought that there were too few of us, and it would be better if we would place ourselves among the people and fight right in the midst of them. There was some opposition to that, to be in the midst of the crowd, as we could not know, who would be our nearest neighbor of the crowd; there might be a detective right near us or some one else." *The plan of Engel was,* however, *finally adopted.* The several features of the plan adopted on Monday evening deserve special consideration, in view of the occurrences at the Haymarket on the succeeding evening.

*First*—As to the attacks upon the police and the police stations. It was Engel's suggestion, that the members of the armed sections should come to the assistance of the working-men, whenever a collision between them and the police should grow out of the eight-hour strike then in progress; that a bomb should be thrown into each police station in the city, beginning with that on North avenue in the North division, and, the policemen, as they rushed out of the station on account of the explosion of the bomb so thrown, should be shot down by the riflemen of the Lehr und Wehr Verein, stationed in line for that purpose; that the police would thus be prevented from coming from their respective stations to the scene of conflict, when they should be summoned by the authorities to do so; that the different "International" bodies, after storming the stations and shooting down the police, should march·

inward towards the center of the city, destroying whatever should oppose them; that the telegraph wires, and the hose of the firemen, should be cut; that the ranks of the Internationals would gain large accessions from the workingmen, as soon as these attacks upon the police should be begun.

*Second*—As to the signal for the inauguration of the attacks upon the police. The defendant Fischer suggested the German word "Ruhe," the signification of which, in English, is "rest" or "peace," as a signal word to be adopted by the meeting. His proposition was agreed to. By the terms of it, whenever the word "Ruhe" should appear in the letter-box column of the "Arbeiter Zeitung," it was to be understood, that the "social revolution" had begun; the publication of that word in the paper named was to be a signal to the members of the "armed sections" of the various groups, that they were to arm themselves and repair to certain specified meeting places, and, when they should there be informed by report from a committee hereinafter named, that a collision or conflict had taken place between the police and the workingmen, they were then to proceed to attack the stations and the policemen therein with bombs and rifles, as already stated.

*Third*—As to the Haymarket meeting. . The third feature of the meeting of the armed sections on Monday night was the arrangement made for a mass meeting on Tuesday evening at the Haymarket square. The chairman, who presided on Monday night, suggested the holding of the mass meeting on the next morning, that is to say Tuesday morning, at ten o'clock, in the Market square in the South division of the city. The defendant Fischer, however, objected to both the time and place designated by the chairman. He advocated the holding of the mass meeting on Tuesday evening rather than Tuesday morning, and at the Haymarket square instead of the Market square. His proposition was adopted by the members of the armed sections, and it was then and there agreed, that the Tuesday evening meeting should be announced

10—122 ILL.

through a hand-bill. The defendant Fischer was commissioned to have this hand-bill printed, and for that purpose, left the Monday night meeting while it was in session. He returned in about half an hour, and reported that the printing office was closed. He, however, had the hand-bill printed the next day, as will he seen hereafter.

Leaving for the present the discussion of the provisions made on Monday night for the gathering at the Haymarket, it will be necessary to notice—

*Fourth*—The appointment by the armed sections of a committee. As a part of the plan adopted on Monday night, a committee, consisting of one or two from each group, was appointed, the business of which was to be present at the Haymarket and "to observe the movement not only on the Haymarket square, but in the different parts of the city, and, if a conflict should happen," to report to the members of the armed sections at their various meeting places, as above indicated. This committee was also intrusted with the task of publishing the word "Ruhe" in the "Arbeiter Zeitung," when, in their judgment, the occasion for doing so should arise. As we understand the evidence, this same committee was to have the general control of the Haymarket meeting.

*Fifth*—A resolution was passed, that the details of the plan, adopted by those present on Monday night, should be communicated to absent members, who could be relied upon.

Rudolph Schnaubelt, whom a part of the evidence tends to identify as the thrower of the bomb on Tuesday night, suggested that the plan adopted should also be communicated to comrades living in other cities, so that the revolution should commence in other places as well as in Chicago. This suggestion, however, does not seem to have been acted upon by the Monday night meeting.

Returning now to a consideration of the appointment of the Haymarket meeting, considered as a part of the Monday night plan, we think the jury were warranted in believing,

from the evidence, that that meeting was not intended by those, who made the arrangements for holding it, to be a peaceable assemblage.

*First*—The resolution, which provided for calling it, was adopted by a secret gathering of the armed sections of the International groups. The record reveals many circumstances, tending to show that a conflict was to be precipitated between the police and the twenty-five thousand workingmen, who were expected to be present at the Haymarket. As one of the witnesses expresses it, it was to be held "to cheer up the workingmen so that they would be prepared if a conflict should happen."

*Second*—The defendant Fischer, in the discussion on Monday night, assigned as a reason why the proposed mass meeting should not be held at Market square, that the latter place was a "mouse-trap." This remark, under all the circumstances of the case, could have had no other meaning than that the conflict, which was expected to occur, might be too easily quelled by the authorities if it took place at Market square. If the assemblage was to be entirely peaceable and lawful in its character, it could make no difference whether the place of its meeting was a "mouse-trap" or not. That the spot selected was not a mouse-trap will appear from an examination of the locality and its surroundings, as they are shown upon the following plat or diagram:

The Haymarket is a widening of Randolph street, which runs east and west. It begins on the east at Desplaines street and terminates on the west at Halsted street, the latter streets running north and south and crossing Randolph street at right angles.

The speakers were not on the Haymarket itself, but on Desplaines street, at a point a little more than a hundred feet north of the eastern end of the Haymarket. They made their speeches from a truck wagon, which stood on the east side of Desplaines street, next to the sidewalk, and at a point about five or six feet north of the western end of Crane's alley, the pole end of the wagon looking to the north and the rear end to the south. Crane's alley begins on Desplaines street at a point ninety feet north of Randolph street, and runs east a short distance and then turns south into Randolph street. Lake street is the next street north of and parallel with Randolph street; and between it and Crane's alley is still another alley, running east from Desplaines street to Jefferson street, and tapped at a point half way between the latter streets by an opening extending north to Lake street. Between the Haymarket on the south and Lake street on the north, a small street, called Eagle street, runs westward from Desplaines street to Halsted street, crossing Union street, which runs north and south between the two streets last named.

Between Crane's alley and the alley north of and parallel with it is the manufacturing establishment of Crane Bros., a large building, closed and unlighted at night, and in the shadow of which stood the wagon of the speakers. Some boxes had been placed on the edge of the east sidewalk of Desplaines street a few feet south of the alley, furnishing a protection from the observation of those in the middle of the street.

On Lake street, just north of the wagon, were many gathering places of the workingmen, such a Greif's Hall, Zepf's Hall and Florus Hall. There were also several such places to the

south on Randolph street.   On Tuesday night the halls and saloons in the neighborhood were crowded with workmen, who were out of employment by reason of the strikes and other disturbances, incident to the eight-hour movement, and whose feelings at this time were hostile to the police by reason of the efforts made by the latter to stop the attacks of strikers upon non-union laborers.

It will thus be seen, that all the surroundings of the wagon, in the way of streets, alleys, halls, buildings, sympathetic crowds, etc., furnished easy means of approach, escape and concealment.   As a mere strategical point, no better position could have been selected for the occurrences, which actually took place on Tuesday night, than the spot, where the speakers' wagon was located.

*Third*—The language of the hand-bill, calling the Haymarket meeting, which was issued in pursuance of instructions from the armed sections assembled in Greif's building on Monday night, shows that the meeting was not intended to be altogether peaceable.   On Tuesday morning at a quarter past seven o'clock, Fischer went to a printing office at the corner of Randolph and Market streets, and procured the hand-bill in question to be printed.   It is as follows:

<div align="center">

ATTENTION, WORKINGMEN!

GREAT

MASS MEETING

To-night, at 7:30 o'clock,

AT THE

HAYMARKET, RANDOLPH ST. BET. DESPLAINES AND HALSTED.

Good speakers will be present to denounce the latest atrocious act of the police, the shooting of our fellow-workmen yesterday afternoon.

*Workingmen, Arm Yourselves and Appear in Full Force!*

THE EXECUTIVE COMMITTEE.

</div>

The testimony is abundant, that many copies of this hand-bill, containing the words:   "Workingmen, arm yourselves and appear in full force," were printed in German and Eng-

lish and distributed among the workingmen throughout the city on Tuesday, May 4, 1886. Why urge men to come armed to an assemblage, if the assemblage is to be peaceful, especially when such arming is in violation of the law of the State?

It is true, that, at a later hour in the day, on Tuesday, a number of hand-bills were distributed, which were exactly the same as the above, with the exception that the words "Arm yourselves and appear in full force" were omitted. But the evidence shows, that the objectionable words were only left out of the second set of hand-bills, through fear that they might deter some of the workmen from attending the meeting.

All the hand-bills, however, both those with and those without the objectionable words, declared the object of the meeting to be, not to discuss the eight-hour movement, but to "denounce the latest atrocious act of the police, the shooting of our fellow-workmen yesterday afternoon." What was the act of the police on Monday afternoon for which they were to be denounced?

A manufacturing company in the south-western part of the city had employed certain laborers, belonging to organizations styled "Unions," and hence called "Union laborers." These "Union" workmen had inaugurated a strike and quit work. The company employed in their places other workmen, not connected with the "Unions," and called "Non-union" workmen. The "striking" "Union" laborers and certain "lumber shovers" had made a most violent attack not only upon the "Non-union" laborers, but upon the buildings and property of the company. The police had been summoned to quell the riot, and, as the result of their efforts to do so, one person, and not six, had died from the effect of wounds received on that occasion.

The city authorities did their duty, when they ordered the police to stop this unjustifiable attack of the union workmen, re-enforced by striking lumber-shovers, upon men, who were

pursuing their lawful business.   It follows, that the Hay-
market meeting was called for the purpose of denouncing the
officers of the law, because they had done their duty.

*Fourth*—The testimony of Waller and Seliger shows, that
some trouble, not clearly defined in the language of unlearned
witnesses speaking through an interpreter, was expected to
take place at the Haymarket meeting.   The discussions at the
Monday night meeting indicated such an expectation.   What
other construction can be placed upon such language as this,
used at that meeting:    "It would be better if we would place
ourselves among the people and fight right in the midst of
them; we could not know who would be our nearest neigh-
bor of the crowd; there might be a detective right near
us," etc. ?

One of the witnesses says, that "it was planned to attack
the police stations to prevent the police from coming to aid,
if there should be a fight in the city," and that those present
Monday night expected there would be a fight.   That this fight
was expected to take place at or near the Haymarket would
appear from the fact, that, as soon as the stations were blown
up, the armed men and the workmen joining them should
march "to the heart of the city," where the fight would com-
mence in earnest.   The Haymarket was in the heart of the
city. · Lingg stated to Seliger on Tuesday night "that there"
should be made a disturbance everywhere on the North Side
to prevent the police from going over *on the West Side.*"   If
the place, to which the police were to be kept from going by
the attacks upon the stations, was in the heart of the city and
on the West Side, it could not have been very far from the
Haymarket square.

*Fifth*—The same committee, which had charge of the Hay-
market meeting, and had the power to call together the
armed men at their meeting places by the insertion of the
word "Ruhe" in the "Arbeiter Zeitung," was also instructed
to attend at the Haymarket and from there carry reports to

them at their meeting places. The thing they were to report to the armed men was a conflict with the police. As they were to attend at the Haymarket and report from there, a conflict must have been expected there.

That the plan adopted on Monday night, with its provisions for bomb-throwing, shooting, meeting places, signal, committee, mass meeting, communication with absent members, etc., was an unlawful conspiracy, there can be no doubt.

The question now arises whether the murder of Degan was committed in pursuance of this conspiracy and as one of the objects to be attained by it, and whether the murder occurred while the parties to the conspiracy were engaged in such prosecution of it that Degan's death is to be considered the natural and necessary outcome and consequence of that prosecution. In other words, were the occurrences of Tuesday night the result of the conspiracy of Monday night? Was that which was done on Tuesday night done for the purpose of carrying out the plan of Monday night?

*First*—The main feature of the Monday night plan was the provision for throwing a bomb into each police station and then shooting down the policemen, as they should come out. This provision had two parts: first, a bomb was to be thrown, creating destruction and confusion; second, in the midst of the confusion following upon the explosion of the bomb, the members of the armed sections and the riflemen of the Lehr und Wehr Verein were to fire into the policemen and destroy them, before they could recover from their surprise. Did this feature correspond with either or any of the events of Tuesday night? In order to determine whether it did or not, it is necessary to notice some of the occurrences, which took place at the Haymarket meeting.

The crowd in attendance there was in the middle of Desplaines street, and on the Desplaines street sidewalks to the south of the wagon, and extended around into the Haymarket to the west, and up into Lake street to the north. Those

appearing to be most in sympathy with the speakers were near the mouth of Crane's alley and on and around the wagon.

The station, where the policemen had been holding themselves in readiness during the evening, was located on the west side of Desplaines street, seventy-five feet south of the Haymarket and some three hundred feet or more south of the wagon, and between Randolph street on the north and Washington street on the south, the latter being the next street south of and parallel with Randolph street. Some electric lights in front of a theater on Desplaines street, south of the station and in the neighborhood of Washington street, served to light up at least that portion of Desplaines street south of the Haymarket.

The police formed in line on Waldo place, a small street running west from Desplaines street and on the south side of the station house. They marched in regular order—with their hands down, clubs in their belts, and pistols in their pockets —northward upon Desplaines street, across the eastern end of the Haymarket, until they came "about to the mouth of Crane Bros.' alley." Here they halted, their front line being only a few feet south of the south end of the wagon. One of the officers in command then gave an order to disperse, as has already been stated.

The language, in which the order was uttered, is as follows: "I command you, in the name of the People of the State of Illinois, to immediately and peaceably disperse." These words are the same as those used in section 253 of division 1 of the Criminal Code of this State, which provides that "when twelve or more persons, any of them armed with clubs or dangerous weapons, or thirty or more, armed or unarmed, are unlawfully, riotously or tumultuously assembled in any city, . . . it shall be the duty of each of the municipal officers . . . to go among the persons so assembled . . . and in the name of the State command them immediately to disperse."

If the police officers had improperly intruded upon the meeting in question, such intrusion would have furnished no justification for the attack hereinafter mentioned. Persons injuriously affected by such improper intrusion or illegal dis-. persion had their remedies at law for damages sustained; or they could have demanded an investigation before the proper authorities, and, upon proving their charges, could have obtained the dismissal of officers guilty of infringement upon the rights of citizens.

We can not say, however, that, in view of all the facts and circumstances surrounding the occasion, the police officers were justly chargeable with exceeding their authority in the premises. Much disturbance and disorder existed in the city. Many strikes had recently occurred among the laboring men, many of whom were out of employment and smarting under feelings of discontent. It had been reported to the authorities, that the riot already referred to of the preceeding afternoon in the south-western part of the city had been mainly incited by a speech delivered to some "lumber shovers" on the "Black Road" by the defendant Spies, who was observed to be the most active spirit at the Haymarket meeting. Copies of the "Revenge Circular" and of the hand-bill, prepared by the defendant Fischer, had fallen into the hands of the police. A rumor had also come to their headquarters that it was the intention of parties at the Haymarket meeting to proceed to some neighboring railroad freight-houses, where non-union laborers were employed, and blow them up. In addition to all this, it was reported to the officer in command of the force at the Desplaines street station, that the defendant Fielden, who was then speaking, had just used the following language: "You have nothing more to do with the law except to lay hands on it and throttle it, until it makes its last kick. . . . Keep your eye upon it, throttle it, kill it, stab it, do everything you can to wound it;" and that the use of these words had produced great excitement and caused noisy demonstra-

tions around the wagon. Upon the reception of this report, the officer in command decided upon the dispersion of the meeting, and his men made the móvement for that purpose, as already stated.

As soon as the order to disperse was given, the defendant Fielden descended from the wagon, making use of the words, "we are peaceable." Whether or not these words were uttered as the English equivalent of the German signal-word "Ruhe," which meant "peace," the evidence does not conclusively show.

Certain it is, that no sooner had Fielden said "we are peaceable" than *the bomb exploded, and, in a few seconds thereafter, a volley of shots was fired.*

Whether the crowd, which, upon the advance of the police in the middle of the street, had scattered to the north of the wagon and to the sidewalks upon the east and west sides of Desplaines street, fired into the police or not, is one of the disputed questions in the case. According to the testimony for the State, persons in the street and upon the sidewalks discharged their revolvers into the midst of the police, some of the witnesses estimating the number of shots at seventy-five or one hundred. On the other hand, witnesses for the defence swear, that the only shooting, which was done, came from the ranks of the police themselves. That the latter fired into the crowd after the explosion is an admitted fact, but the prosecution claims that they did not do so, until after they were fired into.

We think the weight of evidence is in favor of the position of the State upon this subject. If it be conceded, that the witnesses for the prosecution, who are, for the most part, policemen, are interested on one side of the question, and that the witnesses for the defence, who are, for the most part, partisans of or sympathizers with the prisoners, are interested on the other side of the question, there is yet other evidence which seems to us to be decisive of the matter.

The testimony of the surgeons, who are entirely disinterested, shows that two police officers died from the effects of bullet wounds, and that many more, who did not die, received bullet wounds. As the policemen were a solid body of well-drilled men, standing together in the street in well-formed lines and orderly ranks, it is impossible that they should have shot into their own midst. This being so, the bullet wounds received by them, must have been caused by shots from the crowd in their front and on their sides.

In addition to this, it has already appeared that many of the persons around the wagon had been preparing for a long time for the events expected to grow out of the eight-hour movement on May 1, 1886, by exercises in drilling, by the purchase of arms, by experiments with dynamite, and had been repeatedly urged in speeches, in newspaper articles, and by the circulars already mentioned, to meet those events in a state of armed preparation.

Moreover, several of the newspaper reporters, who were present, confirm the statements of the policemen, that shots were fired from the sidewalks into the police. One of the reporters saw several men around the wagon boldly exhibiting their revolvers, while the speaking was going on. A revolver was found on the sidewalk near the wagon, several barrels of which had been discharged.

It is apparent from this review of the evidence, that just such an attack was made at the Haymarket, as was contemplated and arranged for by the conspiracy of Monday night. First, a bomb was thrown among the policemen; next, shots were fired into their ranks by armed men, belonging to the organization heretofore described and who had been gathered around the wagon during the evening. In the order of time, the shooting occurred a few seconds after the bomb exploded. This was the order, in which the onset with the two different kinds of weapons was to be made, according to the terms of

the conspiracy. The mode of attack, as made, corresponded with the mode of attack, as planned.

It is true, that the plan adopted contemplated the throwing of a bomb into each *station* and then shooting down the police, *as they should come out.* This was to be done, however, not only at the North avenue station, but at the stations "in other parts of the city." The Desplaines street station was a station in one of the "other parts of the city," and was as much embraced within the scope of the plan as the rest of the stations. It was in sight of the speakers' wagon and only a short distance south of it. If a bomb had been thrown into the station itself and the policemen had been shot down while coming out, a part of the conspiracy would have been literally executed just as it was agreed upon. It could make no difference in the guilt of those, who were parties to the conspiracy, that the man, who threw the bomb, and his confederates, who fired the shots, waited, before doing their work, until the policemen in the station had left it and had advanced some three hundred feet north of it.

If A hire B to shoot C at the Sherman House in the city of Chicago on a certain night, but B, seeing C enter the Tremont House on the same night, shoots him there, A is none the less guilty of aiding, abetting, advising and encouraging the murder of C. If there is a conspiracy to kill policemen at a station house, but the agents of the conspiracy kill the policemen a short distance away from the station house, there is no such departure from the original design as to relieve the conspirators of responsibility.

A plan for the perpetration of a crime or for the accomplishment of any action, whether worthy or unworthy, can not always be executed in exact accordance with the original conception. It must suffer some change or modification in order to meet emergencies and unforeseen contingencies.

The International groups, as will be seen hereafter, had received information that the police intended to hold them-

selves in readiness for the expected outbreak *at their respective stations.* The presence of one hundred and eighty policemen at the Desplaines street station, only seventy-five feet south of the Haymarket, seemed to contradict the correctness of this information, and to indicate a *concentration* instead of a *scattering* of forces on the part of the authorities. Such action by the authorities may have operated to change the original conspiracy for separate attacks upon the stations, and may have led to the concentration of a larger number of armed men at the Haymarket than was at first intended.

This appears from the language of Spies in his speech from the wagon, when he said: "It seems to have been the opinion of the authorities that this meeting has been called for the purpose of raising a little row and disturbance," etc., and when he asked "what meant this array of Gatling guns, infantry ready to arm, patrol wagons and policemen?" It appears from the excited demeanor of Schwab, who says, that he went from the "Arbeiter Zeitung" office to the Haymarket, passing through the tunnel and walking on Washington street, and that he turned from Washington street north on Desplaines street. This course would take him by the Desplaines street station, where he must have seen the policemen forming on Waldo place. Just after this, he is described by two witnesses as rushing along hurriedly and almost running into the mayor; and by one witness as engaged in a conversation a few moments later with Spies, in which the word "police" was used. Fischer and Waller, also, noticed the mounting of patrol wagons on Waldo place, and indulged in some conjectures as to what it meant. Some change of programme would also seem to be indicated by the delay in opening the meeting. It was not called to order until half-past eight or nine o'clock, although the hour stated in the hand-bills was half-past seven. It was not actually opened until Lingg had deposited the bombs at No. 58 Clybourne avenue. He was evidently slow in his preparations. Mrs. Seliger says that

her husband and Lingg, and Huebner and Thielen, and Hermann, and some others, whose names she did not know, were at work on the bombs at her house until past seven o'clock. From the fact that Seliger and Lingg were met on the way to Neff's Hall by Muenzenberger, the blacksmith, it would appear that the latter had been sent forward to hasten their movements.

The various details here related tend to show, that some occurrence had taken place which had not been expected or provided for.

But notwithstanding the fact, that the Monday night conspiracy may have been varied somewhat to suit the new conditions, we think the jury were warranted in believing, that the bomb was thrown and the shots were fired as a part of the execution of that conspiracy.

*Second* — The second feature of the Monday night conspiracy was the publication of the signal-word "Ruhe" in the "Arbeiter Zeitung," an afternoon paper, issued every day at two o'clock. The word "Ruhe" *was* published in the "Arbeiter Zeitung" on the afternoon of Tuesday, May 4, 1886, about five hours and a half before the hour for which the Haymarket meeting was called. It appeared in the letter-box column in heavy type and heavily underscored. Its publication announced the arrival of the "social revolution." It was a call issued to the "armed sections" to arm themselves and repair to their meeting places and await orders. Here certainly was an execution of a part of the conspiracy shortly before the opening of the meeting, at which the murder of Degan took place.

It is clear that the publication of the word "Ruhe" in a German paper might not be notice to the armed members of the American group, who presumably could not speak or read German. The "Alarm" at this time was only issued every half month. Accordingly, on Tuesday afternoon, at about the same time when the word "Ruhe" appeared in the "Ar-

beiter Zeitung," there also appeared in one of the afternoon English papers of the city the following notice: "American group meets to-night, Tuesday, 107 Fifth avenue. Important business. Every member should attend; 7:30 o'clock sharp. Agitation Committee."

The question which here naturally suggests itself, is: Was there a gathering of the armed men at their meeting places in obedience to the call, implied in the word "Ruhe?"

The evidence does not disclose how many meeting places there were, nor the location of all of them.

The meeting place selected for the members of the Northwest Side group would appear to have been Wicker Park. But whether they actually met there on Tuesday night, or whether the arrangement for their doing so was given up in view of some alteration of plan, such as has already been hinted at, the record does not disclose. A large number of the members of this group were at the Haymarket on that evening.

According to the testimony of Seliger as to the declarations of Lingg, Greif's Hall, or 54 West Lake street, was a designated meeting place for some of the armed men. This hall was crowded on Tuesday night with workingmen, many of whom went over to the Haymarket.

It was only two blocks east from Desplaines street, and distant only a few minutes' walk from the wagon of the speakers. A gathering there was, in effect, a gathering at the Haymarket itself.

The meeting place for the American group on that evening was the "Arbeiter Zeitung" office, at 107 Fifth avenue. Twelve or fifteen members of that group met there pursuant to the published notice.

At least six of those present, including the defendants Parsons and Fielden, belonged to the armed section.

They all left and came over to the Haymarket meeting some time between half-past eight and nine o'clock Tuesday evening.

The meeting place of many of the armed members' of the North Side group on Tuesday evening was Neff's Hall. Lingg, Seliger, Lehmann, Smideke, Thielen and others were there on that evening between eight and half-past nine o'clock.

Many went there to get bombs. Thielen, who had received two loaded bombs, some cartridges, and two cigar boxes full of dynamite from Lingg on that afternoon, was there a considerable portion of the evening, and is spoken of by Neff as "hanging around out in front of the saloon on the sidewalk."

We think the evidence warrants the conclusion, that 58 Clybourne avenue was one of the meeting places, to which the members of the armed sections repaired in pursuance of the arrangement made on Monday night.

Some of the meeting places were to be at certain "corners." The armed men were to go from their meeting places to attack the stations. They were to attack the stations, in order to prevent the policemen from getting out of them so as to go to the scene of conflict, when they should be summoned. Hence, many of the meeting places would be near the stations.

One of the stations to be attacked, and which was specifically named at the Monday night assemblage, was the North avenue station. The evidence shows, that Lingg, Seliger, Lehmann, Smideke, Thielen, and two large men, belonging to the Lehr und Wehr Verein, all of whom were armed with bombs, were seen standing and moving between eight and ten o'clock on Tuesday night, at corners and on streets in the near neighborhood of the North avenue station.

Seliger and Lingg were also that night still further north in the neighborhood of a police station near the corner of Webster and Lincoln avenues. Others, who left 58 Clybourne avenue just after the bombs had been deposited there, "went ahead" of Seliger and Lingg, so that the course taken by them must have been still further northward and in the neighborhood of Deering, where the defendant Schwab made

a speech to some striking workingmen about ten o'clock on that night after he had left the Haymarket.

One or more of these meeting places or corners was in the neighborhood of the Desplaines street station. A group of about twenty-five men were standing, on Tuesday evening, at the south-west corner of Halsted and Randolph streets, two blocks west of the Desplaines street station, and one of the witnesses speaks of seeing Spies and Schwab going into the thickest of this group between eight and nine o'clock. "About an hour previous to the meeting" at the Haymarket, Engel and Fischer, both members of the armed sections, were seen at the corner of Desplaines and Randolph streets. During the evening Fischer and Waller, the latter of whom is proven to have had a revolver, and both of whom belonged to the Lehr und Wehr Verein, were so near the Desplaines street station as to observe the mounting of five or six patrol wagons with policemen. The speakers' wagon itself was only a short distance north of that station, and armed men were gathered around it all the evening, as has already been shown.

Thus it is proven, that armed men did gather at certain corners and meeting places on Tuesday night. There is evidence, which would warrant the jury in believing, that such gatherings took place in obedience to the call agreed upon at the Monday night meeting.

*Third*—The third feature of the Monday night conspiracy was the appointment of a mass meeting at the Haymarket. The meeting was held and its general character has already been discussed.

*Fourth*—The fourth branch of the conspiracy had reference to the action of the *committee*, that was charged with the double duty of publishing the signal-word "Ruhe" and of reporting to the armed men at their meeting places any conflict or collision that might occur at the Haymarket or elsewhere. Did this committee attend at the Haymarket and carry reports

thence to those gathered at the "corners" and other meeting places?

Upon the reception of these reports, attacks were to be made upon the police. The thing to be reported was any collision or conflict, that might happen to occur between the police and the workingmen. Such collisions ordinarily grew out of attempts to protect employers or non-union laborers against strikers. But that an act of interference with a meeting of workingmen would be regarded as coming within the meaning of the word "conflict" or "collision," as here understood, is apparent from Lingg's statement, made to Seliger when he first brought a bomb to the latter's house and showed him pipes and shells. This statement was, that the bombs would be used not only "on occasions of strikes," but "where there were meetings of workingmen and they should be disturbed by the police."

At the Haymarket the collision grew out of an attempt to disperse a meeting that appeared to have been called for an illegal purpose. The movement of the police upon the crowd for the purpose of effecting this dispersion was such a coming together of policemen and workingmen, as would very naturally be construed by many of the conspirators or their unlearned agents to be within the meaning of the Monday night plan. To regard the advance of the police into the midst of those standing around the wagon as authorizing and justifying the attack contemplated by the terms of the Monday night conspiracy was a natural interpretation of those terms, in view of all the circumstances and of the character of the parties concerned.

As the march to the wagon and the order to disperse did not occur, until the station had been left, the police were out of the station, before the occasion for the attack arose, and hence the throwing of the bomb into the station itself was an unnecessary act.

Even if it be true, that the committee already named made no report to the armed men at their meeting places, as contemplated by the terms of the conspiracy, it may be said that such report was unnecessary, so far as those posted near the Desplaines street station were concerned. The only object of such reports was to give information of a conflict or collision. The armed men at the Haymarket themselves saw the collision and heard the order to disperse, and were therefore informed of the arrival of the occasion for an attack without any report from the committee.

However this may be, the evidence tends to show, that certain parties did go from the Haymarket to one or more of the meeting places on Tuesday night, and that they so went, as bearers of some message or communication. Whether the communication, suggested by this passage of persons from point to point, had any reference to the large gathering of policemen at the Desplaines street station, does not appear.

Belthazar Rau, the advertising agent of the "Arbeiter Zeitung," was one of the most active men in the promotion of the schemes of the Internationalists. As has already been stated, he exhibited a specimen bomb in August, 1885, to the central committee in session at the "Arbeiter Zeitung" office, when Seliger was present as a delegate. The written copy of the words "Y.—Komme Montag Abend," published in the "Die Fackel" on Sunday, May 2, and calling the meeting of the armed men on Monday night, was in his handwriting. He introduced Spies to the chairman of the meeting of the lumber shovers on Monday afternoon. He distributed the "Revenge Circular" Monday evening at Zepf's Hall. He knew the meaning of the signal "Ruhe," and, according to the testimony of Spies, talked with the latter about it on Tuesday afternoon. On Tuesday night he was seen moving among the crowd on the Haymarket. On that evening he made two trips between the "Arbeiter Zeitung" office and the Haymarket, once in company with Schwab, and again in com-

pany with Fielden, Parsons and Snyder. He was seen at Zepf's Hall just after the explosion. He was in consultation with Spies, Schwab, Fricke and others at the "Arbeiter Zeitung" office on Tuesday afternoon between five and seven o'clock; and, on Tuesday morning between nine and ten o'clock, he was present at the same place with Fischer, Spies, Schwab and Grueneberg at an interview in reference to the hand-bills heretofore mentioned. Gruenhut speaks of him as being on an agitation committee and on the committee for the Internationalists. Special mention is made of him by Herr Most in his letter to Spies.

This same Rau on Tuesday night went from the Haymarket to the meeting of the American group then in session at the office of the "Arbeiter Zeitung," and, in obedience to a notice from him, all those gathered there went over to the speakers' wagon on Desplaines street.

Parsons, in speaking of what took place at the "Arbeiter Zeitung" office, says: "Some one, I understood it was a *committee*, came over from the Haymarket; they stated that they came from the Haymarket or some one told me they did." Fischer stated after his arrest, that he was at the "Arbeiter Zeitung" office that night, and he was a member of the executive committee, that called the Tuesday night meeting, as shown by the signature to the hand-bill.

Thus there is evidence, from which the jury were warranted in believing, that Fielden and Parsons and their associates were called from their meeting place to the Haymarket by the summons of a committee.

Furthermore, about eight o'clock or a little before that time on Tuesday evening, the defendant Schwab was at the office of the "Arbeiter Zeitung," and several telephone messages passed between him and a letter-carrier of that paper in the north-western part of the city. He went over to the Haymarket and, leaving there later in the evening, took a Clybourne avenue car at the court house, and went to Deering,

at or near the corner of Clybourne and Fullerton avenues. When he arrived at his destination, he was standing on the back platform of the car. During his journey he passed by No. 58 Clybourne avenue, where men had just been helping themselves from the open satchel of loaded bombs, where Lingg had just inquired of Neff, the saloon-keeper, if "some one had been there asking for him," where Thielen, who had been with Lingg that afternoon, while he was making bombs, was "hanging around . . . out in front of the saloon on the sidewalk." During this journey, he passed the intersection of Larrabee street and Clybourne avenue about the time when Seliger, Lingg, Smideke and Lehmann were standing there. He passed the intersection of North avenue with Clybourne avenue a short distance west from the North avenue station, which had been especially singled out for attack. His course was near the spot, where two large men, armed with bombs, members of the Lehr und Wehr Verein, had been seen standing on that night, and from which they had gone ahead towards the north. It was said at the Monday night meeting, that, when the police stations should be attacked, the Internationals hoped to gain accessions from the workingmen. Schwab went late on Tuesday evening to address several thousand "striking" workingmen, assembled at a point not a great distance north from the stations visited on that evening by Seliger and Lingg, and, in order to reach the point in question, went directly by the meeting place of the North Side group, to which he himself belonged, and among the corners where armed members of that group had been hovering all the evening, as if in expectation of some order or signal.

There is no direct or positive evidence, that he passed by No. 58 Clybourne avenue and the corners in its neighborhood, as a member of the committee referred to, for the purpose of summoning to the Haymarket some one or more of those, who had helped themselves to Lingg's bombs. But there are circumstances, which, taken in connection with all the other

evidence in the case, point very strongly in the direction here indicated.

The evidence of the defence tends to show, that Schwab's trip to Deering had no other object than an address to the workingmen, that Rau's visit to the "Arbeiter Zeitung" was for the sole purpose of getting speakers for the Haymarket, and that the American group met at the office of the "Arbeiter Zeitung" on that evening to effect an organization of the sewing-girls. It was for the jury to say whether the evidence of the defence upon this subject was of greater weight than the various circumstances already detailed, which, we think, the jury had a right to look at in the light of the principles advocated by the International organization, and in the light of the peculiar methods, recommended by that organization for concealing its real designs. The "Arbeiter Zeitung," in its instructions "about revolutionary deeds" as found in its issue of March 16, 1885, says, that where a special group is formed for the purpose of action, the *public groups* "*have to serve as a covering, as a shield behind which one of the most effective weapons of revolution is bared;*" that "the danger of discovery ought to be weakened as much as possible, and, if it can be, should be reduced to naught."

*Fifth*—The fifth feature of the plan under consideration was the resolution to communicate its details to absent members.

The record furnishes no direct evidence upon this subject, but it shows that persons, who were present at the meeting on Monday night, were in the company of several of the defendants on Tuesday and Tuesday night. Rudolph Schnaubelt was in consultation with Schwab and Spies on Tuesday night, and was on the wagon that evening with Fielden and Parsons. During the day on Tuesday Rau and Fischer were in the "Arbeiter Zeitung" building with Spies and Schwab, and were there in the evening while Fielden and Parsons were in attendance upon the gathering of the American group.

We have thus reviewed somewhat in detail a number of the events of Tuesday night with a view of seeing whether they took place in accordance with and in pursuance of the provisions of the Monday night plan. Viewed as evidences of a correspondence between what was done and what was planned, some of the occurrences here noted may be unimportant, but taking all the circumstances together, the jury were justified in finding that the actors upon the stage of Tuesday night's tragedy were playing the parts assigned to them in the conspiracy of the previous night, and that the death of Degan occurred as a part of the execution of that conspiracy, and while the parties to it were engaged in carrying it out.

The last and most important question to be considered is: Were the plaintiffs in error parties to the conspiracy formed on the evening of Monday, May 3, 1886?

### *Lingg:*

The jury were warranted in believing from the evidence, that the plaintiff in error Louis Lingg, was a party to the Monday night conspiracy.

According to the testimony of the captain of the police, Lingg admitted after his arrest, that he was present on that evening in the basement of Greif's Hall. If he was, then his presence there, taken in connection with his subsequent conduct, would tend strongly to establish his connection with the plot. It is claimed by the defence, that he was in attendance all the evening at a meeting of the carpenters' union at Zepf's Hall on Lake street at the north-east corner of Lake and Desplaines streets, two blocks west of Greif's Hall and about half a block north of the spot where the speakers' wagon was located on the next night. He certainly was at Zepf's Hall during a part of the evening, but may have gone over to the other meeting in session at Greif's Hall. A public announcement was made to those assembled in Zepf's Hall, requesting all who belonged to the armed sections to go over to the

basement of 54 Lake street.   Schrade says he went to the
latter place from the gathering of the carpenters' union be-
cause of an announcement that "the members of the L. u. W. V.
should go around to the meeting on Lake street." This an-
nouncement certainly informed Lingg, that the armed sections
were in session at a place just two blocks east of him.

It would make no difference, however, in view of his acts
and declarations whether he was at the meeting Monday
night or not.   "Though the common design is the essence of
the charge of conspiracy, it is not necessary to prove, that the
defendants came together and actually agreed in terms to have
that design and to pursue it by common means.   If it be
proved, that the defendants pursued by their acts the same
object, often by the same means, one performing one part and
another another part of the same, so as to complete it, with
a view to the attainment of that same object, the jury will
be justified in the conclusion, that they were engaged in a
conspiracy to effect that object."   3 Greenleaf on Evidence,
sec. 93.

Let us examine some of Lingg's acts and declarations:

The plot of Monday night required the use of bombs to
carry it into effect; Lingg and his assistants were making
bombs on Tuesday.   He brought dynamite to Seliger's house
on Friday, but made no preparations to fill bombs with it
until the day of the Haymarket meeting.   He knew all about
the details of the conspiracy.   On Tuesday night he told
Seliger the meaning of the word "Ruhe," and that its inser-
tion in the paper had been provided for in the meeting of the
previous night.   He took a copy of the paper at Seliger's
house and showed him the signal-word in the letter-box col-
umn.   On Monday night about the time the meetings at
Zepf's Hall and Greif's Hall were adjourning, he came up
behind Lehmann and several other members of the armed
sections, who were standing on the sidewalk at the entrance
to Greif's Hall, and reproached them for their stupidity, call-

ing them fools and oxen.    When Lehmann, who had been standing guard most of the evening on the outside to prevent intruders from entering the basement, asked him what had taken place at the meeting they were just leaving, he said in reply, that if they wanted to know something they should come to 58 Clybourne avenue the next evening.    Lehmann did go to 58 Clybourne avenue the next evening in obedience to this injunction.    As has been already stated, Lingg carried loaded bombs there and spread them out, so that members of the International groups could help themselves to them.    His remark to Lehmann shows that what he did on Tuesday night was done in pursuance of a resolution formed on Monday night. Thielen, Hermann, Huebner and Lehmann, who were with him on Tuesday afternoon, while he was making bombs, were all present at the Monday night meeting.

We regard it as a very significant circumstance, as showing the connection between the conspiracy of Monday night and the bomb-making of Tuesday afternoon, that parties who are proven without any contradiction whatever to have been at the meeting in the basement of Greif's Hall on Monday night and to have belonged to the band of conspirators that met there, went to Seliger's house on the very next afternoon and were there associated with Lingg in making the bombs that he carried to Neff's Hall Tuesday night.

It was as late as eleven o'clock on Monday night when Lingg told Lehmann and several other members of the armed sections to come the next night to Neff's Hall.    It was as early as seven o'clock on the very next morning when he set Seliger to drilling holes in the bomb shells and instructed him to get bolts to fasten the shells together, accompanying his instructions with the statement, that the bombs would be taken away that day.

Lingg. said on Tuesday afternoon, while he and his assistants were at work at the bombs, that they were to be carried to 58 Clybourne avenue as soon as they were finished and

*were to be used that night,* and that they were "going to be good fodder for the capitalist and the police when they came to protect the capitalists." When he returned to Seliger's house from the West Side at one o'clock on Tuesday, he reproached Seliger with the slow progress he had made in his work.

It may be here stated, that six weeks before this time, when Lingg first brought dynamite to Seliger's house, he remarked that every workingman should have dynamite and learn to handle it, as there was to be considerable agitation.

Between nine and ten o'clock on Tuesday night Lingg and Seliger appeared before the North avenue station, and Lingg proposed to Seliger to throw a bomb into the station and shoot down the policemen, two of whom were sitting in front of the building. Whether their failure to carry the proposition into effect proceeded from a want of courage, or from disappointment at not receiving some message or signal, that was expected at Neff's Hall, is not disclosed by the evidence. But the proposition itself bears a startling resemblance to the first and main feature of the Monday night plot as already noticed.

Lingg's conduct during Tuesday and on Tuesday night shows, that he expected a disturbance to occur Tuesday evening. He and Seliger and Lehmann and Smideke were standing on Larrabee street near Clybourne avenue about half past nine o'clock, when either Lingg or Seliger remarked that "'we should not keep together, we four,' and then we went apart." He became wild with excitement after the patrol wagon, manned with policemen, had passed him and he had been unable to light his bomb soon enough to throw it at the wagon. After that, during the evening, he frequently referred to what was going to happen on the West Side and at the Haymarket, and was with difficulty restrained by Seliger from going to the West Side.

Seliger swears, that he was present at the meeting of the carpenters' union on Monday night and was there at the same time with Lingg; he also states, that, before he went, he learned that there was to be a meeting at the Haymarket on the night of the 4th of May. It would thus appear, that Fischer's proposition to hold a mass meeting at the Haymarket was the subject of consultation and arrangement among the members of the groups, before he went to the gathering of the armed men on Monday night.

The proof discloses two circumstances, occurring after the explosion of the bomb on Tuesday night, which tend to show Lingg's connection with the Haymarket crime. About eleven o'clock on that evening the Lehmanns, the Hermanns, the Hagemanns and Hirschberger, the librarian, were in Neff's saloon. Some of them had just come from the Haymarket and they were talking about the explosion of the bomb. In the midst of their conversation Lingg and Seliger entered the saloon, when one Hermann said in an energetic voice to Lingg: "You are the fault of all of it" or, "that is your fault." Thereupon, a subdued conversation took place between Hermann and Lingg. This circumstance is sworn to by both Seliger and Neff, and is competent testimony as against Lingg.

After this, when Seliger and Lingg were on their way home from Neff's saloon, Lingg "made the remark that he was even now scolded—chided—for the work he had done."

The details of the plan adopted on Monday night, as the same are herein set forth, are proven by testimony which is uncontradicted. The evidence introduced by the prosecution as to the acts and declarations of Lingg on Tuesday and Tuesday night and during several weeks prior thereto, is also uncontradicted by any testimony offered on the part of the defence, so far as we have been able to discover. What are the inferences to be drawn from these uncontroverted facts? The jury, who are the judges of the facts in criminal as well

as in civil cases, have a right to draw from proven circum-
stances such conclusions as are natural and reasonable.

The intentions of men can only be determined from their
acts. "Murder is the unlawful killing of a human being, in
the peace of the people, with malice aforethought, either ex-
pressed or implied." (Criminal Code, sec. 140.) We said, in
*Davison* v. *The People,* 90 Ill. 221: "Malice is always pre-
sumed, where one person deliberately injures another. It is
the *deliberation,* with which the act is performed, that gives it
character. It is the opposite of an act, performed under un-
controllable passion, which prevents all deliberation or cool
reflection in forming a purpose."

· Here is a man, connected with a certain organization,
engaged in arming and drilling for a conflict with the police.
He is experimenting with dynamite and in the construction of
bombs under the direction of armed members of that organiza-
tion. He makes bomb shells, fills them with dynamite, takes
them to the meeting place of armed members of that organiza-
tion, puts them where access to them can be easily had, using
such precautions as such dangerous explosives naturally re-
quire. At once, certain of these armed members, such as the
two large men of the Lehr und Wehr Verein already spoken
of, come forward and take bombs and go their several ways.
In a little more than an hour afterwards, one of these very
bombs is thrown into a crowd of policemen and explodes and
kills one of them. Was not the conduct of this man, who
thus coolly and carefully prepared the weapons for one definite
class of men to use in the murder of another definite class of
men, marked by "deliberation," as that term is defined in the
authorities?

It was a fair conclusion from the evidence that Lingg *knew*
that the bombs he was making would be thrown among the
police. It was a fair conclusion from the evidence, that he
*intended* the bombs he placed in the hall-way to be used by
the members of the International groups, not only in the in-

terest of the general movement against the police with which he was connected, but in the interest of the particular conspiracy, that was concocted on Monday night.

Even if he did not know the name of the particular individual who was to throw the bomb, he knew that it would be thrown by some one belonging to the sections or groups already described, and this was sufficient to affect him with the guilt of advising, encouraging, aiding or abetting the crime charged in the indictment.

He may not have known what particular policeman would be killed, whether Matthias J. Degan, or another. But when he opened the loaded satchel at Neff's Hall on Tuesday night, that act, viewed in the light of all the antecedent, attendant and subsequent occurrences, was virtually a designation of the body or class of men, who were to be attacked. When one of such class was killed, the guilt was the same as though a person bearing a particular name had been pointed out as the victim.

Even if he did not know that one of the bombs would be thrown on that evening at a particular place called the Haymarket, it was sufficient that he knew it was to be used at that point in the city, where a collision should occur between the workingmen and the police. Such a collision did occur at the Haymarket.

Counsel for the defence claim, that there is no proof showing the bomb to have been thrown by any one of the members of the organization, for whose use Lingg may have made it; that the bomb may have been thrown by some person outside of that organization and having a private grievance of his own against the police; in other words, that the bomb-thrower has not been identified as a member of the conspiracy or as a person employed by it or acting in its interest.

We think, however, that the jury were justified in believing from the evidence, that the man, who threw the bomb, was either a member of the conspiracy, or an agent employed by it. This appears from the facts already recited. Three circum-

stances especially served to identify him as being connected
with the conspiracy.   First, the bomb, that exploded, was one
of the bombs made by Lingg; second, the bombs made by
Lingg were finished and distributed so short a time before the
explosion, that they could hardly have been obtained else-
where than from his possession, or by others than those for
whose use he intended them; third, the throwing of the bomb
occurred almost at the same time with the firing of the shots;
the latter followed so closely upon the former, that the two
can not be regarded otherwise than as parts of a joint attack,
showing that the man, who threw the bomb, and the men,
who fired the shots, were acting in unison with each other;
this negatives the idea of independent action by an outside
individual having a private grudge; the character of the at-
tack as a joint one and the concert of action between those
making it identify it as that kind of an attack, which the con-
spirators planned to make.   Moreover, there is no evidence
in the record of the making of bombs by anybody except
Lingg and those associated with him.

### Engel and Fischer:

As to the defendants Engel and Fischer, it has already been
shown, that they originated the Monday-night plan and pro-
cured its adoption first by the North-west Side group and
second company of the Lehr und Wehr Verein on Sunday
morning, and afterwards by the representatives of all the
groups on Monday night.   They advised and induced a band
of seventy or eighty armed and drilled men to enter into a plot
to murder the police with bombs and pistols in a certain con-
tingency, and to agree to certain details as to committee, signal-
word, mass meeting, hand-bill, meeting places, etc., with a
view of carrying that plot into effect.   The murder of Degan
took place as the legitimate consequence of an attempt to ac-
complish the objects of the conspiracy originated and planned
by themselves.   Therefore they aided, abetted, advised and

encouraged the commission of that murder.   Both were pres-
ent at the Haymarket meeting on Tuesday night.

The evidence tends to show that Engel was at his home on
Milwaukee avenue near the Haymarket, when the explosion
occurred.   That some of the conspirators might be at home,
when the collision with the police should happen, was a con-
tingency that was provided for by the terms of the plot; in
the event of a collision at night, the committee appointed to
watch the movement was to report to the armed men at their
homes.

It has already been stated, that Fischer was at the Hay-
market early in the evening, and was seen walking about on
Desplaines street and in front of the station, and was present
while Fielden, the last speaker, was talking.   There is testi-
mony on the part of the prosecution tending to show that he
was in the neighborhood of the wagon and near the mouth of
Crane's alley, when the bomb was thrown.   There is also tes-
timony on the part of the defence tending to show, that at that
time he was in the saloon at Zepf's Hall.   Zepf's Hall was
just a few steps north of the wagon and in sight from it.
The hall was crowded that night with workmen, and on the
upper floors several meetings, among others that of the fur-
niture workers, were in session.   Between it and the Hay-
market persons were passing back and forth.   Fischer may
have stepped into the saloon a few moments before the explo-
sion and may have been there at the precise moment of its
occurrence, although one of the newspaper reporters, who was
in the saloon at the time, says he did not see him.

It would make no difference, however, in the degree of re-
sponsibility, with which Engel and Fisher are chargeable under
the facts already narrated, that they were not actually among
those who stood around the wagon, when the bomb was thrown.
Where persons combine to stand by one another in a breach
of the peace with a general resolution to resist all opposers,
and, in the execution of their design, a murder is committed,

12—122 ILL.

all of the company are equally principals in the murder, though at the time of the act, some of them were at such a distance as to be out of view, if the murder be in furtherance of the common design. Wharton on Homicide, (2d ed.) sec. 338; *Williams* v. *The People,* 54 Ill. 422.

On the morning after the Haymarket massacre about ten or eleven o'clock the defendant Fischer was arrested while coming down the stairs of the "Arbeiter Zeitung" building. The officer found upon his person a 44-caliber, self-acting revolver loaded and also a file. He wore a belt and sheath under his coat, the belt having a brass buckle upon it with the letters "L. & W. V.," a buckle of the Lehr und Wehr Verein society. "The file, an old-fashioned, three-cornered file, ground to a sharp edge, very sharp on the point, with a wooden handle, was in the sheath; the revolver was stuck in a slit in the belt; there were ten cartridges in his pocket; there was also a fuse cap—a fulminating cap—in his pocket; the fulminating cap was bright." At Fischer's house after his arrest were found a box of nearly fifty 44-caliber cartridges and a light blue blouse, such as is worn by the Lehr und Wehr Verein.

### Spies and Schwab:

We will now consider the relations of the defendants Spies and Schwab to the Monday night plot.

By the terms of the plot, the word "Ruhe" was to be published in the "Arbeiter Zeitung" as a signal to the members of the armed sections to arm themselves and gather at their meeting places, there to be ready to attack the police when the committee appointed should give information of a disturbance. That word *was* published in the paper, which was issued on the afternoon of Tuesday, May 4. Its publication was the act of the defendant Spies. He wrote with his own hands the words "*Brief Kasten*—RUHE"—the former of which means "letter-box" in German—and, from the original manuscript so written by himself, the printers set up the type from

which the words were printed in the paper of Tuesday afternoon. "Ruhe" was not only in his handwriting, but he underscored it twice, as if to give it greater emphasis and prominence. If he knew its meaning as a signal-word and the object of its insertion in the paper, as explained on the night before by his own foreman, the defendant Fischer, then he was lending himself by its publication to the execution of the plan of Monday night. "Nor is it necessary to prove that the conspiracy originated with the defendants, or that they met during the process of the concoction; for every person entering into a conspiracy or common design, already formed, is deemed in law a party to all acts done by any of the other parties, before or afterwards, in furtherance of the common design." 3 Greenleaf on Evidence, sec. 93.

There is evidence tending to prove, that Spies inserted this word in the International organ as a member of the committee, whose business it was to do so, because that same committee was in charge of the Haymarket meeting, and he was the most active man in the management of that meeting. He himself inserted among the editorial notices in the "Arbeiter Zeitung" on Tuesday afternoon the following notice in almost the same words used in the hand-bill, printed by Fischer: "Attention, workingmen!  Grand mass meeting this evening at half-past seven o'clock on the Haymarket, Randolph, between Desplaines and Halsted streets.  Good speakers will denounce the latest rascally deed of the police in killing our brethren yesterday afternoon, in shooting our brethren yesterday afternoon."  He organized the Haymarket meeting and addressed it.  He mounted the wagon and called for Parsons.  He selected, as the speaker's stand, the wagon with all its advantages of location, as already specified.  He moved among the workingmen on the Haymarket and pressed them north into Desplaines street to the neighborhood of the wagon so selected.  In his address he spoke confidently as to the intentions of the committee, charged with the double duty already

indicated, saying among other things: "The committee that called the meeting wanted to tell you certain facts," etc.

In explanation of the publication of the word "Ruhe," the defendant Spies swears that its meaning was stated to him for the first time by Rau, his advertising agent, and Fischer, his foreman, on Tuesday afternoon after its appearance in the paper, and that he instructed them to speak to the armed men of its insertion at that time, as a mistake. Rau and Fischer were not placed upon the stand to confirm this explanation, and whether it was credible, in view of his printed utterances on that day and several previous days and in view of all the other features of his conduct, as disclosed in the record, was a matter for the jury to determine. If they did not believe his explanation as against the evidence, which tended to contradict it, then they were justified in finding, from the circumstances already mentioned and those hereafter stated, that he was as much a party to the plot as Engel and Fischer and Lingg.

That plot, as has already been shown, contemplated the throwing of a bomb into each police station, and then, in the confusion, using fire-arms against the policemen. In an article upon the riot of Monday afternoon, written by the defendant Spies and published in the same Tuesday afternoon edition, in which the word "Ruhe" appeared, he says: "If brothers, who defended themselves with stones (a few of them had little snappers in the shape of revolvers) had been provided *with good weapons and one single dynamite bomb, not one of the murderers would have escaped his well-merited fate.*" Here is a suggestion of that very mode of attacking the police, which was the main feature of the Monday night conspiracy. This suggestion was made to the workingmen Tuesday afternoon. Tuesday night the very thing suggested took place, that is to say, a bomb was thrown not into a station, but among the police a few feet from a station, and, after it was thrown, "good weapons" were fired into them, killing several

and wounding several more. The article in question did not stop, however, with a *suggestion* of an attack upon the police in the mode specified. It closed by saying: "Last night thousands of copies of the following circular were distributed in all parts of the city," and then quoted and re-published in full the German portion of the "Revenge Circular," that had been composed by Spies and distributed among the working-men on Monday night, thereby urging such workingmen in the most vehement terms to arm themselves and make war upon the police. A translation of this German circular is given hereafter.

The reason why the plan of Monday night provided for throwing a bomb into each police station and shooting the escaping policemen was that the latter might be thereby prevented from going to the scene of the disturbance, which was expected to take place. Such plan would naturally be based upon information, that the police intended to hold themselves in readiness at their stations for a summons to some point of conflict. On the afternoon of April 30, 1886, being the Friday preceding the Tuesday, on which the Haymarket meeting occurred, the "Arbeiter Zeitung," in an editorial written by one or the other of its two editors, Spies and Schwab, thus addressed its three thousand six hundred readers among the members of the International groups and the unions of the workingmen:

"As we are informed from reliable source, the police have received secret orders to keep themselves prepared in their stations, as a labor conflict is feared on Saturday of next week. You see the capitalistic sluggards are thirsty for the blood of workingmen. The workingmen will not permit themselves to be kicked by them like dogs any more. They will not be tortured to death any more by unlimited work, and they will not be starved any more. For this opposition they want vengeance and they cry for blood. May be that this cry will be heeded—but then, beside the red life-sap of the extor-

tioner's victim, there may flow a little of the black-dragon poison of the extortioner. *To the workingmen we again say at this hour, arm yourselves. You have but one life to lose. Defend that with all means. And in this connection we want to caution the armed workingmen as yet to conceal their arms so that they will not be stolen by the minions of the law, as it has happened in various instances."*

Here was a statement that the police had "received secret orders *to keep themselves prepared in their stations*" for a labor conflict expected to occur in about a week, which statement was accompanied with a caution to the workingmen to arm themselves and to conceal their arms. The injunction to arm could have had no other object than to meet the preparations which the police had received secret orders to make. Such preparations could be of no avail, if the stations should be blown up and the police themselves should be shot down. Therefore, the plan of Monday night was exactly adapted to rendering the action of the police in keeping themselves prepared in their stations useless and of no effect. So exactly does the plan in question fit the state of things spoken of in the editorial of April 30, that it would appear to have been suggested by that editorial.

When it is remembered, that, on the very day on which this editorial made its appearance, Lingg brought to Seliger's house the large box of dynamite, already alluded to, and that, on the next Sunday morning, Fischer, who, as foreman of the "Arbeiter Zeitung," was all the time at work under the eyes of Spies and Schwab, went in company with Engel to a meeting of the second company of the Lehr und Wehr Verein and the North-west Side group, where the plan for destroying the stations and their occupants was adopted upon the suggestion of Engel, it would appear, that the defendant Spies and Schwab not only joined the conspiracy now under discussion *after* it was formed, but inspired the conception of it *before* it was formed.

The armed men, who met and entered into that conspiracy on Monday evening, were called together by the "Arbeiter Zeitung" of which Spies and Schwab were the editors and managers. In the edition, called "Die Fackel," issued on Sunday May 2, and in the issue of the afternoon of Monday, May 3, there were published, in the letter-box column, the words: "Y.–Komme Montag Abend'" ("Y.–Come Monday night.") This was a summons to the armed sections to meet, as they did, on Monday night at Greif's Hall. The original manuscript, from which the words were printed for the Sunday issue, was in the handwriting of Rau, advertising agent of the "Arbeiter Zeitung," member with Spies of the bureau of information, and distributor for Spies of the "Revenge" circular. The printing of the call twice, on both Sunday and Monday, indicated the importance of the matters to come before the meeting.

In his testimony, Spies says of the "Revenge" circular: "I wrote it to arouse the working people, who are stupid and ignorant, to a consciousness of the condition that they were in." In the circular as above quoted he uses the words: "Avenge the atrocious murder, which has been committed upon your brothers *to-day* (Monday,) and which will likely be committed upon you *to-morrow*" (Tuesday.) In the minds of "stupid and ignorant" workmen, already excited about the eight-hour day of labor, the language here quoted could mean nothing else than that an attack, similar to the one, which took place in the south-western part of the city on Monday, would probably be made upon the workingmen by the police on Tuesday.

Again, in the issue of the "Arbeiter Zeitung" published on Sunday May 2, it is said: "Everything depends upon quick and immediate action. The tactics of the bosses are to gain time; the tactics of the strikers must be to grant them no time. *By Monday or Tuesday the conflict must have reached its highest intensity, else the success will be doubtful.* Within a

week the fire, the enthusiasm will be gone, and then the bosses will celebrate victories." Here is another designation of *Tuesday* as the day when the excitement would be the most intense. The conduct of Spies and Schwab during the few days preceding May 4 and on that day, as evinced by their utterances in the "Arbeiter Zeitung" and otherwise, shows a constant effort to increase the enthusiasm to the highest pitch.

They advised "stupid and ignorant" workingmen to arm themselves, and then sought by vehement appeals to urge them on to "quick and immediate action." For instance:

On Wednesday, April 28, they said: "The power of the associate manufacturers and their state must be met by labor associations. The police and soldiers, who fight for that power, must be met by armed armies of workingmen; the logic of facts requires this; arms are more necessary in our times than anything else. Whoever has no money, sell his watch and chain to buy fire-arms for the amount realized. Stones and sticks will not avail against the hired assassins of the extortionists. *It is time to arm yourselves.*"

On Thursday, April 29, they said: "If the legitimate means of the thieves and scoundrels, who practice extortion on their fellow-men, are exhausted, then they resort to force. *A wage slave, who is not utterly demoralized, should always have a breech-loader and ammunition in his house.*"

On Friday, April 30, they said what has already been quoted from the editorial of that date, and on the same day they further said, in another article: "What will the 1st of May bring? The workingmen bold and determined. . . . Men of labor, so long as you acknowledge the gracious kicks of your oppressors with words of gratitude, so long you are faithful dogs. . . . *They are enraged, and will attempt, through hired murderers, to do away with you like mad dogs.*"

On Saturday May 1, they again said to the workingmen in the "Arbeiter Zeitung:" "Away with all rolls of membership and minute books where such are kept. *Clean your guns,*

*complete your ammunition. The hired murderers of the capital-ists, the police and militia, are ready to murder. No workingman should leave his house in these days with empty pockets.*"

On Sunday, May 2, in the same editorial, which urged quick and immediate action, and designated Monday or Tuesday, as the time when the conflict would have reached its highest in-tensity, they used the following language: "Everywhere the workingmen are willing to accept a corresponding reduction of wages with the introduction of the eight-hour system, they were mostly refused. 'No, ye dogs; you must work ten hours; that's the way we want it, we're your bosses.' Something like this was the answer of the majority translated into intelligible language. In the face of this fact, it is pitiful and disgusting, but more than that, *it is treacherous, to warn the strikers against energetic, uncompromising measures.*"

On Monday, May 3, in another article in the "Arbeiter Zeitung," they said: "The freight handlers were marching in full force from depot to depot at noon to-day. It was rumored, that 'scabs' had been imported from Milwaukee. The railroad depots are occupied by special policemen, while the municipal minions of order under the command of five lieutenants have entrenched themselves in the armory. The arch-rascals have made provisions for good victuals and drink. . . . A strike will probably take place in the lumber districts. . . . The number of strikers to-day can not be determined, but will probably amount to *forty thousand.* Courage, courage is our cry. Don't forget the words of Herways: *The host of the op-pressors grows pale, when thou, weary of thy burden, in the corner puttest the plow, when thou sayest 'it is enough.'*"

But there were other occurrences during the same period, which tended to incite the workingmen to an attack upon the police.

While Fischer, the first foreman in the compositor's room of the "Arbeiter Zeitung," was present at the Sunday morning meeting on Emma street, Urban, a compositor of the "Arbeiter

Zeitung," was attending a meeting of the Central Labor Union at No. 54 West Lake street in a room back of the saloon. Spies was present at a second meeting of the Central Labor Union at the same place in the afternoon of the same Sunday.

It was arranged at these morning and afternoon gatherings of the Central Labor Union that Spies should address the meeting of the striking lumber shovers, to be held the next afternoon on the "Black road," in the near neighborhood of a large manufacturing establishment in the south-western part of the city.

On Monday afternoon the meeting in question took place. It has already been referred to. The lumber shovers were "on a strike" and met to hear reports from certain committees, whom they had appointed to negotiate with their employers in reference to the eight-hour movement. The immense crowd in attendance upon this occasion was addressed by Spies, as has already been stated. He spoke in the German language from the top of a freight car. His manner was excited and his gestures were violent. One of the witnesses says, that while speaking "he jumped up three or four feet high." About three blocks west from the place where he was speaking was situated the factory which was employing non-union laborers as heretofore explained. The lumber shovers at the meeting were not connected in any way with the workingmen engaged at the factory. But when the latter came out of the factory gate about three o'clock in the afternoon at the ringing of a bell an attack was made upon them by several thousand of the lumber shovers who rushed from the freight car towards the gate, before the speaking was finished, in obedience to an order from some one on the car. A conflict ensued. The police were called out. Stones were thrown, clubs were used, and pistols were fired by both the crowd and the police. Some of the policemen and several of the workingmen were wounded. One of the latter was killed, as has been heretofore mentioned.

It is admitted by the defendant Spies, that, upon this occasion, he urged the workingmen, many of whom were armed with revolvers, to resist the attempt of the police to quell the riot. In an account of what took place, written by himself and published on the next afternoon (Tuesday, May 4) in the "Arbeiter Zeitung," he says:

"*The writer of this hastened to the factory as soon as the first shots were fired* and a comrade urged the assembly to hasten to the rescue of their brothers, who were being murdered, but no one stirred. . . . *The writer ran back. He implored the people to come along—those who had revolvers in their pockets, but it was in vain. With an exasperating indifference they put their hands in their pockets and marched home, babbling as if the whole affair did not concern them in the least.* The revolvers were still cracking and fresh detachments of police, here and there bombarded with stones, were hastening to the battle ground. The battle was lost!"

On Tuesday afternoon Spies inserted in his paper a call for the Haymarket meeting in order to denounce the action of the police at this very riot. The Haymarket meeting was thus nothing more than a continuation of the warfare on the police, which he himself had incited and taken part in on Monday afternoon.

After his return from the "Black road" to the "Arbeiter Zeitung" office on Monday afternoon May 3, 1886, he wrote in English the following address, all of which, except the word "Revenge" at the top, is proven to have been in his handwriting:

"REVENGE.
"*Workingmen, to Arms!!*

"The masters sent out their blood-hounds—the police; they killed six of your brothers at McCormick's this afternoon. They killed the poor wretches, because they, like you, had the courage to disobey the supreme will of your bosses. They killed them because they dared ask for the shortening of the

hours of toil. They killed them to show you, *'free American citizens,'* that you must be satisfied and contented with whatever your bosses condescend to allow you, or you will get killed!

"You have for years endured the most abject humiliations; you have for years suffered unmeasurable iniquities; you have worked yourself to death; you have endured the pangs of want and hunger; your children you have sacrificed to the factory lord—in short, you have been miserable and obedient servants all these years! Why? to satisfy the insatiable greed, to fill the coffers of your lazy, thieving masters! When you ask them now to lessen your burdens, he sends his bloodhounds out to shoot you—kill you! *If you are men, if you are the sons of your grandsires, who have shed their blood to free you, then you will rise in your might, Hercules, and destroy the hideous monster that seeks to destroy you. To arms, we call you, to arms!* Your Brothers."

He at the same time wrote an address in the German language, of which the following is a translation:

"Revenge! Revenge!
"*Workmen, to Arms!*

"Men of labor, this afternoon the blood-hounds of your oppressors murdered six of your brothers at McCormick's. Why did they murder them? Because they dared to be dissatisfied with the lot which your oppressors have assigned to them. They demanded bread, and they gave them lead for an answer, mindful of the fact that thus people are most effectually silenced. You have, for many, many years, endured every humiliation without protest, have drudged from early in the morning till late at night, have suffered all sorts of privations, have even sacrificed your children. You have done everything to fill the coffers of your masters— everything for them! And now, when you approach them and implore them to make your burden a little lighter, as a

reward for your sacrifices, they send their blood-hounds, the police, at you, in order to cure you, with bullets, of your dissatisfaction.   Slaves, we ask and conjure you, by all that is sacred and dear to you, avenge the atrocious murder which has been committed upon your brothers to-day, and which will likely be committed upon you to-morrow. *Laboring men, Hercules, you have arrived at the cross-way.   Which way will you decide?   For slavery and hunger, or for freedom and bread? If you decide for the latter, then do not delay a moment, then, people, to arms!   Annihilation to the beasts in human form who call themselves rulers!   Uncompromising annihilation to them! This must be your motto.   Think of the heroes whose blood has fertilized the road to progress, liberty and humanity, and strive to become worthy of them!*               YOUR BROTHERS."

These two addresses were printed, one in the English and the other in the German language, upon the same sheet of paper and one above the other, as one circular.   The printers in the "Arbeiter Zeitung" office usually stopped work at five o'clock in the afternoon.   On this particular Monday afternoon, however, five or six of them were detained to set up the type for this circular.   By direction of Spies the form was sent across the street to a printing office at No. 88 Fifth avenue.   The order was given to strike off as many as possible.   Twenty-five hundred copies were printed that evening. As soon as they came from the hands of the printer they were carried away.   "A dozen different parties came there after them, coming one and two at a time, taking it as fast as it came from the press."

These circulars were distributed on Monday evening at various places and in different parts of the city.

One of the witnesses says: "It was a few minutes after six o'clock   .   .   .   on Monday afternoon.   I was standing in the doorway of the entrance of 54 West Lake street, talking with the proprietor of the hall, and first had my attention

attracted to a circular by seeing a few of them flying through the air, and remember distinctly picking up one and reading it at the time.   Just at the moment I saw a horseman, and the distribution of the circulars was coincident with the appearance of the horseman in front of 54 West Lake street. My impression was that the horse was ridden west on Lake street."   Later in the evening, the circulars were handed around at Greif's hall in the saloon and at the meeting of the armed sections, which was in session in the basement.   On the same night there was a gathering of the members of the carpenters' union to the number of one thousand or eight hundred men at Zepf's Hall at the corner of West Lake and Desplaines streets, as heretofore stated, and the "Revenge" circulars were brought there and distributed by Rau, the advertising agent of the "Arbeiter Zeitung."   Between nine and ten o'clock, the defendant Neebe carried a number of copies to a saloon at the corner of Franklin and Division streets in the North division of the city and laid some on the counter and some on the tables as hereafter stated.

A copy was seen by one of the witnesses at a meeting that night of the metal-workers at No. 99 West Randolph street.

Another witness says that he was walking west on Randolph street Tuesday evening about half-past seven o'clock, and somebody handed him a circular headed "Revenge" and signed "Your brothers."

That this circular gave impulse to the action of the members of the armed sections at the Monday night meeting and inspired the adoption of the plan agreed upon, is apparent from the fact, that its contents were fully discussed and dwelt upon at that meeting.

The witness Gruenhut says, that he was at the "Arbeiter Zeitung" office between five and seven o'clock on Monday afternoon; that Schwab and the book-keeper and Neebe (though he is not so sure about the latter) were present while Spies was writing the "Revenge" circular and reading the

proof-sheets of it as they came from the hands of the printer; that Spies told them of the lumber shovers' riot, from which he had just come, and of the killing of six men by the police, and deplored the fact that the workingmen had not been better armed for their defence, favoring the use of dynamite as the most effective mode of arming; that the calling of a mass meeting was then discussed and agreed upon among them, and it was agreed that the meeting should be held at night and be in the open air; that the circulars, which Spies was preparing, were to be printed "for distribution for the mass meeting;" that the Haymarket meeting held Tuesday night was the meeting talked about and agreed upon on that Monday afternoon.

Grueneberg says, that he saw Fischer in the compositors' room of the "Arbeiter Zeitung" as late as half-past five o'clock on Monday evening, and when it is remembered that Fischer went to the meeting at Greif's Hall that night and induced the armed men to agree to the holding of an open-air meeting on Tuesday night at the Haymarket, and himself printed and caused to be circulated a hand-bill, calling on the workmen to come armed to that meeting, and when it is further remembered, that the signal-word "Ruhe," which the armed men that night agreed upon at his suggestion, was next day written by Spies with his own hand and published in the "Arbeiter Zeitung" on Tuesday afternoon, the jury certainly had reasonable ground for believing, that the action of Fischer on Monday night was taken in consequence of and pursuant to the arrangements decided upon between Spies, Schwab and others at the "Arbeiter Zeitung" office Monday afternoon.

This conclusion receives confirmation from the character of the articles, which appeared in the "Arbeiter Zeitung" on Tuesday afternoon.

The following editorial published on May 4, 1886, and called the "To arms" editorial, was written by the defendant Schwab:

"Blood has flowed. It happened as it had to. Order has not drilled and disciplined her murdering hounds in vain. The militia has not been drilled in street fighting for mere sport. The robbers, who know best themselves what a mean rabble they are, who keep up their mammon by rendering the masses wretched, who make the slow murdering of laboring men's families their vocation, they are the last to be afraid of directly butchering the laboring men. 'Down with the rabble,' is their watch-word. Is it not an historical fact, that private property has had its origin in acts of violence of all sorts? And shall the 'rabble,' the laboring men, allow this capitalistic pack of robbers to carry on, through hired assassins, their bloody orgies? Nevermore! The war of classes has come. In front of McCormick's factory workmen were shot down yesterday, whose blood cries for vengeance. Who will any longer deny, that the ruling tigers are thirsting for the workman's blood? Countless victims have been slaughtered upon the altars of the golden calf amidst the triumphant shouts of the capitalistic band of robbers. One has only to think of Cleveland, New York, Brooklyn, East St. Louis, Ft. Worth, Chicago and countless other places, in order to recognize the tactics of the extortioners. It is: 'Terror to our working cattle.' But the laborers are not sheep, and the white terror will be answered with the *red*. Do you know what that means? Very well, you will find that out yet.

"Modesty is a vice of the workingman, and can there be anything more modest than this eight-hour demand? Peaceably the workmen made it already a year ago, in order not to neglect to give the extortioner opportunity to prepare for it; and the answer to this was: to drill the police force and the militia and to browbeat the laborers, who worked in favor of the eight-hour system. And yesterday blood flowed. This is the manner, in which these devils reply to a modest petition of their slaves.

"Death rather than a life of wretchedness! If workmen must be shot at, well then let us answer them in a manner which the robbers will not soon forget again. The murderous capitalistic beats have become drunk with the smoking blood of laborers. The tiger lies ready for the jump; his eyes sparkle eager for murder; impatiently he whips his tail, and the sinews of his clutches are drawn tight. Self-defence causes the cry: 'To arms!' 'To arms!' If you do not defend yourselves, you will be torn in pieces and ground by the animal's teeth. The new yoke which awaits you in case of cowardly retreat is heavier still and harder than the severe yoke of slavery as it exists now.

"All the powers, hostile to the workmen, have been (made) common cause. They recognize their common interest. They have the necessary class-consciousness. In such days as ours are, everything else must be subordinated to this one thought: How can the thieving —— together with their gangs of hired murderers, be made harmless?

"The whole newspaper gang makes up the lie to-day that the strikers, who were in the neighborhood of McCormick's factory yesterday, were the first to fire. That is a bold bare-faced lie on the part of the journalistic ragamuffins. Without any warning whatever, they fired at the workmen, when they, of course, returned the fire. Indeed, why should they make so much ado about the rabble? To be sure, if they had been sheep or cattle instead of human beings, one might have reflected a little before shooting. But as it was, a laboring man is quickly replaced, and the gluttons then at their rich dinners and in the circles of their mistresses boast of the splendid achievements of law and order.

"In the poor shanty, miserably-clad women and children are weeping for husband and father. In the palace they touch glasses filled with costly wine and drink to the happiness of the bloody bandits of law and order. Dry your tears, ye poor

13—122 ILL.

and wretched; take heart, ye slaves; arise in your might and overthrow the system of robbery, present order based on robbery."

The following is a portion of the article already quoted from, which was written by the defendant Spies and published in the "Arbeiter Zeitung" on Tuesday, May 4, 1886:

"Six months ago, when the eight-hour movement began, there were speakers and journals of the I. A. A. who proclaimed and wrote: 'Workmen, if you want to see the eight-hour system introduced, arm yourself. If you do not do this you will be sent home with bloody heads and birds will sing May songs upon your graves.' ('That is nonsense,' was the reply.) 'If the workmen are organized they will gain the eight hours in their Sunday clothes.' Well, what do you say now? Were we right or wrong? Would the occurrence of yesterday have been possible if our advice had been followed?

"Wage-workers, yesterday the police of this city murdered at the McCormick factory, so far as it can now be ascertained, four of your brothers, and wounded, more or less seriously, some twenty-five more. If brothers who defended themselves with stones (a few of them had little snappers in the shape of revolvers) had been provided with good weapons *and one single dynamite bomb, not one of the murderers would have escaped his well-merited fate.* As it was, only four of them were disfigured. That is too bad. The massacre of yesterday took place in order to fill the forty thousand workmen of this city with fear and terror—took place in order to force back into the yoke of slavery the laborers who had become dissatisfied and mutinous. Will they succeed in this? . . . About seventy-five well-fed, large and strong murderers, under the command of a fat police lieutenant, were marching toward the factory, and on their heels followed three patrol wagons besides, full of law and order beasts; two hundred policemen were on the spot in less than ten or fifteen minutes, and the firing on fleeing workingmen and women re-

sembled a promiscuous bush-hunt. . . . A few of the strikers had little snappers of revolvers, and with these returned the fire. . . . With their weapons, mainly stones, the people fought with admirable bravery. They laid out half a dozen blue-coats, and their round bellies, developed to extreme fatness in idleness and luxury, tumbled about, groaning on the ground. Four of the fellows are said to be very dangerously wounded; many others, alas! escaped with lighter injuries. (The gang, of course, conceals this, just as in '77 they carefully concealed the number of those who were made to bite the dust.) But it looked worse on the side of the defenceless workmen. Dozens who had received slight shot wounds hastened away amid the bullets which were sent after them. The gang, as always, fired upon the fleeing, while women and men carried away the severely wounded. How many were really injured and how many were mortally wounded could not be determined with certainty, but we think we are not mistaken when we place the number of mortally wounded at about six and those slightly injured at two dozen. We know of four, one of whom was shot in the spleen, another in the forehead, another in the breast, and another in the thigh. A dying boy, Joseph Doedick, was brought home on an express wagon by two policemen."

Also in the issue of the "Arbeiter Zeitung" of Tuesday, May 4, 1886, appeared the following:

"An outbreak was expected on the South-west Side this morning. A regiment of militia and the whole municipal gang of murderers were held in readiness. Just stir, ye free workmen of America, if you want to be shot down."

In the same issue of the "Arbeiter Zeitung" of May 4, 1886, also appeared the following:

"The heroes of the club dispersed with their cudgels yesterday in the most brutal manner a crowd of girls, many of whom had scarcely outgrown their baby shoes. Whose blood does not rush quicker through the veins when he hears of

this atrocity of the minions of the law? He, who is a man, show it these days. Men, to the front!

"The armory on Lake Michigan is guarded by militia tramps. The youngsters say they are fully equipped. Should the anarchists venture an attack from any point, they would find a warm reception. Well, as long as the youngsters are in their barracks, they will probably not be molested. But if they appear in the streets, circumstances might be altered."

The "Alarm" and the "Arbeiter Zeitung" were more than mere newspapers to the members of the International Association. They were the organs of that association. The members looked to those papers for orders and directions. More especially was this the case with the "Arbeiter Zeitung" and its German readers. The record contains many evidences of this fact.

The seventy or eighty armed men who assembled in the basement of Greif's Hall and their absent confederates, who were to be informed of their conspiracy, were to look for the word "Ruhe" in the "Arbeiter Zeitung." From that paper they were to learn when the social revolution had come and when they were to assemble for conflict. This showed, that they were in the habit of reading that paper and consulting it. When a special meeting of the armed sections was desired, they, who belonged to those sections, found the signal-words, calling them together, in the "Arbeiter Zeitung." This implied that they were readers of that paper. The seventy or eighty men just referred to went to Greif's Hall, because they saw the summons to go there in their organ. Some of them testify that they went there for that reason, and there is no evidence, that they received any other notice of the Monday night meeting than the one published in the "Arbeiter Zeitung." The assemblage of seventy or eighty of them there may be regarded as proof that seventy or eighty of them read the paper in question on Sunday and Monday.

Many witnesses in this case, both for the State and for the defence, who testify to their membership in the International Association, testify also to the fact that they were in the habit of reading one or the other of the two organs here referred to.

Waller, a member of the Lehr und Wehr Verein, who presided at the gathering in the basement of Greif's Hall, and who was armed with a revolver at the Haymarket on Tuesday night, says that he saw the word "Ruhe" in the "Arbeiter Zeitung" at six o'clock Tuesday afternoon in a saloon on Milwaukee avenue, and that on Monday he saw the words "Y.—Komme Montag Abend" in the same paper.

When Lingg desired to explain to Seliger the disturbance, that was expected on the West Side, he went to the "Arbeiter Zeitung" and showed the word "Ruhe."

Without going further into the testimony, we think the jury were warranted in believing, that most of the editorials in these papers, which were generally in the form of appeals or addresses to the workingmen, were read at least by those of the workingmen, who belonged to the groups herein mentioned. More especially were these organs consulted during the excitement of the eight-hour movement, when information as to the progress of that movement was eagerly sought after among the classes affected by it.

As already stated, the weight of the evidence is in favor of the conclusion that Degan was killed by some member of the International Association. It was for the jury to say, how far that fatal result may have been brought about through the influence of the utterances, put forth by the organs here designated.

As late as Tuesday afternoon Spies said to the workingmen in an editorial in his paper, proven to have been written by himself: "Then do not delay a moment; then, people to arms! Annihilation to the beasts in human form, who call themselves rulers!"

As late as Tuesday afternoon, Schwab said to the working-men in an editorial in the same paper, proven to have been written by himself: "The murderous capitalistic beats have become drunk with the smoking blood of laborers. The tiger lies ready for the jump; his eyes sparkle eager for murder; impatiently he whips his tail, and the sinews of his clutches are drawn tight. Self-defence causes the cry: 'To arms! To arms!' If you do not defend yourselves you will be torn in pieces and ground by the animal's teeth."

"He, who inflames people's minds and induces them by violent means, to accomplish an illegal object, is himself a rioter, though he take no part in the riot." *Regina* v. *Sharpe,* 3 Cox's C. C. 288.

"One is responsible for what of wrong flows directly from his corrupt intentions. . . . If he set in motion the physical power of another, he is liable for its result. If he contemplated the result, he is answerable, though it is produced in a manner he did not contemplate. . . . If he awoke into action an indiscriminate power, he is responsible. If he gave directions vaguely and incautiously, and the person receiving them acted according to what he might have foreseen would be the understanding, he is responsible." 1 Bishop on Crim. Law, sec. 641.

We conceive that it can make no difference, whether the mind is affected by inflammatory words addressed to the reader, through the newspaper organ of a society to which he belongs, or to the hearer through the spoken words of an orator, whom he looks up to, as a representative of his own peculiar class. *Queen* v. *Most,* L. R. 7 Q. B. D. 244.

It was a question for the jury, whether, with the evidence before them, the attack upon the police at the Haymarket "was so connected with the inflammatory language used, that they can not be separated by time or other circumstances."

We do not wish to be understood as deciding, that the influence of these publications in bringing about the crime at

the Haymarket could be considered by the jury if they were the *only* evidence of encouragement of that crime, which was furnished by the record. We only hold, that the jury were at liberty to consider the publications in question in connection with all the other facts and circumstances of this particular case and as a part of those facts and circumstances, with a view of determining whether the defendants, who were responsible for their issuance, did or did not belong to the conspiracy now under consideration.

It has already been stated, that the defendant Schwab was present at the Haymarket a part of Tuesday evening, but left and went to Deering, where he made a speech. What he said in that speech is not disclosed by the record. The proof shows, that those, who called the Haymarket meeting, expected an attendance of twenty-five thousand workingmen at that place. As matter of fact only about two thousand came. Several thousand had assembled at Deering. That Schwab went to Deering and there addressed some of the workingmen, who were expected at the Haymarket but failed to come, would in nowise lessen his responsibility for the death of Degan, if his acts and declarations, as heretofore and hereafter noticed, helped to cause that death. If he belonged to the same conspiracy with Degan's murderer and the murder of Degan was perpetrated in furtherance of that conspiracy, then the act of the murderer was his act. It is to be noted that he did not go to Deering, until he first went to the Haymarket and had a consultation with one or more of the leaders, who had control of matters at the latter place. But a further consideration of this branch of the case will be postponed for the present.

Spies spoke to the crowd at the Haymarket. One of the witnesses says that, in his speech, he dwelt upon the occurrences of Monday afternoon at the lumber shovers' meeting and the part he took in them, and then "advised the using of violent means by the workingmen to right their wrongs; that

law and government were the tools of the wealthy to oppress the poor; that the ballot was no way in which to right their wrongs; that by physical force was the only way in which they could right their wrongs."

The following is another portion of his speech, as testified to by a witness, who heard it:

"The fight is going on. Now is the chance to strike for the existence of the oppressed classes. The oppressors want us to be content; they will kill us. The thought of liberty which inspired your sires to fight for their freedom ought to animate you to-day. The day is not far distant when we will resort to hanging these men. (Applause, and cries of 'hang them now!') ———— is the man who created the row Monday, and he must be held responsible for the murder of our brothers. (Cries of 'hang him.') Don't make any threats. They are of no avail. Whenever you get ready to do something, do it, and don't make any threats beforehand. There are in the city to-day between forty and fifty thousand men locked out because they refused to obey the supreme will or dictation of a small number of men. The families of twenty-five or thirty thousand men are starving because their husbands and fathers are not men enough to withstand and resist the dictation of a few thieves on a grand scale, to put out of the power of a few men, to say whether they should work or not. Would they place their lives, their happiness, everything out of the arbitrary power of a few rascals? . . . To say whether you shall work or not, you place your lives, your happiness, everything, out of the arbitrary power of a few rascals, who have been raised in idleness and luxury upon the fruits of your labor. Will you stand that?"

Still another witness says: "He talked about the police, the blood-hounds of the law shooting down six of their brothers, and he said: 'When you get ready to do something, do it, and don't tell anybody you are going to.' . . . At the time Mr. Spies was showing them how the officers came down

the 'Black road' and commenced shooting into the crowd of workingmen . . . they appeared very much excited in the neighborhood of the wagon and in the neighborhood, where they hallooed out: 'Let us hang them.'"

The observations, hereafter made in regard to the speech of the defendant Parsons and its effect, apply also to this speech of the defendant Spies.

The evidence thus far commented upon in reference to the acts and declarations of the defendants Spies and Schwab, is such, that the jury were warranted in finding them to be parties to the conspiracy. In addition, however, to the facts and circumstances already noticed, there was other testimony, introduced by the State for the purpose of proving that the defendants Spies and Schwab, either one or both of them, gave the bomb, that killed Degan, into the hands of the person, who threw it, and aided him in his murderous design.

Malvern M. Thompson testifies, that he saw Spies and Schwab together in Crane's alley on the night of the Haymarket meeting and heard the words "police" and "pistols" uttered in a conversation between them; that Spies said to Schwab: "Do you think one is enough or hadn't we better go and get more?" that they came out of the alley and walked together west on Randolph street to the south-west corner of Randolph and Halsted streets where they entered the thickest of a crowd of about twenty-five men, remaining there some three minutes and then returning to Desplaines street; that, on the way back, the word "police" was again used, and Schwab said to Spies: "Now, if they come, we will give it to them;" that, upon their return, Rudolph Schnaubelt met them on the sidewalk near the wagon and Spies handed Schnaubelt something which the latter put in his pocket on the right-hand side; that Spies then mounted the wagon and began to speak; that just after him Schnaubelt also mounted the wagon and sat upon it with his hands in his pockets until Fielden began to speak, when the witness left.

The witness did not know what it was that was handed to Schnaubelt, but, upon the assumption that he tells the truth, it was evidently something that was to be used against a body of policemen, and as a bomb with a projecting fuse is made to be thrown into a crowd of men, the jury, looking at the circumstance here noted in the light of all the other facts and circumstances developed by the testimony in the case, were warranted in believing that the thing given to Schnaubelt was a bomb. Therefore, the evidence of Thompson, if true, tends very strongly to convict Spies and Schwab of aiding and abetting the crime of the Haymarket.

Schwab testifies, that, while he was at the "Arbeiter Zeitung" office on that evening, a call came through the telephone for a speaker to address the meeting at Deering, and that he at once went over to the Haymarket to consult with Spies about it; that he failed to find Spies and did not see him or talk with him at all; that he met Schnaubelt, his brother-in-law, and, after talking with him about sending a speaker to Deering, concluded to go himself; that he thereupon took a Randolph street car and went east to the court house, there boarding a Clybourne avenue car for the north.

The testimony in regard to the matters, about which Thompson testifies, is very conflicting. There is much, that tends to confirm him, and much that tends to contradict him.

*First—As to the proof tending to confirm Thompson.* It is established beyond question, that Schwab went to the Haymarket for the express purpose of seeing Spies; that Schnaubelt was at the Haymarket until after ten o'clock and was on the wagon with Spies, Parsons and Fielden; that Spies *did* walk in company with *somebody* from the wagon westward on Randolph street for the avowed purpose of finding Parsons, who had been seen before eight o'clock at the corner of Randolph and Halsted streets, and *did* return along Randolph street to the wagon in company with the same person, who started with him.

The statements of Owen and Heineman and of Spies and Schwab themselves, when analyzed and compared, show that Schwab was at the Haymarket that evening for at least half an hour and that Spies was there at the same time. Other testimony shows that Schnaubelt was there at the same time.

Thompson is confirmed in many particulars. He says that "Schwab came rushing along Desplaines street in a great hurry." Owen also says: "Schwab came up and almost run into the mayor before he saw him."

Thompson says that, just after seeing Schwab, he crossed to the east side of Desplaines street, went north towards Lake, then returned southward, saw Spies get on the wagon and heard him ask if Parsons was present, then, while he was standing at the entrance to the alley, saw Spies, after his descent from the wagon, go with Schwab for a few moments into the alley, etc. Owen says, that, when Schwab saw the mayor at the corner of Desplaines and Randolph streets, he "immediately upon that turned about and went north on Desplaines street." It thus appears, that Schwab was seen going in the direction of the alley, where Thompson claims to have seen the meeting between him and Spies, and at about the time when that meeting is claimed to have been witnessed. Schwab says himself that he "went across Randolph street and north of Randolph on Desplaines I met my brother-in-law, Rudolph Schnaubelt."

Cosgrove says: "I saw Mr. Schwab there before the meeting began. I saw him there just after the time Mr. Spies returned. . . . The first time I saw him was about forty feet south of Randolph on Desplaines street on the west side of the street. The last time I saw him was at the wagon—it was about half-past eight."

McKeough says: "I saw Schwab on the wagon in the early part of the evening and a man named Schnaubelt. . . . Spies started away then and officer Meyers and I followed him as far as the corner. There was a man with him, who,

I think, was Schwab. I saw Schwab there in the early part of the evening. I lost sight of him finally somewheres in the vicinity of half-past eight o'clock. After that I did not see him at all during the entire evening. . . . He got on the wagon, I think, before the meeting started and tapped Mr. Spies on the shoulder and said something to him. *I saw him at the side of the wagon, talking to Spies.*" Freeman, a reporter, also says that he thought he saw Schwab on the wagon.

The person, who thus spoke to Spies on the wagon and who was Schwab according to McKeough's evidence, is said by Spies to have been one Schroeder. Spies also says, that the man, who started away with him towards the corner of Desplaines and Randolph streets, was Schnaubelt. As McKeough speaks of seeing Schnaubelt on the wagon, he must have known him, and he does not refer to Schnaubelt as being with Spies when the latter went off to the west.

The south end of the wagon was only a few feet from the mouth of the alley, and if Schwab and Spies did step into the alley and utter the few words, which Thompson claims to have heard, it could all have been done in a few seconds before they started towards Randolph street.

The utterance of the words "pistols" and "police" at that time and under those circumstances was natural, as Schwab had just passed the Desplaines street station, and he must have seen what Sahl, one of the witnesses for the defence, says that he saw at about a quarter before eight o'clock, namely "three patrol wagons, manned with police and about one hundred to one hundred and fifty men drawn up in the rear of the patrol wagons on Waldo place." That this created such an excitement among those interested in the Haymarket meeting as would have given rise to the expressions which Thompson claims to have heard, is manifest from the language used by Spies and Parsons in their speeches.

The conversation between Spies and Schwab, as sworn to by Thompson, would indicate a knowledge of the place where

bombs were to be had.   Schwab belonged to the same North
Side group, engaged in arming for May 1, to which Seliger
and Lingg belonged.   Seliger, one of the bomb-makers, was
a member of the central or general committee, which held its
meetings every two weeks in the library room in the rear of
Schwab's office at the "Arbeiter Zeitung" building.   Schwab
says that he started from his house No. 51 Florimond street
to his office on Tuesday night at twenty minutes before eight.
At that time Lingg and Seliger were preparing to leave 442
Sedgwick street to take the bombs to Neff's Hall.

The remark "*Now,* we will give it to them," would imply
that, if Spies and Schwab gave Schnaubelt a bomb, they
obtained it from some one among the twenty-five men, into
whose midst they went at the corner of Halsted and Ran-
dolph streets.   The most direct route to the Haymarket from
No. 58 Clybourne avenue is south on Larrabee street to Chi-
cago avenue, west on Chicago avenue to Halsted street and
south on Halsted to Randolph street.   It is proven in this
record, that on Tuesday night a patrol wagon went from the
corner of North avenue and Larrabee street—a point con-
siderably north of 58 Clybourne avenue—to the Haymarket
in eight minutes by the route here indicated.   From the
precautions, which the record shows to have been necessary
in the handling of these bombs, they could not have been
carried safely and comfortably on a street car without attract-
ing attention.   If they had been brought in a wagon of any
kind or by a person on foot from Neff's Hall to the Hay-
market along the route traveled by the patrol wagon, one of
the corners of Halsted and Randolph streets would have been
a very natural place to look for them.   There is evidence in
the record, tending to show, that several of Lingg's assist-
ants in the matter of making bombs were at the Haymarket
meeting.

*Second*—*As to the proof tending to contradict Thompson.*
Spies and Schwab both swear that they not only did not talk

together or walk together at the Haymarket meeting, but that they did not see each other on that evening.

Henry W. Spies also contradicts Thompson, but we regard his evidence, as seriously weakened by his cross-examination. He testifies on his direct examination as follows: "While the speaking was going on I was standing right alongside of the wagon. . . . I stood there during the entire meeting. . . . I saw Fielden getting off at the back end of the wagon. I told my brother (August Spies, the defendant) to get off and reached my hand over to him to help him jump. He took my hand. . . . Just at that time the explosion took place. . . . As he jumped, somebody jumped behind him with a weapon right by his back, and I grabbed it, and, in warding off the pistol from my brother, I was shot." On his cross-examination he says: "On the 6th of May I was arrested at my house by officers Whalen and Lowenstein. I told them, that, when the bomb exploded, I was at Zepf's Hall, walked out and was shot in the door. I told them that I was not at the Haymarket at all from beginning to end. That was not true when I told it to them. I lied to them. . . . I also said, that I did not see my brother that evening until he called at the house and asked me if I had a good physician. I now state that what I then said about that was not the truth."

Richter says, that he was standing at about the middle of the mouth of the alley and saw Spies on the wagon, when he asked "Is Parsons here?" but did not see him go into the alley after he descended from the wagon. He says, however, that he did not notice on which side of the wagon Spies alighted, nor in what direction he went after leaving the wagon.

Lindinger says, that he did not see Spies or Schwab enter the alley, but he also says, that, after Spies called for Parsons, he descended from the wagon on the north side, and "I didn't follow him only until he was down off the wagon."

So with Liebel—he says that he did not see Spies enter the alley. But he also says, that he did not see in what direction or where Spies went after he left the wagon.

Sahl's testimony tends more strongly to contradict Thompson than that of the other witnesses. He says that he knew Spies and Schwab and had heard them speak at Greif's Hall and Zepf's Hall; that he saw Spies on the wagon and heard him ask for Parsons; that Spies, after he came down from the wagon, passed witness in company with two or three other persons and that Schwab was not one of them. Sahl was at the time in the middle of the street in a south-westerly direction from the wagon in the crowd of persons standing there.

Thompson's testimony is positive in its character and he is unimpeached as a witness, while that of the defence upon this subject is, for the most part, negative in character.

The jury had a right to consider the evidence of Spies and Schwab in the light of the facts, that they were both on trial for murder and that their statements on the stand were inconsistent with and contradictory of previous declarations, made by them. 1 Greenleaf on Evidence, sec. 462, note a.

The prosecution introduced a witness by the name of Harry L. Gilmer. If the testimony of this witness is true there is no doubt but that the defendant Spies is guilty of the murder of Degan. He swears that Spies struck a match and lighted the fuse of a bomb in the hand of Rudolph Schnaubelt, and that Schnaubelt at once, as soon as Spies had applied the match, threw the bomb into the midst of the police.

Gilmer says, that he came to the Haymarket meeting at about a quarter before ten o'clock; that he had been on the South Side and was going to his home on the West Side and stopped at the meeting on his way; that he went up from Randolph street on the east side of Desplaines, while Fielden was speaking, and stood between the lamp-post, on the southeast corner of the alley and Desplaines street, and the wagon

near the east end of the wagon; that he stepped back into the alley on the north side thereof and noticed some parties opposite him on the south side of the alley, who were talking in German and whose conversation he did not understand; that he heard some one on the edge of the sidewalk say, "Here come the police," and then there was a rush as if to see the police as they were coming up; that a man came from the wagon to the parties on the south side of the alley and "lit a match and touched it off, something or other; the fuse commenced to fizzle and he gave a couple of steps forward and tossed it over into the street, . . . the man that lit the match came on this side of him and the two or three of them stood together, and he turned around with it in his hand," etc. The witness stated, that he did not know the name of the man, who threw the bomb, but knew him by sight, as he had seen him several times at meetings at different places in the city. When shown a photograph of Schnaubelt, he said: "I say that is the man that threw the bomb out of the alley." When asked who the man was that came from the wagon towards the group referred to and lighted the match, he pointed to the defendant Spies and said: "That is the man right there." The defence have proven that a match was lighted in the alley at this time, but claim that it was struck by a laborer in order to light his pipe.

The defence introduced nine witnesses living in Chicago for the purpose of impeaching Gilmer. The prosecution introduced eight witnesses from Iowa, where Gilmer lived from 1870 to 1879, and ten witnesses from Chicago, where he lived from 1879 to 1886, to sustain his reputation for truth and veracity. Before a witness can say, that he will not believe a man under oath, he must first swear that he knows that man's reputation for truth and veracity among his neighbors, and that such reputation is bad. The unwillingness to believe under oath must follow from and be based upon two facts: first, the fact, that the witness knows the reputation for truth

and veracity among the man's neighbors, second, the fact, that such reputation is bad. As the reputation must be bad, before it can be known to be bad, the most material fact to be proved is that such reputation is bad. What a man's reputation is, is a fact to be proved just as any other fact. Where, as here, eighteen witnesses of standing and credibility swear that a man's reputation is good, while nine of equal standing and credibility swear that it is bad, the jury must determine for themselves whether they will believe the eighteen men or the nine men.

Other testimony introduced to discredit Gilmer was intended to establish, *first*, that the bomb was not thrown from the point from which Gilmer said it was thrown; *second*, that Spies was just getting off the wagon, when the explosion occurred, and, therefore, could not have been in the alley lighting a match.

A witness by the name of Bernett swore that he saw the bomb thrown and that the man, who threw it, stood right in front of him, and threw the bomb towards the north-west. Desplaines street between the sidewalks is forty-eight feet six inches wide. The bomb fell "on the west side of Desplaines street slightly north from the south line of the alley" extended. The testimony of Bernett does not cast much light upon the subject, either as to the person who threw the bomb, or as to the point, from which it was thrown. When shown the photograph of Schnaubelt and asked if that was the man who threw the bomb, he says: "I guess not. I never could recognize anybody." He says, that the man, who threw the bomb, had his back turned towards him, and that he could not describe him and would not know him, if he saw him. As to the place where he stood when the bomb was thrown, he placed it at one time ten or fifteen feet south of the alley, at another thirty-eight feet south of the alley, at another forty-five feet south of the alley.

14—122 ILL.

The testimony of the witnesses differs very greatly as to the point with reference to the alley from which the bomb ascended into the air before it fell. One witness says it came from a point north of the alley, another that it came from a point five or six feet south of the corner of the alley, others fix the point at various distances south of the alley varying from five to forty-five feet. Witnesses for the defence, identified mostly with the International organization and from whose midst the shots fired at the police must have come, place the point, from which the bomb was thrown, at the greatest distances south of the point where Gilmer fixes it.

Heineman, the reporter, a witness whose testimony is favorably quoted by both sides, says that he was forty-five feet south of the alley on the east sidewalk of Desplaines street when the bomb exploded, and that he saw the bomb, or the burning fuse, rise out of the crowd from "very nearly the southeast corner of the alley" and "fall among the police." This is just about the place, from which Gilmer says that it ascended.

When the police halted and the captain gave the order to disperse, they were very near the south end of the wagon. The main body was on a line with the mouth of the alley which was eleven feet wide. Bonfield says, "the front rank of the first division was near up to the north line of the alley." All the police faced towards the north and were standing in regular fixed lines. Several of the officers describe the course of the bomb through the air, as seen by them from their positions in the ranks. It could not have been seen by them in the manner indicated in their testimony, if it had started from a point as far south as that sworn to by Bernett and some of the other witnesses for the defence.

The defence introduced a number of witnesses, more or less identified with the defendants in their conspiracy against the police and who stood around the wagon during the evening, for the purpose of showing that Spies did not go into

the alley just before the explosion. The testimony is nega-
tive in its character. It may have been true that Spies did
go into the mouth of the alley as Gilmer says, and yet it may
be true, that most of these witnesses, whose attention was
naturally directed towards the approaching columns of the
police, may not have seen him enter the alley. The defend-
ant Spies swears, that, when the order to disperse was given,
he was still on the wagon, and that, when he dismounted,
the bomb exploded just as he touched the sidewalk. The
evidence of other witnesses for the defence tends to confirm
this statement. He says, that, after the explosion, he was
carried northward by the pushing crowd and went into Zepf's
Hall, and that he did not go into the alley nor in the direc-
tion of the alley. But Bonfield swears, that, after his arrest,
Spies claimed to have gone, after the explosion, eastward
through Crane's alley and then southward therefrom to Ran-
dolph street. Henry Spies inquired for his brother at Zepf's
Hall just after the explosion but did not find him there.

To further contradict Gilmer, a witness was examined for
the purpose of showing that Schnaubelt left the Haymarket
before the bomb was exploded. This witness was August
Krueger, the orderly-sergeant and corresponding secretary of
the second company of the Lehr und Wehr Verein. He was
present at the Monday night meeting of the armed sections,
at which Schnaubelt was also present.

Krueger states that he saw the notice of the Haymarket
meeting in the "Arbeiter Zeitung" and went there about nine
o'clock and remained until ten o'clock; that about ten o'clock
he was standing on the west side of Desplaines street about
thirty or forty feet north of Randolph street, when Schnau-
belt came towards him from the north-east; that he had
seen Schnaubelt before, but did not know his name; that
Schnaubelt proposed to him to go home; that he walked
south to Randolph street with Schnaubelt, then eastward to
Clinton street, when Schnaubelt proceeded on eastward on

Randolph street, while he went north on Clinton street, thence by way of Milwaukee avenue to Engel's house.

If this were all true, Schnaubelt may have returned and entered Crane's alley through its opening into Randolph street. Krueger stated, after he was arrested on May 6, that he was not at the Haymarket at all on the evening of May 4, and, upon his cross-examination in this case, he admits that he so stated.

There is a mass of testimony in the record in reference to the statements made by Thompson and Gilmer. Some of this testimony sustains those statements and some of it discredits them. Any further review of it than that, which has already been made, will be impossible in this opinion. It is sufficient to say that it is very conflicting. It was the province of the jury to pass upon it. They had the right to consider it in connection with all the other facts and circumstances in the case.

It is not necessary for us to pass any opinion upon it, as we think there is evidence enough in the record to sustain the finding of the jury independently of the testimony given by Thompson and Gilmer.

### *Fielden:*

On Monday evening the defendant Fielden was making a speech to some wagon-makers on one of the upper floors of the building No. 54 West Lake street, while the armed sections were concocting their conspiracy in the basement of that building. The proof does not show, however, that he was present at the meeting in the basement, or took part in the original formation of the Monday night conspiracy.

"A conspiracy may be described, in general terms, as a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose; or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means." (3 Greenleaf on Evidence, sec.

89; *Heaps* v. *Dunham*, 95 Ill. 583.) It is not necessary, however, that the accused should have been an original con-triver of the mischief, "for *he may become a partaker in it by joining the others while it is being executed.*" (2 Bishop on Crim. Law, 190.) If he concurs, no proof of *agreement to concur* is necessary. . . . As soon as the union of wills for the unlawful purpose is perfected, the offence of conspiracy is complete. This joint assent of minds, like all other parts of a criminal case, may be established as an inference of the jury from other facts proved; in other words, by circumstantial evidence. 2 Bishop on Crim. Law, 190, and note 7.

Are there such facts and circumstances proven in this case, as would warrant a jury in finding that the defendant Fielden became a partaker in the conspiracy planned on Monday night by joining those who were engaged in its execution on Tuesday night?

He says that he had an engagement to make a speech Tuesday night on West Twelfth street, but that he saw in an English evening paper a call to the members of the American group to meet at No. 107 Fifth avenue on important business; that, as he was the treasurer of that group and had its funds in his hands, he cancelled his engagement and went to the meeting so called, arriving at ten minutes before eight. It was held in the office of the "Arbeiter Zeitung" newspaper and has already been referred to. Between eight and nine o'clock he left the "Arbeiter Zeitung" building and went over, in company with Parsons and other members of the "International Rifles," to the Haymarket. After the crowd there had been addressed by Spies and Parsons, the defendant Fielden made a speech from the wagon, some of which was as follows:

"There are premonitions of danger. All knew. The press say the anarchists will sneak away. We are not going to. If we continue to be robbed, it will not be long before we will be murdered. There is no security for the working classes

under the present social system. A few individuals control the means of living, and holding the workingmen in a vise. Everybody does not know. Those who know it are tired of it, and know the others will get tired of it, too. They are determined to end it, and will end it, and there is no power in the land that will prevent them. Congressman Foran said: 'The laborer can get nothing from legislation.' He also said that the laborers can get some relief from their present condition when the rich man knew it was unsafe for him to live in a community where there were dissatisfied workingmen, for they would solve the labor problem. *I don't know whether you are democrats or republicans, but whichever you are, you worship at the shrine of rebels. John Brown, Jefferson, Washington, Patrick Henry and Hopkins said to the people: 'The law is your enemy. We are rebels against it. The law is only framed for those that are your enslavers.' (A voice: 'That is true.') Men in their blind rage attacked McCormick's factory, and were shot down by the law in cold blood, in the city of Chicago, in the protection of property.* Those men were going to do some damage to a certain person's interest, who was a large property owner, therefore the law came to his defence; and when McCormick undertook to do some injury to the interest of those who had no property, the law also came to his defence, and not to the workingman's defence, when he, Mr. McCormick, attacked him and his living. (Cries of 'No.') There is the difference. The law makes no distinctions. A million men own all the property in this country. The law has no use for the other fifty-four million. (A voice: 'Right enough.') *You have nothing more to do with the law except to lay hands on it, and throttle it until it makes its last kick. It turns your brothers out on the wayside, and has degraded them until they have lost the last vestige of humanity, and they are mere things and animals. Keep your eye upon it. Throttle it. Kill it. Stab it. Do everything you can to wound it—to impede its progress. Remember, before trusting them to do anything for your-*

*self, prepare to do it for yourself. Don't turn over your business to anybody else. No man deserves anything unless he is man enough to make an effort to lift himself from oppression.* Is it not a fact that we have no choice as to our existence, for we can't dictate what our labor is worth? He that has to obey the will of any, is a slave. *Can we do anything except by the strong arm of resistance? Socialists are not going to declare war; but I tell you war has been declared upon us, and I ask you to get hold of anything that will help to resist the onslaught of the enemy and the usurper. The skirmish lines have met. People have been shot. Men, women and children have not been spared by the capitalists and minions of private capital. It had no mercy,—so ought you. You are called upon to defend yourselves, your lives, your future. What matters it whether you kill yourselves with work to get a little relief, or die on the battle-field, resisting the enemy? What is the difference? Any animal, however loathsome, will resist when stepped upon. Are men less than snails or worms? I have some resistance in me. I know that you have, too. You have been robbed, and you will be starved into a worse condition.*"

At this point the policemen appeared and ordered the meeting to disperse, as has already been stated. Witnesses for the State swear, that, when the police were approaching the alley, either Fielden, or some one with him on or near the wagon, used the following language: "Here come the bloodhounds; do your duty, men, and I'll do mine." Witnesses for the defence swear, that no such words were spoken. Whether one set of witnesses or the other told the truth upon this subject was a matter for the jury to decide.

There is evidence of a very distinct and positive character that Fielden shot at the police:

Lieutenant Martin *Quinn* says: "There was a shot fired from the wagon by the man that was speaking at that time. . . . It is Mr. Fielden here. . . . He made the remark, 'We are peaceable' just as he was going down off of

the wagon on to the sidewalk . . . and *just as he was
going down he fired right where the inspector was* and Captain
Ward and Lieutenant Steele," etc.

Officer *Krueger* says: "He (Fielden) stood at the south end
of the wagon; . . . he stepped down from the wagon
and passed right to my right behind the wagon, and in about
a moment the bomb fell behind me. *Then I saw a pistol in
his hand and it exploded twice. I am certain of two shots being
fired by that gentleman (Fielden.)* I stood within about six or
eight feet of the wagon, on the street side of it. He (Fielden)
passed right past me; I could almost have touched him with
my hand, and he went right behind the wagon and stepped
up on the sidewalk when the bomb exploded. Then *I saw him
have a pistol in his hand and he fired twice to my recollection;*
. . . he took cover behind the wagon; he covered himself
with the wagon between the police and him; I then returned
his fire and at the same instant *I received a bullet in my knee-
cap;* he fired directly at the column of the police and he fired
two shots from there; he stooped down behind the wagon."

*L. C. Baumann,* a policeman of Lieutenant Steele's com-
pany, says: "I was standing north of that alley there, I
should judge three or four feet from the wagon. . . .
*I saw Mr. Fielden, that he* was standing on the hind wheel,
behind the hind wheel of the wagon, and *had a revolver in his
hand and fired off a shot;* he was standing on the sidewalk
right behind the hind wheel; he shot from east to west; *that
was after the explosion of the bomb, I should say about half a
minute.*"

Officer *Hanley* says: "At the time the bomb exploded I was
about four or five feet from the wagon; I was facing north;
I noticed the man that was the last speaker; immediately
after the bomb exploded I turned my face from (to) where
the explosion was, and I looked for the wagon again, and I
noticed that man right over there (referring to defendant
Fielden) *by the wheel of the wagon, with a revolver, right behind,*

*firing.   I saw one shot go,* then I thought it was time to draw
my revolver, and, just as I got my revolver out, *they rushed
for the alley,* that was a little south of the wagon.   Q.  Who
rushed into the alley?   A.  Well, him (Fielden) and about,
I really should judge, *about twenty more; they kept firing about
fifteen or twenty shots after they started to run in the alley.*"

Officer *Spierling* says:  "I was facing north when the bomb
exploded; I was about ten or twelve feet from the wagon at that
time.   *I saw Mr. Fielden get off of the wagon and fire one shot;
he was standing behind the wagon on the sidewalk.*"

*John Wessler,* a policeman in Lieutenant Bowler's company,
testified:   "The wagon stood next to the curb lengthwise—
and at the middle of the south end of the wagon, *Mr. Fielden
stood there* and I noticed before I got there a man who would
not stand up, and *he would shoot into the police and get down
behind the wheel,  .  .  .  and I went up and saw that Mr.
Fielden was there and he got up a second time and shot into* the
police."

Fielden swears that he not only fired no shots on Tuesday
evening, but that *he had, no revolver and never carried one in
his life.*   It was for the jury to determine whether he told
the truth or not.   They had a right to consider that he was on
trial for murder, and that for more than a year prior to the
Haymarket meeting he had not only been urging others to arm
themselves, but himself belonged to the *armed* section of the
American group, otherwise known as the International Rifles.

Besides Fielden, six witnesses were produced by the defence,
who swore that they did not see any shots fired by Fielden.
If there was a bias against the defendant Fielden on the part
of the policemen testifying for the State, there was just as
much of a bias in his favor on the part of those testifying for
the defence.   Here is a conflict of testimony.   Six men swear
that they saw pistol shots fired by the defendant Fielden; six
other men swear that they did not see such shots fired.   The
jury saw the witnesses and heard them testify and marked

their manner and bearing on the stand.　It was their special province to determine whether the witnesses for the accused or for the People told the truth.

It is true, that Degan was killed by the bomb that was thrown, and not by the shots that were fired.　But the attack at the Haymarket was a joint attack made by a number of persons with two different kinds of weapons in pursuance of a previously arranged conspiracy.　When Fielden lent himself to the execution of that conspiracy by participating in the joint attack, he was just as guilty of the murder of Degan by reason of firing his pistol as though he had thrown the bomb. If the man, who threw the bomb, and the twenty men, whom officer Hanley saw running into the alley, had stood up together and the one had thrown his bomb and the others had fired their shots all at the same time into the ranks of the police and one of the policemen had at once fallen dead, would not each of the twenty men have been as responsible as the bomb-thrower for the death of the man killed, whether such death was caused by the bomb or by the shots?　All had the murderous intent.　All were using deadly weapons in pursuance of a common design to destroy life.　The conduct of Fielden at the Haymarket, considered in connection with his acts prior thereto and with all the other facts, as herein set forth, certainly warranted the jury in finding that he was one of the conspirators.

### Parsons:

.What are the facts in regard to the connection of the defendant Parsons with the Haymarket meeting?

The call to the American group to meet at half-past seven o'clock at the "Arbeiter Zeitung" office on Tuesday evening was published by the defendant Parsons.　The notice, which has already been referred to, was inserted by him in the "Evening News," and the original manuscript, from which it was printed, was in his handwriting.　He was seen by several

witnesses at the Haymarket on the corner of Randolph and Halsted streets before eight o'clock and before he appeared at the gathering of the group he had called together at 107 Fifth avenue. From the latter place he went in company with Fielden, Snyder and others to the speakers' wagon on Desplaines street and made a speech to the crowd there gathered. The witness Allen, who heard his speech, says:

"About the only thing that I could quote exact was that at one time he said: 'What good are these strikes going to do? Do you think that anything will be accomplished by them? Do you think the workingmen are going to gain their point? No, no, they will not. The result of them will be that you will have to go back to work for less money than you are getting.' That is his language, in effect. . . . At one time he mentioned the name of Jay Gould. There were cries from the crowd, 'Hang Jay Gould—throw him into the Lake,' and so on. He said: 'No, no; that would not do any good. If you would hang Jay Gould now, there would be another, and perhaps a hundred, up to-morrow. It don't do any good to hang one man. You have to kill them all, or get rid of them all.' Then he went on to say that it was not the individual always, but the system. That the government should be destroyed. It was the wrong government, and these people who supported it had to be destroyed *en masse.* The temper of the crowd was extremely turbulent, especially after that speech he made about the workingmen not gaining anything by the strike. . . . The crowd seemed to me to be thoroughly in sympathy with the speaker, and applauded almost every utterance."

Tuttle says: "The crowd that was enthusiastic was near the wagon or around it, and some were on the north side of the wagon. The same parties who had spoken when he referred to Gould,—I think the same,—one of them any way, because I had my eye on him for two or three minutes,—two minutes, I should say. I think I could describe the man, and would

know if I saw him. He stuck up his hand like that (illustrating), with a revolver in it, and said, 'We will shoot the devils,' or some such expression. And I saw two others sticking up 'their hands near to him, who made similar expressions, and had what I took to be, at that time, revolvers. But this one man I speak of, I took particular notice of him, and remember his appearance, and saw his revolver very plainly in his right hand,—and he grasped it about the center of the weapon, and stuck it up in front of the speaker."

Cosgrove says: That Parsons talked of the police and capitalists, and militia and Pinkertons. He said he was down in the Hocking Valley region, and said they were only getting twenty-four cents a day, and that was less than Chinamen, and he said, "My friends, you will be worse than Chinamen, if you don't arm yourselves," and he said they would be held responsible for the blood that would flow in the near future.

McKeough testifies: "Parsons, among other things, said: 'I am a tenant and I pay rent to a landlord. . . . The landlord pays taxes, the taxes pay the sheriff, the police, the Pinkerton knights and the militia that are on duty out at the barracks, who are ready to shoot you down when you are looking for your rights. I am a socialist from the top of my head to the soles of my feet and I will express my sentiments if I die before morning.' He said that very strongly and made a great commotion. That seemed to kind of catch the crowd in the neighborhood of the wagon and they let out a great cheer. . . . I went to the outer edge of the crowd. . . . The next remark I heard Mr. Parsons say, taking off his hat in one hand, said he: "To arms, to arms, to arms,' three times distinctly."

English says: "Spies, I think, spoke fifteen or twenty minutes. . . . Well, now here is an abstract of Parsons, and I can't give the exact language when he first started off. It was about the workingmen, that the remedy for their wrongs was in socialism. He said, without them they would soon

become Chinamen. He said: 'It is time to raise a note of warning. There is nothing in the eight-hour movement to excite the capitalist. Don't you know that the military are under arms, and a Gatling gun is ready to mow you down? Was this Germany, or Russia, or Spain?'· (A voice, 'It looks like it.') 'Whenever you make a demand for eight hours pay, an increase of pay, the militia, and the deputy sheriffs, and the Pinkerton men are called out, and you are shot and clubbed and murdered in the streets. I am not here for the purpose of inciting anybody, but to speak out to tell the facts as they exist, even though it shall cost me my life before morning.' Then he went on to tell about the Cincinnati demonstration and about the rifle-guard being needed. There is another part of it here. 'It behooves you, as you love your wife and children, if you don't want to see them perish with hunger, killed or cut down like dogs on the street, Americans, in the interest of your liberty and your independence, to arm, arm yourselves.' "

Simonson, a witness for the defence, says of the speech, made by Parsons: "I remember in his speech he said: *'To arms, to arms, to arms,'* but in what connection I can not remember."

There is no dispute about the fact that Spies spoke first, Parsons next and Fielden last. It is claimed by the defence, that, just before Fielden closed his speech, Parsons left the speakers' wagon, or a wagon standing just north of it, on account of an appearance of rain, and went to Zepf's Hall, and that he was in the saloon at Zepf's Hall when the bomb exploded. Allen, one of the newspaper reporters, says: "When the bomb was thrown I was in the saloon of Zepf's Hall, standing about the middle of the room at the time. I did not see any of the defendants there. . . . I am almost certain Parsons was not at Zepf's Hall. . . . There was a constant passing to and fro from the furniture-workers' meeting up-stairs to the meeting over at the Hay-

market. I was with Mr. Malkoff at Zepf's Hall." Parsons says, that, "in a moment or two" after the explosion, two or three men rushed breathlessly in at the door of the saloon and that he "remained there possibly twenty minutes or so." Knox, another newspaper reporter, swears, that he had a conversation with Spies on the night of May 5, and Spies then said that when the bomb exploded he ran to Zepf's Hall and there found a certain party "*waiting for*" Parsons.

The statement of Parsons, that he was in the saloon at Zepf's Hall when the bomb exploded, is sustained by the testimony of Ingram, of Malkoff, a Russian, who on May 4, 1886, was a reporter for the "Arbeiter Zeitung" and a correspondent of a paper in Moscow, Russia, and had roomed with Rau and lived with Schwab; of Brown, a member of the American group, who had attended the meeting at 107 Fifth avenue on Tuesday night and had been arrested by reason of his connection with the Haymarket meeting; and of Wandray, who had belonged to the North-west Side group for three years before December, 1885.

Two circumstances are to be noted: *First*, it can hardly be said that Parsons was absent from the Haymarket meeting, when he went into Zepf's Hall. It has already been stated, that the latter place was only a few steps north of the speakers' wagon and in sight from it. Parsons himself says that, before he left the wagon, he "saw the lights through the windows of the hall." From the window of the saloon he was watching the proceedings around the wagon, when the explosion occurred. He says: "All at once looking directly at the meeting I saw an illumination." *Second*, he did not start to Zepf's Hall until five or ten minutes before the police came up to the wagon. When he left the wagon for the saloon, Fielden had just uttered the words about stabbing and throttling the law, which had so excited the crowd as to induce McKeough to go to the Desplaines street station and report to the police inspector what had been said.

We do not think, that the defendant Parsons can escape his share of the responsibility for the explosion at the Haymarket because he stepped into a neighboring saloon and looked at the explosion through the window.    While he was speaking, men stood around him with arms in their hands. Many of these men were members of the armed sections of the International groups.    Among them were men, who belonged to the "International Rifles," an armed organization, in which he himself was an officer, and with which he had been drilling in preparation for the events then transpiring. To the men then listening to him he had addressed the incendiary appeals that had been appearing in the "Alarm" for two years.    He had said to them:   "One dynamite bomb properly placed will destroy a regiment of soldiers, a weapon easily made, and carried with perfect safety in the pockets of one's clothing."    He had said to them on Saturday, April 24, 1886, just ten days before May 4, 1886, in the last issue of the "Alarm" that had appeared before May 4:   "Workingmen to arms.    War to the palace, peace to the cottage and death to luxurious idleness.    The wage system is the only cause of the world's misery.    One pound of dynamite is better than a bushel of bullets.    Make your demand for eight hours with weapons in your hands to meet the capitalistic bloodhounds, police and militia in proper manner;" and, at the close of another article in the same issue, he had also said: "*The social war has come and whoever is not with us is against us.*" To many of these same men, there gathered around the wagon from which he was speaking, after denouncing the police and militia as ready to shoot them down, he took off his hat and cried out:   "To arms!   To arms!   To arms!"    Within less than an hour after the delivery of this appeal and on the spot where it was made, persons in the crowd, to which it was addressed, attacked the police with bomb and revolver, and Degan was killed.    What is the law applicable to the state of facts here recited?

"If one purposely excites another to commit an offence, as, if he harangues people, inflaming them to a riot, and the offence is accordingly committed, he is guilty, though he personally takes no part in it." 1 Bishop on Crim. Law, 640.

In *Regina* v. *Sharpe*, 3 Cox's C. C. 288, Chief Justice WILDE, in charging the jury, said:

"If persons are assembled together, to the number of three or more, and speeches are made to those persons, to excite and inflame them, with a view to incite them to acts of violence, and if that same meeting is so connected in point of circumstances, with a subsequent riot, that you can not reasonably sever the latter from the incitement that was used, it appears to me that those who incited are guilty of the riot, although they are not actually present when it occurs. *I think it is not the hand that strikes the blow, or that throws the stone (bomb,) that is alone guilty under such circumstances; but that he who inflames people's minds, and induces them by violent means to accomplish an illegal object, is himself a rioter,* though he take no part in the riot. It will be a *question* for the *jury*, whether the riot that took place was so connected with the inflammatory language used by the defendant that they can not reasonably be separated by time or by other circumstances."

The jury were warranted in believing from the evidence that the defendant Parsons was associated with the man, who threw the bomb, and the men, who fired the shots at the Haymarket, in a conspiracy to bring about a social revolution in Chicago by force on or about May 1, 1886, or, in other words, to destroy the police and militia on or about that date with bombs and revolvers or rifles. It is well settled that, when the fact of a conspiracy is once established, any act of one of the conspirators in the prosecution of the enterprise is considered the act of all. *Nudd* v. *Burrows*, 91 U. S. 426; 1 Wharton's Am. Crim. Law, (6th ed.) sec. 702; 3 Greenleaf on Evidence, sec. 94.

It makes no difference, that Parsons may not have been present in the basement of Greif's Hall when the Monday night conspiracy was planned. He belonged to the armed sections, whose representatives entered into that conspiracy and was one of the absent members, who were to be informed of its provisions. One of those provisions was the holding of a meeting at the Haymarket. When he went to that meeting in obedience to a summons from Rau and there made an incendiary speech, he joined the others in their execution of the conspiracy and thereby became a party to it. "Individuals who, though not specifically parties to the killing, are present and consenting to the assemblage, by whom it is perpetrated, are principals when the killing is in pursuance of the common design." Wharton on Homicide, (2d ed.) sec. 201; Wharton's Am. Law of Homicide, 345, 346, etc.; *Regina* v. *Jackson*, 7 Cox's C. C. 357; *Commonwealth* v. *Daley*, 4 Pa. L. J. 150.

The plan, adopted on Monday night, was merely a specific mode of carrying out the more general conspiracy, to which Parsons and those present on Monday night were all parties. The adoption of the Monday night plot was the *act* of those who were co-conspirators with Parsons. It was therefore his act. He had advised the use of bombs and arms against the police on or about May 1. The men, who met Monday night, merely indicated more specifically the time when and places where and mode in which such bombs and arms should be used, so as to be most effective. "A man may be guilty of a wrong which he did not specifically intend, if it came naturally or even accidentally from some other specific, or a general, evil purpose. *When, therefore, persons combine to do an unlawful thing,* if the act of one proceeding according to the common plan *terminates in a criminal result, though not the particular result meant,* all are liable." 1 Bishop on Crim. Law, 636, and cases cited.

15—122 Ill.

"There might be no special malice against the party slain nor deliberate intention to hurt him; but if the fact was committed in prosecution of the original purpose, which was unlawful, the whole party will be involved in the guilt of him who gave the blow." (Foster, p. 351, sec. 6.) "Where there is a conspiracy to accomplish an unlawful purpose, and *the means are not specifically agreed upon or understood, each conspirator becomes responsible for the means used by any co-conspirator* in the accomplishment of the purpose in which they are all at the time engaged." *State* v. *McCahill,* 72 Iowa, 111.

He, who enters into a combination or conspiracy to do such an unlawful act as will probably result in the unlawful taking of human life, must be presumed to have understood the consequences, which might reasonably be expected to flow from carrying it into effect, and also to have assented to the doing of whatever would reasonably or probably be necessary to accomplish the objects of the conspiracy, even to the taking of life. 1 Wharton on Crim. Law, (9th ed.) sec. 225 a; *Brennan et al.* v. *The People,* 15 Ill. 511; *Hanna* v. *The People,* 86 id. 243; *Lamb* v. *The People,* 96 id. 74.

### *Neebe:*

The defendant Neebe, as has already been stated, was a member of the North Side group, which had resolved "not to meet the enemy unarmed on May 1, 1886." He was one of the stockholders of the "Arbeiter Zeitung" and, next to Spies and Schwab, the most active man in its management. He was looked for and found at the "Arbeiter Zeitung" office in consultation with Spies and Schwab during the week prior to May 4. The testimony of Gruenhut shows that Neebe was active in organizing and preparing for the movements then going on. He was found in possession of the "Arbeiter Zeitung" building after the arrest of Spies and Schwab and announced himself as the person, who had charge of the

office.    He stated to the officers that a package of dynamite, which they found in a closet on one of the floors of the build-ing, was something for "cleaning type." There were found at his house on May 7 a red flag, a sword, a breech-loading gun and a 38-caliber Colt's revolver, five chambers of which had been fired; one chamber was loaded with a cartridge and one had a shell in it.    He is shown to have presided at meetings where the use of arms and dynamite against the police was advocated.    On Monday night May 3, 1886, he was seen distributing the "Revenge" circulars.    He took a package of them into a saloon at the corner of Franklin and Division streets on that night between nine and ten o'clock and placed some on the counter and some on the tables, while seven or eight persons were present.    He stated there, that the circulars had just then been printed.    He exhibited anger towards the police, and said, in reference to the riot of that afternoon:    "It is a shame that the police act that way, but may be the time comes that it goes the other way—that they get the chance, too."

When a man, as prominently connected as Neebe was with the International organization and its organ and leaders, was proven to have been engaged late on the night before the Haymarket murder in distributing an inflammatory circular calling upon ignorant workingmen to arm themselves and avenge the act of the police in quelling a riotous disturbance, we can not say that the jury were not justified in holding him responsible, along with his confederates, for the murder on Tuesday night of one of the very policemen, whose death he was urging and advocating on Monday night.    We do not think that the trial court erred in refusing the instructions asked on his behalf.

Various errors are assigned upon the record.    These errors relate to the evidence introduced, the instructions given and the impaneling of the jury.

It is claimed that the trial court admitted improper testimony. The newspaper articles and the speeches, already referred to, are complained of as having been improperly received in evidence.

We think that there was no error in admitting them for the following reasons:

*First*—The International Association in Chicago, as above described, was an illegal organization, engaged in making bombs and drilling with arms for the unlawful purpose of attacking the police if the latter should assume to do their duty in the protection of the public peace. Its members were conspirators, and, by their act of conspiring together, they "jointly assumed to themselves, as a body, the attribute of individuality, so far as regards the prosecution of the common design." (3 Greenleaf on Evidence, sec. 94.) The papers, which published the articles in question, were the organs of this conspiracy. The men, who made the speeches in question, were its spokesmen and mouth-pieces. Hence the utterances of these papers and speakers were competent evidence, as showing the purposes and intentions of the conspiracy, which they represented.

*Second*—Spies, Schwab, Parsons and Engel were responsible for the articles written and published by them as above shown. Spies, Schwab, Fielden, Parsons and Engel were responsible for the speeches made by them respectively. As against *these* defendants, the articles and speeches in question were properly introduced in evidence, not because they gave *general* advice to commit murder, but because they advised and encouraged a particular class in Chicago, to-wit: the members of the International groups and such other workingmen as could be persuaded to join them, "to arm themselves with guns, revolvers and dynamite," and kill another particular class in Chicago, to-wit: the police at a particular time to-wit: about May 1, 1886. There is evidence in the record tending to show, that the death of Degan occurred

during the prosecution of a conspiracy planned by members of the International groups, who read these articles and heard these speeches. How far the formation and execution of this conspiracy may have been aided and encouraged by the printed and spoken utterances of the particular defendants here named was a proper matter for the jury to consider in the light of all the other circumstances developed by the testimony in the case.

*Third*—The evidence objected to was properly introduced against all the defendants. Where the conspiracy is once established, every act and declaration of each member in furtherance of the common design are, in contemplation of law, the act and declaration of all the members, and are therefore original evidence against each of them. "It makes no difference at what time any one entered into the conspiracy." (1 Greenleaf on Evidence, sec. 111.) All the defendants in this case are proven to have belonged to the illegal organization above specified. Hence they were all co-conspirators. The speeches and newspaper articles here under consideration were in furtherance of the common design. Being the acts and declarations of some of the conspirators they were the acts and declarations of all of them.

It is not necessary to hold, that the conviction of the defendants in this case is to stand merely because they made speeches and published articles advising the murder of the police. Such conviction is sustained because there is evidence in the record, from which the jury were warranted in believing that the defendants advised, encouraged, aided and abetted the perpetration of the crime, committed at the Haymarket. When they combined or conspired together, with a view of bringing about that crime, and became united in a common plan for its commission, then the acts and declarations of any one of them, which had the effect of advising, encouraging, aiding and abetting its perpetration, were the acts and declarations of all.

We do not agree with the position of counsel, that the general conspiracy hereinbefore described and the plot of Monday night, May 3, 1886, were two separate conspiracies. The latter was merely the outgrowth and culmination of the former. The latter merely designated the particular mode in which the objects of the former were to be effected. It was competent to show the acts and declarations of the parties to the general conspiracy, which preceded and led up to the formation of the special plot of May 3 with a view of understanding the latter. The defendants were engaged in a series of efforts to increase the International groups· by accessions from the workingmen, and to educate and discipline those groups in the making of bombs and in the use of firearms, so as to prepare them for a conflict with the police when the eight-hour excitement should reach its height. Among these efforts were the speeches made and the publications issued, as hereinbefore stated. The Monday night conspiracy was the product of these efforts, and could only be understood by showing their nature and character. These views·are sustained by the following authorities: *Campbell* v. *Commonwealth,* 84 Pa. St. 187; *State* v. *McCahill,* 72 Iowa, 111; *Card* v. *State,* 109 Ind. 415; *Rex* v. *Hammond,* 2 Esp. 719; *The People* v. *Mather,* 4 Wend. 229; 2 Bishop on Crim. Proc. sec. 227; *United States* v. *Cole,* 5 McLean, 601; *Queen* v. *Most,* L. R. 7 Q. B. D. 244.

The admission in evidence of Johann Most's book on the Science of Revolutionary Warfare is complained of as error. The work, which is called a book, is really nothing more than a treatise in pamphlet form upon the most improved methods of making bombs and preparing dynamite and other explosives. It is thus characterized by the counsel for plaintiffs in error in their brief: "Here was a voluminous, incendiary, outrageous publication, going into the detail of the manufacture of explosives and arms and the manner of preparing them, filled with vile suggestions as to how to apply the results of

modern science to the work of destruction of the capitalistic system, abounding in advice to persons who, as members' of the so-called revolutionary forces, might propose to engage in the use of these weapons and explosives."

The circulation of this treatise was an act of the illegal organization, to which all the defendants belonged, and was one of the methods by which that organization instructed and advised its members to get ready for the murder of the police during the eight-hour excitement. Its distribution among the members of the International groups at their picnics and meetings, through the agents of the International Association, is proven beyond controversy. The newspaper organs commended it and quoted from it and advertised it without charge. Lingg and Fischer read it and acted upon the suggestions contained in it. When the leaders of the organization thus made use of this treatise, they adopted it as a manual of tactics, and it became a book of their written advice and instructions to their followers. It was competent testimony as showing the purposes and objects which they had in view, and the methods, by which they proposed to accomplish those objects. When the newspaper organs commended its study to their readers, they made its suggestions a part of their own advice to those readers. The efforts of the defendants who controlled these organs, to put this pamphlet into the hands of the members of the International groups, were acts and declarations in furtherance of the conspiracy, and were binding upon the other defendants.

It is also assigned as error, that the trial court admitted in evidence a letter, written to the defendant Spies in 1884 by Johann Most, the author of the treatise above referred to. The letter is set out in the statement, which prefaces this opinion.

The defendant Spies took the stand as a witness for the defence. Upon his cross-examination the prosecution produced the letter in question, examined him in reference to it and then offered it in evidence, and it was admitted.

The main objection is, that, after the arrest of Spies, certain
effects of his, including this letter, were seized by the police
in the "Arbeiter Zeitung" office without a search warrant or
other legal process; that such seizure was in violation of the
United States and Illinois constitutions, and that the admis-
sion of the letter "was," in the language of counsel for plain-
tiffs in error, "improper as being in effect a compelling of the
plaintiffs in error to give testimony against themselves con-
trary to the provision of the fifth amendment of the Federal
constitution and to the provision of article 2 of our constitu-
tion of 1870." In other words, the introduction of the letter
is objected to in this court, as having been in contravention
of the principles laid down by the Supreme Court of the United
States in *Boyd* v. *United States,* 116 U. S. 616. In that case,
an act of Congress, authorizing the Federal courts to require
parties charged with violations of the revenue laws to produce
their books, invoices and papers for inspection and for use in
evidence against themselves, was declared to be unconstitu-
tional. In the case at bar, the defendants were not required
to produce the letter; the State had the letter and produced
it. We will not attempt, however, to draw any distinction
between this case and the *Boyd case.* We do not think that
the record is in such shape as to permit counsel to make the
point, urged by them, before this court.

In the first place, it is not clear from the testimony that
the letter from Most *was* seized by the police in the manner
suggested. Early in the trial two police officers, testifying
for the prosecution, stated that on May 5, 1886, they took
possession of a number of articles found in the office of the
"Arbeiter Zeitung" newspaper, among which were certain
letters lying on the desk occupied by Spies, and certain other
letters in the drawer of the desk. But it nowhere appears in
the record, so far as we can find, that this particular letter
from Most to Spies, introduced near the close of the trial, was
among the letters so taken from the top of Spies' desk or

among those so taken from the drawer of it. For aught that appears to the contrary, this letter may not have come to the hands of the State through the alleged illegal seizure complained of, but may have been obtained in some other proper and legitimate manner. We can not infer, that, because certain letters were seized by the police, the Most letter must have been one of them.

On the trial below counsel for the defence took the position that the letter was not found in the possession of Spies. We find the following statement in the record of what occurred, when the trial judge passed upon the offer to introduce the letter: "The Court: . . . 'Letters which have never been in the possession of the defendant can not be admissible in evidence against him.' Mr. Black: '*There is no evidence in this case that the letter was found in his possession.*' The court: 'He says he received it.' " This brings us to the second reason why the point now under consideration can not be made here.

The objection, that the letter was obtained from the defendants by an unlawful seizure, is made for the first time in this court. It was not made on the trial in the court below. Such an objection as this, which is not suggested by the nature of the offered evidence, but depends upon the proof of an outside fact, should have been made on the trial. The defence should have proved that the Most letter was one of the letters illegally seized by the police and should then have moved to exclude it, or opposed its admission, on the ground that it was obtained by such illegal seizure. This was not done, and, therefore, we can not consider the constitutional question supposed to be involved.

The only objections made to the Most letter, which we find in the record, were: First—that it was not proper cross-examination; second—that it had not been answered by Spies.

The defendant Spies on his direct examination had explained his possession of two bombs with iron shells by say-

ing, that an unknown person, who claimed to be a shoemaker named Schwope and to be on his way from Cleveland to New Zealand, had called at the "Arbeiter Zeitung" office, and, asking Spies if he had seen one of the bombs "*they*" were making, had left the two iron shells, saying "he would not take them along." Spies also testified, that a stranger had called at the office in his absence and left two "czar" bombs on his desk, stating to the book-keeper or office-boy, that he came merely to "inquire whether those were bombs of a good construction, and the man never called for them." He further testified, that he procured the cartridges of dynamite and coils of fuse and detonating caps found in his office for the mere purpose of experimenting, without explaining why he wanted to experiment. He stated that he showed these things, or some of them to the reporters, who swear to having seen them there, merely to give them something sensational to write about in their papers.

The Most letter and the questions about its contents were proper subjects for cross-examination, because they tended to test the sincerity of the claim made by him on his direct examination, that he had no *serious* object in view in keeping the dynamite and other articles, which he had on hand. That letter shows on its face that some communication or message had passed between Spies and Most as to a "letter from the Hocking Valley." It also shows that Most proposed to send twenty or twenty-five pounds of what he calls "*medicine and the genuine article at that*" to one Buchtell and asks Spies for directions how to send it. Taken in connection with other evidence, the letter tended to show that Spies and Most were engaged in the very *serious* business of supplying dynamite to discontented laboring men.

The second objection to the letter was that it was unanswered, and therefore inadmissible on the ground that a letter written to a party by a third person, to which no reply is made, does not show an acquiescence in the facts stated

in it.   As we understand the evidence of the defendant Spies, he admits that this letter is in the handwriting of Most and that he received it from Most and read it.   He does not say, that he did not answer it, but that he does not remember whether he answered it or not.   We do not think, however, that it can be regarded as an unanswered letter.   To all intents and purposes it *was* answered.   Spies swears, that he did not himself give the directions asked for by Most in the letter as to shipping the "medicine" or "genuine article," but he also says:   "There may have been a letter addressed to my care which I may have sent to him."   If he procured a third person to write a letter, giving directions how to ship material to the point indicated, and then enclosed this letter to Most, he, in effect, answered the only portion of Most's letter which required an answer.   Moreover, the letter shows in its opening sentences that it was "*invited*" by Spies, (Wharton on Crim. Evidence, (9th ed.) secs. 644, 682) and that it was written in response to some former communication by him.

It is also objected, that the cross-examination of those of the defendants, who took the stand, compelled them to give evidence against themselves.   After a careful examination of the testimony of these defendants as set out in the record, we can not see that they were cross-examined upon any subjects not connected with the direct examination.   If a defendant offers himself as a witness to disprove a criminal charge, he can not excuse himself from answering on the ground that, by so doing, he may criminate himself.   "So far as concerns questions touching the merits, the defendant, by making himself a witness as to the offence, waives his privileges as to all matters connected with the offence.   It has been ruled also that, to affect his credibility, he may be asked whether   .   .   . he has been concerned in other crimes, part of the same system."   Wharton on Crim. Evidence, sec. 432.

Objection is also made, that certain articles, which had been struck and torn and otherwise injured through the explosion of the Haymarket bomb and also through the explosion, by way of experiment, of certain bombs made by the defendant Lingg, were improperly introduced before the jury. It was the claim of the International Association and its organs and speakers, constantly put forth by them to the working-men to induce the latter to join the movement against the police and militia, that a dynamite bomb in the hands of one man was equal in destructive power to a regiment of soldiers, armed with rifles. The articles in question were presented in the condition, in which they were left after being exposed to the force of an exploding bomb, for the purpose of showing the power of dynamite as an explosive substance. While this kind of testimony may not have been very material, we can not see that it was to such an extent incompetent as to justify a reversal.

It is also objected, that the trial court allowed bombs, and cans containing dynamite and prepared with contrivances for exploding it, which had been found under the sidewalks and buried in the ground at certain points in the city, to be introduced in evidence. Among these were the bombs hidden by Lingg and Seliger under the sidewalk on Sigel street, and those given by Lingg to Lehmann and buried by Lehmann near Ogden Grove, and those given by Lingg to Thielen and found upon the latter's premises. As specimens of the kind of weapons, which Lingg and his associates were preparing, and as showing the malice and evil heart, which the intended use of such weapons indicated, the introduction of bombs made by him was not improper. The jury had a right to see them and compare their structure with the descriptions of the bomb that killed Degan, with a view of determining whether Lingg was the maker of the latter or not. As to the fact, that some of these bombs and cans, like those shown to the American group during their drill, were found buried near

Wicker Park—one of the designated meeting places where certain of the armed men were to gather on Tuesday night— this was a circumstance proper to be considered by the jury in determining the nature and character of the conspiracy and its connection with the events of Tuesday night. As to the suggestion, that these things may have been placed, where they were found, by other parties than those connected with the conspiracy herein described, it was for the jury to say, whether, under all the circumstances, any others than the members of that conspiracy had undertaken to make such weapons or knew anything about them.

It is again urged as error, that a witness on the part of the State, for whom Schnaubelt had been working, was allowed to testify that the latter cut off his beard a few days after the night of May 4. In the photograph, that has been referred to, he had a beard. Gilmer swore that Schnaubelt had a beard, when the bomb was thrown. To explain the fact, that he was seen without a beard after the Haymarket meeting, it was shown that he cut off his beard subsequently to the date of that meeting. The statement made by the witness was merely for the purpose of identification. It was not very important, and we can not see that it did any harm.

It is also objected, that some testimony was admitted as to conversations with the defendant Spies, which were merely narrative of what had been or would be done. It is undoubtedly the law, that, after a conspiracy is established, only those declarations of each member, *which are in furtherance of the common design,* can be introduced in evidence against the other members. Declarations, that are merely narrative as to what has been done or will be done, are incompetent and should not be admitted except as against the defendant making them, or in whose presence they are made. The utterances of the defendant Spies, whether in his paper, his speeches or his conversations, were in furtherance of the purposes and objects of the conspiracy, in which he was engaged. If testimony as to

expressions used by him, that are not of the character here indicated, has crept into the record, it is so inconsiderable that it could not have in any way injured the other defendants. We think this point was sufficiently guarded by the trial judge in his rulings and in his instructions.

A further objection is made as to the *order*, in which the trial court permitted certain portions of the evidence to be introduced. It is claimed, that some of the acts and declarations, proven in the case, were allowed to come in, before proof was made of the conspiracy or of the connection of the defendants with it. This matter is largely discretionary with the trial judge.

The proof of conspiracy, which will authorize the introduction of evidence as to the acts and declarations of the co-conspirators, may be such proof only as is sufficient, in the opinion of the trial judge, to establish *prima facie* the act of conspiracy between the parties, or proper to be laid before the jury, as *tending* to establish such ·fact. (1 Greenleaf on Evidence, sec. 111.) Sometimes, for the sake of convenience, the acts or declarations of one are admitted in evidence, before sufficient proof is given of the conspiracy; the prosecutor undertaking to furnish such proof in a subsequent stage of the cause. (Idem.)

The rule, that the conspiracy must be first established *prima facie*, before the acts and declarations of one conspirator can be received in evidence against another, can not well be enforced "where the proof of the conspiracy depends upon a vast amount of circumstantial evidence, a vast number of isolated and independent facts; and, in any case, where such acts and declarations are introduced in evidence, and the whole of the evidence introduced on the trial, taken together, shows that such a conspiracy actually exists, it will be considered immaterial whether the conspiracy was established before or after the introduction of such acts and declarations."

(*State* v. *Winner*, 17 Kan. 298.)   The prosecutor may either prove the conspiracy, which renders the acts of the conspirators admissible in evidence, or he may prove the acts of the different persons, and thus prove the conspiracy.   Roscoe on Crim. Evidence, (7th ed.) 415.

In many important cases evidence has been given of a general conspiracy, before any proof of the particular part which the accused parties have taken.   (Idem.)   In some peculiar instances, in which it would be difficult to establish the defendant's privity without first proving the existence of a conspiracy, a deviation has been made from the general rule, and evidence of the acts and conduct of others has been admitted to prove the existence of a conspiracy previous to the proof of the defendant's privity.   Roscoe on Crim. Evidence, 414.

The term "acts," as here used, includes written correspondence and other papers relative to the main design.   1 Greenleaf on Evidence, sec. 111.

Many other objections to different items of testimony are insisted upon by counsel for the defence.   We have noticed those, which have seemed to us to be the most important. Any further comment would swell this opinion, already of inordinate length, into still more tiresome proportions.   Taking the whole record together we are unable to see, that the lower court committed any such errors, either in the admission or exclusion of evidence, as prejudiced the rights of the defendants.

The second class of errors assigned relates to the giving and refusal of instructions.

*First*—The instructions, numbered, 4 and $5\frac{1}{2}$, which were given for the State, are claimed to be erroneous because they did not require the prosecution to establish the identity of the bomb-thrower.   The fourth instruction told the jury, that, upon a given state of facts, certain members of the conspiracy mentioned would be guilty of murder, "whether the identity

of the person throwing the bomb be established or not." Instruction No. $5\frac{1}{2}$ said: "All of such conspirators are guilty of such murder, whether the person, who perpetrated such murder, can be identified or not," etc. The identity here intended had reference to name or personal description. The jury were expressly required by the fourth instruction to find from the evidence, that the person throwing the bomb was, at the time, a member of the conspiracy to unlawfully resist the officers of the law, and that he threw the bomb "in pursuance of such conspiracy and in furtherance of the common object." The theory of the fourth instruction was, that the bomb-thrower was sufficiently identified, if he belonged to the conspiracy and if he threw the bomb to carry out the conspiracy and further its designs, even though his name and personal description were not known. We do not think that this theory was an erroneous one.

Counsel for plaintiffs in error say, that "membership in the supposed conspiracy could not be proved without some evidence of identification." In the first place, some of the counts in the indictment charged, that Rudolph Schnaubelt threw the bomb. Evidence was introduced tending to support these counts. If the jury believed it, they must have found that the crime was committed by a member of the conspiracy, the proof as to Schnaubelt's membership in it being uncontradicted.

In the next place, some of the counts in the indictment charged, that the bomb was thrown by an unknown person. All the proof introduced by the defendants themselves, tending to show that Schnaubelt did not throw the bomb, tended also to prove that an unknown person threw it. If the jury believed the evidence of the defence upon this subject, they had before them other testimony from which they were justified in believing, that the bomb-thrower, though unknown by name or personal description, was a member of the conspiracy and acting in furtherance of its objects. This testimony, in-

troduced by the State, tended to show, that the bomb-thrower threw a bomb made on Tuesday afternoon by Lingg, the agent of the conspiracy; that he obtained it from a place where only a member of the conspiracy could have obtained it, and at a time when no one but such a member would have sought to obtain it; that he threw it at a meeting appointed by the conspiracy, from the midst of a company of persons belonging to the conspiracy, upon the happening of a contingency provided for by the conspiracy, and as part of an attack planned by the conspiracy. These and other circumstances, already spoken of, were sufficient to establish his membership.

It is a mistake to assume that a defendant can not be charged with advising, encouraging, aiding and abetting an unknown principal in the perpetration of a crime. Suppose that A instructs B to hire some person to kill C. B hires a person, whose name is unknown to A and never becomes known to the State, and that person kills C in pursuance of B's employment. Will it be said that A is not guilty as an accessory before the fact, because the instrument employed by B is unknown by name or personal description? Archbold says that if the principal felon be unknown, the indictment of the accessory may state it accordingly. (Pr. and Pl. vol. 1, p. 67.) It is also held, that if the principal is declared to be unknown in the indictment, and the proof on the trial shows that he is known, there is a fatal variance. (*Rex* v. *Walker*, 3 Camp. 264; *Rex* v. *Blick*, 4 C. & P. 377.) But where there are two separate counts one charging the principal to be known, and the other charging him to be unknown, it is sufficient if either is proven. (1 Wharton on Crim. Law, secs. 207, 225, 226, 231; 1 Bishop on Crim. Law, secs. 651, 677; *Regina* v. *Tyler*, 8 C. & P. 616; *State* v. *Green*, 26 S. C. 128; *Pilger* v. *Commonwealth*, 112 Pa. St. 220; *Brennan* v. *The People*, 15 Ill. 516; *Baxter* v. *The People*, 3 Gilm. 368; *Ritzman* v. *The People*, 110 Ill. 362.) The objection, that the instructions on behalf of the State are faulty in not requiring the principal

16—122 Ill.

in the commission of the crime charged to be identified, is not well taken.

Counsel for plaintiffs in error make the general objection, that the instructions for the State were at variance with the proof introduced by the State. If we understand the meaning of this objection, it is this: that, some of the counts in the indictment having charged the defendants with advising, encouraging, aiding and abetting Schnaubelt in the perpetration of the crime, and the State having introduced testimony to show that Schnaubelt *did* perpetrate the crime, therefore, the instructions should have directed the attention of the jury solely and exclusively to the theory that Schnaubelt was the perpetrator of the crime, and that such instructions were erroneous in having called the attention of the jury to the theory that an unknown person may have been the perpetrator of the crime, notwithstanding the fact that some of the counts charged the defendants with advising, encouraging, aiding and abetting an unknown person in the commission of the crime, and notwithstanding the fact that there was evidence in the record tending to show that the perpetrator of the crime *was* an unknown person. We regard this position as wholly untenable.

Under our statute and the construction given to it by the decisions of this court (*Baxter* v. *The People*, 3 Gilm. 368, and other cases,) the man, who, "not being present aiding, abetting or assisting, hath advised, encouraged, aided or abetted *the perpetration of the crime*," may be considered as the *principal* in the commission of the crime, may be indicted as principal and may be punished as principal. The indictment need not say anything about his having aided and abetted either a known principal or an unknown principal. It may simply charge him with having committed the murder as principal. Then, if, upon the trial, the proof shows, that he aided, abetted, assisted, advised or encouraged the perpetration of the crime, the charge, that he committed it *as principal*, is estab-

lished against him. It would make no difference, whether the proof showed, that he so aided and abetted, etc., a *known* principal or an *unknown* principal.

In the case at bar, some of the counts in the indictment charge the defendants with the murder of Degan, as *principals* and not as accessories before the fact. If the jury believed from the evidence that the defendants aided, abetted, advised or encouraged the perpetration of such murder, then they were justified in finding the defendants guilty as principals, as charged in the indictment. The material question for them to consider was not so much whether the man, who threw the bomb, was a known person or an unknown person, as whether these defendants aided, abetted, advised or encouraged the throwing of the bomb.

The instructions commented upon and not fully quoted in this opinion, are set out in the statement, which precedes it. They will not be here quoted, except so far as may be necessary to understand the comments made upon them.

The portion of the fifth instruction for the State, which is complained of by the plaintiffs in error, is found in the following words: "Although the jury may further believe from the evidence that the time and place for the bringing about of such revolution or the destruction of such authorities had not been definitely agreed upon by the conspirators, but was left to them and the exigencies of time or to the judgment of any of the conspirators."

It is said, that there was no evidence in the record to support the hypothesis contained in the quotation here made. We think there was such evidence. The hypothesis is, that the time and place for bringing about the destruction of the authorities was left to the judgment of some of the conspirators, instead of being definitely agreed upon by all of them. The publication of the word "Ruhe" in the "Arbeiter Zeitung" was to indicate the *time* for the social revolution to begin and for the armed men to gather at their meeting places. Its

publication was left to the judgment and discretion of a committee appointed by the conspirators. This committee was also to report to the armed men at what *place* the conflict with the police had occurred.

Counsel for plaintiffs in error claim, that instruction No. 5½, given for the State, was erroneous mainly for the following reasons, to-wit: First, "because it assumes that mere *general advice* to the public at large to commit deeds of violence, as contained in speeches or publications, without reference to the particular crime charged and without specifying object, manner, time or place, works responsibility as for murder;" second, because in it "there was the fatal error of an omission of *all reference to the evidence*," or, in other words, that "the jury are not told in it that *if they find from the evidence* so and so, then they can conclude thus and so."

As to the last objection, we think that the defect therein indicated was cured by the instruction, which the trial judge gave to the jury *suo motu*. We have held, that a judge of the circuit court is at liberty to instruct at his discretion if he reduces his instructions to writing, so that the jury can take them with them in considering their verdict. (*Brown* v. *The People*, 4 Gilm. 439; *Green* v. *Lewis*, 13 Ill. 642.) In this case, the judge, who presided at the trial in the court below, himself wrote an instruction and read it to the jury, which contained the following words: "What are the facts and what is the truth the jury must determine *from the evidence and from that alone*. If there are any unguarded expressions *in any of the instructions*, which seem to assume the existence of any facts, or to be any intimation as to what is proved, all such expressions must be disregarded and the *evidence only* looked to to determine the facts." It is difficult to see, how, after such a clear and explicit injunction as this, the jury could have made any finding, that was not based on the evidence.

As to the first objection, if we construed the instruction to mean what counsel claim it to mean, we would be forced to agree with them, that it was erroneous.

It is the duty of the jury to consider all the instructions together, and when this court can see that an instruction in the series, although not stating the law correctly, is qualified by others, so that the jury were not likely to be misled, the error will be obviated. *Toledo, Wabash and Western Ry. Co.* v. *Ingraham*, 77 Ill. 309.

Although an instruction, considered by itself, is too general, yet if it is properly limited by others given on the other side, so that it is not probable it could have misled the jury, judgment will not be reversed on account of such instruction. *Kendall* v. *Brown*, 86 Ill. 387; *Skiles* v. *Caruthers*, 88 id. 458.

The Supreme Court of Iowa has said: "It is usually not practicable, in any one instruction, to present all the limitations and restrictions of which it is susceptible. These very frequently must be presented in other and distinct portions of the charge. The charge must be taken together, and, if, when so considered, it fairly presents the law and is not liable to misapprehension nor calculated to mislead, a cause should not be reversed, simply because some one of the instructions may lay down the law without sufficient qualification." *Rice* v. *City of Des Moines*, 40 Iowa, 638.

The same court held in a criminal case, where the indictment was for murder, that "instructions are all to be considered and construed together," and that an omission to state the law fully in one instruction, when the omission is fully supplied in another, does not constitute error. *State* v. *Maloy*, 44 Iowa, 104.

The Supreme Court of California said in a criminal case: "While some of the instructions are perhaps subject to criticism and may not state the law with precise accuracy, yet, taken as a whole, they were substantially correct and could

not have misled the jury to the prejudice of the defendant."
*The People* v. *Cleveland,* 49 Cal. 577.

The principle here announced, that an instruction, which
is general in its character, may be limited or qualified by
other instructions in the series, does not contravene the rule,
that in a criminal case "material error in one instruction
calculated to mislead is not cured by a subsequent contra-
dictory instruction."   Wharton on Crim. Pl. and Pr. (8th ed.)
sec. 793.

An application of the foregoing views to the instruction now
under consideration will show that it could not have misled
the jury to the prejudice of the defendants.

Counsel contend, that the language of instruction No. 5½
was broad enough to lead the jury to believe, that, if some
person other than either of the plaintiffs in error had advised
and encouraged the commission of the murder and the murder
had been committed by reason of his advice and encourage-
ment, the plaintiffs in error would be guilty, provided such
person was a party with them to the conspiracy to excite to
crime, etc.   The instructions for the defence, however, limited
the responsibility of the defendants to such advice and encour-
agement as were given by themselves alone.

In one instruction given for the defence, the court charged
the jury as follows:   "Unless the prosecution has established
in the minds of the jury, beyond all reasonable doubt, that
either some of the defendants threw the said bomb, or that
*the person, who did so throw the same, was acting under the
advice and procurement of defendants or some of them,* the de-
fendants and all of them should be acquitted."

In another instruction given for the defence the court said:
"It will not do to guess away the lives or liberties of our citi-
zens nor is it proper that the jury should guess that *the person,
who threw the bomb* which killed Degan, *was instigated to do the
act by the procurement of defendants or any of them.   That fact*

*must be established beyond all reasonable doubt* in the minds of the jury," etc.

In still another instruction for the defence the court said; "Therefore the jury must be satisfied beyond all reasonable doubt, that *the person throwing said bomb was acting as the result of the teaching or encouragement of defendants or some of them,* before defendants can be held liable therefor, and this you must find from the evidence."

Counsel also claim, that the instruction now under consideration may be construed to mean, that *mere general advice,* in print or by speech, addressed to the public at large, urging them to commit deeds of violence, works responsibility for murder. If the instruction was too general in this regard, it was limited and qualified by other instructions given for the defendants.

In an instruction given for the defence the court said to the jury: "It will not do to say that, because defendants *may have advised violence,* that, therefore when violence came, it was the result of such advice. There must be a direct connection established by credible testimony between the advice and the consummation of the crime, to the satisfaction of the jury beyond all reasonable doubt."

In another instruction for the defence—and all the instructions for the defence were prepared by the defendants themselves and the giving of them was asked by the defendants— the court said: "Before a party can be lawfully convicted of the commission of a crime under our statute concerning accessories, it is incumbent on the prosecution to show beyond all reasonable doubt, by credible evidence, that the crime was committed by some persons or person acting under the advice, aid, encouragement, abetting or procurement of the defendant or defendants, whose conviction is asked. Though the jury should believe from the evidence, that a party in fact *advised generally* the commission, in certain contingencies, of acts amounting to crime, yet if the act complained of was in

fact committed by some third party of his own mere volition, hatred, malice or ill-will, and not materially influenced, either directly or indirectly, by such advice of the party charged, or if he was actuated only by the advice of other parties not charged, and for whose advice the defendants are not responsible, the party charged would not in such case be responsible."

In another instruction for the defence, the court said: "Although the defendants or some of them may have spoken and also published their views to the effect that a social revolution should be brought about by force, and that the officers of the law should be resisted, and, to this end, dynamite should be used to the extent of taking human life, that persons should arm to resist the law, that the law should be throttled and killed; and *although such language might cause persons to desire to carry out the advice given as aforesaid,* and do the act which caused officer Degan's death, yet the bomb may have been thrown and Degan killed by some one unfamiliar with and unprompted by the teachings of defendants or any of them. Therefore, the jury must be satisfied, beyond all reasonable doubt that the person throwing said bomb was acting as the result of the teaching or encouragement of defendants," etc.

The instruction last quoted, which was drawn by the counsel for the defence and given at their request, recognizes and admits the claim, that advising, encouraging, aiding and abetting murder, within the meaning of our statute, may be effected through the utterance of such speeches and the publication of such articles as have been heretofore referred to. The only thing insisted upon in the instruction is, that the proof must show, clearly and beyond a reasonable doubt, the connection between the speeches and publications, as the cause, and the murder as the result.

The last instruction given for the defendants limited the instructions, having reference to general advice to commit

murder or general conspiracy to commit murder, by calling the attention of the jury specifically to the Monday night plot. It was as follows:

"If the jury find that on the evening of May 3 at 54 West Lake street, at a meeting at which some of the defendants were present, a proposition was adopted, that in the event of a collision between the police force, militia or firemen on one side, and the striking laborers on the other, it was agreed, that certain organizations of which some of the defendants were members, should meet at certain designated places in the city of Chicago, that a committee should attend public places and public meetings where an attack by the police and others might be expected, and in the event of such attack being made, report the same to said armed sections, as aforesaid, to the end that such attack might be resisted and the police stations of the city destroyed, and if the jury further find that, on the night of May 4, some person unknown went to a meeting at the Haymarket and threw a bomb into the assembled police, the explosion of which killed Matthias J. Degan, and that from all the evidence in the case the jury are not satisfied beyond all reasonable doubt, that said act causing the death of said Degan was the result of any act *in furtherance of the common design as herein stated*, but may have been the unauthorized and the individual act of some person acting upon his own responsibility and volition, then none of the defendants can be held responsible therefor on account of said West Lake street meeting."

But instruction No. $5\frac{1}{2}$ will not be found to be so general in character, as it is claimed to be, if its language is carefully analyzed and considered in connection with other instructions given for the State.

The persons referred to therein as being excited to tumult and riot and to the use of deadly weapons and to the taking of life, are "the people or classes of people of this city." The expression is in the alternative. "Classes of people of this

city" are words, which, when construed in the light of the
evidence in this record, could only have been understood to
designate workingmen of the city of Chicago connected with
the groups already referred to. The persons, advised by
print or speech to commit murder, were the same persons,
who were excited to tumult and riot, etc. Therefore, the in-
struction fairly interpreted means, that the persons advised
to commit murder were the workingmen belonging to and
acting with the International groups, and that the murder
spoken of as resulting from the advice given was murder
committed by one or more of such workingmen. It is said,
that the instruction does not indicate the murder of Degan,
but speaks simply of murder generally. It was not neces-
sary to repeat the name of Degan in every instruction. The
instructions must be considered together, and as Degan's
name was mentioned in the two instructions preceding and
the one following No. $5\frac{1}{2}$, the jury could not have been misled
upon this subject. The words "whether the person, who per-
petrated such murder can be identified or not," could have
referred to no one else than the man, who threw the bomb that
killed Degan.

The words "without designating time, place or occasion"
must be taken with the qualification given to them in the fifth
instruction, that is to say, such time, place and occasion as
the committee of the conspirators appointed for that purpose
might designate.

According to the theory of this instruction, the defendants
conspired to excite certain classes to tumult, riot, use of
weapons and taking of life, "as a means to carry their designs
and purposes into effect." The instruction does not specify
what those designs and purposes are, because they had been
stated in the two preceding instructions to be the bringing
about of a social revolution and the destruction of the author-
ities of the city. The ordinary workingman had two purposes
in view, first, to get an eight-hour day of labor, second, to

keep the police from interfering to protect non-union laborers against strikers. The defendants in this case cared nothing about the eight-hour movement or the contentions between union and non-union men. They looked beyond to the social revolution. They sought to make use of the excitement among the workingmen over the eight-hour movement and over the attacks of police upon strikers, in order to create riot and tumult and thus precipitate the social revolution. The stirring up of riot and tumult was with them a means to an end. There is testimony tending to support this view. The men, who excited the tumult and riot by print and speech, may have had a different end in view from that sought by the classes whom they so excited. But they were none the less responsible for murder that resulted from their aid and encouragement.

If the defendants, as a means of bringing about the social revolution and as a part of the larger conspiracy to effect such revolution, also conspired to excite classes of workingmen in Chicago into sedition, tumult and riot and to the use of deadly weapons and the taking of human life, and for the purpose of producing such tumult, riot, use of weapons and taking of life, advised and encouraged such classes by newspaper articles and speeches to murder the authorities of the city, and a murder of a policeman resulted from such advice and encouragement, then defendants are responsible therefor.

It is a familiar doctrine of the law, in criminal cases, that, if a reasonable doubt of the guilt of the prisoner is entertained, the jury have no discretion, but must acquit. The twelfth and thirteenth instructions for the prosecution are objected to as not correctly stating to the jury the meaning of "reasonable doubt." The twelfth instruction is an exact copy, *verbatim et literatim,* of the sixth instruction in *Miller et al.* v. *The People,* 39 Ill. 457, which we approved in that case, and which, since that case, we have endorsed as correct in at least three cases, to-wit: *May* v. *The People,* 60 Ill. 119,

*Connaghan* v. *The People*, 88 id. 460, and *Dunn* v. *The People*, 109 id. 635.

The portion of the thirteenth instruction, which plaintiffs in error complain of, is that which is contained in the following words: "You are not at liberty to disbelieve as jurors if from the evidence you believe as men." This expression has been sanctioned by the Supreme Court of Pennsylvania as having been properly used in an instruction given to the jury by a trial judge, and we are inclined to follow the ruling there laid down. That court said in *Nevling* v. *Commonwealth*, 98 Pa. St. 322: "The learned judge then proceeded to say that the doubt must be a reasonable one, and that jurymen could not doubt as jurymen what they believed as men. In all this there was no error. It is the familiar language found in the text-books and decisions which treat of the subject."

By the twelfth and thirteenth instructions, considered in connection with the eleventh instruction for the State and also in connection with the definitions of reasonable doubt as embodied in the instructions given for the defence, we think the law upon this subject was correctly presented to the jury.

The statute of this State provides that "juries in all criminal cases shall be judges of the law and fact." Instruction No. 13½, given for the prosecution, is objected to as improperly limiting and qualifying this provision of the statute. It tells the jury, that "if they can say upon their oaths that they know the law better than the court itself, they have the right to do so" . . . but that "before saying this, upon their oaths, it is their duty to reflect whether from their study and experience they are better qualified to judge of the law than the court," etc.

The language of instruction No. 13½ is an exact copy, *verbatim et literatim*, of the language used by this court in *Schnier* v. *The People*, 23 Ill. 17. The views expressed in *Schnier* v. *The People* have been approved of and indorsed in *Fisher* v. *The People*, 23 Ill. 283, *Mullinix* v. *The People*,

76 id. 211, and *Davison* v. *The People,* 90 id. 221. The question is settled, and we see no reason to retreat from our position upon this subject.

It is also claimed that the court erred in refusing to give certain instructions asked by the defendants. The refusal of refused instructions numbered 3, 8, 9, 11 and 18 is especially insisted upon as error.

Instruction No. 3 was properly refused because it told the jury, that those of the defendants, who were not *present at the Haymarket,* counseling, aiding or abetting the throwing of the bomb, should be acquitted. Under our statute and the decision of this court in *Brennan* v. *The People,* 15 Ill. 511, the defendants were guilty, if they advised and encouraged the murder to be committed, although they may not have been present.

Instruction No. 8 was wrong for a number of reasons, but it is sufficient to refer to one: it assumes that "a conspiracy to bring about a change of government . . . by peaceful means if possible, but, if necessary, to resort to *force* for that purpose" is not unlawful. The fact that the conspirators may not have intended to resort to force, unless, in their judgment, they should deem it necessary to do so, would not make their conspiracy any the less unlawful.

All that was material in instructions 9, 11 and 18 was embodied in the instructions which were given for the defendants.

The defendants also complain that the court refused to give an instruction for them, which contained the following statement: "It can not be material in this case that defendants or some of them, are or may be socialists, communists or anarchists," etc.

If there was a conspiracy, it was material to show its purposes and objects with a view of determining whether and in what respects it was unlawful. Anarchy is the absence of government; it is a state of society, where there is no law or

supreme power. If the conspiracy had for its object the de-
struction of the law and the government, and of the police
and militia as the representatives of law and government, it
had for its object the bringing about of practical anarchy.
Whether or not the defendants were anarchists may have
been a proper circumstance to be considered in connection
with all the other circumstances in the case, with a view of
showing what connection, if any, they had with the conspiracy
and what were their purposes in joining it. Therefore, we
can not say, that it was error to refuse an instruction, con-
taining such a broad declaration as that announced in the
above quotation.

Defendants further complain because the instruction, num-
bered 13, which was asked by them, was refused by the trial
court. The refusal of this instruction was not error. It was
proper enough, so far as it stated, that, if a person at the
Haymarket "without the knowledge, aid, counsel, procurement,
encouragement or abetting of the defendants or any of them,
then or theretofore given . . . threw a bomb among the
police, wherefrom resulted the murder or homicide charged
in the indictment, then the defendants would not be liable for
the results of such bomb," etc. But the instruction is so
ingeniously worded as to lead the jury to believe, that the
person, who threw the bomb at the Haymarket, was justified
in doing so, if the meeting there was lawfully convened and
peaceably conducted and if the order to disperse was unau-
thorized and illegal. Counsel inject into the instruction the
hypothesis that the bomb may have been thrown by an outside
party "in pursuance of his view of the right of self-defence."
A mere order to disperse can not be an excuse for throwing
a dynamite bomb into a body of policemen. If the bomb-
thrower had been illegally and improperly attacked by the
police, while quietly attending a peaceable meeting and had
thrown the bomb to defend himself against such attack, an-
other question would be presented. The vice of the instruc-

tion lies in the insidious intimation embodied in it, that, when a body of policemen even if in excess of their authority give a verbal order to an assemblage to disperse, a member of that assemblage will be excusable for throwing a bomb on the ground of self-defence and because of the supposed invasion of his rights.

The instruction, given by the court of its own motion and which has already been referred to, is also claimed to be erroneous. So far as it speaks of murder and advice to commit murder in general terms, it is sufficiently limited and qualified when read in connection with all the other instructions, to which it specifically calls attention. It does not supersede and stand as a substitute for the other instructions, given for both sides. It does not so purport upon its face. On the contrary the jury are directed to "carefully scrutinize" such other instructions, and are told that their apparent inconsistencies will disappear under such scrutiny. In the last sentence they are requested to disregard any unguarded expressions that may have crept into the instructions, "which seem to assume the existence of any facts," and look only to the evidence, etc. Why caution the jury to disregard certain expressions of a particular kind in the other instructions, if the latter were to be entirely superseded? We do not think that the instruction, given by the trial judge *suo motu* is obnoxious to the objections urged against it.

Defendants also object to the instruction as to the form of the verdict as being erroneous. It is claimed, that the jury were obliged, under this instruction, to find the defendants either guilty or not guilty of murder, whereas the jury were entitled to find that the offence was a lower grade of homicide than murder, if the evidence so warranted. This position is fully answered by our decisions in the cases of *Dunn* v. *The People*, 109 Ill. 646, and *Dacey* v. *The People*, 116 id. 555. If counsel desired to have the jury differently instructed as to the form of the verdict, they should have prepared an instruc-

tion, indicating such form as they deemed to be correct, and should have asked the trial court to give it. They did not do so, and are in no position to complain here.

The court, at the request of the defendants, did give the jury an instruction, defining manslaughter in the words of the statute and specifying the punishment therefor as fixed by the statute. The court also gave the jury the following instruction: "The jury are instructed, that under an indictment for murder a party accused may be found guilty of manslaughter; and in this case, if from a full and careful consideration of all the evidence before you, you believe beyond a reasonable doubt, that the defendants or any of them are guilty of manslaughter, you may so find by your verdict."

The next error assigned has reference to the impaneling of the jury. The counsel for plaintiffs in error have made an able and elaborate argument for the purpose of showing that the jury, which tried this case, was not an *impartial* jury in the sense in which the word, "impartial," is used in our constitution. We do not deem a consideration of all the points presented as necessary to a determination of the case, and shall only notice those that seem to us to be material.

Nine hundred and eighty-one men were called into the jury box and sworn to answer questions. Each one of the eight defendants was entitled to a peremptory challenge of twenty jurors, making the whole number of peremptory challenges, allowed to the defence, one hundred and sixty. The State was entitled to the same number. Seven hundred and fifty-seven were excused upon challenge for cause. One hundred and sixty were challenged peremptorily by the defence and fifty-two by the State.

Of the twelve jurors, who tried the case, eleven were accepted by the defendants. They challenged one of these, whose name was Denker, for cause, but, after the court overruled the challenge, they proceeded to further question him and finally accepted him, although one hundred and forty-

two of their peremptory challenges were at that time unused. They accepted the ten others, including the juror Adams, without objection. When Adams, the eleventh juror, was taken, they had forty-three peremptory challenges, which they had not yet used.

Therefore, as to eleven of the jurymen, the defendants are estopped from complaining. They virtually agreed to be tried by them, because they accepted them, when, by the exercise of their unused peremptory challenges, they could have compelled every one of them to stand aside.

Counsel for the defence complain, that the trial court overruled their challenges for cause of twenty-six talesmen, to whose examinations they specifically call our attention. As they afterwards peremptorily challenged the talesmen so referred to, no one of them sat upon the jury. Every one of these twenty-six men had been peremptorily challenged before the eleventh juror was taken.

After the eleventh juror was accepted, the forty-three peremptory challenges, which then remained to the defendants, were all used by them before the twelfth juror was taken.

After the defendants had examined the twelfth juror, whose name was Sanford, they challenged him for cause. Their challenge was overruled and they excepted.

The one hundred and sixty talesmen, who were peremptorily challenged by defendants, were first challenged for cause and the challenges for cause were overruled by the trial court. It is claimed that, inasmuch as the defendants exhausted all their peremptory challenges before the panel was finally completed, the action of the court in regard to these particular jurors will be considered, and, if erroneous, such action is good ground of reversal. We think it must be made to appear that an objectionable juror was put upon the defendants after they had exhausted their peremptory challenges. "Unless objection is shown to some one or more of the jury, who *tried* the case, the antecedent rulings of the court upon the competency

17—122 ILL.

or incompetency of jurors, who have been challenged and stood aside, will not be inquired into in this court." *Holt* v. *State,* 9 Texas Ct. App. 571.

We can not reverse this judgment for errors committed in the lower court in overruling challenges for cause to jurors, even though defendants exhausted their peremptory challenges unless . it is further shown that an objectionable juror was forced upon them and sat upon the case after they had exhausted their peremptory challenges. This doctrine is ably discussed in *Loggins* v. *State,* 12 Texas Ct. App. 65. We think the reasoning in that case is sound and answers the objection here made.

In addition to this reason, we have carefully considered the examinations of the several jurors challenged by the defendants peremptorily, and while we can not approve all that was said by the trial judge in respect to some of them, we find no such error in the rulings of the court in overruling the challenges for cause as to any of them as would justify a reversal of the cause. The examinations, as they appear in the record, of the forty-three talesmen, who were challenged peremptorily after the eleventh juror was accepted, show that many of the forty-three challenges were exercised arbitrarily and without any apparent cause. Such challenges were not compelled by any demonstrated unfitness of the jurors, but seem to have been used up for no other purpose than to force the selection of one juror, after the forty-three challenges were exhausted.

The only question, then, which we deem it material to consider, is: Did the trial court err in overruling the challenge for cause of Sanford, the twelfth juror, or, in other words, was he a competent juror?

The following is the material portion of his examination:

"Have you an opinion as to whether or not there was an offence committed at the Haymarket meeting by the throwing of the bomb? A. Yes. Q. Now, from all that you have read.

and all that you have heard have you an opinion as to the guilt or innocence of any of the eight defendants of the throwing of that bomb? A. Yes. Q. You have an opinion upon that question also? A. I have. . . . Now if you should be selected as a juror in this case to try and determine it, do you believe that you could exercise legally the duties of a juror, that you could listen to the testimony and all of the testimony and the charge of the court and after deliberation return a verdict, which would be right and fair as between the defendants and the People of the State of Illinois? A. Yes sir. Q. You believe that you could do that? A. Yes sir. Q. You could fairly and impartially listen to the testimony that is introduced here? A. Yes. Q. And the charge of the court and render an impartial verdict you believe? A. Yes. Q. Have you any knowledge of the principles contended for by socialists, communists and anarchists? A. Nothing except what I read in the papers. Q. Just general reading? A. Yes. Q. You are not a socialist, I presume, or a communist? A. No sir. Q. Have you a prejudice against them from what you have read in the papers? A. Decided. Q. Do you believe that that would influence your verdict in this case or would you try the real issue which is here as to whether these defendants were guilty of the murder of Mr. Degan or not, or would you try the question of socialism and anarchism, which really has nothing to do with the case? A. Well as I know so little about it in reality at present it is a pretty hard question to answer. Q. You would undertake, you would attempt of course to try the case upon the evidence introduced here upon the issue which is presented here? A. Yes, sir. . . . Q. Well, then, so far as that is concerned I do not care very much what your opinion may be now, for your opinion now is made up of random conversations and from newspaper reading, as I understand? A. Yes. Q. That is nothing reliable. You do not regard that as being in the nature of sworn testimony at all, do you? A. No. Q. Now,

when the testimony is introduced here and the witnesses are examined, you see them and look into their countenances, judge who are worthy of belief and who are not worthy of belief, don't you think then you would be able to determine the question? A. Yes. Q. Regardless of any impression that you might have or any opinion? A. Yes. Q. Have you any opposition to the organization by laboring men of associations or societies or unions so far as they have reference to their own advancement and protection and are not in violation of law? A. No sir. Q. Do you know any of the members of the police force of the city of Chicago? A. Not one by name. Q. You are not acquainted with any one, that was either injured or killed, I suppose, at the Haymarket meeting? A. No. . . . Q. If you should be selected as a juror in this case, do you believe that regardless of all prejudice or opinion, which you now have, you could listen to the legitimate testimony introduced in court, and upon that and that alone, render and return a fair and impartial, unprejudiced and unbiased verdict? A. Yes."

The foregoing examination was by the defence. The following was by the State:

."Q. Upon what is your opinion founded—upon newspaper reports? A. Well, it is founded on the general theory and what I read in the newspapers. Q. And what you read in the papers? A. Yes sir. Q. Have you ever talked with any one that was present at the Haymarket at the time the bomb was thrown? A. No sir. Q. Have you ever talked with any one who professed of his own knowledge to know anything about the connection of the defendants with the throwing of that bomb? A. No. Q. Have you ever said to any one whether or not you believed the statements of facts in the newspapers to be true? A. I have never expressed it exactly in that way, but still I have no reason to think they were false. Q. Well, the question is not what your opinion of that was. The question simply is—it is a question made necessary by

our statute, perhaps? A. Well, I don't recall whether I have or not. Q. So far as you know then you never have? A. No sir. Q. Do you believe, that, if taken as a juror, you can try this case fairly and impartially and render a verdict upon the law and the evidence?. A. Yes."

It is objected, that Sanford had formed such an opinion as disqualified him from sitting upon the jury.

It is apparent from the foregoing examination, that the opinion of the juror was based upon rumor or newspaper statements, and that he had expressed no opinion as to the truth of such rumors or statements. He stated upon oath that he believed he could fairly and impartially render a verdict in the case in accordance with the law and the evidence. That the trial court was satisfied of the truth of his statement would appear from the fact, that the challenge for cause was overruled.

Therefore, the examination of the juror shows a state of facts, which brings his case exactly within the scope and meaning of the third proviso of the 14th section of chapter 78, entitled "Jurors," of our Revised Statutes. That proviso is as follows: "*And provided further*, that in the trial of any criminal cause, the fact that a person called as a juror has formed an opinion or impression, based upon rumor or upon newspaper statements (about the truth of which he has expressed no opinion) shall not disqualify him to serve as a juror in such case, if he shall, upon oath, state that he believes he can fairly and impartially render a verdict therein, in accordance with the law and the evidence, and the court shall be satisfied of the truth of such statement."

In *Wilson* v. *The People*, 94 Ill. 299, one William Gray was examined touching his qualifications as a juror and said: "I have read newspaper accounts of the commission of the crime with which the defendant is charged, and have also conversed with several persons in regard to it since coming to Carthage and during my attendance upon this term of court; do not

know whether they are witnesses in the case or not; do not know who the witnesses in the case are. From accounts I have read and from conversations I have had, I have formed an opinion in the case; would have an opinion in the case now, if the facts should turn out as I heard them, and I think it would take some evidence to remove that opinion; would be governed by the evidence in the case and can give the defendant a fair and impartial trial according to the law and the evidence." Gray was challenged for cause and the challenge overruled by the trial court. We held that all objection to Gray's competency was clearly removed by the proviso above quoted. We also there said: "The opinion formed seems not to have been decided, but one of a light and transient character which, at no time, would have disqualified the juror from serving."

The expressions of Sanford in the case at bar as to the opinion formed by him are not so strong as those used by Gray in the *Wilson case* in regard to his opinion. Sanford's impressions were not such as would refuse to yield to the testimony that might be offered, nor were they such as to close his mind to a fair consideration of the testimony. They were not "strong and deep impressions," such as are referred to by Chief Justice MARSHALL when he said upon the trial of Aaron Burr for treason: "Those strong and deep impressions, which will close the mind against the testimony which may be offered in opposition to them, which will combat that testimony and resist its force, do constitute a sufficient objection" to a juror. (1 Burr's Trial, 416.)

Counsel for the defence seem to claim in their argument, that the proviso above quoted is unconstitutional in that it violates section 9 of article 2 of the present constitution of this State, which guarantees to the accused party in every criminal prosecution "a speedy public trial by *an impartial jury* of the county or district in which the offence is alleged to have been committed." We do not think that the proviso

is unconstitutional for the reason stated.   The rule, which it lays down, when wisely applied, does not lead to the selection of partial jurors.   On the contrary, it tends to secure intelligence in the jury-box and to exclude from it that dense ignorance, which has often subjected the jury system to just criticism. A statute upon this subject, similar to ours and attacked as unconstitutional for the same reason here indicated, was held to be constitutional by the Court of Appeals in the State of New York in *Stokes* v. *The People,* 53 N. Y. 171.

The juror Sanford further stated that he had a prejudice against socialists, communists and anarchists.   This did not disqualify him from sitting as a juror.   If the theories of the anarchists should be carried into practical effect, they would involve the destruction of all law and government.   Law and government can not be abolished without revolution, bloodshed and murder.   The socialist or communist, if he attempted to put into practical operation his doctrine of a community of property, would destroy individual rights in property.   Practically considered the idea of taking a man's property from him without his consent, for the purpose of putting it into a common fund for the benefit of the community at large, involves the commission of theft and robbery. Therefore, the prejudice, which the ordinary citizen, who looks at things from a practical standpoint, would have against anarchism and communism, would be nothing more than a prejudice against crime.

In *Winneskeik Insurance Co.* v. *Schueller,* 60 Ill. 465, we said: "A man may have a prejudice against crime, against a mean action, against dishonesty, and still be a competent juror. This is proper, and such prejudice will never force a juror to prejudge an innocent and an honest man." In *Robinson et al.* v. *Randall,* 82 Ill. 521, we again said: "The mere fact, therefore, that a juror may have a prejudice against crime does not disqualify him as a juror.   A juror may be prejudiced against larceny, or burglary, or murder, and yet such fact

would not in the least disqualify him from sitting upon a jury to try some person, who might be charged with one of these crimes."

San ord stated, that he would "attempt to try the case upon the evidence introduced here upon the issue which is presented here." The issue presented was whether the defendants were guilty or not guilty of the murder of Matthias J. Degan. Any prejudice against communism or anarchism would not render a juror incapable of trying that issue fairly and impartially.

We can not see that the trial court erred in overruling the challenge for cause of the twelfth juror. This being so, it does not appear that the defendants were injured, or that their rights were in any way prejudiced by his selection as a juryman.

On the motion for a new trial the defendants read three affidavits for the purpose of showing that, shortly after May 4, 1886, two of the jurors had given utterance to expressions, showing prejudice against the defendants. The two jurors made counter-affidavits denying that they used the expressions attributed to them.

We do not think that the affidavits satisfactorily proved previously expressed opinions on the part of the two jurors referred to. It is a dangerous practice to allow verdicts to be set aside upon *ex parte* affidavits as to what jurors are claimed to have said, before they were summoned to act as jurymen. The parties making such affidavits submit to no cross-examination and the correctness of their statements is subjected to no test whatever. We adhere to the views which we have recently expressed upon this subject in the case of *Hughes* v. *The People,* 116 Ill. 330.

The defendants claim that, although they were entitled to one hundred and sixty peremptory challenges, yet the State was entitled to only twenty, and they charge it as error that the State was allowed to peremptorily challenge more than

twenty talesmen. The statute says: "The attorney prosecuting on behalf of the People shall be admitted to a peremptory challenge of the same number of jurors that the accused is entitled to." (Rev. Stat. chap. 38, sec. 432.) We can not conceive how language can be plainer than that here used. It explains itself and requires no further remark.

The defendants also claim that the trial court erred in refusing a separate trial, from the other defendants, to the defendants Spies, Schwab, Fielden, Neebe and Parsons. Error can not be assigned upon the refusal to grant separate trials, where several are jointly indicted. It was a matter of discretion with the court below. We so decided in *Maton et al.* v. *The People,* 15 Ill. 536. We are unable to see any abuse of the discretion in this case.

Defendants also take exceptions to the conduct of the special bailiff. The regular panel having been exhausted and the defendants having objected "to the sheriff summoning a sufficient number of persons to fill the panel" of jurors, the court appointed a special bailiff named Ryce to summon such persons under section 13, chapter 78, of the Revised Statutes. On the motion for new trial, defendants read the affidavit of one Stevens, in which Stevens swore that he had heard one Favor say, that he, Favor, had heard Ryce say, that he, Ryce, was summoning as jurors such men as the defence would be compelled to challenge peremptorily, etc. The defendants then made a motion, based upon this affidavit, that Favor be compelled to come into court and testify to what Ryce had said to him. The refusal of the court to grant the application is complained of as error.

The statements in the affidavit were mere hearsay and were too indefinite and remote to base any motion upon. Moreover, if Ryce did make the remark in question to Favor, it does not appear that defendants were harmed by it. There is nothing to show that Ryce made any remarks of any kind, proper or improper, to the jurors whom he summoned. In

addition to this, it is not shown that the defendants served Favor with a subpœna so as to lay a foundation for compelling his attendance.

We think that the course, pursued on the trial in regard to the manner of impaneling the jury, was correct and in accordance with the plain meaning of section 21, chapter 78, of the Revised Statutes. That section says "that the jury shall be passed upon and accepted in panels of four by the parties, commencing with the plaintiff." The State is not called upon to tender the defendants a second panel before the defendants tender it back four.

We can not see that the remarks of the State's attorney in his argument to the jury were marked by any such improprieties, as require a reversal of the judgment. *Wilson* v. *The People, supra,* and *Garrity* v. *The People,* 107 Ill. 162.

In their lengthy argument counsel for the defence make some other points of minor importance, which are not here noticed. As to these, it is sufficient to say that we have considered them and do not regard them as well taken.

The judgment of the Criminal Court of Cook county is affirmed.                                   *Judgment affirmed.*

Mr. JUSTICE MULKEY: Not intending to file a separate opinion, as I should have done had health permitted, I desire to avail myself of this occasion to say from the bench, that while I concur in the conclusion reached, and also in the general view presented in the opinion filed, I do not wish to be understood as holding that the record is free from error, for I do not think it is. I am nevertheless of opinion that none of the errors complained of are of so serious a character as to require a reversal of the judgment.

In view of the number of defendants on trial, the great length of time it was in progress, the vast amount of testimony offered and passed upon by the court, and the almost numberless rulings the court was required to make, the won-

·der with me is, that the errors were not more numerous and more serious than they are.

In short, after having carefully examined the record, and given all the questions arising upon it my very best thought, with an earnest and conscientious desire to faithfully discharge my whole duty, I am fully satisfied that the conclusion reached vindicates the law, does complete justice between the prisoners and the State, and that it is fully warranted by the law and the evidence.